MICHAEL E. KINNEY
Bar No. 77018
Law Office of Michael E. Kinney
438 First St.
Fourth Floor
Santa Rosa, CA 95401
(707) 527-4141
Fax (707) 579-9561
kinney@kinnlaw.com

Attorney for Plaintiff
DONNA MATHEWS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DONNA MATHEWS,

        Plaintiff,

vs.

PAN AMERICAN LIFE INSURANCE
COMPANY; and DOE 1 through Doe 20,
Inclusive,

        Defendants.

_____/

No. C 07-02757 SBA

PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

[Filed Concurrently with Declaration
of Donna Mathews; Declaration of
Michael E. Kinney; Declaration of
Burt Bernstein; Declaration of Dan
McCaskell]

Date:  June 10, 2008
Time:  1:00 p.m.
Ctrm:  3

      COMES NOW PLAINTIFF, DONNA MATHEWS, and, hereby opposes Defendant's

Motion for Summary Judgment.

**TABLE OF CONTENTS**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iii

I.  INTRODUCTORY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

    A.  The Claim is Filed; Pan American Misrepresents the Scope of
        Plaintiff's Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

        1.  Michael Jones was completely untrained. . . . . . . . . . . . . . . . .    4

        2.  Pan American has no claims manual. . . . . . . . . . . . . . . . . . . .    4

        3.  Pan American delayed paying Plaintiff on the Third Policy until
            September 2006.  Plaintiff would never have been paid this benefit
            if she had not discovered the existence of the policy. . . . . . . . . . .    5

    B.  Pursuant to an improper business practice, Pan American wrongfully
        terminated the claim after only one benefit payment. . . . . . . . . . .    6

    C.  Pan American Wrongfully Withdraws More than $1,000 from the
        Mathews' Bank Account. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

    D.  Pan American unnecessarily delayed the reinstatement of Plaintiff's
        benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

    E.  Pan American withholds 90 days of benefits, and continues to withhold
        them until last month. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

    F.  Pan American denies Plaintiff's request for rehabilitation benefits
        without explanation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

    G.  Pan American's Engaged in Incomprehensible Accounting Practices
        and Failed to Pay Plaintiff the Refunds and Benefits She Was Owed.    14

    H.  Pan American Became Increasing Hostile Toward Ms. Mathews As
        Time Passed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

III.  ARGUMENT    17

    A.  Standard on Motion for Summary Judgment . . . . . . . . . . . . . . . .    17

    B.  There is Overwhelming Evidence of Breach of Contract and Damages
        Resulting Therefrom. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

    C.  There is Overwhelming Evidence of Bad Faith. . . . . . . . . . . . . .    21

    D.  There is Substantial Evidence of Misrepresentation which Supports
        Plaintiff's Claims for Fraud and Negligent Misrepresentation. . . . .    25

    E.  There is Substantial Evidence that Defendant Has Violated the Unfair
        Competition Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

F.    There is Substantial Evidence which Supports the Claim for
      Intentional Infliction of Emotional Distress. . . . . . . . . . . . . . .    28

G.    There is Substantial Evidence which Supports the Claim for
      Negligent Infliction of Emotional Distress. . . . . . . . . . . . . . .    29

H.    There is Clear and Convincing Evidence to Support the Award of
      Punitive Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

1

# TABLE OF AUTHORITIES

2

**Cases**

3

4   AICCO, Inc. v. Insurance Co. of North America,
        90 Cal. App. 4th 579 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

5   Amadeo v. Principal Mut. Life Ins. Co.,
        290 F.3d 1152, 1161 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17, 30, 31

6

7   Atmel Corp. v. St. Paul Fire & Marine Ins. Co.,
        430 F. Supp. 2d 984, 986 (N.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

8   Balint v. Carson City,
        180 F.3d 1047, 1054 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

9

10  Barquis v. Merchants Collection Ass'n of Oakland, Inc.,
        7 Cal. 3d 94 (1972)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

11  Brandt v. Superior Court,
        37 Cal.3d 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18, 24

12

13  Burgess v. Superior Court,
        2 Cal.4th 1064 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

14  Cassim v. Allstate Ins. Co.,
        33 Cal.4th 780 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

15

16  Cardiner v. Provident Life & Accident Ins. Co.,
        158 F. Supp.2d 1088 (C.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

17  Christensen v. Superior Court,
        54 Cal.3d 868 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

18

19  Coleman v. Republic Indem. Ins. Co. of Calif.,
        132 Cal. App.4th 403 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

20  Egan v. Mutual of Omaha Ins. Co.
        24 Cal. 3d 809 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21, 23, 30

21

22  Erlich v. Menezes,
        21 Cal.4th 543, 555 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

23  Essex Ins. Co. v. Five Star Dye House, Inc.,
        38 Cal. 4th 1252 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

24

25  Estate of Parker ex rel. Parker v. AIG Life Ins.,
        317 F. Supp 1167 (C.D. Cal 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

26  Fletcher v. Western Natl. Life Ins. Co.,
        10 Cal. App.3d 376 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

27

28  Frommoethelydo v. Fire Ins. Exchange,
        42 Cal. 3d 208, 215 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

Gruenberg v. Aetna Insurance Co.
    9 Cal. 3d 566,  (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

Hangarter v. Provident Life & Accident Ins. Co.,
    373 F.3d 998, 1010 (9th Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     17

Hernandez v. General Adjustment Bureau,
    199 Cal. App.3d 999 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     29

Hubka v. Paul Revere Life Ins. Co.,
    215 F. Supp.2d 1089, 1092 (S.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . .     17

Johnson v. Mutual Benefit Life Ins. Co.,
    847 F.2d 600 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25, 30

Jordan v. Allstate Ins. Co.,
    148 Cal. App. 4th 1062 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

Kapsimallis v. Allstate Ins. Co.,
    104 Cal. App. 4th 667 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     27

Klein v. Earth Elements,
    59 Cal. App. 4th 965 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     27

Korea Supply Co. v. Lockheed Martin Corp.,
    29 Cal. 4th 1134 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     26

Legarra v. Federated Mut. Ins. Co.,
    35 Cal. App. 4th 1472, 1486 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

Lopez v. Smith,
    203 F.3d 1122, 1131 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     17

Love v. Fire Ins. Exch.,
    221 Cal. App.3d 1136 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

Mariscal v. Old Republic Ins. Co.,
    42 Cal. App. 4th 1617 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.,
    48 Cal.3d 583 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     29, 30

McCormick v. Sentinel Life Ins. Co.,
    153 Cal. App. 3d 1030 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

Miller v. National American Life Ins. Co. of Calif.
    54 Cal. App. 3d 331 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23, 25, 28, 31

Morris v. Paul Revere Life Ins. Co.,
    109 Cal. App. 4th 966 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

Neal v. Farmers Ins. Exch.,
    21 Cal. 3d 910 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21, 31

People ex rel. Bill Lockyer v. Fremont Life Ins. Co.,
    104 Cal. App. 4th 508 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     26

PPG Industries, Inc. v. Transamerica Ins. Co.,
20 Cal.4th 310 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

Potter v. Firestone Tire and Rubber,
6 Cal. 4th 965 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

Progressive West Ins. Co. v. Superior Court,
135 Cal. App. 4th 263 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

R & B Auto Center, Inc. v. Farmers Group, Inc.,
140 Cal. App. 4th 327 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

Rattan v. United Services Auto. Ass'n,
84 Cal. App.4th 715 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

Schroeder v. Auto Driveway Co.,
11 Cal. 3d 908 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc..
78 Cal. App. 4th 847 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22, 23

Textron Financial Corporation v. National Union Fire Insurance Company of Pittsburgh,
118 Cal. App. 4th 1061, 1077  (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

Ticconi v. Blue Shield of California Life & Health Ins. Co.,
160 Cal. App. 4th 528 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

Waller v. Truck Ins. Exch., Inc.,
11 Cal 4th 1 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21


**Statutes, Rules and Regulations**

9 Cal Admin. Code § 7196 and § 7197m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

10 Cal Admin Code § 2695.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

10 Cal Admin Code § 2695.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

10 Cal. Admin Code §2695.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

Bus. & Prof. Code §17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26-28

Civil Code §3294 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

Insurance Code § 790.03(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

Insurance Code § 10350.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24, 28

Insurance Code § 10111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTORY STATEMENT

This case presents a classic example of insurance bad faith. Plaintiff Donna Mathews purchased long term disability insurance from Defendant Pan American Life Insurance Company ("Pan American") in 1991. An important reason she bought this policy is that it provides vocational rehabilitation benefits. As a dental hygienist, Plaintiff was concerned that she might sustain a disability that prohibited her from working the awkward position that her job required. Plaintiff wanted to be able to retrain into a new profession if that happened, and looked upon Pan American's insurance policy as her bridge to a new career in the event that she could not longer work as a dental hygienist.

In November 2005 she fell off a ladder and was injured. Her injury caused her to be disabled from her occupation of dental hygienist, giving rise to Pan American's obligation to provide policy benefits. What followed thereafter is a litany of insurance bad faith acts.

Pan American began its bad faith conduct on the first day it received the claim. It immediately failed to act diligently to identify all of the benefits to which Ms. Mathews was entitled, overlooking the fact that Ms. Mathews was entitled to monthly benefits of $2700 per month, and instead representing to her that she was only entitled to benefits of $2200 per month. Pan American had a legal obligation to look through its records and to correctly determine the benefits due to Ms. Mathews. Not only did Pan American underpay Ms. Mathews monthly, in August 2006 it wrote to Ms. Mathews, affirmatively misrepresenting that she was only entitled to $2200 per month.

After making only the first monthly payment, Pan American terminated Ms. Mathews' benefits in March 2006. This was done because Pan American maintains a business practice, illegal under California law, of always terminating disability benefits based on the initial estimate of length of disability made by the attending physician. Pan American never investigates whether termination of benefits is proper. At the time it cut off Ms. Mathews' benefits, Pan American possessed documentary evidence that Ms. Mathews was still off work due to disability,

1   but cut off her benefits anyway.

2           Then, while her benefits were cut off, Pan American wrongfully withdrew a year's
3   worth of premiums from Ms. Mathews' bank account.  It should not have withdrawn any
4   premiums, because Ms. Mathews should have been on "waiver of premium" status.  It was never
5   authorized to withdraw more than one month's premiums, and it certainly should not have taken as
6   much as it did.

7           It took Pan American four months to restart Plaintiff's benefits, and when it finally
8   did restart the benefits, it began paying her 90 days in arrears.  Even though California law clearly
9   requires that benefits be paid current, Pan American continued to pay 90 days in arrears until last
10  month.  While at first Pan American provided Explanations of Benefits showing it was paying in
11  arrears, it later sent Plaintiff Explanations of Benefits that falsely stated that the benefits were being
12  paid current.

13          A central reason Plaintiff purchased this policy was because it offers rehabilitation
14  benefits, and the rehabilitation benefits are central to this lawsuit.  Pan American's treatment of the
15  rehabilitation benefits is an exceptionally serious example of bad faith and fraud.  Plaintiff
16  requested rehabilitation benefits in July 2006.  In August 2006, Pan American denied the benefits,
17  providing only a one sentence denial, without any explanation of why the benefits were being
18  denied.  Plaintiff wrote to Pan American to try to find out why her claim was denied, trying to find
19  out what else she needed to present or if she could appeal the denial.  Pan American at first
20  ignored her questions, but finally responded after Plaintiff kept asking.  It told Plaintiff that the
21  rehabilitation was not an entitlement, but the truth is that Plaintiff was entitled to the benefit.  It
22  told Plaintiff that it becomes involved in the design of rehabilitation plans and that it utilizes
23  certified rehabilitation specialists.  Discovery has revealed that these representations were not true,
24  and that Pan American has never paid rehabilitation benefits, has never been involved with
25  developing a rehabilitation plan and has never used a certified rehabilitation specialist.  Pan
26  American refused to elaborate on why Plaintiff was not entitled to the benefit, and did not answer
27  her question about the possibility of appeal.

28          The evidence of insurance bad faith in this case is overwhelming.  Discovery has

revealed that many of the wrongful acts that took place here are the direct result of Defendant's business practices.  Defendant regularly engages in practices that have been held to constitute fraud and that violate California insurance statutes and regulations.  Discovery has also revealed that the highest officers at Pan American are aware of how claims are being mishandled, and have approved Pan American's wrongful and illegal practices.  Plaintiff's expert on insurance practices calls Defendant's conduct "egregious and indicative of bad faith in almost every area of their operations."

II.        STATEMENT OF FACTS

A.        The Claim is Filed; Pan American Misrepresents the Scope of
          Plaintiff's Benefits.

Plaintiff Donna Mathews purchased long term disability insurance from Defendant Pan American Life Insurance Company in 1991.  She duly paid her premiums and supplemented the coverage as the years passed. Mathews Decl. ¶2. In December 2005 she fell off a ladder and suffered neck and upper back injuries that disabled her from performing the principal duties of her occupation of dental hygienist.  Mathews Decl. ¶1.

Pan American began its wrongful conduct as soon as it received the claim early in 2006.  It failed at the inception of the claim to determine which policies covered Plaintiff and what benefits those policies provided.  Mathews Decl. ¶26. Instead, it ignored its obligation to the Plaintiff and overlooked the fact that Ms. Mathews was entitled to monthly benefits of $2700 per month, incorrectly representing to her that she was only entitled to benefits of only $2200 per month. Mathews Decl. ¶24; Depo Exhibit 28.

Cory Simon, designated as the person at Pan American most knowledgeable as to the manner in which claims are generally handled under policies such as those that insured Plaintiff (Simon Depo 6:5-22; Depo Exhibit 1), testified that at the time Plaintiff's claim was presented, Pan American indexed all policies under the insured's name, birth date and social security number. Simon Depo 116:20-117:3.  Thus, Pan American had a computer system that would have permitted the claims examiner to triple check for benefits.  If a claims examiner utilized that system, he could be assured of finding all applicable policies, even if sloppy data entry by Pan

1    American had resulted in a typographical error in one of the fields.

2          Of course, this system does not work unless claims personnel are trained to use it, and

3    unless policies exist requiring claims personnel to use the system correctly each time a claim

4    arrives.  Pan American, however, provides neither training nor policies to its claims personnel.

5                    **1.       Michael Jones was completely untrained.**

6          Michael Jones came to Pan American with no training at all in disability claims.  He

7    had previously worked through temporary personnel agencies that specialized in claims staffing for

8    medical insurance claims.  Jones Depo 10:14-18:8.  In August 2005, Jones began handling all of

9    Pan American's long term disability claims.  He was the only claims examiner handling these

10   claims, and thus had no peers to turn to for training and assistance.  He received no training

11   whatsoever from Pan American on disability claims prior to taking over the entire disability claims

12   portfolio.  Jones Depo 19:3-20:14.  Subsequent to taking on the entire disability claims portfolio,

13   Mr. Jones has received no training whatsoever from Pan American on disability claims.  Jones

14   Depo 20:21-21:8.  In other words, Pan American took someone with no prior disability claim

15   experience, handed him all of the disability claims in the company, and has still not provided him

16   with any training on how to handle those claims. This is a business practice destined to result bad

17   faith, as it did in Ms. Mathews case on numerous occasions.  Bernstein Decl. ¶4-9.

18                    **2.       Pan American has no claims manual.**

19          Astonishingly, Pan American has no claims manual whatsoever for handling disability

20   claims.  Simons Depo 32:6-9; Jones Depo 22:18-25.  Apparently recognizing that it is illegal under

21   California law to operate an insurance company without a claims manual, Defendant engaged in a

22   ludicrous effort to manufacture one during discovery.   Pan American located a pamphlet that

23   another company had written, and produced it in response to a request that it produce its claims

24   manual.  Upon examination at deposition, it quickly became clear that this pamphlet was never

25   considered to be a claims manual, and was never used as one.  Mr. Jones testified that Mr. Simon

26   showed him the pamphlet a year or two, telling him that it provided some general information on

27   what the competition was doing.  Mr. Jones looked at it on that one occasions for a very brief

28   moment, and has never looked at it since.  Jones Depo 142:1-143:17.  Mr. Jones does not recall

Plaintiff's Opposition to Motion for Summary Judgment          Case No. C 07-02757-SBA

ever reading certain sections of the pamphlet that address subjects that would be relevant to Ms. Mathews' claim, and testified clearly that those sections had no influence on his handling of Ms. Mathews' claim. Jones Depo 144:8-145:8. Mr. Simon testified that the pamphlet is the only written document at Pan American that provides guidance for decisions on disability policies. Simon Depo 35:10-15.

### 3. Pan American delayed paying Plaintiff on the Third Policy until September 2006. Plaintiff would never have been paid this benefit if she had not discovered the existence of the policy.

On August 23, 2006, Ms. Mathews wrote to Pan American to discuss a number of matters (several of them the result of other acts of wrongdoing by Pan American discussed below). One of the issues she raised in her August 23 letter was her belief that she was not receiving all of the monthly benefit she had paid for. Ms. Mathews explained that prior to disability, she had been earning between $3000 and $4000 per month. She thought that she had purchased disability insurance that came closer to protecting that income, and the $2200 per month that Pan American was now paying seemed too low. She asked Pan American to provide a "thorough evaluation into the amount awarded to me." Mathews Decl. ¶20; Ex. D to Mathews Decl.

Mr. Jones responded for Pan American on August 25, 2006, telling Ms. Mathews that: "Your policies currently pay at total of $2200." Pan American now acknowledges that this representation was false. Mathews Decl. ¶24; Depo Exhibit 28.

Although Pan American purportedly overlooked the third policy when it calculated the benefits it was required to pay Ms. Mathews, it did not overlook its premiums. Every month, Pan American withdrew a premium from the Mathews' bank account in connection with the third policy. Since she became disabled, Ms. Mathews has encountered numerous problems with Pan American taking incorrect sums out of her bank account, failing to refund the wrongfully taken premiums and failing to explain how it calculated its refunds (discussed in more detail below).

In August 2006, Ms. Mathews noticed that Pan American was still withdrawing $37.70 from her bank account each month. On August 23, 2006, she wrote to Mr. Jones that $37.70 was being withdrawn from her account. Mathews Decl. ¶19; Ex. D to Mathews Decl.

1    When confronted with the fact that Pan American was withdrawing premiums from the Mathews

2    account unconnected with the policies he knew about, Mr. Jones did absolutely nothing.  Jones

3    Depo 148:25-149:13.

4        In September 2006, Plaintiff received an overdraft notice from her bank that was the

5    result of Pan American withdrawing money from her bank account.  Ms. Mathews telephoned the

6    billing department at Pan American and demanded to know why money was being withdrawn from

7    her bank account.  The billing department explained to her that there was a third policy, that it was

8    not being paid as part of her claim, but instead was being treated as though Ms. Mathews was not

9    disabled.  Money was being withdrawn to pay the premium on the third policy.  Ms. Mathews then

10   contacted the claims department, and they agreed to start paying Ms. Mathews the monthly benefit

11   she had purchased.  Mathews Decl. ¶26.

12   **B.        Pursuant to an improper business practice, Pan American wrongfully**

13   **terminated the claim after only one benefit payment.**

14       After making only the first monthly payment, Pan American terminated Ms.

15   Mathews' benefits in March 2006.  At his deposition, Michael Jones, designated by Pan American

16   as the "person most knowledgeable" on the claims presented by Plaintiff herein which are the

17   subject of this lawsuit (Jones Depo 101:7-102:3; Depo Exhibit 1), testified that the only reason Pan

18   American took this action was because the initial Attending Physician Statement contained a

19   prognosis that suggested that Ms. Mathews might recover by March 2006.  Jones Depo

20   59:18-62:7; 62:14-63:11.  The  Attending Physician Statement was ambiguous at best in this

21   regard, as it indicated that Plaintiff might need surgery.  Depo Exhibit 9 at p. PAL0587.

22       Prior to the time that Pan American cut off Plaintiff's benefits, it had received

23   information from Plaintiff's doctor that showed that Plaintiff had not recovered and that her

24   treating doctor had her out of work for several more months.  Mr. Jones acknowledges that he

25   understood that it was inconclusive that P would be back to work by March 15.  Jones Depo

26   67:13-68:22. This information did not affect the decision to cut off Plaintiff's benefits because Pan

27   American's process is always to rely on the original Attending Physician Statement  no matter

28   what.  Jones Depo 68:23-72:6.  Pan American did not investigate to determine whether Ms.

1   Mathews had, in fact, recovered.  It did not contact Ms. Mathews, her employer or her physicians.

2   Such investigation would have been contrary to Pan American's stated business practice of relying

3   exclusively on the initial Attending Physician Statement, regardless of any other evidence.

4   **C.        Pan American Wrongfully Withdraws More than $1,000 from the**

5   **Mathews' Bank Account.**

6   Shortly after it wrongfully terminated her monthly benefits, Pan American withdrew a

7   full year of premiums from the Mathews' bank account.  Mathews Decl. ¶12; Exhibit C to

8   Mathews Decl.  Of course, it should not have withdrawn any money, since the policy provided for

9   a waiver of premiums and Pan American had sent Ms. Mathews a letter on March 13, 2006 (just

10  two days before cutting off her benefits) advising Ms. Mathews that Pan American had classified

11  her as disabled and that all premiums were waived.  Jones Depo 82:6-86:7; Dep Exhibit 15[1].  Pan

12  American certainly had no business taking twelve times the monthly premium, and overdrawing

13  Ms. Mathews' bank account.

14  This is yet another example of the sort of harm that inevitably flowed from the

15  manner in which Pan American's decided to operate its claims department.  Mr. Jones was

16  assigned the task of handling the premium waiver issues, but no one showed him how to do it.

17  Jones Depo 128:20-130:21.  Because Pan American had decided employ the trial and error method

18  to "train" Mr. Jones, Pan American emptied Plaintiff's bank account without notice, causing

19  bounced checks and adding to the stress of an already stressful time in Ms. Mathews' life.

20  **D.        Pan American unnecessarily delayed the reinstatement of Plaintiff's**

21  **benefits.**

22  Pan American refused to pay benefits for about three months, from April through July

23  2006, although it knew Ms. Mathews was not working and that her treating physicians had

24  determined that she was disabled. Pan American had information in its files in March before it

25  stopped paying benefits that showed that Ms. Mathews was still not working due to disability.

26  ───────────────────

27  [1] The letter of March 13 also falsely advised Ms. Mathews that she would be notified
    if Pan American needed further information to confirm her continued disability.  As noted

28  above, Pan American's business practice is to cut off benefits without offering the claimant the
    opportunity to present such further information.

Jones Depo 67:13-68:22.[2]  It received further confirmations of this fact in April and May.  Pan American obtained the records from Plaintiff's treating doctors, all of which it had received by May 23, 2006.  Declaration of Michael E. Kinney ¶5; Exhibit A and B thereto.  Nothing at all happened on the claim between May 23 and July 12, 2006.  On July 12, 2006, based on the information it had been holding for more than six weeks, Pan American resumed paying monthly benefits policy 1257-758 and on policy 1285-764. Depo Exhibit 21.

E.       **Pan American withholds 90 days of benefits, and continues to withhold them until last month.**

When Pan American finally resumed benefit payments in July 2006, it began paying benefits 90 days in arrears.  Mr. Jones made the decision to do this, but he is unable to articulate an acceptable reason for withholding three months of benefits, although he apparently does this frequently.  Jones Depo 135:19-138:4.  Pan American acknowledges that it is obligated to make benefits payments current, and not to pay significantly in arrears as was done here.  Jones Depo 76:2-77:3.  Pan American continued to pay benefits 90 days in arrears until just last month.  On April 5, 2008, it finally brought the benefits current.  Mathews Decl ¶43.  The decision to pay benefits in arrears was clearly a calculated decision by Pan American, made repeatedly and not just a simple oversight.

On August 25, 2006, Mr. Jones wrote to Plaintiff (Depo Exhibit 25) to tell her, among other things, that he had returned her to "waiver of premium" status, therewith returning (some of) her premiums.  Since premiums are not waived or refunded until disability is established, clearly Mr. Jones had made the decision that Ms. Mathews was disabled.  Nonetheless, he sets out a list of the benefits payments made, showing that they were being paid 90 days in arrears.  (Depo Exhibit 25, p. 2.)  He knew she was disabled and he knew she was being paid in arrears.

_____

[2]   In the moving papers, Defendant suggests that Mr. Jones ordered benefits cut off so that he could investigate the claim further.  That is not what happened.  Benefits were cut off because Pan American's business policy requires them to be cut off without investigation based on the initial Attending Physician Statement.  In addition to Mr. Jones testimony on this point, see Depo Exhibit 6, in which Pan American sets forth its understanding as of May 2006.

On September 13, 2006, Pan American sent Ms. Mathews a benefit check on the third policy, 90 days in arrears!  This is plainly set forth in the Explanation of Benefits that accompanied the check.  Kinney Decl. ¶6; Exhibit C thereto.  Thereafter, Pan American made monthly payments, 90 days in arrears, mostly accompanied by EOBs showing the payments were being made in arrears.  These EOBs are not mere computer generated forms that no one at Pan American sees.  Rather, they are actually prepared each month by a human being at Pan American.  Mr. Jones personally authorized each check that went out. Bourg Depo 23:7-35:15; Exhibit D to Kinney Decl..  Thus, each month, Mr. Jones knowingly paid Ms. Mathews 90 days in arrears.

The issue of improper payment in arrears was raised in the Complaint in this matter (Complaint on file herein 4:6-9), which was served on Pan American on April 27, 2007.  (Notice of Removal on file in this case 2:3).  The allegations of the Complaint did not cause Pan American to stop paying in arrears, and this practice continued unabated.

Plaintiff brought this issue up again in the Joint Case Management Statement filed herein on October 1, 2007 (JCMS 4:15-16).  Pan American continued to ignore its obligation to make current payments.

In 2008, Pan American began trying to cover up the fact that it was improperly paying Ms. Mathews in arrears.  On February 7, 2008, Mr. Jones personally prepared EOBs of that date falsely indicating that Ms. Mathews was being paid current, when in fact she was being paid 90 days in arrears.  Jones Depo 246:4-249:6; Mathews Decl. ¶43; Exhibit F.  [M485-487] This false representation was repeated the following month.  Mathews Decl. ¶43.

Plaintiff raised the issue of Pan American's failure to pay benefits current in the depositions taken in New Orleans on March 13 an 14, 2008.  Plaintiff raised the issue in Responses to Interrogatories served March 19, 2008. Exhibit D to Evans Decl., Response to Interrogatory No. 10.

Finally, just before it filed this Motion for Summary Judgment, Pan American decided to cure the arrearage.  On April 7, 2008, Mr. Jones sent Ms Mathews checks for the arrearage, together with a letter setting out an incorrect calculation of the arrearage.  (The letter is wrong; the checks are right.)  Mathews Decl. ¶43; Exhibit G thereto.  The letter falsely states that the

1    payments were the result of an audit of the policies, but the true fact is obviously that Pan

2    American was responding to the claims put forward in this lawsuit.  Plaintiff incurred attorney fees

3    and costs associated with that payment. Kinney Decl. ¶8.

4            **F.**        **Pan American denies Plaintiff's request for rehabilitation benefits**

5                    **without explanation.**

6            The single most important breach of the covenant of good faith and fair dealing has to

7    do with Pan American's obligation to provide vocational rehabilitation benefits.  A primary reason

8    Ms. Mathews purchased a policy from Pan American instead of some better known carrier was Pan

9    American's agreement to provide rehabilitation benefits.  As a dental hygienist, Ms. Mathews was

10   concerned that her ability to hold the necessary awkward position required for many hours, or her

11   ability to perform fine movements in the small workspace of a patient's mouth, could easily

12   become compromised.  She perceived the Pan American policy, providing five years "own

13   occupation" disability benefits and funds for vocational rehabilitation, as a potential bridge to a

14   new career if she could no longer work as a dental hygienist.  Mathews Decl. ¶2-6.  Both the

15   policy and the accompanying literature made clear that Pan American would provide vocational

16   rehabilitation benefits, and Ms. Mathews reasonably relied thereon.  Ibid.

17           The issue of Ms. Mathews' vocational rehabilitation first came up in March 2006.

18   Dr, Eichbaum, one of Ms. Mathews' treating physicians, suggested to Ms Mathews that she should

19   consider retraining in a completely different field.  Ms. Mathews told Pan American about Dr.

20   Eichbaum's recommendation in early April 2006.  Mathews Decl. ¶11; Depo Exhibit 17.[3]  Mr.

21   Jones admits that he saw that recommendation when it came in, but did contact Ms. Mathews, her

22   physicians or a rehabilitation expert on that subject because Pan American has a business practice

23   not to tell the insured what benefits are available under a policy and not to process any benefits that

24   the insured has not specifically requested.  Jones Depo 89:18-91:20.

25           On April 3, 2006, Pan American received an Attending Physician Statement from Dr.

26   Brown, another of Ms. Mathews' treating physicians.  Depo Exhibit 18.  Dr. Brown indicated that

27   _____

28       [3]  A portion of this document is attached to the Jones Declaration as Exhibit I, but
curiously omits the last page that brings up rehabilitation.

he vocational counseling and/or retraining should be considered an option for Plaintiff.

On July 21, 2006, Ms. Mathews wrote to Pan American requesting vocational rehabilitation benefits. Mathews Decl. ¶17; Depo Exhibit 17. She told Pan American that she was already taking classes that were needed to gain admittance to nursing schools, and that she would be able to apply to nursing schools once she had finished those classes. This letter was received by Pan American on July 26, 2006. Jones Depo 149:25.

On or about August 3, 2006, Mr. Jones wrote back to Ms. Mathews asking for "a copy of her rehabilitation plans." Depo Exhibit 7.

On August 23, 2006, Ms. Mathews wrote back to Mr. Jones, laying out her rehabilitation plans as best she could, explaining how important it was for her to return to the work force due to the personal and financial stress that her disability was causing, and pointing out that the rehabilitation benefit was "the primary motivation for my purchasing your company's coverage in the first place." As to her specific plans, she wrote:

> "For me to work as closely with patients in the diagnosis, treatment planning and patient care in medicine as I did in dentistry, I will have to earn at the least a Bachelor's Degree, but I am aiming for Nurse Practitioner certification. This can begin at Santa Rosa Junior College, Napa Valley Junior College, Pacific Union College, or Sonoma State University. I am currently enrolled for fall, beginning today, in Anatomy at Santa Rosa J. C. I finished Physiology over the summer and will be eligible to apply to the Nursing Program at Santa Rosa in October of this year for the spring and fall of 2007. I will also pursue the application processes for the other schools. The first step is a two year program, and the possibilities are many to make the next step to Nurse Practitioner, but it will most likely be an additional 2 years. A Nurse Practitioner certification will allow me greater flexibility in my work setting and be the least detrimental to my disability. This will provide me with more options in returning to the work force."

Mathews Decl. ¶22; Exhibit D thereto; Depo Exhibit 8.

Two days later, on August 25, 2006, Mr. Jones responded to Ms. Mathews' request for rehabilitation benefits. His entire response was as follows:

> "As for your rehabilitation plan Pan American Life will not be extending benefits."

Mathews Decl. ¶25; Depo Exhibit 28.

Discovery has demonstrated that Mr. Jones has denied all of the claims for rehabilitation benefits that he has ever seen. Jones Depo 28:10-16. He has received no training or guidance at all as to how to handle claims for rehabilitation benefits. Pan American has supplied

1  him with no written guidelines on the subject.  Jones Depo 22:18-25.  Mr. Jones' supervisor, Mr.

2  Simon, likewise has no background or training in how to handle rehabilitation claims.  Simon

3  Depo 23:14-23.  Pan American has no claims manual at all.  Simons Depo 32:6-9; Jones Depo

4  22:18-25.

5      Mr. Simon, designated by Pan American as the person most knowledgeable on how

6  claims are handled and on how the rehabilitation language in the policy is interpreted, testified at

7  deposition that as far as he knows, Pan American has never provided rehabilitation benefits to

8  anyone.  Simon Depo 26:18-27:8.  Pan American has never pointed out the rehabilitation benefit

9  to any disabled policyholder.  Simon Depo 27:13-16 and 64:8-12.

10      Pan American admits that Mr. Jones did not have sufficient information to deny the

11  claim when he wrote his denial letter on August 25, 2006.  Mr. Jones testified that the appropriate

12  response to Plaintiff's letter of August 23, 2006 is to request more information.  Jones Depo

13  165:24-166:3.  Mr. Simon agrees that Pan American should have asked Ms. Mathews to provide

14  further information rather than denying her claim.  Simon Depo 137:24-138:16.

15      In fact, Mr. Jones already possessed all of the information he needed to grant the

16  rehabilitation benefits, or could have easily found the information in a matter of minutes on the

17  internet.  Mr. Jones testified that he needed only three pieces of information to provide

18  rehabilitation benefits:  a time line, a dollar amount, and a goal.  Jones Depo 33:6-34:22.  Of

19  course, Mr. Jones never revealed this supposed standard to Ms. Mathews.  Mr. Jones has no idea

20  what time line would be acceptable, and believes that in some cases even a twenty year time line

21  would be adequate to grant benefits.  Jones Depo 38:25-41:1.  In any event, Ms. Mathews

22  provided a time line.  In her letter of August 23, she told Mr. Jones that she intended to undertake

23  a program that would run for about four years. As to a goal, Ms. Mathews made it clear that her

24  goal is to become a nurse.  At deposition, Mr. Jones testified that he does not know whether

25  nursing was an adequate goal.  He would need to acquire more information to determine whether

26  Ms. Mathews could perform as a nurse.  Jones Depo 43:25-48:10  Had he investigated, he would

27  have learned that Ms. Mathews can, indeed, perform as a nurse.  McCaskell Decl.  Finally, Mr.

28  Jones could easily have determined the dollar amount involved.  Ms. Mathews provided Mr. Jones

a list of schools she was considering.  Tuition at those schools is readily ascertainable by anyone.

Mr. Jones, however, chose not to find out how much the tuition is.  Mr. Jones testified that Pan

American's policy is to rely solely on the policyholder to provide that sort of information, and Pan

American never investigates on its own.  Jones Depo 166:5-170:12.  Mr. Simon confirms that this

is Pan American's policy.  Simon Depo 70:22-71:1.

Following Pan American's terse and cryptic denial of rehabilitation benefits, Ms.

Mathews proceeded to complain to the California Department of Insurance and the Napa County

District Attorney, listing the failure to provide rehabilitation benefits as one of the issues.  In

response to these complaints, Pan American wrote letters stating that: "The rehabilitation portion

of the policies is an additional benefit that is disbursed at Pan American's discretion.  The

rehabilitation benefit is not, nor was it ever an entitlement for the insured."  Depo Exhibit 31.

Glenda Griffin at Pan American repeated this assertion in a letter to Ms. Mathews. Depo Exhibit

32.

At about this same time, Ms. Mathews began exploring with the California

Department of Rehabilitation the possibility that it would help pay for her vocational rehabilitation.

Several months later, the Department of Rehabilitation  agreed to provide funding for her nursing

education.  Mathews Decl. ¶40.

Following advice she received from the Department of Insurance, in October 2006

Ms. Mathews wrote to Pan American asking the following questions:  "Can you tell me what

would justify rehabilitation?  Is there a company policy regarding rehabilitation?  Do you ever

approve this benefit or make exceptions, and could I make an appeal for this benefit?" Mathews

Decl. ¶31; Depo Exhibit 33. Plaintiff received no answer to any of her questions for more than a

month, so on November 27, 2006, she wrote to Mr. Jones asking him to respond to her questions.

Mathews Decl. ¶37; Depo Exhibit 37.

On December 8, 2006, Mr. Jones wrote back to Ms. Mathews.  This is what he said:

> "Concerning the rehabilitation clause in our policy, the language states that "We
> will pay for a rehabilitation program if we approve it in advance.  The extent of our
> payment will be what we state in our written approval. Pan American Life reserves
> the right to be involved with an insured's vocational rehabilitation process.  This
> includes but is not limited to evaluation by certified rehabilitation specialists, physical
> testing and vocational aptitude testing.  This benefit is not a guaranteed benefit for all

disabled insured and must be agreed upon and evaluated in advance on a case by case basis. As we have previously indicated in the correspondence dated August 31, 2006 (sic) Pan American Life will not be entering into a rehabilitation agreement with you."

This not only fails to answer Ms. Mathews' questions (Jones Depo 243:7-246:3), some of the information contained in it is untrue. In fact, Pan American makes no effort whatsoever to be involved with an insured's vocational rehabilitation process. Indeed, it could not be less involved. All Pan American does is review the request for rehabilitation benefits and deny it. It does not use certified rehabilitation specialists. Mr. Simon, who runs the claim department and approves all expenditures for outside vendors, does not even know what a certified rehabilitation specialist is, and is sure that Pan American has never used one. Simon Depo 72:14-20. There is no evidence that Pan American has ever used physical testing or vocational rehabilitation testing in connection with a request for rehabilitation benefits. There certainly was none in connection with Ms. Mathews' request.

Since Mr. Jones made it clear in his December 8, 2006 letter that Pan American was never going to provide rehabilitation benefits to Ms. Mathews under any circumstances, and that the door was slammed shut and locked, Ms. Mathews gave up trying to communicate further with Pan American on this subject. Mathews Decl. ¶ 38.

G.       **Pan American's Engaged in Incomprehensible Accounting Practices and Failed to Pay Plaintiff the Refunds and Benefits She Was Owed.**

On four separate occasions, Pan American refunded premiums collected from Ms. Mathews on policies 1257-758 and 1285-764. Not one refund was correct. Today, Pan American still owes Ms. Mathews money for premiums that it was required to refund years ago.

The waiver of premium language is as follows:

"After 90 days of total disability . . ., we will waive any premiums that become due while you remain disabled. We will refund any premiums paid after the first day of Disability if premiums are waived, but we will not refund any part of a premium that was due before the start of Disability."

Depo Exhibit 4, p. PAL1012.

Thus, the insured continues to pay premiums during the first 90 days of disability. In

1    Ms. Mathews case, those premiums were automatically withdrawn from her bank account.

2    Mathews Decl. ¶ 7.  If the insured is still disabled at the end of 90 days, Pan American is required

3    to refund the 90 days of premiums paid.  In Ms. Mathews' case, however, Pan American refunded

4    only 60 days of premiums in March 2006. The premium on policy 1257-758 was $44.20 because

5    Plaintiff had agreed to pay using the Pre-Authorized Collection ("PAC") method (Exhibit B to

6    Jones Decl. in Support of MSJ, p. 3)[4]; Pan American paid $88.40 (Depo Exhibit 15).  The

7    premium on policy 1285-764 was $57.07 (Exhibit A to Jones Decl. in Support of MSJ, p. 3); Pan

8    American paid $114.14. (Depo Exhibit 16).  Thus, the initial refund was light by $106.27.

9             On April 17, 2006, Pan American withdrew the sum of $1189.61 from the Mathews

10   bank account.  Mathews Decl. ¶12, Exhibit C to Mathews Decl.  On May 17, 2006, Pan American

11   issued refunds of $406.80 on policy 1257-758 and $534.57 on policy 1285-764. (Depo Exhibit

12   26.)  At the time of this refund, Mr. Jones indicated that he was refunding only ten months of

13   premiums, although a year's premiums had been seized. In fact, however, he refunded premiums

14   equal to 9.2 months on policy 1257-758 and 8.6 months on policy 1285-764.  To make a ten

15   month refund, Pan American needed to pay $121.33 more.  Thus, this refund was $121.33 light.

16            Following the April 2006 fiasco with her bank account, Pan American began billing

17   Ms. Mathews monthly for premiums on policy 1257-758 and 1285-764.  Because the premiums

18   were no longer being automatically withdrawn, the premium amount increased by $2.00 per month

19   on each policy (See page 3 of Exhibit A and Exhibit B to Jones Decl. in Support of MSJ).

20   Threatened with losing her disability insurance altogether, Ms. Mathews mailed checks to Pan

21   American in June and July 2006 to pay these premiums.  Mathews Decl. ¶15, Exhibit D to

22   Mathews Decl.; Depo Exhibit 8.

23            On August 25, 2006, Pan American issued yet another refund.  As of this time, Ms.

24   Mathews had paid four months premiums: two months premiums had been withheld from the April

25   17 refund, and she had written checks for the other two months.  On August 25, 2006, Pan

26

27          [4]  The documents attached as Exhibit A and B to the Jones Declaration are different

28   from the similar documents produced by Defendant during discovery.  The new addition of
     page 3 helps clarify the refund issue which Defendant badly muddled.

American refunded two months worth of premiums.  Mr. Jones wrote that "Currently all premiums have been waived or refund (sic) beginning in 12/14/05."  Depo Exhibit 28.  This statement was not true.

Fed up with the refund problem and a great many other problems with this insurance, in September 2006 Ms. Mathews contacted the California Department of Insurance and the Napa County District Attorney.  Mathews Decl. ¶27.  In response to an inquiry from the Napa County District Attorney, Mr. Jones wrote that "Ms. Mathews has received all premiums due her for all three of her policies . . . "  Depo Exhibit 31.  This statement was false.

The Department of Insurance proceeded with its investigation.  On October 13, 2006, the DOI wrote to Ms. Mathews that its investigation was ongoing and that it expected results withing 45 days.  Mathews Decl. ¶30; Exhibit E to Mathews Decl.

On October 27, 2006, Pan American issued yet another refund: $96.40 on policy 1257-758; and $118.40 on policy 1285-764.  Depo Exhibit 34. This was a total of $8.00 more than Plaintiff had paid on those two policies in the months of July and August.  As of October 26, 2006, Pan American still owed Plaintiff $219.60 on these two policies.

No further refunds have issued.

In addition to all of these difficulties, there were undated and confusing explanations of benefits (Mathews Decl. ¶24.); payments of benefits in the wrong amount (Mathews Decl. ¶20, 23, 34); and failure to provide explanations for premium refunds (Mathews Decl. ¶10, 14, 23, 28 .)

**H.      Pan American Became Increasing Hostile Toward Ms. Mathews As Time Passed.**

As time passed and Ms. Mathews continued to demand that she be treated fairly, Pan American became increasingly hostile toward her.

For example, in October 2006, shortly after Ms. Mathews complained to the Napa County District Attorney and the Department of Insurance, Mr. Jones demanded that she be examined by a doctor at Stanford.  Stanford is over 100 miles from Ms. Mathews home in Calistoga.  Mathews Decl. ¶29.  This violated Pan American's stated policy of taking the closest doctor who can perform the services, Simon Depo 50:18-51:11, and seems to have been done to

1   punish Ms. Mathews.

2         At about the same time, Pan American placed Ms. Mathews under surveillance.   Mr.

3   Jones stated reason for this surveillance makes no sense.  Jones Depo 199:19-24. Pan American

4   only utilizes surveillance in about ten percent of the cases, and only when disability is in question.

5   Simon Depo 52:22-53:7.  In Ms Mathews' case, surveillance was not utilized until some ten

6   months after the date of disability, and it appears to have been unjustified.

7         On July 12, 2006, Defendant wrote Plaintiff a letter that indicated that Plaintiff had

8   only been insured for two years and that her application was being investigated for that reason.

9   Depo Exhibit 21. The letter of July 12 suggested that Defendant might try to obtain a judgment

10  against Plaintiff.   As discussed above, from August 2006 onwards, Plaintiff tried to find out how

11  to pursue her rehabilitation benefits.  Her efforts were either ignored or she received a curt, hostile

12  rejection without explanation or she was provided with disinformation on the subject.

13  **III.      ARGUMENT**

14        **A.       Standard on Motion for Summary Judgment.**

15        On a Motion for Summary Judgment, the court must view the evidence in the light

16  most favorable to the nonmoving party. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000).

17  The court must not weigh the evidence or determine the truth of the matter, but only determine

18  whether there is a genuine issue for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir.

19  1999).  In insurance bad faith cases, an insurer is not entitled to a summary judgment where,

20  viewing the facts in the light most favorably to the insured, a jury could  conclude that the insurer

21  acted unreasonably. See Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161 (9th Cir.

22  2002); Hubka v. Paul Revere Life Ins. Co., 215 F. Supp.2d 1089, 1092 (S.D. Cal. 2002). The

23  reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact. Hangarter

24  v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1010 (9th Cir.2004).

25        **B.       There is Overwhelming Evidence of Breach of Contract and Damages**

26                  **Resulting Therefrom**.

27        The First Cause of Action of the Complaint alleges three breaches of the insurance

28  contract:  failure to pay benefits in full; failure to refund all premiums per the policy; and failure

to provide rehabilitation benefits.  There is convincing evidence that Defendant breached the contract as alleged.

By its recent actions, Defendant has admitted that it failed to pay benefits in full. At the time the Complaint was filed, Defendant owed Plaintiff for 90 days of past due policy benefits. Each of the policies contain a provision that obligates Defendant to pay benefits current:

> "When Proof of Loss has been received at our home office, we will:
> **Pay all income payments then due**;
> Pay all future income payments monthly **as they become due**;
> When our liability ends, immediately pay any balance due at that time."

Ex. A to Jones Decl. in support of MSJ, PAL 1014; Depo Exhibit 4.

California law requires disability insurers to pay benefits current and not in arrears.  Ins. Code § 10350.8.  Defendant's failure to pay benefits current breached the contract.

In April 2008, after a year of litigation, Defendant finally acknowledged that it had breached the contract by paying the arrearage.  While this voluntary unconditional payment reduces the amount of recoverable contract damages by the amount of payment, it does not affect the tort claims.  Indeed, if anything, the recent payment of the past due benefits strengthens the bad faith case in that it demonstrates the how unreasonable Defendant had been in refusing to pay benefits up until now.  Further, Defendant's payment failed to make Plaintiff whole, because Plaintiff had incurred attorney fees to force Defendant to make the payment. Kinney Decl. ¶8; Exhibit E thereto. These fees constitute damages under the rule announced in <u>Brandt v. Superior Court</u> (1985) 37 Cal.3d 813.

The second category of breach of contract alleged in the Complaint stems from Defendant's failure to refund premiums as provided in the policies.  As set forth above, Defendant has consistently failed to account for or properly refund premiums to Plaintiff, in spite of Plaintiff's many requests and even in spite of inquiries from the California Department of Insurance.  Defendant still has not refunded all of the premiums as required by the policies.

The third category of breach of contract alleged in the Complaint is the failure to pay the rehabilitation benefits provided by the policies.  This is both the largest and most egregious breach of contract.  The rehabilitation benefit was a significant reason Plaintiff purchased these policies (Mathews Decl. ¶2-6).  Plaintiff duly applied for the benefit, and was turned down without

explanation.  When she requested further clarification Defendant at first ignored  her and later misrepresented its bad faith claims practices. Defendant made it eminently clear that there was nothing Plaintiff could say or do that would be convince Defendant to provide the benefits.  She was left with no choice but litigation.  Discovery has revealed that Defendant has no policy manual concerning rehabilitation benefits, no one with experience in vocational rehabilitation reviewing claims, never investigates claims that come in, never advises insureds that they might qualify for the benefit, and has denied every claim for rehabilitation benefits ever presented to it.

After a year of litigation, Defendant still has not acknowledged that Plaintiff is entitled to the rehabilitation benefit, although Plaintiff obviously qualifies for the benefit.  Plaintiff submits herewith the Declaration of Dan McCaskell, Ph.D., an expert on vocational rehabilitation, who unequivocally opines that Plaintiff qualifies for the benefit.  Plaintiff's entitlement to the rehabilitation benefit is underlined by the fact that following Defendant's refusal to provide the benefit, Plaintiff applied to the California Department of Rehabilitation, which found that vocational rehabilitation was appropriate for her.  The Department of Rehabilitation made its decision with no more information from Plaintiff than Defendant had at the time Defendant turned her down.  Mathews Decl. ¶39-40.

In the moving papers, Defendant argues that Plaintiff is not entitled to economic damages from Defendant's breach of its obligation to provide the rehabilitation benefit.  Defendant argues that, because Plaintiff obtained benefits from the State of California, Defendant is not liable to Plaintiff for any damages.  This argument fails for a number of reasons.

First, as a matter of law, insurers are not relieved from their obligation to provide policy benefits merely because the insured has collateral contracts or relations with third persons which relieve him wholly or partly from the loss against which the insurance company agreed to indemnify him. Textron Financial Corporation v. National Union Fire Insurance Company of Pittsburgh, (2004) 118 Cal. App. 4th 1061, 1077; Atmel Corp. v. St. Paul Fire & Marine Ins. Co., (N.D. Cal. 2006) 430 F. Supp. 2d 984, 986.  The public policy behind this rule is obvious.  Absent such a rule, it would be in the best interest of insurance companies to refuse to pay benefits in cases where the benefits might be available from the government.  For example, health insurers

could reject claims in the expectation that the claim would be covered by Medi-Cal. Under Defendant's theory of damages, if Medi-Cal paid the claim, the health insurer could not be held liable for damages. The rule that insurers must pay benefits according to their contracts is embodied in California Insurance Code § 10111.

Second, Defendant has admitted that it must pay the rehabilitation benefit regardless of whether Plaintiff found another source of funding. Defendant designated Cory Simon as its person most knowledgeable on its interpretation of the policy language governing the rehabilitation benefit (Simon Depo 6:2-7:18). Simon testified that Defendant interprets the policy language of the Income Protection Policy to mean that Defendant may not offset rehabilitation benefits received from another source (Simon Depo 103:7-24). In other words, Defendant understands that it has the obligation to pay policy benefits regardless of whether another source provides coverage. Thus, the decision of the Department of Rehabilitation to approve Plaintiff for nursing school is not relevant to damages.

Third, as a matter of law, the benefits provided by the Department of Rehabilitation are secondary to benefits available through private insurance. See Cal. Admin. Code tit. 9, § 7196 and § 7197. The obligation of Defendant is primary, and Defendant may not escape its obligation by looking to the Department of Rehabilitation.

Fourth, the Department of Rehabilitation has not paid all of Plaintiff's expenses under the plan it approved. Plaintiff has past and ongoing expenses that Defendant should pay. Mathews Decl. ¶41.

Finally, if Defendant had not breached its contractual obligation to provide rehabilitation benefits, Plaintiff would have attended the more expensive and better regarded Pacific Union College, which is nearer her home. Mathews Decl. ¶42. Although Defendant was on notice that Plaintiff wanted to attend Pacific Union, Defendant declined to investigate whether Pacific Union was appropriate for Plaintiff's rehabilitation. Defendant's one sentence denial of Plaintiff's claim did not indicate that Defendant's denial was at all based on a refusal to allow Plaintiff to attend Pacific Union. Under these circumstances, Defendant has waived its claim, raised for the first time in its moving papers, that it would not pay the tuition at Pacific Union but

1  would insist that Plaintiff attend a public institution.  See, e.g., <u>Legarra v. Federated Mut. Ins.</u>

2  <u>Co.</u>, 35 Cal. App. 4th 1472, 1486 (1995) holding that: "an insurer waives its right to rely on

3  defenses that it has not specified in its letter denying coverage, but which a reasonable investigation

4  would have disclosed."  <u>Legarra</u> points out that this rule is grounded in the sound public policy that

5  insurers need an incentive to make a thorough investigation of claims.  Here, by refusing to

6  investigate Plaintiff's claim, by refusing to tell Plaintiff what was defective about the claim she

7  submitted, by refusing to allow Plaintiff to appeal her claim, and by refusing to answer Plaintiff's

8  questions about her claim, Defendant waived any right (if it ever had one) to insist that Plaintiff

9  attend only public colleges.

10  **C.      There is Overwhelming Evidence of Bad Faith.**

11  The implied covenant of good faith and fair dealing serves to prevent an insurer from

12  impairing the insured's right to receive the benefits for which she contracted.  <u>Egan v. Mutual of</u>

13  <u>Omaha Ins. Co.</u> (1979)24 Cal. 3d 809, 818-809.  Unreasonable withholding of policy benefits due

14  the insured gives rise to a tort cause of action for breach of the implied covenant.  <u>Gruenberg v.</u>

15  <u>Aetna Insurance Co.</u> (1973) 9 Cal. 3d 566, 574.  Withholding of benefits may take any of the

16  following forms:  denial of benefits due (<u>Mariscal v. Old Republic Ins. Co.</u> (1996) 42 Cal. App.

17  4th 1617, 1623); discontinuing ongoing benefit payments (<u>Morris v. Paul Revere Life Ins. Co.</u>

18  (2003) 109 Cal. App. 4th 966, 977; paying less than due (<u>Neal v. Farmers Ins. Exch.</u> (1978) 21

19  Cal. 3d 910, 921); or unreasonable delay in payment (<u>Waller v. Truck Ins. Exch., Inc</u> (1995) 11

20  Cal 4th 1, 36).  Pan American is guilty of all four forms of withholding benefits.  It improperly

21  denied the rehabilitation benefit.  It improperly cut off the ongoing monthly disability benefits in

22  March 2006 without good cause.  It unreasonably failed to determine how many policies Plaintiff

23  had, and as a result paid less than was due in monthly benefits for an extended period of time, and

24  it underpaid the refund of premiums due under the policy. It unreasonably delayed payment of

25  three months of disability benefits almost until now.

26  The denial of rehabilitation benefits demonstrates bad faith in several ways.  Each of

27  the following is a wrongful act that provides evidence of bad faith.

28  Pan American has a business policy of never advising its insureds that they might be

entitled to rehabilitation benefits. California law requires the carrier to disclose "all benefits, coverage, time limits or other provisions of any insurance policy issued by that insurer that may apply." 10 Cal Admin Code § 2695.4. Pan American violated this rule when it failed to tell Plaintiff that rehabilitation benefits might be available in April 2006 when Pan American first received medical reports that rehabilitation might be appropriate. It has a business practice of violating this rule, and violates it in the case of every policyholder to whom it applies.

Pan American does not have a claims manual that addresses how to handle rehabilitation benefits. In fact, it does not have any claims manual at all. California imposes a legal requirement on all carriers to have a claims manual, and requires that the manual include a copy of California regulations regarding claims handling practices. 10 Cal Admin Code § 2695.6. The same law also requires insurers to train claims personnel, another rule ignored by Defendant. Further, the Unfair Claims Settlement Practices Act (Ins. Code § 790.03(h) requires insurers "to adopt and implement reasonable standards for the prompt investigation or claims." Courts have found that a statutory violation of the Unfair Claims Settlement Practices Act has evidentiary value in a bad faith action, i. e., it tends to show a breach of the insurer's implied covenant. Estate of Parker ex rel. Parker v. AIG Life Ins. (C.D. Cal 2004) 317 F. Supp 1167, 1171-2; Rattan v. United Services Auto. Ass'n, 84 Cal. App.4th 715, 724 (2000).

The duty of good faith and fair dealing requires an insurer to act reasonably in denying coverage. Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc. (2000) 78 Cal. App. 4th 847, 879. An insurer acts unreasonably in denying coverage where it fails to reasonably investigate a claim. Id. at 879-80. "An unreasonable failure to investigate may be found when an insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and damages." Id. at 880. Here, Defendant's failure to investigate was total. It did not even make a pretense of investigation, and never does. Jones Depo 166:5-170:12; Simon Depo 70:22-71:1. As soon as Plaintiff told Defendant that she wanted to rehabilitate into nursing by pursuing a degree at one of three Northern California colleges, Defendant slammed the door in her face. The denial letter went out within forty eight hours. No investigation whatsoever took place, nor does it ever. An insurer commits the tort of bad faith when it denies payments to its insured without fully

1   investigating the grounds for its denial. <u>Frommoethelydo v. Fire Ins. Exchange</u>, 42 Cal. 3d 208,

2   215 (1986); <u>Egan v. Mutual of Omaha Ins. Co.</u>, 24 Cal. 3d 809, 818-19 (1979).

3           Following its initial denial of rehabilitation benefits, Defendant continued its bad faith

4   refusal to investigate.  In October 2006, Plaintiff asked Defendant what she needed to justify

5   rehabilitation benefits, whether Defendant ever granted the benefits, and whether she could appeal.

6   Defendant ignored her questions for a month, then reiterated its conclusion that she was not entitled

7   to benefits.  The duty to investigate is not suspended by the initial denial of the claim (nor by

8   filing of suit).  Defendant's continued failure to investigate also gives rise to bad faith liability.

9   <u>Jordan v. Allstate Ins. Co.</u> (2007) 148 Cal. App. 4th 1062, 1076.

10          Defendant's purported reason for denying the rehabilitation benefits - that Plaintiff did

11  not provide information of exactly the sort it wanted - also gives rise to bad faith liability.

12  <u>McCormick v. Sentinel Life Ins. Co</u>. (1984) 153 Cal. App. 3d 1030, 1046 (insurer does not have

13  the right to insist that the claim be proved only through certain types of evidence).   Defendant also

14  committed bad faith when it failed to respond to Plaintiff's request to appeal the denial of benefits.

15  <u>Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.</u> supra at 880.

16          Defendant also breached its duty of good faith and fair dealing when it improperly

17  terminated benefits in March 2006.  Defendant testified that its business practice is always to cut

18  off monthly disability benefits in accordance with the prognosis in the initial Attending Physician

19  Statement, without inquiry to the doctor, the insured or the employer.  This business practice has

20  been illegal in California for decades.  <u>Miller v. National American Life Ins. Co. of Calif.</u> (1976)

21  54 Cal. App. 3d 331, 339-340.  Defendant's belated suggestion in the moving papers that it cut off

22  Plaintiff's benefits because it needed to perform further investigation is just untrue.  Defendant did

23  not make a decision to perform a further investigation before cutting off benefits.  It automatically

24  cut off the benefits (Jones Depo 68:23-72:6).  Confirmation of the fact that Defendant's current

25  assertion in this regard was recently concocted can be seen in Depo Exhibit 6, a letter sent by

26  Defendant in May 2006.  If Plaintiff's disability benefits were cut off at that time for further

27  investigation, as Defendant now claims, Depo Exhibit 6 would have said so.  Instead it says "you

28  returned to work on 3/15/06," an incorrect statement that flows from Defendant's policy of cutting

1    off benefits automatically and never investigating.

2           Defendant continued to withhold monthly benefits from Plaintiff from March until

3    July 2006.  Even if Defendant had possessed a valid reason for cutting off benefits in March, its

4    delay in reinstating benefits until July is an unreasonable and bad faith delay.  California law

5    requires insurers to process claims withing 40 days.  10 Cal. Code of Regs. §2695.7.  Even absent

6    the regulation, Defendant would be in bad faith if it unreasonably delayed processing the claim.

7    See, e.g., Cardiner v. Provident Life & Accident Ins. Co., 158 F. Supp.2d 1088, 1099 (C.D. Cal.

8    2001); Love v. Fire Ins. Exch., 221 Cal. App.3d 1136, 1148 (1990).  The evidence shows that

9    Defendant sat on the claim for weeks without processing it, ultimately reinstating Plaintiff's

10   benefits in July based on information it had possessed for two months.

11          When Defendant finally did resume the monthly disability payments, it made the

12   payments three months in arrears.  This violated California law which requires that benefits be paid

13   current.  Ins. Code § 10350.8.  It also violated the clear terms of the insurance policies.  See, e.g.,

14   the section entitled "Time of Payment of Claim" Ex. A to Jones Decl. in Support of MAJ, PAL

15   1014.  Defendant continued to violate this law and the terms of the policy every month thereafter

16   until April 2008.  For a year and a half it sent EOBs that showed that it was paying in arrears, and

17   thereafter it provided Plaintiff with EOBs stating that it was paying current, although it was still

18   paying in arrears.  It ignored the claim in the Complaint that it was paying in arrears.  Defendant

19   ignored the claim in the Joint Case Management Statement that it was paying in arrears.  Finally,

20   after the close of discovery and shortly before filing this motion, Defendant paid the three months

21   of benefits it had been withholding.  Thus, Defendant has finally acknowledged that its conduct of

22   paying in arrears was improper.

23          Because Defendant obviously committed bad faith in connection with its failure to pay

24   benefits current, Plaintiff is entitled to fees under Brandt v. Superior Court (1985) 37 Cal.3d 813.

25   See also Cassim v. Allstate Ins. Co. (2004) 33 Cal.4th 780; Essex Ins. Co. v. Five Star Dye

26   House, Inc. (2006) 38 Cal. 4th 1252. Plaintiff has incurred attorney fees in connection with the

27   recovery of the past due benefits (Kinney Decl. ¶8; Exhibit E thereto) and therefore is entitled to

28

recover Brandt fees.[5]

A bad faith disregard of its duties to its insureds permeates Defendant's handling of this claim. Bernstein Decl. It failed to locate all of the insurance policies under which Plaintiff was insured, in spite of Plaintiff's inquiries, resulting in a ten month delay in a portion of Plaintiff's benefits. It misrepresented to Plaintiff that it was paying all of the benefits to which Plaintiff was entitled. The claims department is staffed by untrained and unsupervised personnel, who are not provided with written policies and procedures for handling claims of the sort presented here. It improperly withdrew a year's premiums from Plaintiff's bank account. It unreasonable failed to properly account for premium refunds (see Johnson v. Mutual Benefit Life Ins. Co. (9th Cir. 1988) 847 F.2d 600, 603), it paid benefits in the wrong amount, and provided confusing explanations of refunds and benefit payments. It unreasonably required Plaintiff to travel more than 100 miles for a medical examination, in violation of Defendant's standard practices, immediately after Plaintiff complained about Defendant to the Department or Insurance and the District Attorney. Everything Defendant did on this claim reeks of a conscious disregard for Plaintiff's rights and the rights of policyholders in general.

        D.        **There is Substantial Evidence of Misrepresentation which Supports Plaintiff's Claims for Fraud and Negligent Misrepresentation.**

In addition to bad faith, the Complaint states causes of action for fraud and negligent misrepresentation. Defendant challenges these theories, alleging that it did not make a misrepresentation. There is substantial evidence of misrepresentation here. In fact, deceit is clearly present as a matter of law.

A case directly on point is Miller v. National American Life Ins. Co. of Calif. (1976) 54 Cal. App. 3d 331. In Miller, the Court of Appeals upheld a fraud judgment against an insurance company based upon representations that the company would make the payments described in policy. Id at 338. Here, Plaintiff points to representations both within and outside of the policies, which not only represented that policy benefits would be paid, but also represented

---

[5]    The amount of Brandt fees recoverable in this action is not at issue in this Motion for Summary Judgment. The calculation of the amount will occur at trial.

that Defendant would treat Plaintiff well and that in the event of a claim, Defendant was "there to serve" Plaintiff and that her "satisfaction was very important to" Defendant, and that if she should make a claim, Defendant "fully expect(s) to provide a fair settlement in a timely fashion." Mathews Decl. ¶2-6; Exhibits A and B thereto.  As here, Miller involved a case in which the insurer automatically cut off benefits based solely on the Attending Physician Statement, without investigation.  The Miller Court stated:

>"The wording of the questions, the policy of interpretation without warning or guidance to the attending physician, and the failure to consult the doctor as to an acknowledged uncertainty all lend support to the inference of an intent not to live up to the promised coverage."  Id at 339.

The facts here are for more egregious than those presented in Miller.  Not only did Pan American cut off monthly disability benefits without investigation, when it came to the rehabilitation benefit, it engaged in a business practices that assure that it never pays rehabilitation benefits, that stifle inquiries from claimants about policy benefits, and that, in general, defeat the purpose for which policyholders purchase these policies.

The fact that Pan American designed its business to thwart the reasonable expectations of policyholders demonstrates the falsity of the representations that it made both within and outside of the policies.  It is hard to imagine a clearer example of misrepresentation in the insurance context.

### E.    There is Substantial Evidence that Defendant Has Violated the Unfair Competition Law.

The Complaint states a cause of action for violation of the Unfair Competition Law (Cal. Bus. & Prof. Code §17200 et. seq.).  Substantial evidence supports this theory.

The Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."  The section demonstrates a clear design to protect consumers as well as competitors.  Consumers need the greatest protection from sharp business practices.  People ex rel. Bill Lockyer v. Fremont Life Ins. Co. (2002) 104 Cal. App. 4th 508, 514-515.  The UCL is broad enough to reach practically any

1  form of predatory business practice in whatever context it may occur. <u>Korea Supply Co. v.</u>

2  <u>Lockheed Martin Corp.</u> (2003) 29 Cal. 4th 1134, 1143.  Plaintiff is not required to demonstrate a

3  series of ongoing wrongful acts.  Rather, a single wrongful act is sufficient to establish a violation

4  of §17200.  <u>Klein v. Earth Elements</u> (1997) 59 Cal. App. 4th 965, 968.

5          The UCL applies to anything that can properly be called a business practice and at the

6  same time is forbidden by law.  <u>Barquis v. Merchants Collection Ass'n of Oakland, Inc.</u>  (1972) 7

7  Cal. 3d 94, 113.  A business practice that violates any law - civil or criminal, state or federal -

8  may be enjoined under this statute.  <u>AICCO, Inc. v. Insurance Co. of North America</u> (2001) 90

9  Cal. App. 4th 579, 588-589.  The statute also applies to acts that are unfair.   "Unfair" practices

10  are those practices whose harm to the victim outweighs its benefits. <u>Progressive West Ins. Co. v.</u>

11  <u>Superior Court</u> (2005) 135 Cal. App. 4th 263, 285-286.

12          Courts have not been hesitant to apply the UCL to insurance claims practices.  See,

13  e.g., <u>Kapsimallis v. Allstate Ins. Co.</u> (2002) 104 Cal. App. 4th 667, 676  (carrier used date of

14  earthquake as date of loss in all cases, without investigation into actual claim, resulting in improper

15  denial of claims on statute of limitations basis); <u>Progressive West Ins. Co. v. Superior Court</u>,

16  supra (the insurance company had a pattern and practice of demanding 100 percent of any moneys

17  it paid out to its policyholders under the medical-payments coverage without regard to the

18  company's obligations under the made-whole rule or the common-fund doctrine); <u>Ticconi v. Blue</u>

19  <u>Shield of California Life & Health Ins. Co.</u> (2008)160 Cal. App. 4th 528  (the insurer engaged in a

20  practice of post-claims underwriting to rescind policies and deny claims).  In <u>R & B Auto Center,</u>

21  <u>Inc. v. Farmers Group, Inc.</u> (2006) 140 Cal. App. 4th 327, the insurance company sold the insured

22  car dealership insurance that the insured reasonably believed would cover it for lemon law

23  violations.  Plaintiffs alleged that Defendant never intended to actually provide the coverage and

24  sought equitable relief under the UCL.  The court found that the UCL applied under those facts.

25  Id at 355-356.

26          The evidence presented here shows that Pan American engaged in rampant and

27  egregious unlawful and unfair conduct that the Court should enjoin.  As in <u>R & B Auto Center</u>,

28  supra, Defendant sells a benefit (the rehabilitation benefit) that it has no intention of actually

providing. A reasonable consumer reading the policy would expect that rehabilitation benefits were available, but in fact, Defendant never pays those benefits. It has no policies in place for providing those benefits, it does not honor its legal obligation to tell policyholders about the benefit when it appears they might be entitled to it, it denies the benefits without explanation, it refuses to respond to inquiries from the policyholder about the benefits, it has no appeal process in place and does not answer questions about appeal, and, if the policyholder is insistent about the rehabilitation benefit, Defendant misrepresents how claims for this benefit are processed. An insurance company cannot be any more unfair than Defendant.

No more is needed to deny the Motion for Partial Summary Judgment as to the UCL claim, but more is present. In addition to its fraudulent and unfair practice in connection with the rehabilitation benefit, there is Defendant's business practice of automatically denying benefits based on the initial Attending Physician Statement, without any investigation at all. As discussed at some length above, this practice is fraud per se. Miller v. National American Life Ins. Co. of Calif. (1976) 54 Cal. App. 3d 331. The UCL is California's answer to the problem of how to deal with a business practice like this one.

Another illegal practice engaged in by Defendant is paying disability benefits in arrears. This practice is made illegal by Ins. Code § 10350.8. Defendant has violated this law frequently. Jones Depo 138:1-4. This practice should also be enjoined.

### F.       There is Substantial Evidence which Supports the Claim for Intentional Infliction of Emotional Distress.

Under California law, the elements of a claim for intentional infliction of emotional distress (IIED) are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. Christensen v. Superior Court, 54 Cal.3d 868, 903, (1991)

Defendant committed a series of acts, any one of which would be sufficient to allow Plaintiff's IIED claim to go the jury. It underpaid benefits, it cut off benefits without basis or

investigation, it improperly seized funds from Plaintiff's bank account, it paid benefits in arrears, it refused to provide the rehabilitation benefit, it refused to answer Plaintiff's questions, it improperly calculated refunds, it failed to honor its obligation to waive premiums, it provided incomprehensible and confusing accounting, it wrote insulting letters, and so on.  California case law provides examples of IIED claims against an insurance company for threatened and actual bad faith refusals to make payments under the policy. Fletcher v. Western Natl. Life Ins. Co., 10 Cal. App.3d 376 (1970) (an insurer's intentional conduct and wanton and reckless disregard of consequences to plaintiff in delaying payments of approved benefits vital to the support of plaintiff and her children supported an IIED claim).  See also Hernandez v. General Adjustment Bureau, 199 Cal. App.3d 999 (1988).

Plaintiff's declaration points out that the numerous wrongful acts of Defendant caused her serious emotional upset on several occasions.  Defendant should expect this sort of strong emotional response from a person who has recently become disabled, who is now being denied the lifeline she was depending upon, and who is being treated as outrageously as Defendant treated Plaintiff here.

### G.        There is Substantial Evidence which Supports the Claim for Negligent Infliction of Emotional Distress.

Plaintiff's claim for negligent infliction of emotional distress claim is presented under the "direct victim" theory. Burgess v. Superior Court, 2 Cal.4th 1064, 1071 (1992). In Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc. 48 Cal.3d 583 (1989), the court stated that damages for emotional  distress are recoverable "when they result from the breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two." Id. at 590. "Unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty." Potter v. Firestone Tire and Rubber, 6 Cal. 4th 965, 985 (1997); Erlich v. Menezes, 21 Cal.4th 543, 555 (1999). A legal duty "may be imposed by law, be assumed by the defendant, or exist by virtue of a special

1    relationship." <u>Potter</u>, supra, 6 Cal.4th at 985; <u>Marlene F.</u>, supra, 48 Cal.3d at 590.

2              Defendant argues that Plaintiff cannot establish the requisite duty on behalf of

3    Defendant to support the tort of negligent infliction of emotional distress.  California law does not

4    support Defendant's argument. In <u>Johnson v. Mutual Ben. Life Ins. Co.</u>, 847 F.2d 600 (9th Cir.

5    1988), a Ninth Circuit court decision where an insured brought an NIED claim against the insurer

6    as well as a claim for breach of the implied covenant of good faith and fair dealing, the court held

7    that genuine issues of material fact existed on both claims to preclude summary judgment.  In

8    insurance litigation suits, an action for negligent infliction of emotional distress can be maintained

9    so long as there is a duty of good faith and fair dealing. <u>Coleman v. Republic Indem. Ins. Co. of</u>

10   <u>Calif.</u>, 132 Cal. App.4th 403, 415-16 (2005). Here, there is very clearly a duty of good faith and

11   fair dealing, as well as several obvious breaches of that duty.  Since a duty exists, the negligent

12   infliction claim must survive this motion and go to the jury.

13              **H.        There is Clear and Convincing Evidence to Support the Award of**

14                         **Punitive Damages.**

15              Punitive damages are made available to discourage the perpetuation of objectionable

16   corporate policies that breach the public's trust and sacrifice the interests of the vulnerable for

17   commercial gain. <u>Amadeo v. Principal Mut. Life Ins. Co.</u>, 290 F.3d 1152, 1164-1165 (9th Cir.

18   2002) (reversing a grant of summary judgment and remanding for further proceedings on an

19   insured's claim for punitive damages, finding sufficient evidence that the denial of her claim "was

20   not simply the unfortunate result of poor judgment" to allow a jury to conclude that the insurer's

21   actions were willful and "rooted in established company practice"), quoting <u>Egan</u>, supra, 24 Cal.3d

22   at 820.

23              Punitive damages are available when the insured proves by clear and convincing

24   evidence that the insurance company engaged in conduct that is oppressive, fraudulent, or

25   malicious. <u>Amadeo</u>, 290 F.3d at 1164, quoting <u>PPG Industries, Inc. v. Transamerica Ins. Co.</u>, 20

26   Cal.4th 310, 318-319 (1999).

27              "[A] plaintiff may meet the state of mind requirement for an award of punitive

28   damages by showing that the insurer's bad faith was 'part of a conscious course of conduct, firmly

Plaintiff's Opposition to Motion for Summary Judgment          Case No. C 07-02757-SBA

1  grounded in established company policy." <u>Amadeo</u>, 290 F.3d at 1165, quoting <u>Neal v. Farmers</u>

2  <u>Ins. Exchange</u>, 21 Cal.3d 910 (1978).

3        Pan American has engaged in conduct that is fraudulent, oppressive and malicious as

4  defined by California Civil Code section 3294.

5        Fraudulent conduct sufficient to support punitive damages is evident both in

6  Defendant's business policy of cutting off benefits without investigation and in its business policy

7  of refusing to pay rehabilitation benefits.  In <u>Miller v. National American Life Ins. Co. of Calif.</u>,

8  supra, the Court upheld the award of punitive damages based solely on the fraudulent conduct of

9  the insurer that flows from business practice of cutting off benefits without investigation.  Here,

10  the fraudulent conduct of the insurer goes far beyond that found in <u>Miller</u>.  Not only does the

11  insurer cut off benefits without investigation, it never pay one class of rehabilitation benefits at all,

12  never investigates claims for that type of benefit, stonewalls when a claimant inquires about the

13  benefit, and even makes misrepresentations to the claimant if the claimant insists on a response.

14        Besides being fraudulent, the conduct of Defendant was malicious and/or oppressive.

15  Conduct is considered malicious if it is either intended by a defendant to cause injury or if it is

16  despicable conduct which is carried on by the defendant with a willful and conscious disregard of

17  the rights of others.  Cal. Civil Code §3294(c)(1).  It is not necessary to show that Defendant had

18  personal animosity toward plaintiff or acted out of "evil" motives.  It is enough that Defendant

19  intended the consequences that were substantially certain to result from its conduct.  <u>Schroeder v.</u>

20  <u>Auto Driveway Co.</u> (1974) supra at 922.

21        Conduct is considered oppressive when it is despicable conduct that subjects a person

22  to cruel and unjust hardship in conscious disregard of that person's rights.  Civil Code §3294(c)(2).

23        Malicious and oppressive conduct is shown here by the following:

24      •  Pan American placed a claims representative with no experience at all in disability

25         claims in sole control of all disability claims;

26      •  Pan American has no written policies at all regarding the handling of disability

27         claims;

28      •  Pan American did not locate all of the monthly disability benefits it was supposed

to pay Plaintiff until ten months after the date of disability, and after Plaintiff contacted Pan American's billing department to find out why it was still collecting premiums;

- Pan American terminated Plaintiff's monthly disability benefits without investigation;

- Pan American required Ms. Mathews to travel over 100 miles for a medical examination immediately after Ms. Mathews complained to the Department of Insurance;

- Pan American withdrew twelve months' premiums from Plaintiff's bank account;

- Pan American withheld Plaintiff's monthly benefits for two months after it completed its investigation into her disability;

- When Pan American restarted Plaintiff's benefits in July 2006, it paid her 90 days in arrears;

- Defendant wrote to Plaintiff in July 2006 indicating that Plaintiff had only been insured for two years, that her application was being investigated and that Defendant might seek a judgment against Plaintiff;

- Pan American refused to pay rehabilitation benefits without explanation;

- Pan American denied Plaintiff's claim for rehabilitation when it knew that it did not have sufficient information to deny that claim;

- Pan American refused to investigate whether Plaintiff was entitled to rehabilitation benefits;

- Pan American refused to answer Plaintiff's questions about what information was needed to provide rehabilitation benefits;

- Pan American told Plaintiff that rehabilitation benefits were not an "entitlement" when in truth Plaintiff was entitled to the benefit;

- Pan American told Plaintiff that it used vocational rehabilitation specialists to assess rehabilitation claims although it does not do that and its senior officer for claims does not even know what a vocational rehabilitation specialist is;

1   • Pan American did not properly account to Plaintiff for benefits and refunds of

2   premium, but instead repeatedly sent Plaintiff incomprehensible and erroneous

3   information;

4   • Pan American sent Plaintiff Explanations of Benefits that falsely represented that

5   she was being paid current, when in fact she was being paid in arrears.

6   There is clear and convincing evidence of each and every one of these items.  In fact,

7   the evidence in support of these charges is incontrovertible.

8   The moving papers have not raised the issue of corporate liability for the fraudulent,

9   malicious and oppressive conduct here.  The evidence that Pan American is liable in punitive

10  damages for such conduct by its employees is abundant here.  Not only was everything that was

11  done here by Mr. Jones supervised by Mr. Simon, the company's Chief Claim Officer (Simon

12  Depo 6:1), Plaintiff's claim was reviewed by Mr. Simon, together with Pan American's Vice

13  President for Administration and a lawyer from Pan American's office of in-house counsel, and the

14  wrongful activity that is the subject of this lawsuit was explicitly ratified  Simon Depo 73:9-79:19.

15  **IV.       CONCLUSION**

16  The conduct of Defendant which is the subject of this lawsuit could hardly be worse.

17  At every step of the process, Defendant ignored its obligations to Plaintiff.  In several areas,

18  Defendant has admitted that it treats all policyholders as reprehensibly as it treated Plaintiff.  In

19  other areas, it has admitted that it frequently engages in the wrongful conduct that is present here.

20  Overall, this case presents a near perfect example of insurance bad faith.  The conduct shown here

21  is the reason that bad faith law exists.

22  It is respectfully submitted that Defendant's motion should be denied and this case be

23  allowed to proceed to a jury trial.

24  Dated: May 20, 2008                    LAW OFFICE OF MICHAEL E. KINNEY

25

26                                        By: __/s/_____
                                              Michael E. Kinney
27                                            Attorney for Plaintiff

28