1         UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA
2
           NO. C 07-02757
3
         DONNA MATHEWS
4
           VERSUS
5
  PAN AMERICAN LIFE INSURANCE COMPANY;
6    And Doe 1 through Doe 20, Inclusive
7           VOLUME I
8    Videotape deposition of CORY R. SIMON,
601 Poydras Street, New Orleans, Louisiana
9  70130, taken in the offices of Affiliated
Reporting, 650 Poydras Street, Suite 2610,
10 New Orleans, Louisiana 70130 on Thursday,
March 13, 2008.
11
APPEARANCES:
12
13    LAW OFFICE OF MICHAEL E. KINNEY
    Attorneys at Law
14    BY:  MICHAEL E. KINNEY, Esquire
    438 First Street, Fourth Floor
15    Santa Rosa, California 95401
16      ATTORNEYS FOR PLAINTIFF
17
    REED SMITH
18    Attorneys at Law
    BY:  THOMAS E. EVANS, Esquire
19    1999 Harrison Street, Suite 2400
    Oakland, California  94612
20
      ATTORNEYS FOR DEFENDANT
21
22    PAN AMERICAN LIFE
    Attorneys at Law
23    By:  PATRICK C. FRAIZER, Esquire
    601 Poydras Street
24    New Orleans, Louisiana  70130
25      ATTORNEYS FOR DEFENDANT
26

1

2

3

4

5

6    VIDEOGRAPHER:   KARL STEGEMAN

7

8

9    REPORTED BY:

10

11            LINDY ROOT

12            Certified Court Reporter

13            Registered Professional Reporter

14

```
 1                DONNA MATHEWS VS.

 2      PAN AMERICAN LIFE INSURANCE COMPANY; and

 3           Doe 1 through Doe 20, Inclusive

 4            Deposition of CORY R. SIMON

 5              Taken on March 13, 2008

 6

 7

 8

 9                     INDEX

10

11

12

13                              Page, Line

14

15

16

17      Exhibit #1                7      17

18

19      Exhibit #2                32      21

20

21

22

23

24

25      EXAMINATION BY MR. KINNEY    5      10

26
```

```
 1              S T I P U L A T I O N

 2          It is stipulated and agreed by and

 3     between counsel for the parties hereto that

 4     the deposition of the aforementioned

 5     witness is hereby being taken under the

 6     Federal Rules of Civil Procedure, for all

 7     purposes, in accordance with law;

 8          That the formalities of reading and

 9     signing are specifically not waived;

10          That the formalities of sealing,

11     certification and filing are specifically

12     waived;

13          That all objections, save those as to

14     the form of the question and the

15     responsiveness of the answer, are hereby

16     reserved until such time as this

17     deposition, or any part thereof, may be

18     used or sought to be used in evidence.

19              *     *     *     *

20          LINDY ROOT, Registered Professional

21     Reporter, and Certified Court Reporter, in

22     and for the Parish of Orleans, State of

23     Louisiana, officiated in administering the

24

25     oath to the witness.

26
```

```
1              (Video introduction.)
2         MR. KINNEY:
3              Michael Kinney for the plaintiff.
4         MR. EVANS:
5              This is Thomas Evans for the
6            defendant, Pan American Life.
7                   CORY R. SIMON,
8    after having been first duly sworn by the
9    above-mentioned court reporter, did testify
10   as follows:
11   EXAMINATION BY MR. KINNEY:
12   Q. State your name for the record.
13   A. Cory Simon.
14   Q. What is your address -- business address?
15   A. 601 Poydras Street, New Orleans, Louisiana
16      70130.
17   Q. And is that a business address?
18   A. That's correct.
19   Q. And what business is located at that
20      address?
21   A. Pan American Life Insurance Group.
22   Q. And you're employed by Pan American Life
23      Insurance Group?
24   A. I am.
25   Q. Okay.  What is your job title?
26
```

1    A. Chief claims officer.

2    Q. I am going to direct a question here to

3       your attorney.

4          MR. KINNEY:

5             Mr. Evans, I understand that Pan

6             American has designated Mr. Simon as

7             the person most knowledgeable on

8             certain questions that I requested

9             that they make such a designation.

10            Is that right.

11         THE WITNESS:

12            That's correct.

13         MR. KINNEY:

14            Okay.  And can we put it on the

15            record what subjects he has been

16            designated on?

17         MR. EVANS:

18            It's subjects 2 through 5 of the

19            30(b)(6) notice which I assume will

20            be an exhibit to the deposition.

21            Why don't we go ahead and enter

22            that?

23         MR. KINNEY:

24            Yeah.  Let's go ahead and mark

25            that.

26

```
 1                    Go off the record a second.

 2              THE VIDEOGRAPHER:

 3                    Going off the record at 10:05.

 4                This is videotape number one.

 5              (Off the record.)

 6              THE VIDEOGRAPHER:

 7                    Back on the record at 10:09, but

 8                my camera obviously says 9:09.

 9                    Sorry about that.

10              MR. KINNEY:

11                    All right.  While we were off the

12                record, we marked as Exhibit #1 a

13                copy of the notice of taking

14                deposition of Pan American Life

15                Insurance Company, and that will be

16                part of the deposition.

17              (Exhibit #1 was marked for

18                identification.)

19       EXAMINATION BY MR. KINNEY:

20       Q. Mr. Simon, how long have you been employed

21          by Pan American Life?

22       A. It will be four years in August.

23       Q. And have you had the same job title

24          throughout those four years?

25       A. I have.

26
```

1    Q. Could you briefly tell me your educational

2       background?

3    A. College.  College graduate.

4    Q. What college did you graduate from?

5    A. Brooklyn College.

6    Q. I'm sorry?

7    A. Brooklyn College.

8    Q. Can you spell that?

9    A. B-R-O-O-K-L-Y-N.

10   Q. Okay.  And what sort of degree did you get

11      there?

12   A. Business.

13   Q. Do you hold any special licenses of any

14      sort?

15   A. I hold some insurance industry

16      designations.

17   Q. Okay.  Could you tell me what those are?

18   A. One is through an organization called ICA,

19      International Claims Association, and that

20      designation is Associate of Life and Health

21      Claims or ALHC.

22         The other is through an insurance

23      industry organization called LOMA, and

24      through that I have an Associate of

25      Customer Service, also known as ACS.

26

```
 1    Q. Do you know -- What does one have to do in
 2       order to become an Associate of Life and
 3       Health Claims?
 4    A. It is a series of four courses of study
 5       along with testing regarding those
 6       subjects.
 7    Q. Okay.  And when did you become an Associate
 8       of Life and Health Services?
 9    A. 1999.
10    Q. And what does one have to do to become an
11       Associate of Customer Service?
12    A. I believe it's a series of five insurance
13       courses with corresponding exams.
14    Q. Who is LOMA?
15    A. LOMA is an insurance organization.  It's
16       Life Organization or Operational Management
17       Association.  It's insurance industry.
18    Q. When did you become an Associate of
19       Customer Service?
20    A. I believe in 2004.
21    Q. The classes that you take to become an
22       Associate of Customer Service, could
23       you -- do you recall the subjects of those
24       classes?
25    A. There are four I would say general
26
```

1     insurance education classes that would

2     consist of insurance administration, life

3     and health law, life and health marketing,

4     and then the customer service oriented

5     course work.

6  Q. Okay.  And going back to the associate

7     of life and health claims, do you recall

8     the courses you had to take to become one?

9  A. It is also similar.  It is general

10    insurance course work along with claims

11    administration, life and -- general life

12    and health insurance law, and medical and

13    dental course work.

14  Q. Have you ever had your deposition taken

15    before?

16  A. I have.

17  Q. How many times?

18  A. Twice.

19  Q. Well, at the risk of repeating some things

20    that you probably have already heard and

21    know from the prior depositions, I will go

22    over very basically the ground rules we are

23    under here.

24      You have been sworn to tell the truth.

25    It's the same oath that you would take in a

26

```
 1        court of law even though we're in the
 2        informal surroundings of the court
 3        reporter's office.
 4             You have the same obligation to tell
 5        the truth today as you would if this matter
 6        were to go forward in a court of law.
 7             Do you understand that?
 8    A. I do.
 9    Q. You have to answer out loud, as you're
10        doing, because the court reporter only
11        takes down the out loud statements, and
12        nods of the head and those sorts of
13        gestures don't really work, although the
14        videographer will pick those up.
15             Try not to use uh-huh or uh-uh --
16    A. Uh-huh (affirmative response).
17    Q. -- in your answers, because sometimes those
18        are confused on the record.  Better to have
19        a clear record for everybody.
20    A. Okay.
21    Q. When the deposition is completed, the court
22        reporter is going to type up a transcript
23        of the record, and you will have a chance
24        to read over that transcript and to make
25        any changes in the transcript that you feel
26
```

1    appropriate.

2        If you make any changes, I or any other

3    attorney who is involved in the case can

4    comment on the fact that you have made

5    changes, and if they are significant

6    changes that could change the outcome of

7    the case.  That could be important.

8        So it's important for everyone that you

9    give each question some thought and try to

10   give your correct answer today so you don't

11   have to make any major changes

12   substantively to the deposition transcript.

13       Do you understand that?

14   A. I do understand.

15   Q. Okay.  If I ask you a question and you

16   don't understand it, tell me, and I will

17   try to rephrase the question.

18       If I ask a question and you don't

19   recall the answer, tell me that.  You don't

20   have to guess at something.  If you don't

21   know the answer, say so.

22       If you do understand the question, then

23   please answer it to the best of your

24   ability.

25       Is there any reason why we can't

26

1   proceed with your deposition at this time?

2 A. No.

3 Q. You haven't had any medication today that

4   would affect your ability to testify?

5 A. No.

6 Q. Have you ever given any written or recorded

7   statement about this case?

8 A. Not to my knowledge.

9 Q. Okay.  Did you review any documents before

10   coming to the deposition?

11 A. No.

12 Q. How old are you?

13 A. 44.

14 Q. Okay.  Prior to becoming employed with Pan

15   Am, where were you employed?

16 A. Swiss Re Life & Health in New York City.

17 Q. How long were you there?

18 A. Seven years.

19 Q. And what jobs did you hold there?

20 A. I was the director of claims.

21 Q. Throughout your entire seven years?

22 A. No.  I believe I started out as a senior

23   claims examiner.

24 Q. Just those two jobs then, senior claims and

25   director --

26

1    A. Those were the two, you know, titles that I

2       held there.

3    Q. Okay.  And Swiss Re, is that a reinsurance?

4    A. Correct.

5    Q. And what sorts of claims did you handle for

6       Swiss Re?

7    A. Individual life, group life, individual

8       disability, and group disability, and their

9       corresponding components.  Waiver of

10      premium and things of that nature.

11   Q. But it was all in the life and disability

12      area?

13   A. That's correct.

14   Q. So that takes us back 11 years ago.  Is

15      that right?

16          Approximately?

17   A. 1997, 1998, around there, yeah.

18   Q. Immediately prior to Swiss Re, where were

19      you employed?

20   A. The company has changed names, but I

21      believe they are known as ING now.

22   Q. That's an insurance company?

23   A. Yes.

24   Q. And how long were you with ING?

25   A. I believe a year and a half.

26

1    Q. What did you do there?

2    A. I was the claims examiner for life, health,

3       and disability claims.

4    Q. Prior to ING, had you worked in claims for

5       an insurance company?

6    A. Yes.

7    Q. Okay.  Why don't you just briefly give me

8       your background in claims for insurance

9       companies?

10   A. Well, I have been in a claims capacity now

11      for 25 years since 1984 with increasingly

12      higher authority and increased title and

13      responsibilities.

14   Q. And just -- And could you give me the list

15      of the companies that you have worked for

16      since '84 up to --

17   A. Amalgamated Life Insurance Company was 1984

18      through 1988 or '89.

19          National Benefit Life Insurance

20      Company -- And all of these are located in

21      New York City.  National Benefit Life

22      Insurance Company from '89 through 1995.

23          ING from 19 --

24   Q. Yeah.  Okay.

25          So we are back to ING and --

26

1    A. Correct.

2    Q. -- I have got your history since then?

3    A. That's correct.

4    Q. As chief claims officer at Pan American

5       Life, what in general are your job duties?

6    A. To ensure day-to-day operations, timeliness

7       of payment of claims, reviewing and

8       advising on complex matters.

9    Q. We are here about claims that arise under a

10      disability income policy and an income

11      protection policy.

12          Other than the general disability area,

13      what sorts of claims do you deal with at

14      Pan American?

15   A. Life.  Life insurance claims.

16   Q. So it's all life and disability?

17   A. That's correct.

18   Q. To your knowledge does Pan American offer

19      insurance outside the life and disability

20      area?

21   A. They do.

22   Q. What other sorts of insurance do they

23      offer?

24   A. They offer a work site type product.

25      Generally a health benefit.

26

1   Q. And do you deal with claims that arise

2      under the health benefits policies?

3   A. I do not.

4   Q. Okay.  Are those claims handled in a

5      different department than yours?

6   A. They are.

7   Q. Okay.  Are you the head of the claims

8      department?

9   A. For the life and disability operations.

10   Q. Okay.  Who do you report to in terms of

11      structure?

12   A. I report to the vice-president of

13      administration.  I'm not sure -- I think

14      her exact title is service delivery.

15   Q. And what is her name?

16   A. Judy Norwalt, N-O-R-W-A-L-T.

17   Q. In the department that you manage, how many

18      employees are there?

19   A. I have -- Give me one moment.

20        I have five employees in the life and

21      disability.  I also manage a separate

22      department of customer service telephone

23      representatives, and there are ten

24      employees in that department.

25   Q. All right.  The five employees in life and

26

```
 1        disability, are they claims personnel?

 2   A. They are claims personnel.

 3   Q. Okay.  And the ten employees in customer

 4        service, are they also claims personnel?

 5   A. No.  They are general representatives for

 6        all aspects of the company.

 7   Q. Okay.  One of the names that's come up in

 8        this case is Elaine Bourg.

 9   A. Correct.

10   Q. Do you know Elaine Bourg?

11   A. I do.

12   Q. Did she work for you?

13   A. She did.

14   Q. Okay.  Was she among the employees in the

15        life and disability area?

16   A. She was.

17   Q. Okay.  And another name that's come up in

18        this case is Michael Jones.

19            Do you know Mr. Jones?

20   A. I do.

21   Q. Is he currently employed at Pan American?

22   A. He is.

23   Q. Does he work for you?

24   A. He does.

25   Q. Is he also in the life and disability area?

26
```

1    A. He is.

2    Q. Okay.  Have there been -- Over your four

3       years at Pan American, have there been

4       consistently around five employees in the

5       life and disability area?

6    A. Yes.

7    Q. Okay.  And so at one time Ms. Bourg and

8       Mr. Jones were two of the five employees.

9       Is that right?

10   A. That's correct.

11   Q. Okay.  Are you counting yourself as one of

12      the five employees?

13   A. No.

14   Q. Okay.  On a monthly basis, how many claims

15      are handled by the five employees in the

16      life and disability area?

17   A. Specifically to life claims or disability

18      claims or overall?

19   Q. Well, let me ask you -- That's a good

20      distinction.

21         Of the five employees, are they

22      specialized between the life claims and the

23      disability claims?

24   A. Yes.

25   Q. Okay.  How many deal with the life claims?

26

1    A. Three of the five.

2    Q. Okay.  And then I take it the two deal with

3       disability claims.

4    A. Correct.

5    Q. Is that right?

6    A. That's correct.

7    Q. Okay.  And is there any crossover?

8         I mean do sometimes the life reps deal

9       with disability claims or not?

10   A. Rarely.

11   Q. Okay.  Well, then let's just stick with the

12      disability claims.

13   A. Okay.

14   Q. On a monthly basis -- if you can give me an

15      answer to this -- how many disability

16      claims are processed by the two claims reps

17      who handle those?

18   A. About 132 to 135.

19   Q. Has that been relatively constant over your

20      four years?

21   A. Yes.

22   Q. Okay.  Was Ms. Bourg working for Pan

23      American when you first came on board?

24   A. No.

25   Q. And Mr. Jones, was he?

26

1    A. He was working as a temporary when I came

2       on board.

3    Q. Do you know when Ms. Bourg was hired by Pan

4       American?

5    A. I believe either October or November of

6       2004.

7    Q. Okay.  Did she receive any training at Pan

8       American after she came on board?

9    A. She did.

10   Q. Do you know what training she received?

11   A. She received general training in the area

12      of a support staff.  Which forms to mail

13      out, how to order medical records, how to

14      follow up on certain items, and how to cut

15      our disbursement checks.

16   Q. Okay.  Did she receive any training as to

17      determining whether somebody was disabled

18      or not?

19   A. No.

20   Q. Since you have been employed by Pan

21      American, to your knowledge has Mr. Jones

22      received any training from Pan American?

23   A. In the formal sense, no.

24   Q. Okay.  By the formal sense, I take it you

25      mean he hasn't attended any specific

26

1      classes?

2  A. Correct.

3  Q. Okay.  Do you know if he has attended any

4      specific classes in the subject of

5      insurance outside of classes offered by Pan

6      American since you have been employed by

7      Pan American?

8  A. He has not.

9  Q. Okay.  Have you personally advised

10     Mr. Jones on aspects of handling disability

11     claims?

12  A. Yes.

13  Q. Okay.  Other than what you have personally

14     told him, to your knowledge has he had any

15     training in handling disability claims?

16  A. He came with experience in handling

17     disability claims.

18  Q. Okay.  Could you briefly tell me what you

19     understand his experience to be?

20  A. Michael has worked in multiple companies as

21     a temporary consultant handling different

22     aspects of claims, including disability

23     claims.

24  Q. Okay.  Now, earlier in the deposition you

25     gave me some subjects that you had -- I

26

```
 1          don't know -- What do you call the

 2          associated -- association of life and

 3          disability claims?

 4     A. That's called ICA, International Claims

 5          Association.

 6     Q. All right.  The ICA or LOMA designations

 7          that you received, does Mr. Jones have such

 8          similar designations?

 9     A. He does not.

10     Q. Have you personally received any training

11          from Pan American regarding Pan American's

12          disability policies?

13     A. No.

14     Q. Okay.  Prior to coming to Pan American, in

15          your experience handling disability

16          policies, had you ever been required to

17          address the issue of rehabilitation

18          benefits?

19     A. No.

20     Q. Okay.  Have you received any special

21          training from any source on rehabilitation

22          benefits?

23     A. No.

24     Q. Okay.  The 132 to 135 claims a month in the

25          disability area that are processed by Pan

26
```

```
 1        American, what proportion of those do you

 2        personally look at?

 3    A. The 132 to 135 are a combination of new,

 4        pending, and ongoing claims.  I look at

 5        a -- I would say I look at about 50 percent

 6        of the new claims that come into Pan

 7        American.

 8    Q. Okay.  And do you regularly review the

 9        ongoing claims as well?

10    A. Some of them.

11    Q. Okay.  Is there some criteria that you use

12        to decide whether to look at a new claim?

13    A. No.

14    Q. Okay.  So they are just random choices?

15    A. Well, they are random choices through an

16        audit process.

17    Q. Well, could you explain what an audit

18        process is?

19    A. I generally look at -- you know, in all

20        aspects of the department, I generally take

21        a sampling of all claims that come into the

22        company that are processed for payment.

23    Q. Okay.  So is there anything about the

24        claims, the new claims that makes you

25        decide to look at them in particular?

26
```

1    A. No.

2    Q. Okay.  And the ongoing claims --

3    A. Uh-huh (affirmative response).

4    Q. Is it the same thing, a sort of generalized

5        selection, or are there criteria that you

6        use to --

7    A. No.  The ongoing claims are those that we

8        deem with some disability are reviewed once

9        a year.  So I will generally look at a few

10       of those each year.

11   Q. Okay.  But there are no specific things

12       that automatically require that you review

13       a claim.  Is that right?

14   A. No.

15   Q. Okay.  Sometimes do the claims

16       representatives bring you problem claims?

17   A. Yes.

18   Q. Okay.  So when those problems are brought

19       to you, of course, you review those.

20           Is that right?

21   A. That's correct.

22   Q. Okay.  Of the 132 to 135 claims that are

23       processed a month in the disability area of

24       Pan Am, how many of those on average

25       contain a claim for rehabilitation

26

1       benefits?

2   A. To my knowledge, there have been two or

3       three prior claims.

4   Q. Total?

5   A. Total.

6   Q. Okay.  As you sit here today, do you have a

7       recollection of reviewing two or three

8       claims other than the Mathews claim for

9       rehab benefits?

10  A. I have a recollection -- a very good

11      recollection of one.  A slight recollection

12      of another.

13  Q. Okay.  So that would be two?

14  A. Correct.

15  Q. Okay.  Did Pan Am provide rehabilitation

16      benefits to either of those claimants?

17  A. No.

18  Q. So to your knowledge, since you have been

19      at Pan American, no claimant has received

20      rehabilitation benefits.

21          Is that correct?

22  A. That is correct.

23  Q. Have you made any investigation to see

24      whether Pan American provided any

25      rehabilitation benefits to any claimant

26

1        prior to your tenure at Pan Am?

2    A. No.

3    Q. No, you have never?

4    A. No, I have not done that.

5    Q. Okay.  Have you asked anyone whether Pan Am

6        has ever provided any rehabilitation

7        benefits?

8    A. No.

9    Q. Okay.  If you were to ask that question,

10       who would you ask?

11   A. Most likely somebody from our controller's

12       department.

13   Q. During your tenure at Pan Am, has Pan Am to

14       your knowledge ever suggested to a claimant

15       that the claimant seek rehabilitation?

16   A. Not to my knowledge.

17   Q. And we are talking about occupational --

18   A. I understand.

19   Q. Let me just -- It's important that the

20       court reporter get both of us, and if we

21       both talk at the same time the record comes

22       out all garbled.

23           Well, when I say rehabilitation

24       benefits, I'm talking about occupational

25       rehabilitation benefits.

26

1          Is that how you understood it?

2     A. Yes.

3     Q. Okay.

4          MR. EVANS:

5               You know, just to interpose an

6             objection to that as vague.

7          MR. KINNEY:

8               Vague?

9          MR. EVANS:

10              Whatever you mean by occupational

11            rehab.

12    EXAMINATION BY MR. KINNEY:

13    Q. Okay.  Vocational rehabilitation, do you

14       understand what I mean by that?

15    A. Yes.

16         MR. EVANS:

17              Same objection.

18    EXAMINATION BY MR. KINNEY:

19    Q. When a claimant requests rehabilitation

20       benefits, what is Pan Am's process for

21       reviewing and deciding on that claim?

22    A. Generally we would find out what type of

23       occupational vocational rehabilitation and

24       into what field for future employment the

25       insured would want to take on.

26

1    Q. Anything else?

2    A. We generally ask them for some type of

3        action plan that would describe what the

4        course of study would be, how long it would

5        take, how they expect this to accomplish

6        their goal of returning to work.

7    Q. Okay.  Anything else in terms of

8        information you would request?

9    A. No.

10   Q. Okay.  And what criteria would you use to

11       decide whether or not to provide the

12       rehabilitation benefits?

13   A. If it was -- If it would result in an

14       occupation whereas the insured or claimant

15       would be able to return to normal full-time

16       work.

17   Q. That's the only criteria?

18   A. We would also -- Once they returned to such

19       normal full-time work, we would expect the

20       claim to end at that point.

21   Q. Anything else that would be a criterion in

22       determining whether or not to grant the

23       rehabilitation benefits?

24   A. Not to my knowledge.

25   Q. Okay.  The two other rehabilitation claims

26

1          that you recall as you sit here today, do

2          you recall what criteria they failed to

3          meet?

4     A. They failed to meet -- to provide us with

5          a -- you know, an action plan or even an

6          occupation in which they wished to

7          endeavor.

8     Q. One of these claims you recall fairly

9          clearly.  Is that right?

10    A. Correct.

11    Q. Let's talk about that one just for a

12         minute.

13             In that claim, the claimant -- Well,

14         what did the claimant ask for?

15    A. The claimant asked for some type of voice

16         to speech software and, you know, training

17         on that software.  You know, on that

18         software or those types of systems.

19    Q. Do you recall what his disability was?

20    A. Quadriplegic.

21    Q. Okay.  And do you know what occupation he

22         hoped to pursue with that?

23    A. There was no occupation.

24    Q. Okay.  Did Pan Am do any study to determine

25         whether he could perform an occupation if

26

1    he had the voice to speech software?

2  A. No.

3  Q. Okay.  So you relied entirely upon him to

4     tell you what occupation?

5  A. The person didn't provide an occupation.

6        They wanted this rehabilitation really

7     to enhance their day-to-day -- or it was

8     actually a her.  Her day-to-day living.

9  Q. The other claim that you recall, but not as

10     clearly --

11  A. Uh-huh (affirmative response).

12  Q. -- do you recall why -- Strike that.

13        Do you recall what criteria that

14     claimant failed to meet for rehabilitation

15     benefits?

16  A. I think -- No.  I don't recall what

17     criteria they failed to meet on that one.

18  Q. Okay.  Do you recall what rehabilitation

19     they requested?

20  A. They requested I believe some training,

21     education, or schooling to become a real

22     estate agent.

23  Q. Do you recall what the disability was?

24  A. I don't.

25  Q. Do you recall why Pan Am declined to

26

```
1          provide that rehabilitation?

2     A. I don't.

3     Q. Do you recall what the claimant had done

4          prior to that?

5     A. No.

6     Q. Does Pan American Life Insurance Company

7          utilize a claims manual in connection with

8          disability claims?

9     A. We do not.

10    Q. Okay.  Well, I requested and counsel

11         provided me with a document which I would

12         like to talk to you about.

13    A. Uh-huh (affirmative response).

14    Q. Here's one for you.

15              We will mark that as the next exhibit,

16         which would be Exhibit #2, for the purposes

17         of this deposition.

18              And I show you this document,

19         Mr. Simon, and ask you if you can identify

20         it?

21              (Exhibit #2 was marked for

22                  identification.)

23    A. I can.

24    Q. What is it?

25    A. This is a reference guide that we utilize

26
```

1       from one of our reinsurers.

2   Q. What do you utilize it for?

3   A. General reference.

4   Q. Other than this document, Exhibit #2, is

5       there any other written material that

6       claims personnel use in deciding whether to

7       provide disability benefits?

8   A. Only the policy.

9   Q. Only the policy?

10  A. Correct.

11  Q. How long has Pan American Life Insurance

12      Company been using Exhibit #2 as a

13      reference guide?

14  A. I would say within the last two or three

15      years.

16  Q. Okay.  Was it using this reference guide as

17      of December of 2005?

18  A. I can't be sure.

19  Q. Okay.  Since you have been at Pan American

20      Life Insurance Company, other than

21      Exhibit #2, has Pan American Life Insurance

22      Company used any written documents as a

23      reference guide for disability claims other

24      than Exhibit #2?

25  A. We have some documents of general

26

```
 1      knowledge.

 2   Q. Could you describe those documents?

 3   A. Generally they are documents which I

 4      acquire from industry conferences,

 5      specifically to trends within the industry.

 6   Q. Do any of those documents provide guidance

 7      for claims personnel in determining whether

 8      to grant benefits under a disability

 9      policy?

10   A. No.

11   Q. So then since you have been at Pan Am, the

12      only document in writing that provides

13      guidance for claims decisions on disability

14      policies is Exhibit #2.

15         Is that right?

16      MR. EVANS:

17            Objection.  Misstates his

18         testimony.

19   EXAMINATION BY MR. KINNEY:

20   Q. You can answer.

21   A. It's okay to answer?

22      MR. EVANS:

23            Yeah.

24            I'm just objecting for the record.

25         Unless I instruct you not to answer,

26
```

1              you should go ahead and answer.

2         THE WITNESS:

3              Okay.  I'm sorry.  I just wanted

4         to make sure.

5              Would you repeat the question?

6    EXAMINATION BY MR. KINNEY:

7    Q. Could you read the question back, please?

8         (The requested testimony was read back

9         as follows:

10             Q.   So then since you have been

11        at Pan Am, the only document in

12        writing that provides guidance for

13        claims decisions on disability

14        policies is Exhibit #2.

15             Is that right?)

16        THE WITNESS:

17             That's correct.

18   EXAMINATION BY MR. KINNEY:

19   Q. Do the claims personnel who work in your

20        department in the disability area have

21        access to Exhibit #2?

22   A. Yes.

23   Q. Okay.  Do they each have a copy of

24        Exhibit #2?

25   A. They do.

26

```
 1    Q. Okay.  Have you personally read Exhibit #2?

 2    A. Not from cover to cover.

 3    Q. You have read parts of it?

 4    A. I have read -- I have read the sections in

 5       which I needed to seek reference.

 6    Q. Do you keep a copy of this Exhibit #2 at

 7       your desk?

 8    A. I keep an electronic copy of it on my

 9       desktop.  Right.

10    Q. Okay.  The other claims reps -- Strike

11       that.

12          The claims representatives who work for

13       you in disability, is their copy also

14       electronic?

15    A. They have a -- We all have a hard copy or

16       an electronic copy.  It's a matter of

17       preference.

18    Q. Okay.  I see that this document was

19       prepared by somebody called Munich Re

20       Group.

21    A. Correct.

22    Q. Do you know who that is?

23    A. Yes.

24    Q. Who?

25    A. They are -- They are a reinsurance company.

26
```

```
 1       They are also one of our reinsurers.

 2   Q. Do you know what markets Munich Re

 3       occupies?

 4   A. Life and health and property and casualty.

 5   Q. Okay.  And how about geographically where

 6       do they reinsure?

 7          Do you know?

 8   A. Worldwide.

 9   Q. Okay.  And does Munich Re reinsure some Pan

10       American policies?

11   A. They do.

12   Q. Do they reinsure Pan American disability

13       policies?

14   A. They do.

15   Q. The policies that we are going to talk

16       about in a little bit, the Mathews

17       policies, do they reinsure those policies?

18   A. They do not.

19   Q. Okay.  Do you know if anyone reinsures

20       those policies?

21   A. They are not reinsured.

22   Q. Does Munich Re perform any services for Pan

23       American Life Insurance Company?

24   A. Can you expand on that?

25   Q. Well, I will tell you why I asked that.  It

26
```

1      is because somewhere in this Exhibit #2,

2      Munich Re says we will be happy to help you

3      out with any of your claims or anything

4      like that if we can help you.

5        So I'm just curious as to whether or

6      not Munich Re does something for Pan

7      American Life Insurance Company other than

8      just be a traditional reinsurer?

9  A. They will provide advisement services if

10     requested.

11  Q. Okay.  Since you have been at Pan American

12     Life Insurance Company, has Pan American

13     requested any advisement services from

14     Munich Re regarding disability claims?

15  A. I couldn't say specifically from Munich.

16  Q. Okay.  Has it requested services as to

17     disability policies from any reinsurer?

18  A. We have.

19  Q. Okay.  What sorts of services?

20  A. Generally services or recommendations for

21     further outside either investigations or

22     vendors or things of that nature.

23  Q. Okay.  Do you know whether any such

24     services were requested from any reinsurer

25     as to the Mathews claims?

26

 1    A. No.

 2    Q. No, you don't?

 3    A. I don't know.

 4    Q. Okay.

 5    A. I'm sorry.

 6          From the reinsurer?

 7    Q. Yes.

 8    A. No, not from the reinsurer.

 9    Q. From any reinsurer?

10    A. No.

11    Q. Okay.

12    A. I don't know.  My answer is I don't know if

13       we requested.

14          I'm sorry.

15    Q. That's fine.

16          You know, you're right.  We need to get

17       the testimony clear.  So thank you for

18       cleaning that up.

19          Who at Pan American decided to use

20       Exhibit #2 as a reference guide?

21    A. This was given to us by the reinsurer as a

22       reference guide.  So ultimately it was my

23       decision that this could be helpful.

24    Q. Okay.  And before making that decision,

25       you, I take it, read over --

26

1    A. I did.

2    Q. -- the pertinent portions of this?

3    A. I did.  I did.

4    Q. Okay.  And you agreed with the statements

5        that were made in here.  Is that right?

6    A. I agreed that --

7        MR. EVANS:

8            Objection.  Calls for speculation.

9        He testified he hasn't read the whole

10       thing.

11   EXAMINATION BY MR. KINNEY:

12   Q. You may answer.

13   A. I agree that there were portions within

14       this document that were relatable to our

15       policy.

16   Q. Okay.  Did you -- Strike that.

17       At any time since you first saw

18       Exhibit #2, have you seen anything in

19       Exhibit #2 that you thought was wrong?

20   A. Not as it relates to our policy.

21   Q. You thought that it was wrong about

22       something else?

23   A. I couldn't say if it was wrong about

24       something else.  I can only speak to our

25       policy.

26

1    Q. Okay.  When you -- Strike that.

2        You personally distributed this to the

3    disability claims personnel.

4        Is that right?

5    A. That's correct.

6    Q. And when you did, did you tell them why you

7    were giving it to them?

8    A. I did.

9    Q. What did you tell them?

10   A. I told them to use this as general

11   reference.

12   Q. Okay.  Did you tell them it was good?

13   A. I told them that I thought it had parts

14   that were relevant to our lines of

15   business.

16   Q. Okay.  Did you specifically direct them to

17   specific parts of Exhibit #2 that you

18   thought were relevant?

19   A. No.

20   Q. Since you first distributed Exhibit #2 to

21   the claims representatives, have any of the

22   disability claims representatives who work

23   for you asked you any questions about

24   Exhibit #2?

25   A. Not to my knowledge.

26

1    Q. Have any of the disability claims

2       representatives said anything to you at all

3       about Exhibit #2?

4    A. Nothing other than when I initially

5       distributed it.

6    Q. Do you know whether Mr. Jones has read

7       Exhibit #2?

8    A. I couldn't answer for Mr. Jones.

9    Q. Okay.  Did you instruct him to read it when

10      you gave it to him?

11   A. No.

12   Q. Okay.  And for Ms. Bourg, do you know

13      whether Ms. Bourg has read Exhibit #2?

14   A. I don't believe Ms. Bourg received a copy

15      of this.

16          And if I said that the claims

17      personnel -- We have a distinction between

18      claims personnel, the people who actually

19      adjudicate claims, and support staff.

20          So support staff would not have

21      received this.

22   Q. Okay.  Well, I probably should go back and

23      clean up that whole area.

24   A. Okay.

25   Q. Ms. Bourg, do you classify her as claims

26

1       personnel or support staff?

2   A. Support staff.

3   Q. Okay.  And Mr. Jones?

4   A. He is claims personnel.

5   Q. Okay.  So of the 132 to 135 disability

6       claims per month that are processed at Pan

7       American, all of those are processed by

8       Mr. Jones.

9          Is that right?

10  A. They are all evaluated by Mr. Jones.

11  Q. With the assistance of support staff.  Is

12      that right?

13  A. Through the paperwork aspect, as I

14      indicated sending forms, receiving forms,

15      tracking medical records, processing

16      payments.

17  Q. Okay.  Well, I am just trying to get a

18      clear picture.

19        I understood from your earlier

20      testimony there were two people in the

21      disability claims area.

22  A. That's correct.

23  Q. And at one time those two people were

24      Mr. Jones and Ms. Bourg?

25  A. That's correct.

26

1    Q. Okay.  Now I understand Ms. Bourg is all

2       support.

3            Is that right?

4    A. Ms. Bourg is all support, that's correct.

5    Q. And Mr. Jones is everything else.

6            Is that right?

7    A. That's correct.

8    Q. Okay.  So all of the 132 to 135 claims are

9       decided upon by Mr. Jones.

10           Is that right?

11   A. That's correct.

12          THE VIDEOGRAPHER:

13               Excuse me, Counsel.  I need to

14            change tapes.

15          MR. KINNEY:

16               Certainly.

17          THE VIDEOGRAPHER:

18               Okay.  We are going off the

19            record.  It's 11:05.  This is the end

20            of videotape number one.

21          (Off the record.)

22          THE VIDEOGRAPHER:

23               We're back on the record.  This is

24            the beginning of videotape number

25            two.  It's 11:07.

26

```
1    EXAMINATION BY MR. KINNEY:

2    Q. Back on the record, Mr. Simon.

3         I would like for you to turn to the

4       page that's Bates stamp PAL 1049 of the

5       Exhibit #2.

6    A. Okay.

7    Q. Okay.  And the second paragraph from the

8       bottom.

9    A. Okay.

10   Q. Do you see that?

11   A. Uh-huh (affirmative response).

12   Q. The last sentence says in extreme

13      situations they may want to investigate the

14      veracity of the claimant's statements or

15      subject of the claimant --

16   A. I don't have -- I'm sorry.  I don't have

17      that on my page.

18   Q. Yes, you do.  The second-to-last paragraph,

19      the last sentence.

20   A. Oh, the last sentence.  Okay.

21         I'm sorry.  Go ahead.

22   Q. In extreme situations they may want to

23      investigate the veracity of the claimant's

24      statements or subject the claimant to an

25      independent medical examination.

26
```

1              Do you see that?

2    A. I do.

3    Q. Okay.  Is that Pan American's policy?

4    A. Yes.

5    Q. That you only require independent medical

6       examinations in extreme situations?

7           MR. EVANS:

8               Objection.  Misstates the

9               testimony and the document.

10   EXAMINATION BY MR. KINNEY:

11   Q. You can answer.

12   A. Not only in extreme situations.

13   Q. Okay.  It's more common?

14   A. It's more often than not.

15   Q. Okay.  So you have -- So Pan American

16      doesn't follow this particular guideline

17      from the Munich Re manual.

18          Is that right?

19          MR. EVANS:

20              Objection.  This is one sentence

21              out of a three-page section.  I can't

22              say that that's an accurate -- I

23              believe it misstates the document.

24   EXAMINATION BY MR. KINNEY:

25   Q. You can answer.

26

1    A. We do not follow the verbiage extreme.

2    Q. Why not?

3    A. We do it for a good majority of our

4       claimants to get a full objective

5       evaluation of their disability.

6    Q. So more than half of the claimants you send

7       to an independent medical examiner?

8    A. I would say --

9          MR. EVANS:

10             Can I object?

11             I didn't hear the end of your

12          question.

13          MR. KINNEY:

14             Let me just say it again.

15   EXAMINATION BY MR. KINNEY:

16   Q. I thought I just heard you say a full

17      majority, and so I --

18   A. A good majority, correct.

19          MR. EVANS:

20             Well, can we back up?

21             I want to hear the end of your

22          question, because I didn't hear what

23          you are asking.

24   EXAMINATION BY MR. KINNEY:

25   Q. Okay.  So my question is do more -- Does

26

1       Pan American require more than 50 percent

2       of disability claimants to go to an

3       independent medical examination?

4   A. We require I would say either an

5       independent medical examination or some

6       type of functional capacity testing, you

7       know, synonymous outside testing or

8       evaluation.

9   Q. For more than half of the claimants?

10  A. I would say yes, that's accurate.

11  Q. Okay.  Do you know whether Ms. Mathews was

12      sent to an independent medical examination?

13  A. She was.

14  Q. Okay.  Do you know who decided to send her

15      to an independent medical examination?

16  A. It was through advisement.  So I would say

17      I made the ultimate decision.

18  Q. So did Mr. Jones come to you with a

19      question about that?

20  A. Any use of outside vendors other than our

21      medical director needs to be approved by

22      me.

23  Q. So the answer to my question was no, he did

24      not come to you?

25  A. He did come to me.

26

```
 1   Q. Did he have a special question about using

 2      an independent medical examination in this

 3      case?

 4   A. He had some information -- He expressed

 5      some information to me that he thought it

 6      would be helpful in evaluating this case.

 7   Q. Okay.  Now, do you recall what he told you

 8      about that?

 9   A. I don't recall exactly what he told me

10      about that.

11   Q. In general?

12   A. Generally that we could not objectively

13      confirm or deny the existence of disability

14      in this person.

15   Q. Did you review any documents to determine

16      whether Mr. Jones was right on that

17      subject?

18   A. I did.

19   Q. Do you recall what you reviewed?

20   A. I do not.

21   Q. Did you form an opinion as to whether or

22      not an independent medical examination was

23      appropriate in this case?

24   A. I did.

25   Q. And what opinion was that?

26
```

1   A. That it was appropriate.

2   Q. Okay.  Do you recall why you formed that

3      opinion?

4   A. Because we could not confirm or deny

5      whether she was disabled.

6   Q. Okay.  Once Pan American decides to send a

7      disability claimant to an independent

8      medical examination, how does it decide

9      what doctor to use?

10  A. We will generally get a reference from our

11     medical director.  That is the most likely

12     scenario.

13  Q. Do you know if that was done in the Mathews

14     case?

15  A. I can't confirm or deny.  I can't.

16  Q. Okay.

17  A. That's the most likely outcome.

18  Q. Are there any criteria that you use for

19     where an independent medical examination

20     will take place?

21  A. Well, we try to make it within, you know, a

22     geographic area.

23  Q. Okay.

24  A. Within the same state.

25  Q. All right.  Well, of course, we are out in

26

1        California.

2    A. Right.

3    Q. Pretty big state.

4        So I just wonder is there a mileage

5        distance that you try to keep within?

6    A. You know, I -- You know, we don't know the

7        geographics of some of the areas.  We

8        believe we take the closest person that we

9        think will, you know, perform the

10       services -- the best services, you know,

11       that they can provide.

12   Q. Okay.  I would like you to turn to the next

13       page of this Munich Re document,

14       Exhibit #2, 1050.

15   A. Okay.

16   Q. The very first complete sentence on the top

17       of the page.

18   A. Okay.

19   Q. Usually claims professionals will be

20       satisfied that the claimant is disabled

21       within the meaning of the policy wording

22       and will approve benefits.  On rare

23       occasions they will believe that reasonable

24       grounds exist to resist the claim.

25       Do you see that?

26

1    A. I do.

2    Q. Okay.  Does that reflect your experience at

3       Pan American?

4    A. It does.

5    Q. That only rarely do you resist the claim.

6          Is that right?

7    A. We pay substantially more claims than we

8       resist.

9    Q. Okay.  Approximately what percentage of

10      claims do you resist in disability?

11   A. One to two percent.

12   Q. I would like for you to turn to the

13      section at Bates stamp PAL 1056.

14   A. Okay.  I am there.

15   Q. There's a section at the bottom half of the

16      page called Investigations and

17      Surveillance.

18          Do you see that?

19   A. Correct.  I do see that.

20   Q. Okay.  Before I go through that, let me

21      just ask you.

22          Under what circumstances does Pan

23      American place a disability claimant under

24      surveillance?

25   A. When we cannot confirm or deny disability.

26

```
 1   Q. Okay.  So every time that you can't confirm
 2      or deny disability?
 3   A. We use it as one of our investigative
 4      tools.
 5   Q. In what percentage of cases do you utilize
 6      surveillance?
 7   A. About ten percent.
 8   Q. Okay.  And is it correct to say that in
 9      those ten percent of cases, all of those
10      ten percent also have an independent
11      medical examination?
12   A. I cannot -- I can't confirm that.
13   Q. Okay.  Well, I would like for you to go to
14      the very last full sentence on the page
15      that you're looking at, PAL 1056.
16   A. Okay.
17   Q. In extreme cases claimants may be placed
18      under surveillance for several days and
19      their movements recorded.
20         Do you see that?
21   A. I do.
22   Q. Okay.  Is that Pan American's policy, that
23      surveillance of that sort is only used in
24      extreme cases?
25   A. It's not.
26
```

```
 1   Q. Do you know whether Ms. Mathews was placed
 2      under surveillance?
 3   A. She was.
 4   Q. Who decided to do that?
 5   A. Again, any use of outside vendors, the
 6      decision is ultimately mine.
 7   Q. Okay.  So how did it come to your attention
 8      that you might use outside surveillance in
 9      this case?
10          Did Mr. Jones bring that up?
11   A. It was through Mr. Jones' recommendation.
12   Q. Okay.  What did he say when he recommended
13      surveillance?
14   A. He thought it would be helpful in
15      determining whether the disability exists
16      or not.
17   Q. Okay.  Do you know what Ms. Mathews'
18      disability is?
19   A. Some type of back and neck pain.
20   Q. Okay.  What -- Well, Strike that.
21          Did you actually have anything to do
22      with hiring a private investigator to put
23      her under surveillance?
24   A. No.
25   Q. Who did that?
26
```

1    A. Mr. Jones.

2    Q. When you approved the surveillance request,

3       how long did you approve the surveillance

4       for?

5    A. I don't recall if it was for a specific

6       length of time.

7    Q. And it was your understanding that the

8       surveillance might show that Ms. Mathews

9       was not disabled.

10          Is that right?

11   A. That's correct.

12   Q. Okay.  And what would you anticipate a

13      private investigator might find that would

14      show a claimant with Ms. Mathews'

15      disabilities was not disabled?

16          MR. EVANS:

17             Objection.  Calls for speculation,

18          and assumes facts not in evidence.

19   EXAMINATION BY MR. KINNEY:

20   Q. You can answer.

21   A. I would expect that they would find -- I'm

22      sorry.

23          Repeat the question.

24   Q. Well, my question is this.

25          You authorized a private investigator

26

1          to put Ms. Mathews under surveillance --

2     A. Right.

3     Q. -- because you thought he might find that

4          she was not disabled.

5             Correct?

6     A. Right.

7     Q. Okay.  What would you expect -- What thing

8          might he come back with which would show

9          she wasn't disabled?

10    A. Normal day-to-day activities.

11    Q. Like what?

12    A. Driving, walking, carrying objects, lifting

13         objects, bending, turning.  Just general

14         day-to-day functions.

15    Q. Okay.  Did you understand that Ms. Mathews

16         was disabled from driving?

17    A. I did not.  I don't know if she was

18         disabled from driving.

19             From the video?

20    Q. No.

21             From when you authorized the video.

22    A. No.

23    Q. You didn't know, or you thought she was not

24         disabled from driving?

25    A. I did not know if she was disabled or not

26

```
 1        from driving.
 2    Q.  Well, did you make an analysis of that in
 3        determining whether or not to send out a
 4        private investigator?
 5    A.  That was determined on Mr. Jones'
 6        recommendation so --
 7    Q.  Okay.
 8    A.  We did not believe that she would have been
 9        disabled from driving.
10    Q.  Okay.  Well, I guess my question is in Ms.
11        Mathews' case --
12    A.  Uh-huh (affirmative response).
13    Q.  -- what activity that could be seen by a
14        private investigator would demonstrate that
15        she was not disabled?
16    A.  Those that would be involved in bending,
17        twisting, lifting.  Those types of
18        activities.
19    Q.  Okay.  Is there a particular point in the
20        disability claim process where Pan American
21        typically sends out a private investigator
22        for surveillance?
23    A.  Generally if we cannot confirm or deny
24        disability.  So --
25    Q.  So what -- Let me ask you this.
26
```

```
 1            Would you typically send a claimant to

 2        an independent medical examination first

 3        before sending out a private investigator?

 4    A. Generally.

 5    Q. Have you ever sent a private investigator

 6        out for surveillance of a claimant before

 7        you sent the claimant to an independent

 8        medical examination?

 9    A. I couldn't confirm that.

10    Q. Have you ever sent a claimant to an

11        independent medical examination and sent

12        out a private investigator at the same

13        time?

14    A. We have.

15    Q. Why would you do that?

16    A. We would observe the actions to and from

17        the doctor's office.

18    Q. Have you done that in cases other than Ms.

19        Mathews?

20    A. We have.

21    Q. Have you ever seen a case of that sort

22        where the private investigator has provided

23        information that showed that the claimant

24        was not disabled?

25    A. Well, the private investigator --

26
```

1          MR. EVANS:

2                Objection.

3                Just to clarify, this is strictly

4          as to Pan American claims?

5     EXAMINATION BY MR. KINNEY:

6     Q. Yeah, I'm asking about as to Pan American.

7                You testified that there are occasions

8          where you send a private investigator out

9          to watch the claimant go to the doctor.

10               Is that right?

11    A. We send an investigator out to monitor

12         their -- them just prior to going to the

13         doctor, yes.

14    Q. Okay.  Do you actually have the private

15         investigator watch the claimant drive to

16         the doctor's office?

17    A. That I can't confirm or deny.

18    Q. Okay.  Can you think of -- I mean is there

19         a reason why Pan American would send a

20         private investigator to watch a claimant

21         drive to the doctor's office?

22    A. Well, generally to confirm -- to confirm

23         surveillance findings with what the doctor

24         may find strictly as a, you know, strictly

25         as an objective comparison.

26

1    Q. I see.

2        All right.  I would like for you to go

3       back in Exhibit #2 to page PAL 1052.

4    A. All right.

5    Q. Are you there?

6    A. Uh-huh (affirmative response).

7    Q. And there's a section about -- it's about

8       halfway down called Independent Medical

9       Examinations.

10   A. I'm there.

11   Q. Okay.  The second paragraph --

12   A. Okay.

13   Q. -- if you go to the second sentence, which

14      is referring to independent medical

15      examinations, it says, this tool is

16      normally used when some doubt exists about

17      the severity of the restrictions and

18      limitations being reported.

19        Do you see that?

20   A. I do.

21   Q. Okay.  Is that when Pan American uses an

22      independent medical examination?

23   A. Yes, that's a correct statement.

24   Q. Okay.  And in the Mathews case, was there

25      some doubt about the severity of the

26

1    restrictions and limitations being

2    reported?

3  A. There was not sufficient evidence to

4    confirm that she was disabled.

5  Q. How do you know that?

6  A. I have read through some of the file.  I'm

7    familiar with certain aspects of the file.

8  Q. Okay.  Prior to the independent medical

9    examination, had Pan American obtained

10    documents from Ms. Mathews' treating

11    physicians?

12  A. We did.

13  Q. Okay.  And was there something in those

14    documents that led Pan American to believe

15    that there was doubt about the severity of

16    restrictions and limitations being

17    reported?

18  A. Those documents, along with other medical

19    records, were sent to our medical director

20    for review.

21  Q. Okay.  And did you receive a review from

22    your medical director?

23  A. We did.

24  Q. Was it in writing?

25  A. It was.

26

1     Q. And what did it conclude?

2     A. It concluded that there was no objective

3        findings that her state of disability could

4        preclude her from performing her normal

5        work -- work duties.

6     Q. Okay.  Is that writing in the claim file?

7     A. It is.

8     Q. Who's the doctor, the medical director?

9     A. Dr. Nudelman.

10    Q. Oh.

11        How long was it from the time you

12       received Dr. Nudelman's report until the

13       time that Pan American decided to send the

14       claimant to an independent medical

15       examination?

16    A. I don't know the time frame.

17    Q. Okay.  How long would it typically be in a

18       situation where Dr. Nudelman says there's

19       no objective evidence?

20    A. I would say possibly 30 to 90 days.

21    Q. Okay.  And during that 30 to 90-day period,

22       does Pan Am pay benefits typically to the

23       claimant?

24    A. In some cases.

25    Q. Okay.  Let's go to page 1053.

26

1   A. Okay.

2   Q. At the bottom of the page there's a section

3       on rehabilitation.

4           Do you see that?

5   A. Yes.

6   Q. Have you read that section on

7       rehabilitation?

8   A. I have.

9   Q. Okay.  Does the section on rehabilitation

10      in general reflect Pan American's practices

11      as to rehabilitation benefits under the

12      disability policies involved in the Mathews

13      case?

14  A. Some portions.

15  Q. What portions reflect Pan American's

16      policies?

17  A. That the idea is to return the claimant to

18      a place of normal employment and

19      effectively be able to end our claim.

20  Q. Okay.  Go to the last sentence on page

21      1053.

22  A. Okay.

23  Q. Since the claimant is not normally

24      obligated to participate in rehabilitation

25      programs, most insurers consider motivation

26

1      as a prime factor in selecting candidates.

2         Do you see that?

3  A. Yes.

4  Q. Does that reflect Pan American's practices?

5  A. It does not.

6  Q. It does not?

7  A. No.

8  Q. Motivation is not a prime factor then in

9      Pan American's view.

10       Is that right?

11  A. We do not actively pursue claimants to

12      become rehabilitated.

13  Q. Is it your understanding that that sentence

14      refers to situations in which insurance

15      companies are actively pursuing claimants

16      to be rehabilitated?

17  A. There are some insurance companies that do.

18  Q. And that -- This sentence is written for

19      them, and not for a company like Pan

20      American.

21       Is that right?

22  A. This is general -- general application of

23      the -- of rehabilitation.

24  Q. Okay.  But you don't utilize it at Pan

25      American, that particular sentence?

26

```
 1    A. No.

 2    Q. Okay.  Let's go to the next sentence at the

 3       top of the next page.

 4    A. Okay.

 5    Q. A goal of any responsible disability

 6       insurer will be to minimize total liability

 7       while providing equitable treatment to its

 8       claimants.

 9    A. Uh-huh (affirmative response).

10    Q. Is that a goal of Pan American Life

11       Insurance Company?

12    A. Yes.

13    Q. Is it a goal of Pan American Life Insurance

14       Company when it decides whether to utilize

15       rehabilitation?

16    A. Yes.

17    Q. Okay.  So one of the factors that you

18       utilize in deciding whether or not to

19       provide rehabilitation benefits is whether

20       it will minimize Pan Am's total liability.

21          Is that right?

22    A. It -- I can't say for sure.  I mean the

23       object is to have the person return to work

24       and discontinue the claim.

25    Q. Okay.

26
```

```
1    A. It may or may not limit our liability.

2    Q. Okay.  But if having the person return to

3       work does not discontinue the claim, you

4       don't do it.  Right?

5    A. The objective is that the person -- We

6       don't -- we don't -- we don't determine it

7       as a win win situation.

8    Q. And you don't authorize the rehabilitation

9       benefits.  Is that right?

10   A. That's a correct statement.

11   Q. Okay.  Did you review Ms. Mathews' claim

12      for rehabilitation benefits prior to the

13      time that Pan American denied that claim?

14   A. No.

15   Q. Okay.  Have you reviewed that claim since?

16   A. Some aspects of it.

17   Q. Okay.  What aspects have you reviewed?

18   A. The general claim file.

19   Q. Okay.  Have you formed a personal opinion

20      as to whether or not the claim for

21      rehabilitation benefits was correctly

22      denied?

23   A. No.

24   Q. You don't know one way or another?

25   A. I haven't formed a personal opinion.  I

26
```

1        have formed an objective opinion.

2     Q. Okay.  Well, what is your opinion?

3     A. My opinion is that the occupation in which

4        she wished to endeavor would not ultimately

5        be a suitable occupation based on her

6        restrictions.

7     Q. What occupation did she wish to endeavor?

8     A. Nursing.

9     Q. And why would it not be suitable?

10    A. Nursing generally requires physical

11       portions of that job when it comes to, you

12       know, specifically patients.  Moving

13       patients, lifting patients, administering

14       care to patients.

15    Q. And you're not aware of any nursing jobs

16       that don't require those manual skills?

17    A. I believe she specifically stated RN.  I

18       can't be sure.

19          But I would say I don't know of any

20       nursing occupations that don't -- do not

21       require -- that would not require some type

22       of physical abilities.

23    Q. Okay.  Have you made any investigation into

24       that particular subject, the physical

25       requirements of a nursing occupation?

26

```
1    A. We have not.

2    Q. Okay.  Have you looked at any sources of

3       information on that subject, such as the

4       Dictionary of Occupational Titles?

5    A. I have not.

6    Q. In your experience as a disability claims

7       representative and claims manager, have you

8       dealt with nurses who were disabled?

9    A. I have.

10   Q. Okay.  And in the course of doing that

11      work, have you had the obligation to look

12      at the occupational duties of nurses?

13   A. I have.

14   Q. Okay.  And do you know what a nurse does?

15   A. Well, a nurse specifically assists doctors

16      in caring for patients.

17   Q. Okay.  But do you know what manual --

18      physical requirements there are to be a

19      registered nurse?

20   A. Not specifically.

21   Q. Okay.  Do you know why Mr. Jones denied Ms.

22      Mathews' claim for rehabilitation benefits?

23   A. I believe he denied it, because when

24      responding to Ms. Mathews' request for

25      rehabilitation, we did not get a clear

26
```

```
 1      answer or plan as to what this

 2      rehabilitation would entail and how it

 3      would expect to return her to normal work

 4      activity in the future.

 5   Q. Okay.  And you have since reviewed the

 6      claim since that determination was made not

 7      to give her the benefit.

 8          Is that right?

 9   A. I have looked at aspects of the file.

10   Q. Okay.  And do you believe that Mr. Jones

11      was correct to deny the claim on that

12      basis?

13   A. I do.

14   Q. What additional information should Ms.

15      Mathews have provided to Pan American such

16      that Pan American would have had sufficient

17      information to grant the claim?

18   A. We would have been able to make --

19          MR. EVANS:

20              I'm sorry.

21              Objection.  Calls for speculation.

22              Go ahead.

23          THE WITNESS:

24              We would have been able to make,

25          you know, a determination or review

26
```

```
 1              if we had known which school she was

 2              planning to attend, how many course

 3              hours she was planning to take, the

 4              number of courses, the cost of -- you

 5              know, of these courses, and her, you

 6              know, pretty much, you know,

 7              prognosis for going ahead and, you

 8              know, completing such course work.

 9      EXAMINATION BY MR. KINNEY:

10      Q. Okay.  Did Pan American ask Ms. Jones to

11         provide that information?

12      A. We did.

13      Q. When?

14      A. After she made her request for the

15         rehabilitation benefit.

16      Q. Okay.  Did she provide it?

17      A. She replied with not much information.

18      Q. Okay.  Did Pan American explain to her what

19         additional information would be needed?

20      A. I don't recall.  I think that was asked in

21         the original letter.

22      Q. Okay.  Does Pan American have a duty to its

23         claimants to tell them what information is

24         needed to perfect their claim?

25              MR. EVANS:

26
```

```
1                    Objection.  Objection.  Calls

2                    for -- He's not a lawyer.  Calls for

3                    a legal conclusion.

4      EXAMINATION BY MR. KINNEY:

5      Q. You can answer.

6      A. I would say that was outlined in our

7         original letter.

8      Q. Okay.  Did Pan American make any effort to

9         your knowledge to find out the information

10        on its own?

11     A. Not to my knowledge.

12     Q. Okay.  To your knowledge does Pan American

13        have any duty to its claimants for

14        disability benefits to make an independent

15        investigation as to their

16        disability -- their rehabilitation

17        application?

18         MR. EVANS:

19                    Objection.  Vague and ambiguous,

20                    and also calls for a legal

21                    conclusion.

22     EXAMINATION BY MR. KINNEY:

23     Q. You can answer.

24     A. I think the claimant was given sufficient

25        opportunity based on our original letter to

26
```

1      provide the information that we requested.

2   Q. Okay.  Well, that's not my question.

3      My question is does Pan American have

4      any obligation to make an independent

5      investigation beyond what the claimant

6      provides?

7      MR. EVANS:

8          Objection.  Misleading, misstates

9          the law, calls for legal conclusion,

10         and vague and ambiguous.

11  EXAMINATION BY MR. KINNEY:

12  Q. You can answer.

13  A. I don't know.

14  Q. Do you know what a certified rehabilitation

15     specialist is?

16  A. No.

17  Q. So Pan Am has never used a certified

18     rehabilitation specialist to your

19     knowledge?

20  A. That's correct.  We have never used one.

21  Q. Okay.  Let's go to page 1073 of this

22     document.

23     This is a section called Claims

24     Disputes, and I am directing your attention

25     to the second paragraph of this document,

26

1     the second sentence.

2         Most major disability insurers have

3     established elaborate internal procedures

4     to review unfavorable adjudication

5     decisions before they are communicated to

6     the claimant.

7         Do you see that?

8     A. I do.

9     Q. Okay.  Does Pan American Life Insurance

10    Company have elaborate internal procedures

11    regarding unfavorable decisions on

12    rehabilitation benefit claims?

13       MR. EVANS:

14          Objection.  Vague, calls for

15        speculation.

16       THE WITNESS:

17          We have legal department review

18         when our findings are that we should

19         make an adverse decision.

20    EXAMINATION BY MR. KINNEY:

21    Q. Okay.  And is that review performed before

22    the adverse decision is communicated to the

23    insured?

24    A. Yes.

25    Q. And is that done for rehabilitation

26

1       benefits?

2   A. It's done for all adverse decisions.

3   Q. Okay.  Was it done in the Mathews case?

4   A. It was.

5   Q. Do you know when that was performed?

6   A. I don't recall.

7   Q. Okay.  And what exactly was done in terms

8       of that?

9   A. The facts of the case were -- The claim

10      file was reviewed by legal.  They reviewed

11      our policy language.

12          I can't say what else -- what other

13      research that the legal department did, but

14      they concurred --

15      MR. EVANS:

16              At this point I will object to the

17          extent that he is being requested to

18          provide privileged communications

19          with counsel.

20      MR. KINNEY:

21              All right.  I would like to make

22          sure we have got the scope of the

23          objection.

24              You certainly have the right --

25          It's all right with me if you make

26

```
1              that objection, but I want to make

2              sure we have the scope of the

3              objection and it is clear.

4                  Are you advising him not to

5              provide any information about the

6              review by counsel of the Mathews

7              claim?

8         MR. EVANS:

9                  I am not.  But I am instructing

10             him not to answer about specific

11             communications with counsel.

12        MR. KINNEY:

13                 Okay.  Well, I am going to have to

14             keep asking some questions, and you

15             can object and instruct him not to

16             answer.

17        MR. EVANS:

18                 We will do that, and this may be

19             something we resolve after the break,

20             but go ahead.

21        MR. KINNEY:

22                 Okay.

23   EXAMINATION BY MR. KINNEY:

24   Q. Did you personally send the file to the

25      legal department?

26
```

```
 1    A. I did not.

 2    Q. Okay.  Did you tell Mr. Jones to do that?

 3    A. I don't believe that I did.

 4    Q. How do you know it was done?

 5    A. I received either a request from Mr. Jones

 6       to be a part of a meeting with legal on the

 7       claim or from the legal department.  I

 8       can't be sure.

 9    Q. Okay.  And was there a meeting that

10       involved a lawyer?

11    A. From our company, yes.

12    Q. Okay.  When was that meeting held?

13    A. I can't -- I don't know.

14    Q. Is there something in the claim file that

15       would tell you?

16    A. I don't know.

17    Q. Okay.  How long -- Let me ask you this.

18          Were you present at the meeting?

19    A. I was.

20    Q. Okay.  Who else was present?

21    A. Our legal counsel and Judy Norwalt, the

22       vice-president of administration.

23    Q. Okay.  Was that Mr. Fraizer, who is sitting

24       here today?

25    A. I'm sorry?

26
```

1           Oh, was he the attorney for our

2      company?

3   Q. Yes.

4   A. No, it was not.

5   Q. Okay.  Who was it?

6   A. Raymond Munna.

7   Q. Can you spell that?

8   A. M-U-N-N-A.  Raymond.

9   Q. So there was you, Mr. Munna, Mr. Jones.

10          Is that right?

11  A. Correct.

12  Q. And the vice-president you just identified?

13  A. That's correct.

14  Q. Anybody else?

15  A. No.

16  Q. Where was the meeting held?

17  A. In a conference room.

18  Q. Okay.  In the Pan American building across

19      the street here?

20  A. Correct.

21  Q. Okay.  How long did the meeting last?

22  A. Approximately 30 minutes.

23  Q. Okay.  What documents were present at the

24      meeting?

25  A. I don't recall.

26

1    Q. Was Ms. Mathews' request for disability

2       -- I'm sorry.

3          Was Ms. Mathews' request for

4       rehabilitation benefits present?

5    A. I don't recall.

6    Q. Okay.  What did Mr. Jones say at the

7       meeting?

8    A. I don't recall.

9    Q. What did you say at the meeting?

10   A. I don't recall.

11   Q. What did Mr. Munna say at the meeting?

12   A. Mr. Munna concurred with Mr. Jones'

13      assessment that the -- that we should not

14      grant these benefits.

15   Q. Did he say anything else?

16   A. Not to my knowledge.

17   Q. Okay.

18      MR. EVANS:

19          Can I interpose an objection here?

20          I am providing a little leeway.

21      No waiver of the privilege is

22          intended at this point, but it's all

23          I can -- either I can object to every

24          single question or I don't.

25      MR. KINNEY:

26

1             That's up to you.  I mean it is.

2             You know why I'm doing it.  If you

3          want to interpose an objection, go

4          ahead.

5      MR. EVANS:

6          Okay.  Well, I have already.

7         That's fine.  That's fine.

8          I just wanted to make that for the

9          record, and if I have got objections,

10         I will start objecting.

11      MR. KINNEY:

12         Okay.

13   EXAMINATION BY MR. KINNEY:

14   Q. Did Mr. Munna say why he concurred with

15     Mr. Jones' decision?

16      MR. EVANS:

17         At this point I will invoke the

18         privilege, and instruct the witness

19         not to answer.

20      MR. KINNEY:

21         Okay.  Let's go off the record a

22         second.

23      THE VIDEOGRAPHER:

24         We are going off the record.  It

25         is 11:54.  This is videotape number

26

1          two.

2              (Off the record.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

```
1              Deposition of CORY R. SIMON

2                Taken on March 13, 2008

3

4

5              WITNESS' CERTIFICATE

6

7

8      I have read or have had the foregoing

9   testimony read to me and hereby certify that

10   it is a true and correct transcription of my

11   testimony, with the exception of any attached

12   corrections or changes.

13

14

15

16

17

18              CORY R. SIMON

19

20

21

22

23

24

25

26
```

1                    REPORTER'S CERTIFICATE

2

3        I, LINDY ROOT, Certified Court Reporter,

4    do hereby certify that the above-mentioned

5    witness, after having been first duly sworn by

6    me to testify to the truth, did testify as

7    hereinabove set forth;

8        That the testimony was reported by me in

9    shorthand and transcribed under my personal

10   direction and supervision, and is a true and

11   correct transcript, to the best of my ability

12   and understanding;

13       That I am not of counsel, not related to

14   counsel or the parties hereto, and not in any

15   way interested in the outcome of this matter.

16

17

18

19

20

21                    LINDY ROOT

22            CERTIFIED COURT REPORTER

23        REGISTERED PROFESSIONAL REPORTER

24

25