```
 1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
 2
 3      NO. C 07-02757 SBA
 4                   DONNA MATHEWS
 5                      VERSUS
 6      PAN AMERICAN LIFE INSURANCE COMPANY; and
               DOE 1 through Doe 20, Inclusive
 7
 8                     VOLUME 2
 9         Video deposition of CORY SIMON, 601
        Poydras Street, 10th Floor, New Orleans,
10      Louisiana 70130, taken in the offices of
        AFFILIATED REPORTING on Thursday, March
11      13, 2008.
12      APPEARANCES:
               LAW OFFICES OF MICHAEL E. KINNEY
13             Attorney at Law
               BY:  MICHAEL E. KINNEY, ESQUIRE
14             438 First Street, Fourth Floor
               Santa Rosa, California  95401
15                  ATTORNEY FOR PLAINTIFF
16             REED SMITH
               Attorneys at Law
17             BY:  THOMAS A. EVANS, ESQUIRE
               1999 Harrison Street, Suite 2400
18             Oakland, California  94612
                    ATTORNEYS FOR PAN AMERICAN LIFE
19
               VIDEOGRAPHER:  KARL STIEGMAN
20
               ALSO PRESENT:  PATRICK C. FRAIZER
21      REPORTED BY:
22             THERESA MATHERNE
               Certified Court Reporter
23             Registered Professional Reporter
24
25
26
```

```
 1              DONNA MATHEWS VS. PAN AMERICAN LIFE

 2        INSURANCE COMPANY; and DOE 1 through Doe 20,

 3                        Inclusive

 4                        VOLUME 2

 5            Video deposition of CORY SIMON

 6               Taken on March 13, 2008

 7

 8

 9                      EXHIBIT INDEX

10     3.   Disability income policy.

11     4.   Income protection policy.

12     5.   Medical director's form.

13     6.   Letter dated May 3, 2006.

14     7.   Letter from Michael Jones.

15     8.   Document.

16

17

18

19

20

21

22

23

24

25

26
```

```
 1                        INDEX

 2

 3                                    Page    Line

 4    EXHIBIT # 3                      90      7

 5    EXHIBIT # 4                      96      6

 6    EXHIBIT # 5                     128     11

 7    EXHIBIT # 6                     130     12

 8    EXHIBIT # 7                     133     17

 9    EXHIBIT # 8                     134     15

10

11

12    EXAMINATION BY MR. KINNEY        87     18

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

```
1    1         MR. KINNEY:

2    2              We're back on the record after

3    3         lunch.  Let me just say for the

4    4         record, because the court reporter

5    5         had to leave, we changed court

6    6         reports here.  And we closed out the

7    7         initial written transcript as

8    8         Volume 1, as the period that took

9    9         place prior to lunch.  We're now

10   10         starting on Volume 2.

11   11              Mr. Simon, you're still under

12   12         oath, the same oath you took at the

13   13         beginning of the deposition.

14   14         THE WITNESS:

15   15              I understand.

16   16         MR. KINNEY:

17   17              I understand, Mr. Evans, you may

18   18         have came to a conclusion as to your

19   19         attorney-client privilege objection.

20   20         MR. EVANS:

21   21              Yes.  As to any communications

22   22         with in-house counsel regarding the

23   23         claim, any opinions rendered by

24   24         in-house counsel, we are invoking the

25   25         privilege, recognizing that in doing

26
```

1               so we will not be raising the advice

2               of counsel and reliance on that

3               counsel's opinion as a defense in

4               this case.  Is that sufficient?

5       MR. KINNEY:

6               That's sufficient.  So just to

7               make sure I got it clear, you're

8               telling me that I'm not going to be

9               allowed to ask any questions of that

10              meeting we started to go down?

11      MR. EVANS:

12              That's correct.  The fact of the

13              meeting is fine, but we won't discuss

14              either the substance or to any

15              conclusions from it.

16      MR. KINNEY:

17              Okay.

18  EXAMINATION BY MR. KINNEY:

19  Q.  Since December of 2005, has Pan American

20      made any changes in its claim handling

21      process or for claims for rehabilitation

22      benefits?

23  A.  No.

24  Q.  Back at the beginning of the deposition,

25      Mr. Evans advised that you were designated

26

```
 1        as the company's person most knowledgable

 2        on certain subjects.  Among those subjects

 3        was the language, certain language that I

 4        asked about regarding two insurance

 5        policies that are involved in this case.

 6            The first of those policies that I want

 7        to talk about, I guess, is a policy called

 8        "A disability income policy."  Are you

 9        familiar with Pan American Disability

10        Income Policy that's involved in the

11        Mathews case?

12   A.   I am.

13   Q.   There's also a second policy that's called

14        "An income protection policy."  Are you

15        familiar with that policy as well?

16   A.   I am.

17   Q.   In general, in the broadest terms, can you

18        describe the difference between the two

19        policies?

20   A.   Generally, the disability income policy is

21        to pay for courses of disability, whereas

22        income protective policy is specifically

23        designed to pay for losses of income

24        exceeding 20 percent.

25   Q.   Okay.  Is it common for insurers to have

26
```

```
 1        both policies?

 2              MR. EVANS:

 3                    Objection.  Vague.

 4     BY MR. KINNEY:

 5     Q.   If you know.

 6     A.   I have seen other insurers have both

 7          policies.

 8     Q.   Is it your experience handling disability

 9          claims that disability policies, in

10          general, are either own-occupational

11          policies or all-occupational policies?

12     A.   That's correct.

13     Q.   The disability income policy in the

14          Mathews case, do you know whether that's

15          an own-occupation policy are an

16          all-occupation policy?

17     A.   I believe the disability income is

18          all-occupations.

19     Q.   Let's take a look at that policy now.

20     A.   All right.

21     Q.   Let's mark this as Exhibit 3.

22              MR. KINNEY:

23                    By the way, let me inform the

24              court reporter.  What we're doing,

25              because we're gonna have some other

26
```

```
 1                people take depositions in this case,
 2                we're gonna bind the exhibits
 3                separately into a separate binder.
 4                And then we're gonna use the same
 5                exhibit numbers for subsequent
 6                depositions.
 7                     (Exhibit 3, disability income
 8                     policy, was marked for
 9                     identification.)
10     BY MR. KINNEY:
11     Q.  So I'll show you now a document, which we
12         marked as Exhibit 3 for purposes of this
13         deposition, and ask you if that appears to
14         be the disability income policy that
15         pertains to Ms. Mathews' claim?
16     A.  It is.
17     Q.  Now, I directed you to page, bates stamp
18         PAL0945, the definitions page.  Do you see
19         that?
20     A.  Uh-huh.
21     Q.  I direct you down to the definition of
22         total disability.  Do you see that?
23     A.  I do.
24     Q.  I'd like you to read the definition of
25         total disability under this policy and ask
26
```

1       if that changes your opinion as to whether

2       this is an own-occupation or

3       all-occupation policy?

4   A.  "Cannot work at your regular job because

5       of injury or sickness during the first

6       five years of disability following five

7       years of total disability.  Total

8       disability requires that you do not be

9       engaged in any type of paid work."

10  Q.  So for the first five years this was an

11      own-occupation policy?

12  A.  That's correct.

13  Q.  Then it turned into an all-occupation

14      policy?

15  A.  That's correct.

16  Q.  I like you to turn to page six of this

17      policy.  And on page six in the left

18      column, you'll see a section entitled

19      "rehabilitation."  Do you see that?

20  A.  I do see that.

21  Q.  And you've been designated as the person

22      most knowledgable at Pan American Life

23      regarding that section.  So I take it you

24      read that section before; is that correct?

25  A.  I have.

26

```
1    Q.  The first sentence says, "We will pay for
2        a rehabilitation program if we approve it
3        in advance."  Do you see that?
4    A.  I do.
5    Q.  Is it your opinion that Pan American Life
6        Insurance Company has unfettered
7        discretion as to its approval of a
8        disability policy, rehabilitation plan?
9            MR. EVANS:
10               Objection.  Vague as to
11               unfettered and argumentative.
12   BY MR. KINNEY:
13   Q.  You may answer.
14   A.  No, I don't believe that we have
15       unfettered discretionary to approve or
16       disapprove.
17   Q.  What are the limits placed upon your
18       ability to approve or disapprove?
19   A.  That we receive sufficient proof from the
20       claimant that once again will indicate how
21       this benefit is going to return her to an
22       occupation suitable for her limitations.
23   Q.  So is it your testimony today that if such
24       proof is forthcoming from the claimant,
25       Pan American must provide payment for a
26
```

```
 1        rehabilitation program?

 2             MR. EVANS:

 3                  Objection.  Incomplete

 4             hypothetical.  Calls for speculation.

 5   BY MR. KINNEY:

 6   Q.  You can answer.

 7   A.  If we receive proof sufficient to us, we

 8        would extend this benefit.

 9   Q.  The next sentence says, "The extent of our

10        payment will be what we state in our

11        written approval."  Do you see that?

12   A.  That's correct.

13   Q.  How does Pan American go about deciding

14        what the extent of its payment should be?

15   A.  Well, from this particular policy line,

16        which we would have determined that if the

17        insurer had provided us, once again, with

18        the course of study, the hours of study,

19        the cost of tuition, books and things of

20        that nature.

21   Q.  Would it be a factor in Pan American's

22        determination of how much that cost?

23   A.  I couldn't tell you that.  I don't know.

24        I would say that we would believe that it

25        would be usual and reasonable for that

26
```

1       course of education.

2   Q.  Is there any upper limit on how much Pan

3       American would pay for a rehabilitation

4       program?

5   A.  Not to my knowledge.

6   Q.  Next sentence says, "We will not pay for

7       any rehabilitation expenses covered by

8       another source."  Do you see that?

9   A.  I do.

10   Q.  What source of expenses does this policy

11       contemplate?

12   A.  She may be receiving, you know, the

13       insured could be receiving state financial

14       aid, local financial aid, or other

15       educational assistance through an

16       educational organization.

17   Q.  And the final sentence says, "This payment

18       will have no affect on any other benefit

19       of this policy."  Do you see that?

20   A.  That's correct.

21   Q.  Do you know how much does this particular

22       policy pay?

23   A.  I don't know which policy number this is.

24   Q.  If you look in here somewhere, does it

25       explain?

26

1    A.  No, it does not.

2    Q.  The amount of benefits.  It does not?

3    A.  It does not.

4          MR. EVANS:

5             And to that extent, I object to

6          this.  It is an incomplete copy.

7          There should be some sort of benefit

8          summary attached to this.

9          MR. KINNEY:

10          Okay.

11  BY MR. KINNEY:

12    Q.  So you look to a different page of benefit

13        summary to find out what the benefits are

14        here?

15    A.  There was a schedule of benefits that

16        accompanies this that's specific to our

17        reinsured.

18    Q.  You don't know what that is for

19        Ms. Mathews?

20    A.  I don't.

21    Q.  Let's go to the next document, which we'll

22        mark as Exhibit 4.  I show you now Exhibit

23        4, which appears to be an income

24        protection policy which was provided by

25        Pan Am's attorneys in this case.

26

1          Before we get into the substance of it,

2     I'd like you to look at the first page at

3     the top where it says "MN" and it's

4     circled.  And then underneath that, "2-A

5     plus."  Do you know what that means?

6               (Exhibit 4, income protection

7                policy, was marked for

8                identification.)

9  A.  I don't know what the MN means.  I know

10     that the 2-A is an occupational class.

11  Q.  Do you know what occupational class that

12     is?

13  A.  I think it's a general occupation.

14     Whereas, you know, 4-A would be doctors

15     and professionals.  And 3-A would be more

16     labor-intensive person.

17  Q.  Does the plus mean anything to you?

18  A.  I don't know.  It doesn't mean anything to

19     me.

20  Q.  Is this -- do you know whether this is an

21     own occupation or an all-occupation

22     policy?

23  A.  This particular one, I do not know.  It

24     depends on the occupation class.

25  Q.  Well, I direct you to page four.  That's

26

1          the definitions page.

2    A.   Okay.

3    Q.   And the definition of total disability.

4    A.   Uh-huh.   "Cannot work at his or her

5          regular job because of injury or sickness

6          for two years following two years of total

7          disability.   The total disability requires

8          that the insured not be engaged in any

9          paid work."

10   Q.   So is it your understanding for the first

11         two years it's an own-occupation policy;

12         is that right?

13   A.   That's correct.

14   Q.   And then does it become an all-occupation

15         policy after that?

16   A.   It does.

17   Q.   Has Pan American Life Insurance Company

18         determined whether Ms. Mathews is disabled

19         from her own occupation?

20   A.   Not to my knowledge.   Well, I would

21         imagine if we granted benefits for the

22         restricted amount of time in both

23         policies, then it would have been for any

24         and own occupation.   It's both.

25   Q.   Would have encompassed both?

26

1    A.  Sure.

2    Q.  As far as Pan Am is concerned, she's

3        disability from all occupations?

4    A.  I don't have the specifics of the file, so

5        I can't speak to that.

6    Q.  Would Mr. Jones know that?

7    A.  He would.

8    Q.  Well, I'll ask him when he comes in.  I'm

9        gonna direct you to page six.

10   A.  Okay.

11   Q.  The first sentence of the rehabilitation

12       clause, which is in the upper right

13       column, do you see that?

14   A.  I do see that.

15   Q.  "We will pay for a rehabilitation program

16       that we approve."  Do you see that?

17   A.  I do.

18   Q.  That's slightly different wording from the

19       language in the Exhibit 3.

20   A.  It is.

21   Q.  But does Pan American interpret that

22       differently than it does the language in

23       Exhibit 3?

24   A.  Only an amount that, that, that could be

25       paid.

26

1    Q.  But in terms of the -- I'm asking just

2        about the language.  This one says, "A

3        rehabilitation program that we approve."

4    A.  Correct.

5    Q.  The other one says "A rehabilitation

6        program if we approve it in advance."

7    A.  It's the same.

8    Q.  That's the same?

9    A.  That's correct.

10   Q.  Next sentence says, "Maximum payment for a

11       single disability will be 24 times the

12       monthly benefit."

13   A.  I see that.

14   Q.  That's different than the other policy; is

15       that right?

16   A.  It is.

17   Q.  Do you know what the monthly benefit is

18       under this policy?

19   A.  I do not.

20   Q.  Do you know why there's a cap on the

21       monthly benefit provision in Exhibit 4?

22           MR. EVANS:

23               Objection.  Calls for

24       speculation.

25           MR. KINNEY:

26

1              I'm asking him if he knew.

2         THE WITNESS:

3              I do not.

4    BY MR. KINNEY:

5    Q.  Would the amount of the cap in any way

6         affect whether Pan Am would provide the

7         benefit?

8    A.  No.

9    Q.  In other words, if someone came to you

10        with a benefit program, the cost of which

11        exceeded the cap, would Pan Am still

12        provide the benefit even though the total

13        program exceeded the cap?

14   A.  We may.

15        MR. EVANS:

16             Objection to an incomplete

17        hypothetical.  Calls for speculation.

18        THE WITNESS:

19             We may.

20   BY MR. KINNEY:

21   Q.  So that the factor of the cap itself would

22        not influence your decision as to whether

23        or not the program was acceptable?

24        MR. EVANS:

25             Same objection.  Calls for

26

```
1                speculation and incomplete

2                hypothetical.

3           THE WITNESS:

4                That's correct.

5    BY MR. KINNEY:

6    Q.  Next sentence, "With our permission, this

7        maximum may be waived."

8    A.  Yes.

9    Q.  You see that?

10   A.  Yes.

11   Q.  I take it from your earlier testimony that

12       that has never happened, to your

13       knowledge, that the maximum has been

14       waived; is that right?

15   A.  That's correct.

16   Q.  Does Pan Am have any policies in force as

17       to when it should or should not waive the

18       maximum benefit?

19   A.  It does not.

20   Q.  As the person most knowledgable at Pan Am

21       on this provision of the policy, when do

22       you believe that Pan Am should waive the

23       maximum amount of the benefit?

24           MR. EVANS:

25                Objection.  Calls for

26
```

1              Speculation.  Calls for a legal

2              opinion and . . .

3    BY MR. KINNEY:

4    Q.  You can answer.

5    A.  We would waive the maximum based on the

6        type of program that the insured may be

7        enrolled.

8    Q.  Can you give me an example?

9    A.  Well --

10             MR. EVANS:

11                  Same objection.  Calls for

12             speculation.

13   BY MR. KINNEY:

14   Q.  Go ahead.

15   A.  If the person was only a high school

16       graduate and was pursuing a college degree

17       for an occupation, college degrees are

18       typically four years in nature.  If we

19       felt that the college degree would meet

20       what this person was trying, and be able

21       to reenter the workforce with such degree,

22       I think we would give that consideration.

23   Q.  Then the final sentence here is, "This

24       payment will have no affect on any other

25       benefit of this policy."  Do you see that?

26

```
 1    A.  I do.

 2    Q.  That language is identical with the

 3        language of the other policy?

 4    A.  Yes.

 5    Q.  And is interpreted the same way?

 6    A.  That's correct.

 7    Q.  Now, in policy Exhibit 3, we read a

 8        sentence that said, "We will not pay for

 9        any rehabilitation benefits,

10        rehabilitation expense covered by any

11        other source."  Do you recall that?

12    A.  That's correct.

13    Q.  That language doesn't appear in Exhibit 4;

14        is that right?

15    A.  That's correct.

16    Q.  What is the affect of the absence of that

17        language in Exhibit 4?

18            MR. EVANS:

19                Objection.  Calls for a legal

20            conclusion.  Calls for speculation.

21  BY MR. KINNEY:

22    Q.  Go ahead.

23    A.  That we would not coordinate with another

24        benefit.

25    Q.  Prior to the time that plaintiff's request

26
```

```
 1        for rehabilitation benefits was denied,

 2        how many times did you speak with

 3        Mr. Jones about any aspect of plaintiff's

 4        case?

 5   A.   At least one time.

 6   Q.   One that you can recall?

 7   A.   Vaguely.

 8   Q.   Was anyone else present at that one

 9        conversation?

10   A.   No.

11   Q.   What was discussed in that conversation?

12   A.   I don't recall exactly at what course of

13        the policy that we had this, that we had

14        this conversation.

15   Q.   Do you recall what was said during the

16        conversation?

17   A.   I don't.

18   Q.   Not a single thing?

19   A.   It depends, you know.  A lot of things

20        happened prior to the filing for

21        rehabilitation.  So I can't be sure what

22        point we had a discussion.

23   Q.   Okay.  Well, I mean, one of the things

24        that's my job to do is to find out what

25        you remember and what you don't remember.

26
```

 1         So if you don't remember it, just say I

 2         don't remember.  Is that your correct

 3         statement?

 4    A.   That's correct.

 5    Q.   Did you review the paper file, or a

 6         computerized version of the paper file,

 7         prior to the time the rehabilitation

 8         benefits were denied?

 9    A.   I did.

10    Q.   How many times did you review the file

11         before the denial of the rehab benefits?

12    A.   At least once.

13    Q.   Do you recall what you saw when you

14         reviewed the file at that time?

15    A.   I recall the course of events.

16    Q.   What course of events do you recall?

17    A.   That we had previously denied benefits on

18         the disability portion.  And through the

19         findings of the I.M.E. that we had and

20         through the review of our medical

21         director, we extended benefits of the

22         regular policies.

23    Q.   Anything else?

24    A.   That's it.

25    Q.   At any time up until today, were you aware

26

```
 1          that there was any kind of problem or

 2          issue with the payment of premiums for the

 3          policies?

 4    A.    I wasn't aware of that at any time.

 5    Q.    You never heard anything about a problem

 6          with improper withdrawal of premiums from

 7          plaintiff's account?

 8    A.    That I do recall.

 9    Q.    When did you first hear something about

10          that?

11    A.    It was most -- it was probably while we

12          were out of the city during the hurricane.

13    Q.    Where were you?

14    A.    We were in Texas.

15    Q.    Where at in Texas?

16    A.    Irving or -- Dallas area.

17    Q.    You moved there right after the Hurricane

18          Katrina?

19    A.    That's correct.

20    Q.    How long were you over there?

21    A.    Four months.  About four months.

22    Q.    I'm sure this is clearer to you than to

23          me.  When exactly was Hurricane Katrina?

24    A.    At the end of August.

25    Q.    August of '05?

26
```

1   A.  That's correct.

2   Q.  So you were there until the end of the

3       year?

4   A.  I was there until the end of November.

5   Q.  Then you came back to New Orleans?

6   A.  That's correct.  Different staff came back

7       at different times.  But I believe I was

8       back at the end of November.

9   Q.  And your office right now is, I think we

10      said right across the street from this

11      office on Poydras Street in New Orleans?

12  A.  That's correct.

13  Q.  When you came back after the move to

14      Texas, did you come directly back to the

15      Poydras Street address?

16  A.  We did.

17  Q.  Did Mr. Jones come back from Texas the

18      same time you did?

19  A.  He did.

20  Q.  Same for Ms. Bourg?

21  A.  Yes.

22  Q.  Well, I don't know if this will help you

23      at all.  But my understanding is that

24      Ms. Mathews became disabled in December of

25      '05.  Which, if I understand your

26

```
 1          testimony correctly, would be after you
 2          moved back here to New Orleans.
 3    A.    That's correct.
 4    Q.    So does that, in any way, refresh your
 5          recollection as to when you first heard
 6          that there was a problem with the
 7          withdrawals from her bank account?
 8    A.    I remember that -- I don't remember
 9          specific Ms. Mathews.  I do remember that
10          there was an issue with withdrawals and a
11          lot of overdraft fees associated with
12          those withdrawals.  I specifically
13          remember that us being in Texas when I was
14          aware of that.
15    Q.    But you don't recall if that particular
16          problem had to do with Ms. Mathews?
17    A.    I don't.
18    Q.    Do you recall specific to Ms. Mathews, not
19          just a general recollection, but specific
20          to Ms. Mathews, at any time do you recall
21          hearing about or seeing some kind of
22          problem regarding Ms. Mathews and
23          withdrawals from her specific account?
24    A.    I don't.
25    Q.    In terms of claims processing policies and
26
```

1   practices, is there some coordination --

2   let me ask you this.  Are you at all in

3   charge of personnel who collect the

4   premiums?

5 A. No.

6 Q. When a claim comes in in a disability

7   policy, some policies have a waiver of

8   premium term; is that right?

9 A. That's correct.

10 Q. Do you recall whether Ms. Mathews' policy

11   has a waiver of premium term?

12 A. I don't.

13 Q. Well, it's right in front of you.  Where

14   would you see it?

15 A. Well, sometime in some policies it's

16   embedded within the policy.  And some

17   policies, it is a separate benefit listed

18   on the schedule of benefits.

19 Q. Well, I want you to assume that there's a

20   waiver of premium benefit in these

21   policies.

22 A. Okay.

23 Q. Rather than studying these policies right

24   now.  When a claim comes in on a policy in

25   which there's a waiver of premium benefit,

26

```
 1          what kind of communication takes place

 2          between your department and other people

 3          at Pan American about the premium?

 4    A.    There generally is no communication.

 5    Q.    Well, what happens with the premiums in

 6          that situation?  Do you know?

 7    A.    If we were to go ahead and place a

 8          personal waiver premium?

 9    Q.    Yeah.

10    A.    The general policy?

11    Q.    Yes.

12    A.    We would handle that within the claims

13          department.

14    Q.    How would you handle that?

15    A.    By a, system work.  And we would place the

16          policy on a premium waiving status,

17          reverse and refund premiums, if necessary,

18          and waive premiums going forward.

19    Q.    When you say you would place the policy on

20          a premium waiving status --

21    A.    Correct.

22    Q.    -- is that done on a commuter?

23    A.    It is.

24    Q.    And so a computer screen comes up, and you

25          type something into it; is that right?

26
```

1   A.  Correct.  That's a code.  A status coding

2       policy.

3   Q.  What impact does typing that code into the

4       computer have on the collection of policy

5       benefits, of policy premiums?

6   A.  If the code is put into a premiums, all

7       billing activity should cease.

8   Q.  And have you experienced a situation where

9       that code was put into the computer but

10      billing activity did not cease?

11  A.  There could be a situation.  Because our

12      systems are run in overnight batches, that

13      if we put it on a Thursday and a bill was

14      set to generate on Thursday, just by

15      coincidence it was that date, that bill

16      would go out.  Because the status really

17      wouldn't take effect until the following

18      morning.

19  Q.  Are you familiar with the fact that some

20      premiums are paid to Pan American through

21      direct withdrawals from the policyholder's

22      account?

23  A.  I am.

24  Q.  Is it your understanding that typing this

25      code into the computer at the claims

26

```
 1         department will stop withdrawals,

 2         automatic withdrawals, from the

 3         policyholder's account?

 4    A.   I don't know the effect on that, if it's a

 5         direct effect.

 6    Q.   Has anyone at Pan Am told you that there

 7         was some problem in 2006 with coordinating

 8         the waiver of premiums that the claims

 9         department did and the automatic

10         withdrawals from policyholder's accounts?

11    A.   No.

12    Q.   Do you know whether a waiver of premium

13         code was ever placed into Ms. Mathews'

14         computer data?

15    A.   No.

16    Q.   So then I take it you don't know whether

17         automatic withdrawals continued to take

18         place after such event?

19    A.   That's correct.

20    Q.   And you don't recall anybody bringing that

21         specifically to your attention as to

22         Ms. Mathews?

23    A.   No.

24    Q.   Now, we've got two insurance policies here

25         in front us for Ms. Mathews.  And you

26
```

1       testified earlier it's -- you've seen

2       other cases where disability claimants

3       have more than one insurance policy with

4       Pan Am.

5   A.  That's correct.

6   Q.  So does Pan Am have a policy or practice

7       when a claim comes in to determine what

8       policies the insured has?

9   A.  We do.

10  Q.  Could you describe that policy practice?

11  A.  We generally run a Social Security number

12      search to see if there are any other

13      policies.

14  Q.  Does that show all the other policies?

15  A.  It would show any other policies that that

16      person has under that Social Security

17      number.

18  Q.  Was that done for Ms. Mathews' claim?

19  A.  It was.

20  Q.  And it showed both of those policies; is

21      that right?

22  A.  It did.

23  Q.  Did it show any other policies?

24  A.  Not to my knowledge.

25  Q.  Was there any other policy?

26

1   A.  Well, we later found out that there was

2       another policy.

3   Q.  Do you know what kind of policy that is?

4   A.  I think that's also a disability-type

5       policy.

6   Q.  Does it have a separate, you know, policy

7       of the sort that, written policy of the

8       sort that Exhibit 3 or Exhibit 4 --

9   A.  It could be the same.  It would be exactly

10      the same.

11  Q.  But it has a different policy number?

12  A.  It would have definitely have a different

13      policy number and a different policy date.

14  Q.  Do you know whether that policy number,

15      let's call that the third policy, do you

16      know whether the third policy showed up on

17      Ms. Mathews' Social Security number when

18      Pan Am did its initial search for her

19      policies?

20  A.  I understand that it did not.

21  Q.  Do you know how that happened?

22  A.  I believe that the other policy had a

23      different Social Security number, or it

24      was a digit off or something of that

25      nature.

26

1   Q.   Who told you that?

2   A.   I don't know if anybody told me it.  I

3        just knew of a situation where there was a

4        third policy.  So I can't say specifically

5        that anybody told me it.  I just know the

6        course of events, you know, of the policy

7        file.

8   Q.   And your recollection is you determined

9        that the Social Security number for the

10       third policy was different than the Social

11       Security number for the first two?

12  A.   Well, I think what we found out that there

13       was another policy for Ms. Mathews under a

14       different number, not like the number that

15       was on these policies.

16  Q.   A different Social Security number?

17  A.   A different -- yeah, it must have been a

18       different Social Security number because

19       that's generally our search criteria or

20       birth date.  So it had to be one of the

21       two.

22          We generally don't go further, you

23       know, when the Social Security number

24       comes with the policies, that generally

25       concludes our search.

26

```
 1    Q.   Do you search only by Social Security

 2         number?

 3    A.   We will sometimes search by, well, we'll

 4         search -- and birth date.  But we'll

 5         sometimes search by name.  But we find

 6         that to be, we have found that to be

 7         flawed because that data is only as good

 8         as -- because if they have a middle

 9         initial or they spell their name with --

10         like Cory.  I spell it C-O-R-Y and they

11         spell it C-O-R-E-Y.  I mean, it's an exact

12         date of match, so it would not come up.

13         So we, basically, suspended doing that

14         because of issues we had with that.

15    Q.   When did you suspend searching by name?

16    A.   I couldn't tell you.  No specific date.

17    Q.   As of December of 2005, were you still

18         searching by name?

19    A.   I would say most probably.

20    Q.   So in December of 2005, you were searching

21         by name, Social Security number, and birth

22         date; is that right?

23    A.   We were probably searching by those

24         criteria.  Any criteria that the system

25         would allow us to search by, which were

26
```

```
 1        usually those.

 2   Q.   And same question for February of 2006?

 3   A.   Yeah.

 4   Q.   When did you find out that Ms. Mathews was

 5        the beneficiary of the third policy?

 6   A.   I don't recall.

 7   Q.   How did you find that out?

 8   A.   Well, we prepare reports through our

 9        actuarial department.  And it was through

10        that when we added another policy, you

11        know, to that report.  That's when I found

12        out, because I'm the keeper of that

13        report.

14   Q.   I see.  And did you make any inquires of

15        anyone when you saw a third policy arise

16        for Ms. Mathews?

17   A.   I did not.

18   Q.   It didn't cause you any concern that there

19        was a third policy that had been missed

20        for a considerable period?

21   A.   It may have been questioned by actuarial

22        just because the disability date was so

23        far before then.  We actually reported it

24        to them.

25            So they may have questioned it.

26
```

1       Because they would have all had the same

2       disability date, but the reporting dates

3       were different.  So they would have

4       inquired about that.

5    Q.  Okay.  When a claimant has a new

6       disability claim like Pan American, are

7       they required to submit a claim on a Pan

8       American form?

9    A.  They are.  We send them out the

10      appropriate forms.

11   Q.  Do you also request that they get an

12      attending physician statement?

13   A.  We do.

14   Q.  And on the attending physician statement,

15      do you ask a question about the claimant's

16      prognosis?

17   A.  We do.

18   Q.  Do you ask the attending physician to give

19      some estimate of how long the claimant

20      will be disabled?

21   A.  That is a question on the form.

22   Q.  What do you do with that particular piece

23      of information when it comes in?  Is that

24      computerized in some way?

25   A.  No.  It's restored in a hard paper file.

26

```
 1   Q.  Okay.  If you determine that a claimant is

 2       disabled within the definition of the

 3       policy, do you begin making benefit

 4       payments immediately?

 5   A.  If that person has satisfied the

 6       elimination portion of their policy.

 7   Q.  Let's say that in Ms. Mathews' policy

 8       there's a 60-day elimination period, let's

 9       just say.  After 60 days, will you, will

10       Pan Am send her money if she qualifies as

11       disabled?

12   A.  Not on the 61st day because we may not

13       determine if she was disabled.  At the

14       point we determined she was disabled, we

15       would start from day 61 and go forward.

16   Q.  Well, let's say --

17   A.  Pay benefits in the rears.

18   Q.  Let me see if I've got this clear.  Let's

19       say that on day 75 you determine then that

20       Ms. Mathews is disabled within the meaning

21       of the policy.

22   A.  Yes.

23   Q.  When will she receive her first check?

24   A.  Shortly after.

25   Q.  And that will be for the first month's

26
```

1          disability benefit; is that right?

2     A.   That would be for payment in the rears.

3     Q.   Well, I'm asking -- let's say she's got a

4          60-day elimination period.  On the 75th

5          day you decide she's disabled.

6     A.   We may wait until the 90th day and pay her

7          for that, you know, for that month.

8     Q.   So you pay, wait until the end of the --

9     A.   Generally, because we pay in the rears.

10         We pay a month in the rears.  Correct.

11    Q.   So, in other words, at the end of the 90th

12         day, she'll get a payment that will cover

13         her from day 60 to day 90?

14    A.   That's correct.

15    Q.   And let's say -- let's go back to the

16         attending physician statement.  Let's say

17         the attending physician statement says

18         that his prognosis is that she'll be

19         disabled for six months, let's just say.

20         At the end of six months, do you just

21         automatically cancel her benefits?

22    A.   That's not our practice.

23    Q.   What is your practice in terms of --

24    A.   Our practice is generally a little bit

25         before, you know, we inform them that, you

26

1       know, your course of disability is about

2       to end, and to submit another attending

3       physician statement.

4   Q.  Was that done in Ms. Mathews' case?

5   A.  I don't know.

6   Q.  Did anyone ever tell you that Ms. Mathews'

7       benefits were cut off after they had begun

8       being paid?

9   A.  No.

10   Q.  When you reviewed her claim file, did you

11       notice that there had been a period where

12       her benefits had been cut off?

13   A.  I didn't recall.

14   Q.  Did you know that Ms. Mathews made a

15       complaint to the counsel of the Department

16       of Insurance about Pan American Life

17       Insurance Company?

18   A.  I believe I do know that.

19   Q.  Do you know what she complained about?

20   A.  No.

21   Q.  Did you have anything to do with handling

22       that?

23   A.  I may have.  I generally handle the

24       complaints.  I generally, I review the

25       file, write the letter.

26

1   Q.  When, prior to today, was the last time

2       that you reviewed Ms. Mathews' claim file?

3   A.  Probably at the point of attorney

4       intervention when we received, you know, a

5       letter from either your office or some

6       other attorney's office.

7   Q.  And then you didn't handle it after that?

8   A.  No, I didn't.

9   Q.  Did you know that Ms. Mathews made a

10      complaint to the Napa County District

11      Attorney's Office about Pan Am's handling

12      her claim?

13   A.  I do recall that, that there was a

14      secondary complaint to another

15      organization.

16   Q.  Do you recall what was the nature of her

17      complaint to that organization?

18   A.  I don't.

19   Q.  Do you recall whether Ms. Mathews'

20      complaint to the California Department of

21      Insurance came before or after she was put

22      under surveillance by a private

23      investigator?

24   A.  I don't recall.

25   Q.  Was your decision to have her surveilled

26

1          by a private investigator influenced by

2          the fact that she had made a complaint to

3          the Department of Insurance?

4    A.   No.

5    Q.   Was your decision to have her put under

6          surveillance by a private investigator

7          influenced by the fact that she had made a

8          complaint to the Napa County District

9          Attorney's Office?

10   A.   No.

11   Q.   Do you ever recall Mr. Jones telling you

12         that Ms. Mathews was a difficult customer,

13         or words to that effect?

14   A.   No.

15   Q.   Do you ever recall him saying that he had

16         some argument with her?

17   A.   No.

18   Q.   Do you ever recall Ms. Bourg saying that

19         she had some difficulty dealing with

20         Ms. Mathews?

21   A.   No.

22   Q.   Is there a department at Pan Am called the

23         benefits department?

24   A.   Yes.

25   Q.   Do you work in the benefits department?

26

1   A.  Yes.

2   Q.  Are you the supervisor of the benefits

3       department?

4   A.  Yes.

5   Q.  Do you have -- strike that.  At any time

6       do you recall a person who worked in the

7       benefits department who would have signed

8       a letter with the initials C.R.M.C.?

9   A.  Yes.

10  Q.  Who's that?

11  A.  That's our customer relations management

12      center.  I also have authority over that

13      department as well.

14  Q.  When you discussed the one occasion that

15      you can recall discussing something about

16      rehabilitation benefits with Mr. Jones in

17      the Mathews matter, do you recall

18      discussing with him that there were two

19      separate policies with rehabilitation

20      benefits?

21  A.  No.

22  Q.  And the exercise that you and I went

23      through a few minutes ago looking and

24      comparing the two policy provisions, did

25      you go through a similar exercise with

26

1          Mr. Jones?

2    A.   I did not.

3    Q.   When you talked to Mr. Jones about

4         rehabilitation benefits, did you

5         personally take a look at either of the

6         policies that we talked about today?

7    A.   I did not.

8    Q.   At that time you talked to Mr. Jones about

9         rehabilitation benefits for Ms. Mathews,

10        did you know that the policy that she had

11        provided for rehabilitation benefits?

12   A.   Yes.

13   Q.   How did you know that?

14   A.   That was the nature of -- that's how it

15        was brought to my attention through

16        Mr. Jones.

17   Q.   Pan American has other disability

18        insurance policies besides the two we

19        looked at, doesn't it?

20   A.   They have other policy forms.

21   Q.   And do the other policy forms all contain

22        provision for rehabilitation benefits?

23   A.   Not to my knowledge.

24   Q.   Do any of the other policy forms contain

25        provisions for rehabilitation benefits?

26

1    A.  I would imagine they do.

2    Q.  But you don't know?

3    A.  The majority of forms I have seen do

4        contain a provision.

5    Q.  Most do?

6    A.  The ones that I have seen.

7    Q.  Taken on a per-claim basis, in other

8        words, of the 132 to 135 claims per month

9        that are processed by your department, do

10       you have any idea what percentage of those

11       claims arise under policies that contain

12       rehabilitation benefits?

13   A.  I would say -- it's difficult to say.

14       It's the latter policies, the more recent

15       policy forms that do.  I believe some of

16       the older policy forms do not.

17   Q.  Do you have any estimate, though, of the

18       132 to 135 per month?

19   A.  I couldn't begin to speculate.

20   Q.  Have you ever talked to any of the Pan

21       American employees in the underwriting

22       department about the language of the

23       rehabilitation policies?

24   A.  I have not.

25   Q.  Do you know, as you sit here today, why

26

```
1              Pan American includes a provision on
2              rehabilitation benefits in its newer
3              policies?
4                   MR. EVANS:
5                        Objection.  Calls for
6              speculation.
7                   THE WITNESS:
8                        I would imagine that that is
9              something that is, has become an
10             industry practice and is provided by
11             other insurance, other companies as
12             well.
13        BY MR. KINNEY:
14        Q.  You don't know?
15        A.  I don't know what?
16        Q.  You don't know why it's --
17        A.  I don't know why a benefit would be added
18             or not added.
19        Q.  Do you know if there's any advertising
20             that Pan Am does regarding rehabilitation
21             benefits?
22        A.  I don't know about any advertise that Pan
23             American does on these policies.
24        Q.  Can we go off the record for one second?
25                  MR. EVANS:
26
```

1         Sure.

2              (Off the record.)

3    BY MR. KINNEY:

4    Q.  Mr. Simon, I'd like to show you another

5         document we'll mark as Exhibit 5 for

6         purposes of this deposition.  And I show

7         you that document.  I'll tell you that

8         document was produced by Pan American's

9         counsel in this case.  And I'll ask you if

10        you can identify that.

11                  (Exhibit 5, medical director's

12                  form, was marked for

13                  identification.)

14   A.  Yes.

15   Q.  What is it?

16   A.  This is from our medical director.

17   Q.  Is this the document you referred to

18        earlier as demonstrating that further

19        study needed to be done to determine

20        whether or not Ms. Mathews was disabled?

21   A.  Yes.

22   Q.  Can you tell when your department received

23        this document?

24   A.  April 25, 2006.

25   Q.  Was there something in this document that

26

```
 1          led you to believe that Ms. Mathews should

 2          be sent to an independent medical

 3          examination?

 4      A.  There is.

 5      Q.  What is it?

 6      A.  There is something that indicates that

 7          Dr. Brown was not qualified to elaborate

 8          on her condition or diagnosis.

 9      Q.  Okay.  That's it?

10      A.  I have to read through the entire

11          document.

12      Q.  I don't want you to necessarily do that.

13          When you receive a report from the medical

14          director that indicates to you that an

15          independent medical examination is

16          necessary, how long after the report is

17          received do you typically schedule the

18          I.M.E.?

19      A.  We try to do it within 30 to 60 days.

20      Q.  Do you know of any reason in the Mathews

21          case why the I.M.E. would not take place

22          for, say, six months after this April 25th

23          date?

24      A.  I don't.

25      Q.  Would that seem unusual to you?

26
```

1    A.   It's not our usual practice.

2    Q.   Are you aware of any events that came up

3         in the Mathews case after April 25, 2006

4         that influenced Pan Am's decision as to

5         whether or not to send Ms. Mathews to an

6         independent medical examination?

7    A.   All of this document, to my knowledge.

8    Q.   I'll show you another document which we'll

9         mark as Exhibit 6 to this deposition.

10        You've been handed a document marked as

11        Exhibit 6?

12                  (Exhibit 6, letter dated May 3,

13                  2006, was marked for

14                  identification.)

15   A.   Correct.

16   Q.   Which appears to be a letter dated

17        May 3, 2006.  Do you see that?

18   A.   That's correct.

19   Q.   And is it your understanding that the

20        C.R.M.C. referenced here -- let me ask it

21        this way.  Who was C.R.M.C.?

22   A.   C.R.M.C. is our customer relations

23        management center or our call center.

24   Q.   You see this is a letter that discusses

25        the waiver of premium issue?  Do you see

26

1        that?

2    A.  Yes.

3    Q.  You see the sentence, "Our benefits

4        department has advised that you are not

5        currently on waiver since you returned to

6        work on March 15, 2006?"  Do you see that?

7    A.  I do.

8    Q.  The benefits department, would that be the

9        department, the claims department?

10   A.  Yes.

11   Q.  So do you know who at the benefits

12       department would have provided this

13       information to C.R.M.C.?

14   A.  No.

15   Q.  Could it have been anyone other than

16       Mr. Jones or Ms. Bourg?

17   A.  No.

18   Q.  So it had to be one of them?

19   A.  It was one of the two.

20   Q.  As you sit here today, do you know why

21       Mr. Jones or Ms. Bourg thought that

22       Ms. Mathews was back at work on

23       March 15, 2006?

24   A.  No.

25   Q.  What kind of information would Pan

26

```
 1        American want in order to make that

 2        statement?

 3   A.   Generally, a statement from her treating

 4        doctor.

 5   Q.   To the effect that she was back at work?

 6   A.   Yes.  Because, generally, the insured will

 7        indicate to the doctor that they have

 8        returned to work or are planning to return

 9        to work, or the doctor says you can return

10        to work.

11   Q.   Would Pan Am typically make a phone call

12        to the insured to make sure that they were

13        back at work?

14   A.   We generally would not.

15   Q.   Would you make a phone call to the

16        employer?

17   A.   Not for this type of policy.

18   Q.   For a group policy you would?

19   A.   Yes.

20   Q.   Does Mr. Jones and Ms. Bourg, that

21        department, also handle group policies?

22   A.   No.

23   Q.   Do you supervisor the group policy claims

24        department?

25   A.   I do.

26
```

```
 1    Q.   And there are also group disability

 2         policies; is that right?

 3    A.   There are group disability policies.

 4         That's correct.

 5    Q.   And somebody else handles those?

 6    A.   That's correct.  Somebody else within my

 7         department.

 8    Q.   Within your department?

 9    A.   That's correct.

10    Q.   How many employees do you have who handle

11         group disability policies?

12    A.   One.

13    Q.   Let me show you another document which

14         we'll mark as Exhibit 7.  I'll show you

15         that document, sir, and ask if you can

16         identify that?

17                    (Exhibit 7, letter from Michael

18                     Jones, was marked for

19                     identification.)

20    A.   This is a letter from Michael Jones to the

21         insured.

22    Q.   Do you recall whether Mr. Jones discussed

23         this letter with you prior to the time he

24         wrote it?

25    A.   I don't recall.

26
```

1    Q.   Do you see in the last sentence of the
2         first paragraph, he asks for a detailed
3         plan of treatment and estimated costs and
4         estimated date of rehabilitation
5         completion?  Do you see that?
6    A.   I do.
7    Q.   Is that what you typically ask for when
8         someone asks for rehabilitation benefits?
9    A.   Yes.
10   Q.   Let's go to the next document, which we'll
11        mark as Exhibit 8.  I'll show you this
12        document.  And I'll represent to you that
13        this was a document produced by Pan
14        American's attorneys in this matter.
15                    (Exhibit 8, document, was
16                     marked for identification.)
17   A.   Okay.
18   Q.   First thing is I notice that there are
19        some, it's a little hard to read, but
20        there are some marginal notations on this
21        document.
22   A.   I do see that.
23   Q.   Can you identify the handwriting on these
24        marginal notations?
25   A.   It's not mine.  So, no, I can't identify
26

```
 1        it.

 2   Q.   Is it Mr. Jones?

 3   A.   I don't believe so.  His is generally

 4        worse than mine.

 5   Q.   Let's go to the second page of this

 6        document.  I want you to look at the last

 7        two paragraphs.

 8           I'm sorry.  Let's go to the third page.

 9        I want you to look at the last two

10        paragraphs of this document.  Have you

11        seen those?  Have you had a chance to look

12        at those?

13   A.   I've reviewed them.

14   Q.   Do you understand that this was

15        Ms. Mathews' response to Mr. Jones' letter

16        that we have as Exhibit 7?

17   A.   Yes, this is her response.  That's

18        correct.

19   Q.   And is it your belief that her response

20        was not adequate to grant rehabilitation

21        benefits?

22   A.   That's correct.

23   Q.   Do you see she wants to -- she was going

24        to try to retrain for a nurse practitioner

25        certification?  Do you see that?

26
```

1    A.  Yes.

2    Q.  And that there were four possibly schools

3        that she could attend?

4    A.  Correct.

5    Q.  And she tells you something about where

6        she is in terms of attending these

7        schools?

8    A.  That's correct.

9    Q.  And, in general, what she thinks would be

10       involved in retraining to be a nurse

11       practitioner?

12   A.  Correct.

13   Q.  So what other information was necessary,

14       other than what was provided here in

15       Exhibit 8, for Ms. Mathews to obtain

16       rehabilitation benefits?

17   A.  We would have liked to have seen possibly

18       a course study or the course of study that

19       goes along and cost associated with that.

20   Q.  Anything else?

21   A.  And certainly a more, a more, more really

22       of her commitment of what she is, you know

23       aiming to do.  She abandoned her

24       bachelors' degree.

25          You know, without more detail of what's

26

```
1        gonna go on, we couldn't make any, you

2        know, any decision or anything that, you

3        know, that she may or may not abandon such

4        a program as well.

5   Q.   Well, do you know whether that sort of

6        information was then requested of

7        Ms. Mathews?

8   A.   I don't.

9   Q.   Should it have been?

10  A.   It may have been helpful in further

11       evaluating.

12  Q.   Do you know how long after this letter of

13       August 23rd it was until Pan Am advised

14       Ms. Mathews that her request for

15       rehabilitation benefits was denied?

16  A.   I don't.

17  Q.   Was it more than 48 hours?

18  A.   I couldn't tell you.  I don't know.

19  Q.   Did you see this document, Exhibit 8,

20       prior to the time that Pan Am notified

21       Ms. Mathews that her rehabilitation

22       benefits were denied?

23  A.   I had not.

24  Q.   If you had seen this document, Exhibit 8,

25       would you have directed Mr. Jones to do

26
```

```
 1         anything in particular in response to this

 2         document?

 3              MR. EVANS:

 4                   Object.  Calls for speculation.

 5    BY MR. KINNEY:

 6    Q.  You can answer.

 7    A.  It's difficult to say, but I may have.

 8    Q.  You may have done what?

 9    A.  I may have asked him to get some

10         additional information from her to expand

11         upon this.

12    Q.  As you sit here today, do you know whether

13         Mr. Jones ever asked her for any

14         additional information to expand upon

15         this?

16    A.  Not to my knowledge.

17    Q.  Do you know an employee at Pan American by

18         the name of Glenda Griffin?

19    A.  I know the name.  I can't associate the

20         face.

21    Q.  Do you know what department Ms. Griffin

22         works in?

23    A.  She may be in policy on a service or

24         premium bill, one of the two.

25    Q.  Does Pan American have a department that

26
```

1        handles administrative complaints such as

2        complaints made to the California

3        Department of Insurance?

4   A.  I believe there is a department that --

5        well, I believe the legal department

6        handles the recording end and of tracking

7        of the responses.  So there is somebody

8        that maintains a complaint log.  I'm not

9        sure who that person is.

10   Q.  Do you know who actually makes the

11        responses to, say, the California

12        Department of Insurance?  Is that the

13        legal department?

14   A.  If it was based on a claims --

15   Q.  Yes.

16   A.  I would generally respond.

17   Q.  So you don't -- in other words, if

18        Ms. Mathews had made a complaint to the

19        California Department of Insurance in 2006

20        about the way the claim was being

21        handled --

22   A.  Correct.

23   Q.  -- that would be something you would

24        respond to?

25   A.  It would be something either I would

26

1          respond -- see, the procedures may have

2          been different back then.  But it would

3          either be something I would respond to

4          directly, or a request for information

5          would be given by the person that was

6          maybe handling the responses at that time.

7          And they would refer to the different

8          exhibits that they would attach with the

9          file.

10              MR. KINNEY:

11                  I think I'll stop there with

12              Mr. Simon.  Would you like to ask him

13              any questions?

14              MR. EVANS:

15                  No.

16              MR. KINNEY:

17                  That's it.

18                  (Conclusion.)

19

20

21

22

23

24

25

26

```
 1              Video deposition of CORY SIMON

 2                taken on March 13, 2008

 3

 4

 5                WITNESS' CERTIFICATE

 6

 7

 8     I have read or have had the foregoing

 9  testimony read to me and hereby certify that

10  it is a true and correct transcription of my

11  testimony, with the exception of any attached

12  corrections or changes.

13

14

15

16

17     _____

18                CORY SIMON

19

20

21

22

23

24

25

26
```

```
1                    REPORTER'S CERTIFICATE

2         I, THERESA MATHERNE, Certified Court

3    Reporter, do hereby certify that the

4    above-mentioned witness, after having been

5    first duly sworn by me to testify to the

6    truth, did testify as hereinabove set forth;

7         That the testimony was reported by me in

8    shorthand and transcribed under my personal

9    direction and supervision, and is a true and

10   correct transcript, to the best of my ability

11   and understanding;

12        That I am not of counsel, not related to

13   counsel or the parties hereto, and not in any

14   way interested in the outcome of this matter.

15

16

17

18

19         _____

20         THERESA (TERRI) MATHERNE

21         CERTIFIED COURT REPORTER

22         REGISTERED PROFESSIONAL REPORTER

23

24

25
```