1                UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

2

3        NO. C 07-02757 SBA

4                    DONNA MATHEWS

5                       VERSUS

6        PAN AMERICAN LIFE INSURANCE COMPANY; and

            DOE 1 through Doe 20, Inclusive

7

8                    VOLUME 1

9            Video deposition of MICHAEL JONES, 601

        Poydras Street, 10th Floor, New Orleans,

10      Louisiana 70130, taken in the offices of

        AFFILIATED REPORTING on Thursday, March

11      13, 2008.

12

13      APPEARANCES:

14            LAW OFFICES OF MICHAEL E. KINNEY

              Attorney at Law

15            BY:  MICHAEL E. KINNEY, ESQUIRE

              438 First Street, Fourth Floor

16            Santa Rosa, California  95401

17                ATTORNEY FOR PLAINTIFF

18            REED SMITH

              Attorneys at Law

19            BY:  THOMAS A. EVANS, ESQUIRE

              1999 Harrison Street, Suite 2400

20            Oakland, California  94612

21                ATTORNEYS FOR PAN AMERICAN LIFE

22            VIDEOGRAPHER:  KARL STIEGMAN

23      REPORTED BY:

24            THERESA MATHERNE

              Certified Court Reporter

25            Registered Professional Reporter

26

```
 1              DONNA MATHEWS VS. PAN AMERICAN LIFE

 2                   INSURANCE COMPANY;

 3                        VOLUME 1

 4          Video deposition of MICHAEL JONES

 5               Taken on March 13, 2008

 6

 7

 8                     EXHIBIT INDEX

 9      9.   Attending physician

10           statement.

11     10.   Medical records request.

12     11.   Medical records.

13     12.   Check and form.

14     13.   Check and document.

15     14.   Letter.

16     15.   Letter.

17     16.   Letter.

18     17.   Claimant's statement.

19     18.   Attending physician

20           statement.

21

22

23

24

25

26
```

1                           INDEX

2

3                                          Page    Line

4    EXHIBIT # 9                           59      22

5    EXHIBIT # 10                          63      19

6    EXHIBIT # 11                          67       5

7    EXHIBIT # 12.                         72      23

8    EXHIBIT # 13                          79       4

9    EXHIBIT # 14                          80      23

10   EXHIBIT # 15                          82      10

11   EXHIBIT # 16                          86      24

12   EXHIBIT # 17                          87      15

13   EXHIBIT # 18                          91      25

14

15

16   EXAMINATION BY MR. KINNEY              5       6

17

18

19

20

21

22

23

24

25

26

1                          S T I P U L A T I O N

2

3          It is stipulated and agreed by and

4     between counsel for the parties hereto that

5     the deposition of the aforementioned witness

6     is hereby being taken under the Federal Rules

7     of Civil Procedure, for all purposes, in

8     accordance with law;

9          That the formalities of reading and

10    signing are specifically not waived;

11          That the formalities of sealing,

12    certification, and filing are specifically

13    waived;

14          That all objections, save those as to the

15    form of the question and the responsiveness of

16    the answer, are hereby reserved until such

17    time as this deposition, or any part thereof,

18    may be used or sought to be used in evidence.

19                    *     *     *     *

20          THERESA MATHERNE, Registered Professional

21    Reporter and Certified Court Reporter, in and

22    for the Parish of Jefferson, State of

23    Louisiana, officiated in administering the

24    oath to the witness.

25

26

1                    MICHAEL JONES,

2    after having been first duly sworn by the

3    above-mentioned court reporter, did testify

4    as follows:

5                    (Video introduction.)

6    EXAMINATION BY MR. KINNEY:

7    Q.  State your name for the record.

8    A.  Sure.  My name is Michael R. Jones.

9    Q.  Mr. Jones, have you ever had your

10        deposition taken before?

11   A.  No, I have not.

12   Q.  Have you had an opportunity to discuss the

13        rules of a deposition with your attorney

14        prior to starting today?

15   A.  Yes.

16   Q.  At the risk of repeating some of the

17        things that he's probably told you, I want

18        to make a clear record that we can use

19        here in this case.

20   A.  Okay.

21   Q.  Let me just explain to you that the lady

22        seated to your right is a court reporter.

23        And she's taking down everything that is

24        being said here today.  That's everything

25        everybody is saying here today.

26

```
 1          And at the conclusion of the
 2     deposition, she's going to type up a
 3     booklet which will contain all of the
 4     testimony that's been given here today.
 5     You'll have an opportunity to read over
 6     that booklet and to make changes in the
 7     booklet before we can use it in court.
 8          But I want to tell you that if you do
 9     make any changes, I can comment on those,
10     or any lawyer can comment on those in
11     court.  And that could be embarrassing to
12     you and could affect the outcome of the
13     case, especially if any of the changes are
14     important ones.
15          Therefore, it's in everybody's best
16     interest for you to give your best
17     testimony here today.  Do you understand
18     that?
19  A.  Yes.
20  Q.  The oath you've been put under is the same
21     oath that you would take in a court of
22     law.  You have the same obligation to tell
23     the truth today as you would if this
24     proceeding were going forward in a court
25     of law.
26
```

1          So even though this appears to be an

2          informal procedure in the court reporter's

3          office, it is, in fact, a formal

4          procedure, and you are under oath.  Do you

5          understand that?

6    A.    Yes.

7    Q.    I'm going to be asking you questions about

8          things that happened a couple years ago.

9          You may not remember completely everything

10         that took place.  If you don't remember,

11         you can tell me you don't remember.  But

12         if you remember in part, then tell me the

13         part that you do remember, what part you

14         don't remember.

15         If I ask a question and you don't

16         understand it, tell me you don't

17         understand it.  And I'll try to rephrase

18         it so that you do understand it.  Don't

19         guess at anything.  But if you have an

20         answer that you believe is correct or that

21         you can answer pretty much correctly, then

22         I like to go with that answer.  Do you

23         understand all that?

24   A.    Yes.

25   Q.    Do you have any questions before we

26

1      proceed?

2  A.  No.

3  Q.  If you need a break at any time, just say

4      so.

5  A.  Okay.

6  Q.  Is there any reason why we cannot proceed

7      with your deposition at this time?

8  A.  No.

9  Q.  Have you had any medication today that

10     would affect your ability to testify?

11 A.  No.

12 Q.  How old are you?

13 A.  I'm 35.

14 Q.  Where do you work?

15 A.  I work at Pan American Life right here in

16     New Orleans, Louisiana.

17 Q.  What's the address where you work?

18 A.  601 Poydras Street, New Orleans,

19     Louisiana, zip code 70130.

20 Q.  What is your job title?

21 A.  I am a senior claims examiner.

22 Q.  Could you briefly give me your educational

23     background?

24 A.  Sure.  I have an undergraduate in

25     sociology.  And on April 3rd, I will

26

1          finish my M.B.A.

2     Q.   Where did you get your sociology degree?

3     A.   Florida State University.

4     Q.   Where, Florida State?

5     A.   Florida State University.

6     Q.   And your M.B.A. will be from where?

7     A.   University of Phoenix.

8     Q.   When did you get your bachelor's degree?

9     A.   December of 1994.

10    Q.   Do you have any special licenses?

11    A.   Other than drivers license?

12    Q.   Other than driver's license.

13    A.   No.

14    Q.   What about special insurance credentials?

15         Sometimes you see insurance people who

16         have a lot of letters after their name.

17         Do you have any of those?

18    A.   No, I do not.

19    Q.   Have you given any written or recorded

20         statement about this case?

21    A.   To whom?

22    Q.   To anybody.

23    A.   No.

24    Q.   Have you reviewed any documents prior to

25         coming to this deposition?

26

1   A.  No.

2   Q.  We are here about a case that's been filed

3       in the United States District Court for

4       the Northern District of California by

5       Donna Mathews.

6           When is the last time that you have

7       reviewed any documents pertaining to Donna

8       Mathews?

9   A.  It would have been at the time that I

10      placed her on claim and issued benefits,

11      so '06.

12  Q.  You haven't looked at the file since then?

13  A.  No.

14  Q.  All right.  Beginning -- following your

15      bachelor's degree in 1994, could you just

16      tell me where you've worked?

17  A.  Sure.  I worked for Unisys in Tallahassee,

18      Florida.

19  Q.  Unisys, U-N-I-S-Y-S?

20  A.  Yes.

21  Q.  How long were you there?

22  A.  I was there for two years.

23  Q.  Left when, about '96?

24  A.  No.  I started in '96.

25  Q.  So '96 to '98 at Unisys?

26

1    A.  Yes.

2    Q.  Where did you go after that?

3    A.  I went to Atlanta, Georgia.  And I began

4        to work for Meridian Health Care and

5        C.S.R.G, which is now Ross Perot Systems.

6    Q.  Did you work for both of them at the same

7        time?

8    A.  Well, Perot Systems and C.S.R.G. are

9        actually the same company.

10   Q.  You said Meridian Health?

11   A.  Oh, I see what you're saying.  No.

12   Q.  Which did you work for first, Meridian or

13       C.S.R.G.?

14   A.  C.S.R.G.

15   Q.  After Unisys you went to C.S.R.G.?

16   A.  Yes.

17   Q.  So did you start with C.S.R.G. in 1998?

18   A.  Thereabouts.

19   Q.  And how long did you work for C.S.R.G?

20   A.  On and off, over the next four or five

21       years.

22   Q.  And somewhere in there you began to work

23       for Meridian Health; is that right?

24   A.  That's correct.

25   Q.  When did you begin working for Meridian?

26

```
 1    A.  I couldn't give you a date.

 2    Q.  Estimate.

 3    A.  Somewhere in those four/five years.

 4    Q.  So between 1998 and 2002?

 5    A.  Yes.

 6    Q.  And how long did you work for Meridian?

 7    A.  Over that same time span.  It wasn't a

 8        continual relationship with them.

 9    Q.  And they're both in Atlanta?

10    A.  Yes.

11    Q.  And then after you -- did you leave them

12        both at about the same time?

13    A.  Yes.

14    Q.  Then where did you go?

15    A.  I began to work for Jacobson Solutions.

16    Q.  Jacobson Solutions?

17    A.  Yes.

18    Q.  What city is that located in?

19    A.  Jacobson Solutions is actually located in

20        Chicago, Illinois.

21    Q.  Were you actually working for them in

22        Chicago?

23    A.  No.

24    Q.  Where were you working for them?

25    A.  All over.  All over the eastern half of

26
```

1       the country.

2   Q.  You traveled?

3   A.  Yes.

4   Q.  Where were you headquartered?

5   A.  Atlanta was my home residence.

6   Q.  When did you begin for Jacobson?

7   A.  I guess that was 2002.

8   Q.  How long did you continue to work for

9       Jacobson?

10  A.  I worked for Jacobson until 2004, middle

11      of 2004.  I'm sorry, the end of 2004.

12  Q.  Then where did you go?

13  A.  I worked for Pan American Life.

14  Q.  That was the same office here in New

15      Orleans?

16  A.  Yes.

17  Q.  When did you start with Pan American?

18  A.  November 1, 2004.

19  Q.  What was your job with Jacobson Solutions?

20  A.  To work as an insurance specialist.

21  Q.  What business is Jacobson Solutions in?

22  A.  The insurance business.

23  Q.  Do they sell insurance?

24  A.  No.  They provide solutions for insurance

25      companies by providing them with

26

```
 1        experienced insurance personnel who are
 2        able to come in and assist them in
 3        whatever their endeavors may be, whether
 4        it's customer service, whether it's claims
 5        processing, or benefit configuration and
 6        the like.
 7   Q.   So they provide consulting services to
 8        insurance companies.  Is that a fair
 9        statement?
10   A.   Yes.
11   Q.   And that's what you were doing was
12        providing consulting services?
13   A.   Yes.  We would show up -- I say we because
14        we traveled in teams.  We would show up,
15        and we would help the clients.
16   Q.   Was there a subject area within the
17        general insurance industry that you
18        particularly provided consultation on?
19   A.   Just the things that I mentioned.
20   Q.   I guess I'm confused.  What do you
21        particularly focus your work on?
22   A.   Claims would be the main focus.
23   Q.   And while you were at Jacobson Solutions,
24        were you actually handling claims?  Or
25        were you rather advising insurance
26
```

```
1          companies on how they ought to do it?
2     A.   No.  I would handle claims.
3     Q.   So you would go in to a particular
4          insurance company, and you would actually
5          handle their claims?
6     A.   Uh-huh.
7     Q.   Is that yes?
8     A.   Yes.
9     Q.   One of the rules of the deposition I
10         forgot to mention is that it's much better
11         to say yes or no than an uh-huh or unh-unh
12         because the transcript comes out
13         confusing.
14              C.S.R.G., when you worked for them,
15         what were you doing for them?
16    A.   I worked with claims with them as well.
17    Q.   Are they an insurance company?
18    A.   No.  They provide solutions much the same
19         as Jacobson Solutions.
20    Q.   I see.  So that would be they would send
21         personnel in to a variety of insurance
22         companies to do certain tasks?
23    A.   Yes.
24    Q.   And Meridian Health, what were you doing
25         for them?
26
```

```
1    A.  About the same.

2    Q.  It was also claims?

3    A.  Yes, it was also claims.  And they

4        provided personnel to handle claims

5        situations as well.

6    Q.  And back to Unisys, what were you doing

7        for them?

8    A.  That was also claims.

9    Q.  Was Unisys the first employer that you

10       worked for where you handled claims?

11   A.  Yes.

12   Q.  Did Unisys provide you with any special

13       classes on how to handle claims?

14   A.  Yes.

15   Q.  What kind of classes did you take at

16       Unisys?

17   A.  Well, we had training classes where we

18       would be, where we learned to work on the

19       system.  And we learned the flow of the

20       claim throughout the life of the company,

21       as far as how it came in through the mail,

22       how we actually needed to adjudicate it,

23       any kind of adjustments that might need to

24       be made at that time, depending on their

25       financial and administrative situation of

26
```

```
 1        the claim.
 2   Q.   What kind of claims were you handling
 3        while you were with Unisys?  Were they
 4        disability claims, life claims, health
 5        claims?
 6   A.   These were medical claims and dental as
 7        well.
 8   Q.   How about Meridian Health, what kind of
 9        claims were you handling with Meridian
10        Health?
11   A.   Meridian was also a medical entity too.
12   Q.   Did Meridian provide you with any
13        particular training on how to handle those
14        claims?
15   A.   No.
16   Q.   C.S.R.G., what sort of claims were you
17        handling for them?
18   A.   That was mental -- excuse me, medical,
19        dental, and also, how to phrase it, some
20        legal claims as well.  The claims against
21        the Fen-phen suit.  I don't know how
22        familiar anyone is with that.
23   Q.   Sure.
24   A.   Yes, that was something I did with them as
25        well.
26
```

```
 1    Q.   No life or disability claims for C.S.R.G.;
 2         is that right?
 3    A.   Yeah, that's correct.
 4    Q.   Jacobson Solutions, what sort of claims
 5         were you handling there?
 6    A.   The same, medical, life -- excuse me,
 7         medical, dental, and mental health
 8         sometimes.
 9    Q.   When you came to work for Pan Am on
10         November 1, 2004, what was your job title?
11    A.   When I first came to Pan American Life?
12    Q.   Yes.
13    A.   Senior claims examiner.
14    Q.   Were you in a particular department?
15    A.   Yes.
16    Q.   What was the department?
17    A.   Policy benefits.
18    Q.   What sort of claims were you handling when
19         you first began working for Pan Am?
20    A.   I handled life.
21    Q.   Life but not disability; is that right?
22    A.   That's correct.
23    Q.   How long did you handle exclusively life
24         claims?
25    A.   Almost a year.
26
```

1    Q.  Until around November of 2005?

2    A.  No.  Until August of 2005.

3    Q.  And then did you begin to handle other

4        sorts of claims after August of 2005?

5    A.  Yes.

6    Q.  What sort of claims did you begin to

7        handle in August of 2005?

8    A.  I became responsible for the disability

9        line of insurance.

10   Q.  At that time, August 2005, how many people

11       were working, handling claims under the

12       disability line of insurance?

13   A.  I couldn't exactly -- two or three I

14       suppose.

15   Q.  Of which you were one; is that right?

16   A.  Yes.

17   Q.  Was Elaine Bourg also one?

18   A.  No.  She didn't handle claims.

19   Q.  Was Cory Simon of the people you listed in

20       your two or three people?

21   A.  As my boss.

22   Q.  Was he one of the two or three handling

23       disability, the disability line of

24       insurance in August of 2005?

25   A.  Well, could you define handling?

26

1    Q.  I'm just trying to find out how big the
2        department was.
3    A.  Small.
4    Q.  I know.  But I want to know, was it just
5        you?  Or was there somebody else there who
6        was also handling, at the same level as
7        you, handling the disability claims?
8    A.  It was me.
9    Q.  It was just you?
10   A.  It was just me.
11   Q.  Before you began handling the disability
12       line claims, did you receive any training
13       specific to disability claims?
14   A.  No, not before.
15   Q.  Since August of 2005, have you received
16       any training specific to disability
17       claims?
18   A.  Yes, some.
19   Q.  What training have you received?
20   A.  How do you mean that?
21   Q.  I don't know.  You said you received some
22       training on disability claims.  What
23       training?
24   A.  Well, use of the materials that we have in
25       the company, not necessarily that they
26

```
1          would be totally dedicated to disability.
2          Also information sharing with various
3          vendors.
4     Q.   Anything else?
5     A.   Well, no.
6     Q.   Did you take any classes on handling
7          disability claims?
8     A.   No.
9     Q.   Were you given any written materials on
10         handling disability claims?
11    A.   Again, nothing specific to handling solely
12         disability claims.
13    Q.   Were you given more generic sorts of
14         materials about handling claims, in
15         general?
16    A.   Yes.
17    Q.   Since August of 2005 when you began
18         handling disability claims, have you been
19         engaged in any other job duties at Pan Am
20         other than handling disability claims?
21    A.   No.
22    Q.   About how many disability claims do you
23         handle in a month?
24    A.   All of them.
25    Q.   How many?  What's the number?
26
```

1    A.   Are you asking me how many new claims we

2         get?

3    Q.   Let's start with that.  How many new

4         claims do you handle per month?

5    A.   I think on average it would be safe to say

6         we maybe get three to five in a month.

7    Q.   Three to five new disability claims per

8         month?

9    A.   Yes.

10   Q.   How many continuing claims do you handle

11        each month?

12   A.   People that are actually already on claim?

13   Q.   Yes.  That you actually do something with.

14        Not just automatically receive a check,

15        but that you actually have something to do

16        with it.

17   A.   Fifteen, maybe, 15 to 20.

18   Q.   Have you received any training of any sort

19        at Pan Am regarding handling claims for

20        rehabilitation benefits?

21   A.   No.

22   Q.   Have you received any written materials

23        that address how to handle rehabilitation

24        benefits?

25   A.   No.

26

```
 1   Q.  Prior to coming to Pan Am, had you ever
 2       handled a claim for rehabilitation
 3       benefits?
 4   A.  How do you mean that?
 5   Q.  As broadly as possible.
 6   A.  Well, yes.
 7   Q.  When had you handled a claim for
 8       rehabilitation benefits?
 9   A.  Well, throughout my career.  A lot of
10       medical claims that would come in would
11       be, you would define it as rehabilitation.
12   Q.  So when you handled medical claims, some
13       of the claims included claims for
14       vocational rehabilitation?
15   A.  Physical rehabilitation.
16   Q.  You mean -- okay, physical rehabilitation.
17       Let me ask you about vocational
18       rehabilitation.  You understand there's a
19       difference between physical or medical
20       rehabilitation and vocational or
21       occupational rehabilitation.
22   A.  Uh-hun.
23   Q.  Had you ever handled a claim, prior to
24       coming to Pan Am, had you ever handled a
25       claim for vocational or occupational
26
```

```
 1          rehabilitation?

 2   A.   Yeah, some.

 3   Q.   Where had you handled those?

 4   A.   C.S.R.G.

 5   Q.   Did those come up in the context with

 6          medical policies?

 7   A.   Yes.

 8   Q.   And did C.S.R.G. -- strike that.  C.S.R.G.

 9          didn't actually write any policies.

10          Right.

11   A.   No, they did not.

12   Q.   You went to a different insurer who had a

13          policy that included rehabilitation

14          benefits; is that right?

15   A.   Yes.

16   Q.   What insurer did you work for who had a

17          medical policy that included vocational or

18          occupational rehabilitation benefits?

19   A.   That's a very broad question.  I worked

20          for a lot of insurers, and many of them

21          had these benefits in their policies.  I

22          couldn't be more specific than that.

23   Q.   Okay.

24   A.   Given that over the course of a year I

25          could have worked for three, four, five

26
```

1           insurers in a year.

2    Q.    As you sit here today, you cannot recall

3           the name of any insurance company that you

4           worked for that had a medical policy that

5           provided for vocational rehabilitation

6           benefits; is that correct?

7    A.    That's correct.

8    Q.    Do you recall, as you sit here today, the

9           policy provisions of any of the policies

10          that provided for vocational

11          rehabilitation benefits while you worked

12          with C.S.R.G.?

13   A.    No.

14   Q.    Do you recall whether there were policies

15          that you worked with that contained a

16          separate provision for vocational

17          rehabilitation benefits?

18   A.    No.

19   Q.    No you don't recall that?

20   A.    No, I don't.

21   Q.    When you worked for C.S.R.G. and you were

22          required to make decisions about

23          rehabilitation benefits, what criteria did

24          you use to decide whether to grant

25          vocational rehabilitation benefits?

26

1   A.   Whatever the guidelines were for the

2        client.

3   Q.   So you would look to a specific set of

4        guidelines that would be provided to you?

5   A.   Yes.  They would have provided them.

6   Q.   And then you would see whether or not the

7        claim met those guidelines?

8   A.   That's correct.

9   Q.   Then if it did, you would authorize the

10       benefits?

11  A.   That's correct.

12  Q.   As you sit here today, do you recall in

13       any specific case what those guidelines

14       were?

15  A.   No.  I couldn't be specific.

16  Q.   In your job at Pan American, are you

17       required to deal with claims arising under

18       different disability insurance policies?

19  A.   No.  All the policies are for Pan American

20       Life.

21  Q.   Does Pan American have more than one

22       disability policy?

23  A.   Yes, they do.

24  Q.   And are you required to review claims

25       under its various disability insurance

26

```
 1        policies?  Or are you limited to a single

 2        disability insurance policy?

 3   A.   No.  All the policies.

 4   Q.   And do the policies have different terms

 5        that affect whether or not the benefits

 6        are granted?

 7   A.   Yes.

 8   Q.   So do you keep all of the policies at your

 9        desk?

10   A.   Yes.

11   Q.   Who is your supervisor at Pan Am?

12   A.   Cory Simon.

13   Q.   Has he been your supervisor since you

14        started handling disability claims in

15        August of 2005?

16   A.   Yes.

17   Q.   Now, you testified earlier that you've

18        handled on average three to five new

19        claims for disability per month on

20        average; is that right?

21   A.   Yes.

22   Q.   So would it be correct that you handled

23        between 36 and 60 claims per year for

24        disability benefits, new claims?

25   A.   You said 36 and 60?

26
```

1   Q.  Between 36 and 60.

2   A.  Yes.

3   Q.  What percentage of those claims do people

4       apply for rehabilitation benefits?

5   A.  A very small percentage.

6   Q.  Since August of 2005 when you started

7       working in this line, how many claims for

8       disability benefits have you personally

9       handled -- strike that.  That was broad.

10          Since August 2005, how many claims for

11      rehabilitation benefits have you

12      personally handled?

13  A.  Three.

14  Q.  How many of those claims have you provided

15      benefits?

16  A.  None.

17  Q.  We're gonna be talking about the claim

18      Donna Mathews made at some length.  But I

19      want to ask you about the other two, first

20      of all.

21          Do you recall those other two claims

22      for rehabilitation benefits?

23  A.  Yes.

24  Q.  The first one of those two, what was the

25      insured's disability?

26

1   A.  In which one are you referring to?

2   Q.  Pick one, the earlier one.

3   A.  What was the insured's disability?

4   Q.  Yes.

5   A.  It would really help if you give me which

6       one you would like to talk about.

7   Q.  Well, how are we going to demark one from

8       the other?  Let's pick the first one.  Is

9       that okay?  Can you recall one that you

10      think was the first one?

11  A.  Sure thing.

12  Q.  That person, was it a man or a woman?

13  A.  Woman.

14  Q.  What was her disability?

15  A.  She was injured in a fall at her home.

16      She broke her neck.

17  Q.  What did that preclude her from doing?

18  A.  Well, she was a quadriplegic.

19  Q.  What kind of rehabilitation did she

20      request?

21  A.  Voice activated software to improve her

22      quality of life.

23  Q.  And did Pan Am provide her with that

24      benefit?

25  A.  No.

26

1    Q.  Why not?

2    A.  Well, the request was made in some very

3        vague terms.

4    Q.  Any other reason?

5    A.  Well, no.

6    Q.  The other claim, other than Ms. Mathews'

7        claim for rehabilitation benefits, was

8        that made by a man or a woman?

9    A.  That was by a woman as well.

10   Q.  That woman, what was her disability?

11   A.  I cannot specifically recall.  I believe

12       it had something to do with her -- I can't

13       specifically recall.

14   Q.  What sort of rehabilitation benefit did

15       she ask for?

16   A.  She wanted money so that she could become

17       a real estate agent.

18   Q.  Did Pan Am provide that benefit?

19   A.  No.

20   Q.  Why not?

21   A.  Because her request was also on very vague

22       terms.

23   Q.  Any other reason why you declined that?

24   A.  No.

25   Q.  Is there a policy or practice that you

26

```
 1          utilize when a request for rehabilitation

 2          benefits comes in?

 3     A.   Yes.

 4     Q.   Could you describe that policy or

 5          practice?

 6     A.   I actually use the policy itself.

 7     Q.   The actual physical insurance policy?

 8     A.   Yes.

 9     Q.   You get the policy out and do what with

10          it?

11     A.   I get the policy out, and I read it.

12     Q.   Okay.

13     A.   And with specific attention to the rehab

14          language.

15     Q.   Then what?

16     A.   I apply the request -- excuse me, compare

17          the request to what the policy language

18          is.

19     Q.   Okay.  Then what?

20     A.   I make a determination as to whether or

21          not their request fits the terms of the

22          policy.

23     Q.   Anything else?

24     A.   No.

25     Q.   I take it since you've turned down all the

26
```

1   requests that have come your way, you

2   haven't seen any that have actually fit

3   the terms of the policy; is that right?

4 A. That's correct.

5 Q. Is that the practice that you followed for

6   Ms. Mathews' request for rehabilitation?

7 A. Yes.

8 Q. Let's look at a document that was

9   previously marked in the last deposition

10   as Exhibit 3, which is called a disability

11   income policy.  I'll show you that

12   document.  Do you see that Exhibit 3?

13 A. Yes.

14 Q. Are you familiar with this disability

15   income policy through your work at Pan Am?

16 A. Yes, I am.

17 Q. Is this, to your knowledge, is this an

18   own-occupation policy?

19 A. That writer is not attached to the policy,

20   that I recall.

21 Q. There would be a writer attached to the

22   policy if it was an own-occupational

23   policy?

24 A. Yes.  There are own-oc writers that are

25   attached to the policies.

26

```
 1    Q.  Your understanding is if there's no

 2         writer, then it's an all-occupational

 3         policy?

 4    A.  Yes.  Unless there's language in there

 5         that might refer to a regular job.

 6    Q.  I want you it skip on up to page six,

 7         which is bates stamp PAL0947.  Do you see

 8         that?

 9    A.  Uh-huh.

10    Q.  There's a section there on the left column

11         entitled "rehabilitation."  Do you see

12         that?

13    A.  Yes, I do.

14    Q.  And is that the section that you read when

15         Ms. Mathews' request for rehabilitation

16         benefits came in?

17    A.  Yes.

18    Q.  All right.  I want you to look at the

19         first sentence of that.  "We will pay for

20         a rehabilitation program if we approve it

21         in advance."  Do you see that?

22    A.  I sure do.

23    Q.  What retirements -- strike that.  What

24         things are necessary for you to approve a

25         rehabilitation program?

26
```

```
 1    A.  An actual plan.

 2    Q.  Which is what exactly?

 3    A.  Well, depends on the sort of rehab, the

 4        benefit of the person wanted to do.

 5        Excuse me, the benefit that -- the program

 6        that the person wanted to pursue.  It

 7        would be depend on that.

 8    Q.  Under what circumstances would you approve

 9        a plan?

10    A.  If we had a complete plan.

11    Q.  What is a complete plan, in your

12        estimation?

13    A.  Well, a complete plan would need to give

14        you a dollar amount.  It would need to

15        give you a time line.  It would need to

16        give you some indication as to what their,

17        what they anticipate this plan

18        accomplishing for them, them being

19        insured.

20    Q.  Anything else?

21    A.  Nothing I can think of right at this

22        moment.

23    Q.  So is it correct to say that if

24        Ms. Mathews had submitted a plan that

25        contained a dollar amount, a time line,

26
```

1        and what she intended to accomplish that

2        she would have received rehabilitation

3        benefits?

4            MR. EVANS:

5               Objection.  Calls for

6        speculation, incomplete hypothetical.

7            MR. KINNEY:

8             I'm not trying to give him a

9        hypothetical.  I'm trying to give him

10       a basis.  Go ahead, you can answer

11       it.

12           MR. EVANS:

13            You can answer it.

14           THE WITNESS:

15            I'm sorry.

16   BY MR. KINNEY:

17   Q.  Is it correct that if Ms. Mathews had

18       submitted a rehabilitation document to you

19       that included the dollar amount, the time

20       line, and what she hoped to accomplish

21       that you would approved her rehabilitation

22       plan?

23           MR. EVANS:

24             Same objection.  It's a

25        incomplete hypothetical.

26

1    BY MR. KINNEY:

2    Q.  You may respond.

3    A.  I really could not be sure.  There's a lot

4        of details.

5    Q.  So there's something else besides those

6        three elements, then, that you would use

7        to make your decision; is that right?

8            MR. EVANS:

9                Objection.  Argumentative.

10               Those elements are completely

11               undefined.  Does the plan have a

12               20-year course of action?  Is that

13               the time line?  It's incomplete.

14   BY MR. KINNEY:

15   Q.  You can answer.

16   A.  It would be difficult for me to give a

17       very specific answer to that question

18       because there would just be -- in those

19       subjects that I provided for you, there

20       would be a lot of discretion.  There would

21       be a lot of variables to try to

22       understand.

23   Q.  So it's not just a matter of submitting

24       something in those areas.  It's actually,

25       also depends on the content of the

26

1         submission in those areas; is that right?

2    A.   I think that's an accurate statement.

3    Q.   What is the maximum dollar amount that

4         somebody could submit a rehabilitation

5         plan for that you would approve?

6              MR. EVANS:

7                   Objection.  Calls for

8              speculation, incomplete hypothetical.

9              THE WITNESS:

10                  It would really depend on the

11             policy.

12   BY MR. KINNEY:

13   Q.   On this policy?

14             MR. EVANS:

15                  Same objection.

16             THE WITNESS:

17                  I don't have an answer for that.

18   BY MR. KINNEY:

19   Q.   Is there some place you could go to to

20        find the answer to that?

21   A.   Yes, I suppose.

22   Q.   Where?

23   A.   It would really depend on the policies,

24        the individual policy that the request is

25        being made on.  Some of the policies

26

```
1              actually detail the dollar amount.

2    Q.   Well --

3    A.   I just don't recall if this particular

4         one, right off the top of my head, had one

5         of those elements.

6    Q.   Well, please feel free to look through

7         them and tell me if you feel that there is

8         a dollar amount that's involved in this

9         particular policy.

10   A.   As I flip through this, I don't see any

11        particular.

12   Q.   So is there a dollar amount that would be

13        too high for you to approve a

14        rehabilitation program under this policy?

15   A.   I couldn't answer that.

16   Q.   Why not?

17   A.   Is there a dollar amount?  I mean, you

18        just want me to pull one out of the air?

19   Q.   I want an answer, yes or no.  Is there a

20        dollar amount that would make the

21        rehabilitation program unacceptable to

22        you?

23   A.   I've never been down that road.  I

24        couldn't answer that.

25   Q.   How about a time line?  You say a time

26
```

1   line is an important element of a

2   rehabilitation plan.  What is the maximum

3   acceptable time line under this policy

4   that you would accept for a rehabilitation

5   plan?

6    MR. EVANS:

7     Objection.  Calls for

8    speculation and complete

9    hypothetical.

10 BY MR. KINNEY:

11 Q.  You can answer.

12 A.  I really couldn't answer that.

13 Q.  Would you accept, maybe, a time line for

14   rehabilitation of one year under this

15   policy?

16 A.  It's possible.

17 Q.  Would you accept a time line for

18   rehabilitation of two years under this

19   policy?

20 A.  It's possible.

21 Q.  Would you accept a time line for

22   rehabilitation of three years under this

23   policy?

24    MR. EVANS:

25     Object to these questions as

26

1              incomplete hypotheticals,

2              argumentative.

3    BY MR. KINNEY:

4    Q.  You may answer.

5    A.  Again, it's possible.

6    Q.  Would you accept a rehabilitation plan of

7        ten years under this policy?

8    A.  I think that would be kind of strange.  I

9        really couldn't answer that.

10   Q.  You don't know yes or no up to ten years?

11   A.  I --

12           MR. EVANS:

13               Objection.  Incomplete

14       hypothetical.

15           MR. KINNEY:

16               Could you read him the question

17       again?

18               (The following was read

19               Back:  Question.  Would you

20               accept a rehabilitation plan of

21               ten years under this policy?

22               You don't know yes or no up to

23               ten years?)

24           THE WITNESS:

25               I couldn't answer that.

26

1    BY MR. KINNEY:

2    Q.  How about 20 years?

3            MR. EVANS:

4                Objection calls for speculation,

5            incomplete hypothetical.

6            THE WITNESS:

7                I couldn't answer that.

8    BY MR. KINNEY:

9    Q.  So you don't know if you could accept a

10       rehabilitation plan that ran for 20 years?

11   A.  Not at this point, no.

12   Q.  And then finally the third element that

13       you listed was what the plan intended to

14       accomplish; is that right?

15   A.  Yes.

16   Q.  What, in general, would be the definition

17       of an acceptable goal?

18   A.  A situation that would be favorable for

19       both the insured and the company.

20   Q.  How would it be favorable for the company?

21   A.  That we would've fulfilled our obligation

22       by assisting the insured.

23   Q.  Is there ever, would there ever be a

24       situation where the goal would be

25       favorable to the insured but not to the

26

1      company?

2           MR. EVANS:

3               Objection.  Calls for

4           speculation.

5           THE WITNESS:

6               Could you repeat that question?

7   BY MR. KINNEY:

8   Q.  Would there ever be a situation where the

9      goal would be favorable to the insured but

10     not to the company?

11          MR. EVANS:

12             Same objection.

13          THE WITNESS:

14             I could imagine lots of things.

15   BY MR. KINNEY:

16   Q.  Give me an example.

17          MR. EVANS:

18             Same objection.

19          MR. KINNEY:

20             Okay.  I heard your objection.

21   BY MR. KINNEY:

22   Q.  Go ahead and answer.

23   A.  No.  Not right off the top of my head.

24   Q.  Going the other way, would there ever be a

25      situation where you felt that the goal was

26

```
1        not favorable for the insured but was

2        favorable for the company?

3           MR. EVANS:

4               Objection.  Calls for

5           speculation.

6           THE WITNESS:

7               No, I couldn't answer that.

8   BY MR. KINNEY:

9   Q.  Do you recall what Ms Mathews' goal was

10       when she asked for rehabilitation?

11  A.  To my recollection, she did not have a

12       goal.

13  Q.  What do you recall, as we sit here today,

14       about her request for rehabilitation?

15  A.  Her request was impossibly vague.  It was

16       something along the lines of I would like

17       to go to any one of the number of schools

18       to do maybe -- it was something along the

19       lines maybe I want to go become a nurse.

20       And that was pretty much it.

21          It was just maybe I want to go to maybe

22       four or five schools I think she listed.

23       I think I would like to maybe some day be

24       a nurse, but I'm not really sure.

25  Q.  Would becoming a nurse be an acceptable

26
```

```
1            goal to meet that element of the

2            requirements for a rehabilitation benefit?

3    A.   What element was that, sir?

4    Q.   The element that you listed as one of the

5            elements that you consider in granting

6            benefits, the goal element.

7    A.   It's possible.

8    Q.   In Ms. Mathews' case, if Ms. Mathews had

9            said she wanted to become a nurse, would

10           that have been an adequate goal for

11           rehabilitation benefits?

12               MR. EVANS:

13                   Objection.  Incomplete

14               hypothetical.  Calls for speculation.

15               THE WITNESS:

16                   Could you repeat the question?

17   BY MR. KINNEY:

18   Q.   In Ms. Mathews' case, if she had said she

19           wanted to become a nurse, would that have

20           been an adequate goal for purposes of

21           rehabilitation benefits?

22   A.   That's possible.

23               MR. EVANS:

24                   Same objection.

25   BY MR. KINNEY:

26
```

```
 1   Q.  But you're not sure?

 2   A.  No.  Not as it was presented.

 3   Q.  I'm just asking you just a flat out, just

 4       if she said I want to be a nurse, would

 5       that have been enough of a goal for

 6       rehabilitation benefits?

 7           MR. EVANS:

 8               Same objection.  Incomplete

 9           hypothetical.  Calls for speculation.

10           THE WITNESS:

11               It's possible.

12   BY MR. KINNEY:

13   Q.  Is it possible that it wouldn't have been

14       an acceptable goal?

15   A.  That's correct.

16   Q.  How do you decide whether that's an

17       acceptable goal or not?

18   A.  Well, using those guidelines and applying

19       them to the policy.

20   Q.  Well, here's the policy.  It's in front of

21       you.  You see it?

22         If Ms. Mathews had written to you and

23       said I want to have rehabilitation

24       benefits to become a nurse, would that

25       have been adequate as a goal to qualify

26
```

```
 1         her for rehabilitation benefits?
 2    A.   It's possible.  But I don't recall her
 3         actually stating that.
 4    Q.   Is it also possible that you would still
 5         have declined the benefits if she said
 6         that?
 7    A.   It's possible.
 8    Q.   Because of the goal?
 9    A.   Because of the goal?
10    Q.   Right.
11    A.   I can't exactly say that.
12    Q.   Why not?
13    A.   I'm sorry.  Perhaps I'm not following you.
14    Q.   You told me that you have certain
15         considerations that you weigh to determine
16         whether someone gets rehabilitation
17         benefits:  Dollar amount, time line, and
18         the goal they seek to accomplish.
19           Those are the three elements that you
20         look to to decide whether or not you're
21         gonna provide rehabilitation benefits.
22         Right?
23    A.   Yes.
24    Q.   And I'm talking about the goal.  I'm
25         asking is, was there something, is there
26
```

| | | |
|---|---|---|
| 1 | | something wrong with a goal of becoming a |
| 2 | | nurse in Ms. Mathews' case? |
| 3 | A. | I don't believe there's anything wrong |
| 4 | | with that as a goal. |
| 5 | Q. | So that would have an acceptable goal for |
| 6 | | rehabilitation benefits; is that right? |
| 7 | A. | That's possible. |
| 8 | Q. | Well, why can't you just say yes?  What |
| 9 | | makes you hedge it that way? |
| 10 | | MR. EVANS: |
| 11 | | Objection.  Argumentative.  And |
| 12 | | my objection still stands because |
| 13 | | these are incomplete hypotheticals |
| 14 | | and because they call for |
| 15 | | speculation. |
| 16 | BY MR. KINNEY: | |
| 17 | Q. | You can answer. |
| 18 | A. | Could you repeat your question? |
| 19 | Q. | What else do you need to know about |
| 20 | | Ms. Mathews' goal, other than that she |
| 21 | | wants to be a nurse, for you to decide |
| 22 | | whether her goal is acceptable? |
| 23 | A. | Well, I think one thing you would want to |
| 24 | | know is, is it possible for the person to |
| 25 | | actually become a nurse? |
| 26 | | |

```
 1   Q.  How would you decide that?

 2   A.  If it was medically impossible for her to

 3       become a nurse, then that would not be a

 4       good goal.

 5   Q.  Did you ever make that determination in

 6       Ms. Mathews' case?

 7   A.  We never got that far.  She never

 8       specifically stated she wanted to be a

 9       nurse and presented a plan to reference

10       that.

11   Q.  Let's go to another exhibit we previously

12       marked as Exhibit 4.  You should have it

13       there.

14   A.  Okay.

15   Q.  That's entitled "An income protection

16       policy."  Do you see that?

17   A.  Uh-huh.

18   Q.  Yes?

19   A.  Yes.

20   Q.  What's the difference between an income

21       protection policy and a disability income

22       policy, in general?

23   A.  From my prospective?

24   Q.  Yes.

25   A.  Not a lot.

26
```

1    Q.  From your prospective as a --

2    A.  As a claims examiner.

3    Q.  As a claims examiner, they're essentially

4        the same; is that right?

5    A.  Yes.

6    Q.  Now, do you also have a copy of the income

7        protection policy at your desk?

8    A.  Yes, I do.

9    Q.  And Ms. Mathews was insured under both

10       policies, did you know that?

11   A.  I accept you saying that.

12   Q.  But you didn't know that until I told you?

13   A.  Well, it makes sense.  I recall she did

14       have more than one policy.

15   Q.  Did you review the language of both

16       policies when she asked for rehabilitation

17       benefits?

18   A.  Yes.

19   Q.  Was it the same?  Was the language of both

20       policies the same?

21   A.  I don't recall.

22   Q.  Would it have mattered to you if the

23       language was different?

24   A.  Yes.

25   Q.  I want you to look at page six on the

26

```
 1        upper right-hand portion.  Do you see

 2        that?

 3   A.   Yes, I do.

 4   Q.   Rehabilitation?

 5   A.   Yes.

 6   Q.   Now, you just read the rehabilitation

 7        provision in Exhibit 3.  Now you see the

 8        rehabilitation provision in Exhibit 4.

 9   A.   Uh-huh.

10   Q.   Are there differences between the two that

11        would affect your decision whether or not

12        to grant rehabilitation benefits?

13   A.   No.

14   Q.   Okay.  In December 2005, do you know how

15        many insurance policies for disability

16        benefits Ms. Mathews had in force with Pan

17        American Life Insurance Company?

18   A.   I believe there were three.

19   Q.   So we've looked at two insurance policies

20        here, Exhibit 3 and Exhibit 4.  Is it your

21        understanding that there is yet another

22        insurance policy that we have not looked

23        at?

24   A.   No.  We just looked at two.

25   Q.   You just told me there was three.

26
```

```
 1    A.  Yes, there are three policies.

 2    Q.  So is there another policy that we haven't

 3        looked at?

 4    A.  I don't believe so.  And I say that

 5        because of the policy types.

 6    Q.  Okay.  What about the policy types tells

 7        you that these two are all of the policies

 8        that you need to look at?

 9    A.  Well, it's possible for a person to have

10        two policies and have them be of the same

11        policy, the same type of policy.

12    Q.  Is that what Ms. Mathews had?

13    A.  I believe so.

14    Q.  Do you know, the third policy, which of

15        these two policies was it like?

16    A.  No, I don't recall that.

17    Q.  You don't.

18            VIDEOGRAPHER:

19                I need to change tapes.

20              (Off the record.)

21    BY MR. KINNEY:

22    Q.  How do you find out that a new claim for

23        disability benefits has come in to Pan Am?

24    A.  We would receive the claim forms, and they

25        end up on my desk.

26
```

```
 1    Q.  And what do you do then?

 2    A.  I begin the evaluation process.

 3    Q.  What do you usually get when the claim

 4        form comes in, just the claim form itself

 5        and nothing else?

 6    A.  Well, no.  There's the claim form and then

 7        the claim proofs.

 8    Q.  Okay.  Is the claim form -- who fills out

 9        the claim form?

10    A.  Well, the claim statement is just what I'm

11        thinking of when I think claim form, is

12        filled out by the claimant.

13    Q.  Then you also get something called claim

14        proof?

15    A.  Well, no.  The claim proofs would be all

16        the materials that make up the claim.

17    Q.  The very first piece of paper you get is

18        the claim form; is that right?

19    A.  Well, it's part of it.  It normally comes

20        as a package.

21    Q.  What else is in the package?

22    A.  You have the attending physician

23        statement.  You have the claimant

24        statement.  You have the occupational

25        description statement.  You have the tax

26
```

1        records and the HIPPA authorization.

2    Q.  Those all come in together usually?

3    A.  Yes.

4    Q.  When you get all that information in, what

5        do you do?  What's the first thing you do

6        once you see, okay, I got all this stuff?

7    A.  First thing I would do is order the

8        medical records if the HIPPA had come in

9        with the package.  If something is

10       missing, then I send out a letter to

11       request whatever is missing.

12   Q.  Do you do -- do you check to see that

13       policy is in force?

14   A.  Yes, I do.

15   Q.  You do that at the beginning of the claim?

16   A.  Yes.

17   Q.  How do you do it?

18   A.  I will look at the software that we have

19       that let's you know if the person has paid

20       their premiums.

21   Q.  Does that software tell you what insurance

22       policies they have with Pan American?

23   A.  Yes.

24   Q.  Is it your practice to check and see what

25       insurance policies they have?

26

1   A.  Yes.

2   Q.  Does the software that you have tell you

3       how they go about paying the premium?  In

4       other words, does it show whether there's

5       automatic withdrawals from the account or

6       whether they send a check in, how they do

7       it?

8   A.  Yes.

9   Q.  It does show that?

10  A.  Yes, it does.

11  Q.  Do you check to see if there's a waiver of

12      premium provision associated with the

13      policy?

14  A.  Yes, I do.

15  Q.  Right there that first day, if there's a

16      waiver of premium provision associated

17      with the policy, do you do anything about

18      the waiver of premium?

19  A.  No.

20  Q.  At some point do you do anything about the

21      waiver of premium?

22  A.  At some point, yes.

23  Q.  What's that point?

24  A.  That would be at the point that the

25      insured was actually going to begin to

26

```
 1          receive benefits.

 2    Q.    So at the point when you were gonna begin

 3          to provide benefits, you would do

 4          something about the waiver of premium

 5          provision; is that right?

 6    A.    Yes.

 7    Q.    What would you typically do about the

 8          waiver of premium provision at that point?

 9    A.    I would activate the waiver of premium in

10          the software.

11    Q.    How would you do that?  Physically, what

12          do you have to do?

13    A.    You have to change the codes in the

14          software.

15    Q.    So you just type something into the

16          computer?

17    A.    Yes, you do.

18    Q.    And then premiums are then waived; is that

19          right?

20    A.    More or less, yes.  I'm sorry, yes.

21    Q.    Let me hear about the less part.

22    A.    I'm sorry, yes.

23    Q.    The premiums are then waived; is that

24          right?

25    A.    Yes.

26
```

```
 1    Q.  Now, you can see from your computer screen

 2        that in some cases they're automatic

 3        withdrawals from the checking account to

 4        pay the premium.  Right?

 5    A.  Yes.

 6    Q.  So when the premiums are waived, does that

 7        automatically shut off the withdrawal from

 8        the checking account?

 9    A.  No, it did not.

10    Q.  So what has to be done in order to shut

11        off the withdrawals from the checking

12        accounts?

13    A.  We would have to make a -- you would have

14        to perform a special transaction in order

15        to turn off the automatic withdrawal.

16    Q.  Who does that?

17    A.  That's me.

18    Q.  And is it your practice to do that

19        whenever you see that there are automatic

20        withdrawals being taken?

21    A.  Today?

22    Q.  Yes.

23    A.  Yes.

24    Q.  Has that always been your practice?

25    A.  No.

26
```

```
 1    Q.   When did your practice change?

 2    A.   When I realized that activating the waiver

 3         premium would not automatically turn off

 4         the automated withdrawal.

 5    Q.   When did you find that out?

 6    A.   In '06.

 7    Q.   Was that in connection with the Mathews

 8         case?

 9    A.   Yes.

10    Q.   How did you find that out?

11    A.   When she called up screaming.

12    Q.   Did you talk to anybody about that subject

13         at Pan Am?

14    A.   Yes.  After she called up screaming.

15    Q.   Who did you talk to?

16    A.   I spoke to some individuals in the billing

17         department.

18    Q.   Do you remember who?

19    A.   Not particular.

20    Q.   Do you remember what was told to you?

21    A.   Yes.  They told me how to take it out of

22         the automatic withdrawal.

23    Q.   I take it that was the first occasion in

24         which you learned how to do that; is that

25         right?

26
```

1   A.  Yes.

2   Q.  Did you get anything in writing about that

3      from the billing department?

4   A.  No.

5   Q.  No memos were generated or nothing like

6      that?

7   A.  No.

8   Q.  Now, in your department there are other

9      insurance claims personnel who handle

10     claims on subjects other than disability;

11     is that right?

12  A.  That's correct.

13  Q.  Have you ever talked to them about the

14     fact that you have to do something special

15     to turn off the automatic withdrawals from

16     accounts?

17  A.  Have I ever?

18  Q.  Yes.

19  A.  Yes.

20  Q.  Since after the Mathews case?

21  A.  Yes.

22  Q.  And were they already aware that something

23     had to be done in that regard?

24  A.  Surprisingly, yes.

25  Q.  Do you know how they became aware of that

26

```
 1        factor?

 2   A.   No, I don't.

 3   Q.   One of the things that you get at the

 4        inception of the claim is something called

 5        an attending physician statement; is that

 6        right?

 7   A.   That's right.

 8   Q.   What information do you look for on the

 9        attending physician statement?

10   A.   Well, I look to see if there is a day

11        given for a return to work.  I look to see

12        the physician's address.  I look to see

13        their diagnosis.

14           I look for just a general completeness

15        of the form, their beginning date of

16        disability, all the things that are listed

17        on the form.

18   Q.   Let me show you a document which we will

19        mark as Exhibit 9 for the purpose of these

20        depositions.  You have that in front of

21        you now, sir?

22                     (Exhibit 9, attending physician

23                      statement, was marked for

24                      identification.)

25   A.   Yes, I do.

26
```

1   Q.  Is this an attending physician statement?

2   A.  Yes, it is.

3   Q.  Can you tell when Pan American Life

4       received this document?

5   A.  Sure.  February 6, 2006.

6   Q.  And this is relating to Donna Mathews; is

7       that right?

8   A.  That's correct.

9   Q.  And I want you to turn to the second page

10      of this document, the section nine called

11      "prognosis."  Do you see that?

12  A.  Yes, I do.

13  Q.  And you see the notation about returning

14      to regular work?  Do you see that?

15  A.  Yes, I do.

16  Q.  And that indicates that at the time this

17      doctor wrote this, he thought

18      March 15, 2006.  Do you see that?

19  A.  Yes, I do.

20  Q.  What do you do with that piece of

21      information when you see it on an

22      attending physician statement?

23  A.  What do I do with it?

24  Q.  Yeah.  Does that get programmed into the

25      computer?  Do you just put this in the

26

```
 1          file and something happens to it?
 2    A.    It goes into the file.
 3    Q.    It just goes into the file?
 4    A.    Yes.
 5    Q.    Do you make any assumptions based on this
 6          prognosis number nine here that we just
 7          looked at, as to whether or not the
 8          insured will return to work on March 15th?
 9    A.    The only assumption I make is that that's
10          what the physician fills out that a person
11          would be able to return to work by.
12    Q.    If you determine that Ms. Mathews was
13          qualified for benefits, would you
14          automatically cut her benefits off on
15          March 15th based only on this document?
16    A.    Yes, I would.
17    Q.    Would you check with her to see if she
18          returned to work?
19    A.    No, I would not.
20    Q.    Would you check with the physician to see
21          if he had changed his opinion?
22    A.    No, I would not.
23    Q.    Would you check with the employer to see
24          if she had returned to work?
25    A.    No, I would not.
26
```

```
 1    Q.  You would rely solely on this document

 2        with a prognosis of March 15th to cut off

 3        her benefits?

 4    A.  Yes, I would.

 5    Q.  Is that Pan American's policy and practice

 6        regarding disability policies?

 7    A.  Yes.

 8            MR. EVANS:

 9                Take our break now?

10            MR. KINNEY:

11                Sure.

12              (Off the record.)

13    BY MR. KINNEY:

14    Q.  Mr. Jones, we are back on the record after

15        a short break.  We were talking about

16        Exhibit 9 when we took the break.  It's

17        still in front of you I believe.

18    A.  Yes.

19    Q.  I want you to look at Section 11 of this

20        document under "remarks."  You see that?

21    A.  Okay.

22    Q.  "May need surgical intervention."  Do you

23        see that?

24    A.  Yes, I do.

25    Q.  Would that affect your decision in any way

26
```

```
 1        about whether or not you should assume

 2        that Ms. Mathews returns to work on

 3        March 15th?

 4   A.   No.

 5   Q.   Now, would your -- suppose instead of

 6        March 15th here it had said June 15th,

 7        would you have automatically cut off her

 8        benefits on June 15th in that situation?

 9   A.   Yes.

10   Q.   With no further inquiry?

11   A.   That's correct.

12   Q.   I'll show you another document, which we

13        will mark as Exhibit 10 to this

14        deposition.  I'll represent that this was

15        produced to me by Pan American's attorney.

16        It goes from bates stamp PAL0714 through

17        720.  Do you have that in front of you,

18        sir?

19                  (Exhibit 10, medical records

20                   request, was marked for

21                   identification.)

22   A.   Yes.

23   Q.   What those documents that are stapled

24        together as Exhibit 10?

25   A.   Just a record of the medical records

26
```

```
 1         requests that were placed through E.M.S.I.
 2    Q.   Do you personally place these requests, or
 3         is that done by somebody at Pan Am?
 4    A.   No.  That is it done by somebody else.
 5    Q.   Would Elaine Bourg have been the person
 6         who did this?
 7    A.   Yes.
 8    Q.   That would be within her job
 9         responsibilities?
10    A.   Yes.
11    Q.   Can you tell when these records were
12         ordered from these documents that you have
13         in front of you?
14    A.   Well, I can tell they were printed out on
15         the 13th of February 2006.
16    Q.   Does that indicate to you that they were
17         ordered on or about the 13th of February?
18    A.   Yes.
19    Q.   Is it Pan American standard policy to send
20         that request for the treating physician's
21         records?
22    A.   Yes.
23    Q.   And when the records are received back
24         from the treating physicians, does
25         somebody read them?
26
```

1    A.  Yes.

2    Q.  Now, I notice on the first page of the

3        Exhibit 10 under "attending physician

4        statement" there's the word, next to it

5        the word "success."  Do you see that?

6    A.  Yes, I do.

7    Q.  What does that mean?

8    A.  It means that the data collections

9        specialties were able to make some sort of

10       contact with that physician.

11   Q.  Is that Dr. Bodor on this first page?

12   A.  Yes, that's the name on my first page.

13   Q.  Does the word "success" mean that there

14       had been a successful contact with

15       Dr. Bodor?

16   A.  Yes.

17   Q.  Can you tell what sort of contact that was

18       by looking at Exhibit 10?

19   A.  No.

20   Q.  Is it typically a telephone call that's

21       made?

22   A.  I would imagine.  I'm not actually

23       involved in that aspect of it.

24   Q.  I don't want -- if you don't do it, just

25       say you don't do it.

26

```
 1    A.   I don't do it.

 2    Q.   Okay.  Fine.  Do you know what the

 3         elimination period was for Ms. Mathews'

 4         policies?

 5    A.   Not right off the top of my head.

 6    Q.   I'm going to represent to you it was 60

 7         days.

 8    A.   Okay.

 9    Q.   And that she represented to Pan Am that

10         she was injured on December 15, 2005.

11         Okay?

12    A.   Okay.

13    Q.   Is it your understanding that if benefits

14         would become payable to her, the benefit

15         period would begin on February 14th of

16         '06?

17    A.   It would begin after the elimination

18         period had ended.

19    Q.   And do you know if Pan Am made a payment

20         to Ms. Mathews for the period that began

21         in February of '06, after the elimination

22         period?

23    A.   Yes.

24    Q.   I'm going to show you another document,

25         which we will a mark as Exhibit 11 for the

26
```

1       purpose of this deposition.  Mr. Jones,

2       I've just handed you a document marked as

3       Exhibit 11 for the purposes of this

4       deposition.  Can you tell what that is?

5                 (Exhibit 11, medical records,

6                    were marked for

7                    identification.)

8  A.  Sure.  It is a medical record.

9  Q.  Can you tell what doctor this applies to?

10  A.  Yes, I can.

11  Q.  Who is that?

12  A.  Dr. Alexander.

13  Q.  Can you tell when Pan Am received this

14       record in Exhibit 11?

15  A.  Yes.

16  Q.  When?

17  A.  It says, "Entered March 14, 2006."

18  Q.  And that would be the date it was

19       received?

20  A.  Yes.

21  Q.  And did you read it when it came in?

22  A.  Yes.  I would have looked at it.

23  Q.  I want you to turn to the last page that's

24       bates stamp PAL0206.  Do you have that in

25       front of you now?

26

1    A.  Yes.

2    Q.  Do you see the date of this chart record?

3    A.  Yes, I do.

4    Q.  What is the date?

5    A.  It says 2/21/06.

6    Q.  And I want you to look at the last

7        sentence under Category P.  Do you see

8        that?

9    A.  Yes, I do.

10   Q.  "We'll see her back in one month, hoping

11       she might get back to work in two months."

12       Do you see that?

13   A.  Yes, I do.

14   Q.  So based on that, was it your

15       understanding that Ms. Mathews was back at

16       work on February 21, 2006?

17   A.  This doesn't indicate that she's back at

18       work at that time.

19   Q.  Was it your understanding, based on this,

20       that she would be back at work on

21       March 15, 2006?

22   A.  It's not stated definitively.

23   Q.  I want you to go -- here's my question for

24       you, when you received Exhibit 11, did

25       that change in any way your belief based

26

```
 1          on Exhibit 9 that Ms. Mathews was

 2          returning to work on March 15, 2006?

 3   A.     No.

 4   Q.     Why not?

 5   A.     Why didn't it change my mind?

 6   Q.     Why didn't it change your opinion?  You

 7          have an opinion based on Exhibit 9 that

 8          she was going back to work on March 19th.

 9          Right?

10   A.     Yes.

11   Q.     And then you received Exhibit 11 with the

12          language we just looked at.  Right?

13   A.     Yes.

14   Q.     Why didn't Exhibit 11 cause you to revise

15          your opinion that you made based on

16          Exhibit 9?

17   A.     Because the attending physician statement

18          is typically the guiding document as far

19          as when we would expect a person to return

20          back to work.  So that's what I go by.

21   Q.     Even when the same doctor provides updated

22          information that contradicts that; is that

23          right?

24   A.     I didn't see that.

25   Q.     Well, this is Dr. Alexander's record,

26
```

```
 1            right, Exhibit 11?

 2     A.     Uh-huh.

 3     Q.     And this attending physician statement is

 4            also from Dr. Alexander; isn't it?

 5     A.     Yes.

 6     Q.     And Exhibit 11 was made more recently than

 7            Exhibit 9.  Right?

 8     A.     Yes.

 9     Q.     And Exhibit 11 indicates she was going to

10            be out of work for a couple more months.

11            Right?

12     A.     He says hoping.

13     Q.     Hoping?

14     A.     He wasn't definitive either way.

15     Q.     Do you recall, when you looked at

16            Exhibit 11 back in 2006, whether you

17            noticed this sentence that I just had you

18            read to the effect that Dr. Alexander was

19            going to have her come back in one month,

20            hoping she might get back to work in two

21            months?

22     A.     Do I recall?

23     Q.     Yeah, do you recall seeing that?

24     A.     Vaguely.

25     Q.     Do you recall whether you, whether it

26
```

```
 1          occurred to you that that might contradict

 2          the attending physician statement, Exhibit

 3          9?

 4   A.     Yes.  That would have crossed my mind.

 5   Q.     Was there some reason that you didn't

 6          follow up with a phone call to somebody to

 7          find out when Ms. Mathews was really

 8          returning to work?

 9   A.     Yes.

10   Q.     Why?

11   A.     That wouldn't be the procedure.  This is a

12          self-reported claim.  The insureds called

13          the company and say, hello, I'm disabled.

14          We send them the forms.

15             What the whole process is driven by

16          what the insured is doing, saying.  It's

17          not driven by me picking up the phone and,

18          for instance, calling every policyholder

19          that we have to see if they're doing okay

20          that day.

21             I wouldn't pick up the phone and call

22          her like I wouldn't pick up the phone and

23          call any other policyholder.

24   Q.     Even when you see an ambiguity or a

25          question is raised in your mind as to

26
```

```
 1        what's going on?

 2   A.   That's correct.

 3   Q.   Is it Pan America Life Insurance Company's

 4        policy not to investigate when an insured

 5        is going to return to work?

 6   A.   Yes.

 7   Q.   That's the policy?

 8             MR. EVANS:

 9                  Objection.  It assumes some

10             facts not in evidence, and it's

11             overbroad.

12             MR. KINNEY:

13                  I'm going to stop.  I think I

14             have enough on that subject.

15   BY MR. KINNEY:

16   Q.   We're going to go to the next exhibit,

17        which we'll mark as Exhibit 12 for the

18        purposes of this deposition.

19           Mr Jones, you've been handed a document

20        marked as Exhibit 12 which consists of,

21        what appears to be a check and a form.  Do

22        you see that?

23                  (Exhibit 12, check and form,

24                   were marked for

25                   identification.)

26
```

```
 1   A.  Yes.

 2   Q.  Can you tell -- strike that.  I see

 3       there's some handwriting on the check

 4       underneath the date March 7, 2007.  Do you

 5       see that?

 6   A.  Yes.

 7   Q.  Do you know whose handwriting that is?

 8   A.  No.

 9   Q.  Not yours?

10   A.  No.

11   Q.  I like you to turn to the second page.

12       This is a form that seems to be entitled

13       "Accident and health claim check

14       request/work sheet."  Do you see that?

15   A.  Yes, I do.

16   Q.  Is a document like this prepared every

17       time a benefits check is issued?

18   A.  Yes.

19   Q.  And is this a document prepared in the

20       ordinary course of business of Pan

21       American Life Insurance Company?

22   A.  Yes.

23   Q.  Is it made at or about the time of the

24       events that are reflected in there?

25   A.  Yes.

26
```

```
 1    Q.   Can you tell what date this particular

 2         document was prepared?

 3    A.   Yes.

 4    Q.   What?

 5    A.   March 6 of 2006.

 6    Q.   And does it refer to a benefits payment?

 7    A.   Yes.

 8    Q.   How much?

 9    A.   $500.

10    Q.   On which policy?

11    A.   Policy belonging to 57-758.

12    Q.   There's a category there, A-U-T-H, under

13         which some initials appear, MRJ1.  Do you

14         know whose initials those are?

15    A.   Those would be mine.

16    Q.   And does that reflect the fact that you

17         have authorized this payment?

18    A.   No.

19    Q.   Well, what does it mean then?

20    A.   It's a code that would allow for the

21         processing of the check.

22    Q.   Why do your initials appear on this

23         document?

24    A.   Because those are the initials Elaine used

25         to process the check.

26
```

```
1    Q.  Did you have anything to do with the
2        processing of this check?
3    A.  No.  Just approving it for benefits.
4    Q.  So you would have approved her for
5        benefits before this had been prepared; is
6        that right?
7    A.  Yes.
8    Q.  You see the monthly benefit period for
9        this particular check?
10   A.  Yes.
11   Q.  And that would be what?
12   A.  February 14th of 2006 to March 14th of
13       2006.
14   Q.  So that would be -- am I right that the
15       check would have issued covering that
16       particular period of benefits; is that
17       right?
18   A.  Yes.
19   Q.  So that check would have been for the
20       current period of benefits.  Right?
21   A.  The current period?
22   Q.  Yes.  In other words, is a check issued on
23       March 6th covering the period from
24       February to March of '06?
25   A.  Yes.  It would've been current at that
26
```

```
 1        time.

 2   Q.   Is that Pan American's policy to pay

 3        current benefits?

 4   A.   Yes.

 5   Q.   Is it ever Pan America's policy to

 6        withhold benefits for a period of, say, 90

 7        days?

 8   A.   I'm sorry.  Could you --

 9   Q.   Do you know what it means to pay in the

10        rears?

11   A.   Yes.

12   Q.   Does Pan Am ever pay benefits 90 days in

13        the rears?

14   A.   Yes.

15   Q.   Why would it pay benefits in the rears?

16   A.   Well, depends on when we received

17        notification of the person being disabled.

18   Q.   So, in other words, sometimes you would

19        have to pay back benefits to catch up to

20        the current period; is that right?

21   A.   Yes.

22   Q.   Once you've done that on the first

23        instance, do you thereafter pay for the

24        current period?

25   A.   Yes.

26
```

1   Q.  You don't continue to run at 90 days in

2       the rears, do you?

3   A.  No.

4   Q.  Can you think of any reason why Pan Am

5       would continue to pay benefits 90 days in

6       the rears over the life of a policy?

7   A.  Well, one reason I could think of would

8       just be because of the sequence of events

9       with the dating of the EOBs, of the check

10      request sheet, that, that could be off.

11  Q.  It could just be the check request sheets

12      that are off?

13  A.  Yes.  That happens.

14  Q.  Does Pan Am have any policy or practice in

15      place to make sure that it's paying

16      benefits currently rather than 90 days or

17      so in the rears?

18  A.  Just to go back and look at the claims,

19      the policies.

20  Q.  When it does -- if you were to do that and

21      see that the claims were 90 days in the

22      rears, would you pay 90 days worth of

23      benefits all at once and catch them up?

24  A.  Yes.

25  Q.  And I see also at the bottom of the page

26

```
 1          you're looking at, Exhibit 12, I see

 2          Elaine Bourg's name.

 3     A.   Yes.

 4     Q.   Was this document prepared by Ms. Bourg?

 5     A.   Yes.

 6     Q.   Does Ms. Bourg still work for Pan

 7          American?

 8     A.   No.

 9     Q.   Do you know when she ceased to work for

10          Pan American?

11     A.   Yes.

12     Q.   When?

13     A.   The middle of January of this year.

14     Q.   Has she been replaced by somebody else?

15     A.   Yes.

16     Q.   Who's her replacement?

17     A.   Juanita Varela, V-A-R-E-L-A.

18     Q.   Am I correct, then, that all of the

19          documents of this sort that go out after

20          the middle of January will no longer be

21          signed by Elaine Bourg but will be signed

22          by Ms. Varela; is that right?

23     A.   I'm assuming that we remembered to change

24          the excelsal (spelled phonetically), yes.

25     Q.   Let's go to the next document, which we'll

26
```

```
 1          marked as Exhibit 13 for purposes of this
 2          deposition.  Do you have that in front of
 3          you, sir, Exhibit 13?
 4                    (Exhibit 12, check and
 5                     document, were marked for
 6                     identification.)
 7     A.   Yeah, I'm looking at Exhibit 13.
 8     Q.   That, like Exhibit 12, is a check with a
 9          document attached.  This is also, looking
10          at the second page, this is also a work
11          sheet related to Donna Mathews; is it not?
12     A.   Yes, it is.
13     Q.   And this is also, references a check that
14          was payable to her in the sum of $1,700;
15          is that right?
16     A.   That's correct.
17     Q.   And this check was also payable on
18          March 6th.  Right?
19     A.   The check request was created on
20          March 6th.
21     Q.   And it was for the current period of
22          February 14th, '06 through March 14th,
23          '06.  Right?
24     A.   That's correct.
25     Q.   I want you to go back to the Exhibit 12,
26
```

```
1          that we looked at a minute ago.

2    A.    Okay.

3    Q.    The work sheet on page two of Exhibit 12

4          toward the bottom right above Ms. Bourg's

5          name there's an entry that says "Final

6          benefit return to work."  Do you see that?

7    A.    Yes.

8    Q.    Do you know what was the source of that

9          particular piece of information?

10   A.    The attending physician statement.

11   Q.    And nothing else.  Right?

12   A.    That's correct.

13   Q.    Now, that didn't appear on the bottom

14         right of Exhibit 13.  Do you see that?

15   A.    That's correct.

16   Q.    Do you know how come that's missing from

17         the bottom right of Exhibit 13?

18   A.    No.

19   Q.    Let's go to the next document, which we'll

20         mark as Exhibit 14 for the purpose of this

21         deposition.  I show you that document,

22         sir, and ask if you can identify it?

23                   (Exhibit 14, letter, was marked

24                    for identification.)

25   A.    It's a letter with Pan American at the

26
```

1           upper left-hand side.

2     Q.    It's from Elaine Bourg to Donna Mathews.

3           Right?

4     A.    That's correct.

5     Q.    Do you know why Ms. Bourg sent out this

6           letter?

7     A.    No.

8     Q.    Did you tell her to send it out?

9     A.    I don't recall that.

10    Q.    Is it -- was it her practice while she was

11          working at Pan Am to send out letters that

12          were not directed by you?

13    A.    On occasion.

14    Q.    Do you know what forms would have been

15          enclosed with this letter?

16    A.    Not with complete certainty.

17    Q.    You see it says, "Forms to be completed by

18          you and your physician."  Do you see that?

19    A.    Yes, I do.

20    Q.    Were there forms that Pan Am was regularly

21          using in March of '06 that were to be

22          completed both by claimant and physician?

23    A.    The attending physician statement.

24    Q.    Anything else?

25    A.    I can't think of anything else that would

26

1          fit that definition right now.

2    Q.    Do you know of any reason why Ms. Bourg

3          would be sending out a attending physician

4          statement on March 6, 2006?

5    A.    No.

6    Q.    Okay.  Let's go to one more.  We marked

7          that as Exhibit 15 for this deposition.

8          I'll show you that, sir, and ask if you

9          can identify that?

10                    (Exhibit 15, letter, was marked

11                     for identification.)

12   A.    Yes.  It's a letter on Pan American Life

13         letterhead.

14   Q.    This is the letter from you.  Right?

15   A.    That's correct.

16   Q.    I noticed there's no actual ink signature

17         on this document.  Or, in fact, I wasn't

18         able to find any signatures on any of the

19         letters.  Do you not actually physically

20         sign your letters?

21   A.    No, we do not.

22   Q.    What was this letter about?

23   A.    This was, this was to detail the return of

24         her premium for the period that she had

25         been disabled.

26

```
 1    Q.   This is the waiver of premium was

 2         approved.  Is that what you're talking

 3         about?

 4    A.   Yes.

 5    Q.   And you sent her a check or $88.40.  Do

 6         you recall how you calculated that sum?

 7    A.   I would've looked at what her premium, her

 8         premium charges were.

 9    Q.   Then I like you to go to the paragraph

10         that follows the amount of $88.40, "Future

11         premiums would be waived."  Do you see

12         that?

13    A.   Yes, I do.

14    Q.   "As long as you continue to be disabled

15         within the meaning of the policy, you will

16         be advised" -- let me just -- I'm doing a

17         bad job.

18            I'm going to read that paragraph into

19         the record:  "The future premiums will be

20         waive as long as you continue to be

21         disabled within the meaning of the

22         disability agreement.  And the company

23         reserves the right to require evidence of

24         your continued disability in accordance

25         with the provisions thereof.  You will be

26
```

```
 1        advised when such evidence is decided."
 2        Do you see that?
 3    A.  Yes.
 4    Q.  Now, this letter was dated March 13, 2006.
 5        Right?
 6    A.  Yes.
 7    Q.  And at that time it was your intention to
 8        cut off her disability benefits on
 9        March 15, 2006; is that right?
10    A.  Yes.  According to the A.P.S.
11    Q.  So why didn't you tell her in this letter
12        that she was going to be cut off on
13        March 15th?
14    A.  Because this was addressing the return of
15        her premium moneys.
16    Q.  But this paragraph says, this paragraph
17        addresses her continued disability in
18        accordance with the provisions.  Right?
19    A.  Yes, it does.
20    Q.  You had already decided to cut off her
21        benefits in two days; is that right?
22    A.  That was the timing that benefits were
23        scheduled to stop.
24    Q.  And yet you say, "You will be advised when
25        such evidence is desired."  Do you see
26
```

1       that?

2   A.  Yes.

3   Q.  Well, why didn't you tell her on

4       March 13th that you were cutting off her

5       benefits on March 15th and give her an

6       opportunity to provide such additional

7       evidence?

8   A.  Why didn't I do that?

9   Q.  Yes.

10  A.  Because it's a self-reporting claim.

11  Q.  Were you concerned that this letter would

12      mislead her into believing that she was

13      going to continue to receive benefits?

14  A.  No, I would not interpret this letter as

15      being misleading.

16  Q.  And the final sentence in this letter --

17  A.  Okay.

18  Q.  "We certainly hope your health will

19      improve soon."  Do you see that?

20  A.  Yes.

21  Q.  Did you believe that she had a condition

22      as of March 13, 2006 that needed to

23      improve?

24  A.  I can't exactly say that.  This is just a

25      wording that goes along with the standard

26

```
1         letters.
2    Q.   Well, don't you think that someone who
3         received a letter that said that would
4         assume that the insurance company
5         understood that her health had not
6         improved yet?
7    A.   No.
8    Q.   This $88.40 referenced on Exhibit 15 and
9         on the check that is behind it on Exhibit
10        15, do you know how many months premium
11        that was?
12   A.   I believe it to be two.  I could be wrong
13        because I'm not looking at the actual
14        premium schedule.
15   Q.   Now, she had another policy of insurance
16        besides 127-758 that you knew of as of
17        March 13.  Correct?
18   A.   I'm story?
19   Q.   I'll just make it easy.  We'll mark this
20        as the next exhibit, Exhibit 16.  I show
21        you, Mr. Jones, a letter which we marked
22        as Exhibit 16, also dated March 13, 2006.
23        Do you have that in front of you?
24                  (Exhibit 16, letter, was marked
25                   for identification.)
26
```

1    A.  Yes, I do.

2    Q.  That refers to another premium refund of

3        $114.14.  Do you see that?

4    A.  Yes, I do.

5    Q.  Do you know the period of time that that

6        premium refund applied to?

7    A.  It would be the same period of time as the

8        Exhibit 15.

9    Q.  And that premium was for the policy that's

10       referenced in this letter, Exhibit 16?

11   A.  Yes.

12   Q.  Let's go to another exhibit, which we'll

13       mark as Exhibit 17.  Do you have that in

14       front of you now, Mr. Jones, Exhibit 17?

15                   (Exhibit 17, claimant's

16                   statement, was marked for

17                   identification.)

18   A.  Yes, I do.

19   Q.  Do you know what that is?

20   A.  Yes.

21   Q.  What is it?

22   A.  It is a claimant's statement.

23   Q.  Do you know when you received this

24       document?

25   A.  Yes.

26

```
 1    Q.  When?

 2    A.  April 3, 2006.

 3    Q.  I direct you to Category 6.

 4    A.  Okay.

 5    Q.  Date total disability began.  Do you see

 6        that sub-category A, "Are you still

 7        totally disabled and unable to perform all

 8        the duties of your regular occupation"?

 9        Checked box yes.  Do you see that?

10    A.  Yes, I do.

11    Q.  Now, at the time you received this

12        document on April 3, 2006, was Pan

13        American Life paying Ms. Mathews'

14        benefits?

15    A.  I don't recall.

16    Q.  Well, I will represent to you, sir, that

17        no benefits were paid for a period of

18        time --

19    A.  Okay.

20    Q.  -- following the payments that we looked

21        at earlier that were made in March of

22        2006.

23    A.  Okay.

24    Q.  And you testified that you would

25        automatically have ceased making payments

26
```

```
 1          based on the March 15th date in the first

 2          attending physician statement.  Okay?

 3             My question is, when you received this

 4          document in April of 2006, did that cause

 5          you to consider that Ms. Mathews might

 6          still be disabled even though it was now

 7          after March 15th?

 8    A.    Yes, that could have caused me to consider

 9          that.

10    Q.    Then what would you do if you saw this and

11          considered that she was still disabled?

12    A.    We would go about gathering the most

13          update medical records that we could.

14    Q.    Did you do that?

15    A.    Probably.

16    Q.    You don't recall?

17    A.    Yes.

18    Q.    Now, I want you to go to the back of this

19          document, the very last page, which is

20          bates stamp PAL0536, at the top of the

21          page which is where the writing is.

22    A.    Uh-huh.

23    Q.    Ms. Mathews is referring to a consultation

24          she had with her physician.  And she says,

25          "He recommended that I pursue occupational

26
```

1          retraining."  Do you see that?

2     A.   Yes.

3     Q.   Did you see that when this document came

4          in in April of 2006?

5     A.   Yes.

6     Q.   Did that cause you to contact Ms. Mathews

7          and advise her that her policy provided

8          for occupational retraining?

9     A.   I'm sorry.  Did you say would or could?

10    Q.   Did you contact her after you saw this to

11         tell her that her policy provided a

12         benefit for occupational retraining?

13    A.   No.

14    Q.   Why not?

15    A.   That's not our practice.  The benefits are

16         spelled out in the policy.

17    Q.   It's Pan American's view that it's up to

18         the policyholder to determine what

19         benefits are available and to ask for

20         them; is that correct?

21              MR. EVANS:

22                   Objection.  Misstates his

23              testimony.

24              MR. KINNEY:

25                   Well, I'm trying to find out his

26

```
 1              testimony.

 2              MR. EVANS:

 3                  Okay.  That's not what he said.

 4    BY MR. KINNEY:

 5    Q.  What do you say in answer to that

 6        question, sir?

 7    A.  That these are insured self-reporting

 8        claims.  And that when the insured decides

 9        to use their policy, we respond to

10        whatever their requests are.

11    Q.  If there's a benefit in the policy and the

12        insured doesn't ask for it, they don't get

13        it; is that right?

14    A.  I couldn't make a definitive statement

15        towards that.

16    Q.  But it is correct that you make no effort

17        to advise the insured what benefits are

18        available to them in their policies; is

19        that right?

20    A.  Yes, that's correct.

21    Q.  Let's do another one.  I'll show you yet

22        another document we'll mark as Exhibit 18

23        to this deposition.  Do you have that in

24        front of you, sir?

25                  (Exhibit 18, attending

26
```

1                      physician statement, was marked

2                      for identification.)

3    A.  Yes.

4    Q.  What is this?

5    A.  This is an attending physician statement.

6    Q.  Could you tell when you received it?

7    A.  Yes.

8    Q.  When?

9    A.  The stamp says April 3, 2006.

10   Q.  I draw your attention to Section 9 on

11       Page 2 of this document.  Are you there?

12   A.  Yes, I am.

13   Q.  You see the section, "Is the patient now

14       totally disabled from performing his/her

15       regular occupation"?  Do you see that

16       section?

17   A.  Yes.

18   Q.  And what box is checked?

19   A.  The box to the right of three to six

20       months.

21   Q.  So from this document, Exhibit 18, did you

22       understand that Ms. Mathews was out of

23       work due to a disability?

24   A.  I understood that she had a physician that

25       felt that she would not be able to go to

26

1           work for three to six months.

2    Q.    Did you understand she was out, she was

3           not currently at work?

4    A.    Yes.

5    Q.    And did this cause you to start her

6           benefits back up?

7    A.    I don't recall this being the document

8           that caused me to start her benefits back

9           up.

10   Q.    Why not?

11   A.    Why don't I recall it?

12   Q.    I mean, I will represent to you, sir, she

13          did not receive another benefit until July

14          of 2006.

15   A.    Okay.

16   Q.    I would like to know why this didn't

17          restart her benefits?

18   A.    Well, the attending physician statement is

19          a guideline.  As we had received the

20          initial attending physician statement, we

21          ordered the medical records.

22             I received another attending physician

23          statement.  I ordered the medical records.

24          After the evaluation of the medical

25          records, were able to make a decision on

26

1         whether or not to extend benefits.

2              MR. KINNEY:

3                   We're gonna wrap this deposition

4              up.  The court reporter is gonna

5              prepare today's volume of the

6              deposition as a separate volume and

7              certify it.

8                   We're gonna come back tomorrow

9              with Mr. Jones and have another day

10             of deposition tomorrow.

11             MR. EVANS:

12                  Right.  At 11:00.

13             MR. KINNEY:

14                  That's fine.  Okay.

15                (Conclusion.)

16

17

18

19

20

21

22

23

24

25

26

```
 1          Video deposition of MICHAEL JONES

 2               taken on March 13, 2008

 3

 4

 5               WITNESS' CERTIFICATE

 6

 7

 8     I have read or have had the foregoing

 9   testimony read to me and hereby certify that

10   it is a true and correct transcription of my

11   testimony, with the exception of any attached

12   corrections or changes.

13

14

15

16

17          _____

18               MICHAEL JONES

19

20

21

22

23

24

25

26
```

```
1                    REPORTER'S CERTIFICATE
2         I, THERESA MATHERNE, Certified Court
3    Reporter, do hereby certify that the
4    above-mentioned witness, after having been
5    first duly sworn by me to testify to the
6    truth, did testify as hereinabove set forth;
7         That the testimony was reported by me in
8    shorthand and transcribed under my personal
9    direction and supervision, and is a true and
10   correct transcript, to the best of my ability
11   and understanding;
12        That I am not of counsel, not related to
13   counsel or the parties hereto, and not in any
14   way interested in the outcome of this matter.
15
16
17
18
19        _____
20             THERESA (TERRI) MATHERNE
21             CERTIFIED COURT REPORTER
22             REGISTERED PROFESSIONAL REPORTER
23
24
25
```