```
 1                                          97
 2            UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
 3
                  NO. C 07-02757
 4
                  DONNA MATHEWS
 5
                     VERSUS
 6
       PAN AMERICAN LIFE INSURANCE COMPANY;
 7       And Doe 1 through Doe 20, Inclusive
 8                   VOLUME II
 9       Videotape deposition of MICHAEL R.
       JONES, 601 Poydras Street, New Orleans,
10     Louisiana 70130, taken in the offices of
       Affiliated Reporting, 650 Poydras Street,
11     Suite 2610, New Orleans, Louisiana 70130 on
       Friday, March 14, 2008.
12
       APPEARANCES:
13
14       LAW OFFICE OF MICHAEL E. KINNEY
         Attorneys at Law
15       BY:  MICHAEL E. KINNEY, Esquire
         438 First Street, Fourth Floor
16       Santa Rosa, California 95401
17          ATTORNEYS FOR PLAINTIFF
18
         REED SMITH
19       Attorneys at Law
         BY:  THOMAS E. EVANS, Esquire
20       1999 Harrison Street, Suite 2400
         Oakland, California  94612
21
            ATTORNEYS FOR DEFENDANT
22
23       PAN AMERICAN LIFE
         Attorneys at Law
24       By:  PATRICK C. FRAIZER, Esquire
         601 Poydras Street
25       New Orleans, Louisiana  70130
26          ATTORNEYS FOR DEFENDANT
27
```

1

2

3

4

5

6     VIDEOGRAPHER:   KARL STEGEMAN

7

8

9     REPORTED BY:

10

11              LINDY ROOT

12              Certified Court Reporter

13              Registered Professional Reporter

14

```
 1                    DONNA MATHEWS VS.

 2          PAN AMERICAN LIFE INSURANCE COMPANY; and

 3             Doe 1 through Doe 20, Inclusive

 4             Deposition of MICHAEL R. JONES

 5               Taken on March 14, 2008

 6

 7                        INDEX

 8

 9                              Page, Line

10
```

```
           Exhibit #22           102    13
11         Exhibit #23           111    3
           Exhibit #24           113    13
12         Exhibit #25           120    17
           Exhibit #26           128    4
13         Exhibit #27           140    16
           Exhibit #28           175    17
14         Exhibit #29           187    9
           Exhibit #30           192    15
15         Exhibit #31           193    22
           Exhibit #32           198    21
16         Exhibit #33           209    4
           Exhibit #34           216    8
17         Exhibit #35           216    24
           Exhibit #36           226    6
18         Exhibit #37           232    7
19         Exhibit #38           239    5
20         Exhibit #39           244    20
21         Exhibit #40           246    6
22         Exhibit #41           249    14
```

```
23

24

25      EXAMINATION BY MR. KINNEY    102    3

26
```

```
1              S T I P U L A T I O N

2              It is stipulated and agreed by and

3       between counsel for the parties hereto that

4       the deposition of the aforementioned

5       witness is hereby being taken under the

6       Federal Rules of Civil Procedure, for all

7       purposes, in accordance with law;

8           That the formalities of reading and

9       signing are specifically not waived;

10          That the formalities of sealing,

11      certification and filing are specifically

12      waived;

13          That all objections, save those as to

14      the form of the question and the

15      responsiveness of the answer, are hereby

16      reserved until such time as this

17      deposition, or any part thereof, may be

18      used or sought to be used in evidence.

19              *      *      *      *

20          LINDY ROOT, Registered Professional

21      Reporter, and Certified Court Reporter, in

22      and for the Parish of Orleans, State of

23      Louisiana, officiated in administering the

24

25      oath to the witness.

26
```

```
1              (Video introduction.)

2                  MICHAEL R. JONES,

3      after having been first duly sworn by the

4      above-mentioned court reporter, did testify

5      as follows:

6          MR. KINNEY:

7              Before we begin the questioning,

8              Mr. Evans and I had a brief

9              discussion off the record, and I

10             understand that Mr. Jones has been

11             designated as the person most

12             knowledgeable as to category one of

13             my request for -- to depose the

14             person most knowledgeable at Pan

15             American Life which would be the

16             claims presented by plaintiff herein

17             which are the subject of this

18             lawsuit.

19         MR. EVANS:

20             That is correct.

21         MR. KINNEY:

22             Okay.  And I will just note that

23             Exhibit #1 -- the notice of taking

24             deposition is attached as Exhibit #1.

25             This single deposition will count

26
```

```
 1              as both Mr. Jones' personal

 2              deposition and the person most

 3              knowledgeable on that category.

 4    EXAMINATION BY MR. KINNEY:

 5    Q. All right.  We are back on the record,

 6       Mr. Jones.

 7           You recall you were sworn to tell the

 8       truth yesterday.  That same oath still

 9       applies today.

10    A. Okay.

11    Q. Let's go to a new document which we will

12       mark as Exhibit #22 for this deposition.

13           (Exhibit #22 was marked for

14              identification.)

15    A. Thank you, ma'am.

16    Q. I show you that document, sir, and ask you

17       if you know what sort of a document that

18       is.

19    A. I sure do.

20    Q. What is it?

21    A. It is a printout of a transaction screen in

22       our Life Com system.

23    Q. Okay.  And can you tell me what sort of

24       transaction or transactions is involved on

25       this Exhibit #22?

26
```

1    A. Sure.

2         What you see is cash moving from the

3       premium account, and you can see a

4       distribution of the 2982 point, and that

5       would have been indicating that a check was

6       cut.

7    Q. I'm sorry.

8         The 2982 point?

9    A. Yeah, it is transaction 2982.

10        On the transaction column, if you go

11      down --

12   Q. Oh, I see it.  Okay.

13        So that would be a transaction code.

14      Is that right?

15   A. Yes.

16   Q. And what does 2982 mean?

17   A. That's a distribution -- That means a check

18      was cut --

19   Q. I see.

20   A. -- for that -- for those amounts that are

21      on the right-hand corner -- excuse me -- on

22      the right-hand side underneath the

23      transaction amount.

24   Q. So was there a -- was there a -- were there

25      three checks issued?

26

```
 1            One for 53477, one for 6437, and one

 2       for 5357?

 3   A. No.

 4            The transaction codes are 2982, and

 5       they are above the line.

 6   Q. I see that.

 7   A. And those are indications that checks were

 8       cut and the amounts were $57.07 and another

 9       $57.07, and they would have come out

10       together in one check.

11   Q. So that would be $114.14 total.  Is that

12       right?

13   A. That's correct.

14   Q. So let me ask you about immediately below

15       the handwritten line there.

16            There's a number $652.71.

17            Do you see that?

18   A. I sure do.

19   Q. And do you know what that means?

20   A. No, I actually don't.

21            I'm not familiar with the 6002

22       transactions, because I don't utilize them

23       in the course of what I do.

24   Q. Okay.

25   A. I'm not the only person that would actually

26
```

```
 1      make -- that would use the screen in the

 2      company.

 3   Q. Okay.  Can you tell whether you actually

 4      did anything in relationship to

 5      Exhibit #22?

 6   A. Oh, yes.  Uh-huh (affirmative response).

 7   Q. How can you tell?

 8   A. Because my DP desk code is BB 2B7.

 9   Q. So all of the entries above the line that

10      show BB 2B7 were made by you.

11         Is that right?

12   A. Yes.

13   Q. Okay.  So going to the top line, that

14      begins with a date of 3/12/06 and an

15      account number of 220000 and a transaction

16      amount of $57.07.

17         Can you tell me what that is?

18   A. That's a transaction to -- What is 01?

19         01 is to credit, I believe, if I recall

20      correctly.  I generally have to check my

21      notes.

22         But 2001 is generally a credit to the

23      premium account.

24   Q. Okay.  And do you know what transaction

25      code 2002 is?

26
```

```
1    A. Yes.  That is a debit to a -- Let's see.
2            2001 would put money into an account,
3         and 2002 would take money out of an
4         account.
5    Q. All right.  Can you tell by looking at this
6         document whether it pertains to Donna
7         Mathews?
8    A. Well, no.  I don't see her name on it.  I
9         mean I see a policy number in the upper
10        left-hand corner, and I -- if I was at my
11        desk, let's say, I would type in the policy
12        number and that would tell me that was
13        her or anyone's policy number.
14   Q. I see.
15           Well, I will represent to you, sir,
16        this was produced by Pan American's
17        attorney as a document somehow related to
18        the Donna Mathews case.
19   A. Okay.
20   Q. Can you recall making any of these
21        transactions that appear listed above the
22        handwritten line?
23   A. Not the particulars.  I mean when I look at
24        the transaction code I have an idea about
25        what was going on, and based on the dates
26
```

```
1        of the information that you were giving

2        yesterday of the documentation that you

3        were showing, I would anticipate that this

4        was a transaction to generate the premium

5        refund that would later be mailed to the

6        insured.

7    Q. Does this appear to be consistent with a

8        premium refund?

9    A. Yes.

10   Q. Okay.  Now, as you sit here today -- Well,

11       let me ask you another question first.

12           Go to the third transaction -- Strike

13       that.

14           Go to the second transaction from the

15       top.  It starts with a J date of 3/12/06.

16           Do you see that?

17   A. Okay.  Uh-huh (affirmative response).

18   Q. What is a J date?

19   A. That would be the date that the transaction

20       is taking place.

21   Q. Okay.  And then the next column is a due

22       date.

23           Do you see that?

24   A. Uh-huh (affirmative response).

25   Q. Is that yes?

26
```

1    A. Yes.  I'm sorry.  Yes.

2    Q. And that appears to say 1/6/06.

3         Do you see that?

4    A. Yes, it does.

5    Q. What does that refer to?

6    A. That refers to the -- We call it a

7       monthiversary, and that would have been the

8       month that -- excuse me -- the month and

9       day that her premium would have been due at

10      the company.

11   Q. Okay.  And then transaction 2002 is a

12      credit.  Is that right?

13   A. That's correct.

14   Q. Okay.  And then the amount was $47.03.  Is

15      that right?

16   A. Yes.

17   Q. So --

18   A. But that's just part of it.

19   Q. Okay.  What --

20   A. Because the next two lines actually are

21      also part of that transaction.

22   Q. Oh, okay.

23         What do they refer to?

24   A. The same dollar amount.  The $57.07.

25         For reasons that are unknown to me, on

26

1      occasion when you make a transaction in the

2      Life Com system, the system will separate

3      the dollar amounts.  I don't know why it

4      does that, but it doesn't change the amount

5      that the person, you know, on the outside,

6      the insured, the dollar amounts, it doesn't

7      do anything to what the check amount would

8      be.  But it does -- in the system it just

9      has these odd little breakdowns.

10  Q. Okay.  So the total of those three numbers

11     comes out to 57.07.  Right?

12  A. Yes, I believe so.

13  Q. I do, too.

14         And that was credited to a premium

15     account.  Is that right?

16  A. Yes.

17  Q. Why would you credit money to a premium

18     account?

19  A. For a number of reasons.  In trying to make

20     sure that you generate the dollars for the

21     refund, you might have to do some

22     maneuvering in the system to make sure that

23     the insured gets the proper amount of

24     dollars in their refund check.

25  Q. Okay.  But am I right that what these

26

```
1       first -- these three lines we just

2       discussed with the due date of 1/6/06 -- is

3       you credited $57.07 to this insured's

4       premium account for a premium date of

5       January 6, 2006.

6            Is that right?

7   A.  Yes.

8   Q.  So prior to this credit, her premium

9       account with Pan American had $57.07 less

10      in it than after this transaction.

11           Is that right?

12  A.  No.  Not exactly.

13           I mean all these journal dates happened

14      on the same day, and the sum of the

15      accounting transactions could be a net of

16      zero, if you follow what I'm saying.

17  Q.  Well, I --

18  A.  This system is not a realtime system.  It's

19      a batch system.  So whatever you do during

20      the day doesn't take effect until the

21      evening time.

22           So you can have a lot of transactions

23      moving around in the day with no actual

24      effect to the person's policy.  It's just

25      accounting transactions.

26
```

```
 1    Q. Okay.  Let's go to another document which
 2       we will mark as Exhibit #23.
 3          (Exhibit #23 was marked for
 4             identification.)
 5    A. Okay.
 6    Q. And I show you that document, sir, and ask
 7       you if you can identify that.
 8    A. Sure.  This is another screen print from
 9       the Life Com system.
10    Q. Okay.  On the front page there's some
11       handwriting.
12          Do you see that?
13    A. Yes.
14    Q. Is that your handwriting?
15    A. Yes, it is.
16    Q. Okay.  Can you tell when the first page of
17       this document was generated?
18    A. Yes, I can.
19    Q. When?
20    A. 4/20/06.
21    Q. Okay.  And does it refer to some
22       transactions?
23    A. Yes, it does.
24    Q. What transactions are referenced on the
25       first page of this document?
26
```

1    A. This is a sum of $652.71 of being moved

2       around on April 6 -- Well, sorry.  For

3       April 6, 2007.

4    Q. Okay.  And when you say moved around, what

5       happened to that money?

6    A. It was moved from the premium account into

7       the waiver account.

8    Q. Okay.  What is the difference between a

9       premium account and a waiver account?

10   A. Well, the premium account is an account

11      that would hold or at least record dollars

12      that are attached to a person's premium,

13      and the waiver account is a general account

14      where we would have money for -- money to

15      be applied to a person's policy for the

16      purpose of waiver.

17   Q. Okay.  I want you to go to the last page of

18      this document, PAL 0174.

19         Once, again, there's some handwriting

20      on this page.

21         Do you see that?

22   A. Yes, I do.

23   Q. Is that also your handwriting?

24   A. No, that's not.

25         I mean you can read that.  So that's

26

1    not mine.

2    Q. Do you know whose handwriting this is?

3    A. No.

4    Q. Okay.  This page of the document, do you

5       know what it is?

6    A. No.  I'm not actually familiar with this

7       screen.

8    Q. Okay.

9    A. I mean really not familiar with it.  I

10      don't recall ever seeing this one before.

11   Q. Okay.  Let's move to another exhibit then.

12      This will be Exhibit 24.

13         (Exhibit #24 was marked for

14            identification.)

15         I direct your attention to the first

16      page of Exhibit #24.

17   A. Okay.

18   Q. Okay.  And am I correct that this is the

19      same sort of document that was -- we saw on

20      the first page of Exhibit #23?

21   A. Yes, it is.

22   Q. Okay.  And do you know whether you

23      generated this document?

24   A. Yes, I do.

25   Q. Okay.  And can you tell me what is

26

1    represented by this document?

2    A. Sure.  This would be money moving from the

3    premium account into the waiver account.

4    Q. Okay.  And when did that transaction take

5    place?

6    A. April 6, 2007.

7        I'm sorry.  No.

8        It actually took place on April 20,

9    2006, with a due date of April 6, 2007.

10   Q. What does that mean, a due date of April 6,

11   2007?

12   A. That would be the date that a premium

13   payment was due on this particular -- on

14   this particular policy, and as I am looking

15   at the transaction codes, what I see is

16   that this money was being taken from the

17   premium account and placed into the waiver

18   account, because according to this date --

19   Actually on both of these, April 20, 2006,

20   it would have been money applied to the

21   account from her waiver -- excuse

22   me -- from our waiver to her by premium

23   policy, and that money would have been

24   moved back into the waiver account.

25   Q. Okay.  I have to confess I'm a little

26

1      confused by these accounts.  I will see if

2      I can clear it up, but I don't want to

3      spend a lot of time on it.

4   A. Okay.

5   Q. But I want to see if I can clear it up a

6      little bit.

7   A. Okay.

8   Q. Under what circumstances do you move money

9      from -- Strike that.

10         Let me ask you this.

11         Am I right this Exhibit #24 refers to

12     the movement of funds from a waiver account

13     to a premium account?

14         Is that right?

15  A. No.

16         Actually these are representing money

17     going into the waiver account.

18  Q. So from a premium account into a waiver

19     account.  Is that right?

20  A. Yes.

21  Q. Okay.  So under what circumstances would

22     Pan American move money from a premium

23     account into a waiver account?

24  A. Well, if the money is placed in a premium

25     account and it's -- it came from a waiver

26

1       account, when the person is no longer on

2       waiver, then that money would need to go

3       back into a waiver account.

4           So that would be why it's being moved,

5       and -- I'm sorry.  I think -- I mean I

6       don't want to -- You said you don't want to

7       spend a lot of time.

8   Q. No, I don't.

9   A. So I don't want to get into the particulars

10      of these.

11  Q. I am just trying to understand.

12          Well, what is the waiver account used

13      for?

14  A. It hold funds that are applied to an

15      individual's policy for waiver.  When a

16      policy is placed on waiver, it

17      doesn't -- it's not like time is suspended

18      for the policy.  Money is still due on the

19      policy, but if a person's policy is in a

20      waiver, then Pan American -- you as an

21      insured don't have to pay the premiums

22      anymore that month, but the accounting

23      transactions that are performed in Life Com

24      still require money to be applied to the

25      policy.

26

```
 1            So Pan American Life has a waiver

 2       account so that internally the money goes

 3       from the waiver account to the premium

 4       account, and in effect takes the -- pays

 5       the account so that the insured doesn't

 6       have to.

 7   Q. Thank you.

 8            All right.  I would like you to turn to

 9       a document we previously marked as

10       Exhibit #5.

11            Well, you can't very well turn to it,

12       because it's over here.

13   A. Oh.

14   Q. Have you ever seen this document before?

15   A. Yes, I have.

16   Q. What is this letter?

17   A. This is a letter from Medical Director

18       Solutions.  It was sent to me regarding

19       Donna Mathews.

20   Q. Okay.  And who is Medical Director

21       Solutions?

22   A. It's a company, and there are a number of

23       people that work there that are vendors for

24       Pan American Life, or at least for me.

25       They are a vendor of mine with my line of

26
```

1       business, and I work with them.

2    Q. Okay.  And what service do they perform for

3       Pan American?

4    A. They provide a second opinion as far as

5       medical records that are received regarding

6       people's disability policies.

7    Q. Okay.  When you received this document did

8       you read it?

9    A. Yes.

10   Q. And did it cause you to take any action?

11   A. I couldn't say that this one particular

12      document caused me to do anything.

13   Q. Okay.  Did it in any way affect your

14      understanding of whether or not Ms. Mathews

15      was back at work?

16   A. No.  This didn't make any reference I

17      believe to her being at work or not.

18   Q. Okay.

19   A. I think it just pretty much focused on the

20      medical notes that I would have forwarded

21      to them, and they would have given me an

22      opinion regarding what they thought those

23      medical notes indicated her medical

24      condition was.

25   Q. Okay.  I would like for you to look at the

26

```
 1        very top paragraph on page 2 of this

 2        document.

 3            It says there's one other APS form of

 4        unclear date and illegible signature.

 5    A. Uh-huh (affirmative response).

 6    Q. And then following that the sentence an APS

 7        form with these diagnoses should be from

 8        either Dr. Bodor or Dr. Smith.

 9            Do you see that?

10    A. Yes, I do.

11    Q. Did that in any way cause you to seek

12        further medical documentation from Ms.

13        Mathews?

14    A. That one paragraph?

15    Q. Yes.

16    A. No.  I couldn't make that statement.

17    Q. Okay.  Do you recall after you received

18        this document requesting further medical

19        information from Ms. Mathews' physicians?

20    A. No, I don't recall.

21    Q. Okay.  When you received this document --

22        Strike that.

23            Go back to the first page of the

24        document.

25    A. Okay.  Sorry.

26
```

1    Q. Can you tell me when you received it?

2    A. It's stamped April 25, 2006.

3    Q. And is that generally stamped at or about

4       the time it's received?

5    A. Yes.

6    Q. Okay.  Did this document in any way

7       influence your decision as to whether to

8       send Ms. Mathews to an independent medical

9       examination?

10   A. No, not this one document.

11          When you make a decision on a claim,

12      you try to look at it as a whole.  I try to

13      look at all the information I have before I

14      make a decision.

15   Q. Okay.  Let's go to the next document.  We

16      will mark this as Exhibit #25.

17          (Exhibit #25 was marked for

18            identification.)

19          It's a two-page document which appears

20      to be two e-mail printouts.

21          Do you see that, sir?

22   A. Yes, I do.

23   Q. Okay.  Can you tell me what these e-mail

24      printouts relate to?

25   A. They relate to medical record requests.

26

1    Q. Okay.  And did you make these medical

2       record requests?

3    A. Yes, I did.

4    Q. Okay.  You instructed Ms. Bourg to get some

5       further medical records.  Is that right?

6    A. Yes, that's correct.

7    Q. Okay.

8    A. She would have placed the request with our

9       third party data collection specialist.

10   Q. Okay.  And what date did you ask Ms. Bourg

11      to obtain these medical records?

12   A. Well, the date on the e-mail says May 8,

13      2006.

14   Q. Any reason to believe that's incorrect?

15   A. No.

16   Q. So am I correct that as of May 8, 2006, you

17      were still gathering medical records in

18      connection with this claim?

19   A. No.  I wouldn't -- I don't think that's an

20      accurate way of putting it.

21   Q. Okay.  How would you describe what was

22      going on at the time you sent these

23      e-mails?

24   A. Well, at the time the e-mails were sent,

25      this would have been after we -- well,

26

1        after I had made a decision to open up the

2        claim.  And by open, I mean issue a benefit

3        to the insured, and based on the APS the

4        claim would have been closed.

5            If the insured felt that she was still

6        disabled, or he or she was still disabled,

7        then they would, you know, they would

8        express that to us, and if they felt like

9        there was something that would support a

10        continued claim, then they would request

11        that we further evaluate it.

12            So as far as looking at the life

13        process of this claim, this was going to

14        second base by me.

15   Q. Okay.  So this -- Am I correct that your

16        testimony is that Exhibit #25, the e-mails

17        to Ms. Bourg, were a response by you to a

18        request by Ms. Mathews to open her claim?

19   A. Yes.

20   Q. Okay.  And is it your understanding that

21        Ms. Mathews knew that her claim was closed

22        as of May 8, 2006?

23   A. Yes.

24   Q. And how would she have come by that

25        information?

26

```
 1    A. Because when I sent her -- Well, two ways.
 2          One way is the EOB's would indicate
 3       that you are receiving a final payment, and
 4       by May, if for some reason she was not
 5       reading the EOB's and, you know, crumpled
 6       them up and threw them away or something, I
 7       think by May not receiving a check, she
 8       would have understood that she wasn't
 9       receiving benefits.
10    Q. Okay.  Other than the EOB's, there was no
11       communication from Pan Am to Ms. Mathews
12       indicating to her that the claim had been
13       closed.
14          Is that right?
15    A. Well, other than the correspondence, yes.
16    Q. There was correspondence other than the
17       explanation of benefits?
18    A. Oh, I'm sorry.
19          No.
20          Correspondence and the explanation of
21       benefits for me are the same thing.
22    Q. Okay.  Well --
23    A. So in the correspondence, the EOB's, that
24       would be how I would communicate to her
25       that the claim was closed.
26
```

1   Q. You wouldn't write to her and say we

2       decided to close your claim.

3           Is that right?

4   A. That's correct.

5   Q. And if she received an EOB that didn't

6       contain the statement that your claim is

7       closed, she would reasonably expect the

8       claim would be open.  Right?

9       MR. EVANS:

10              Objection.  Calls for speculation.

11      MR. KINNEY:

12              Oh, no it doesn't.

13              She did receive that EOB, and it's

14           in the record.  That is not

15           speculation.

16      MR. EVANS:

17              You're asking him to speculate as

18           to what she believed.

19              Certainly she can testify as to

20           what she believed at her deposition,

21           but I'm not -- That's my objection.

22  EXAMINATION BY MR. KINNEY:

23  Q. Are you aware that Ms. Mathews received an

24      EOB prior to May 8, 2006, that did not tell

25      her that her benefits had been terminated?

26

1    A. Now?  Today?

2    Q. Yes.

3        Right now are you aware of that fact?

4    A. I believe yesterday you had an EOB that did

5       not have a statement on there saying that

6       this is your final benefit, but that would

7       have been one of several EOB's she would

8       have received, and there was an EOB that

9       said this is your final benefit payment.

10        Also -- I'm sorry.  Not also.

11        Just, yeah, that's the statement.

12   Q. Okay.  When you saw that yesterday, was

13       that the first time you had seen an EOB

14       that had gone to Ms. Mathews prior to May 8

15       that had omitted to tell her that that was

16       her final benefit payment?

17   A. Yes, that was the first time.

18   Q. You don't look at the EOB's before they go

19       out.

20        Is that right?

21   A. Yes, I do.  I try to look at them all.

22   Q. Okay.  But on that particular one you

23       missed the fact that it failed to tell her

24       that her benefit had been terminated?

25   A. That would appear to be the case.

26

```
1    Q. So when you saw it yesterday were you

2       shocked?

3    A. Shocked?

4    Q. Yes.

5    A. Well, I wasn't happy about it.

6    Q. Okay.  Let's go to a document which we

7       previously marked as Exhibit #6.

8          It should be in that stack.

9    A. Okay.

10   Q. Do you see that, sir?

11   A. Yes, I do.

12   Q. Okay.  Is this -- Today is the first time

13      you have ever seen this document?

14   A. Yes, it is.

15   Q. Okay.  Do you see the second sentence there

16      of this document -- Make that the third

17      sentence.

18         It says our benefits department has

19      advised that you are not currently on

20      waiver since you returned to work on March

21      15, 2006.

22   A. Yes, I do.

23   Q. And was that information that you

24      personally provided to whoever wrote this

25      letter?

26
```

```
1     A. I can't make that statement.

2     Q. Do you know how whoever wrote this letter

3        came to that information?

4     A. No, I don't.

5     Q. Okay.  Was there anyone -- Strike that.

6           Were you in the benefits department as

7        of May 3, 2006?

8     A. Yes, I was.

9     Q. Okay.  Was there anyone else in the

10       benefits department from whom the author of

11       this letter could have received that

12       information?

13    A. Yes.

14    Q. Who?

15    A. Elaine Bourg.

16    Q. Anybody else?

17    A. Not to my knowledge.

18    Q. Okay.  Had you told Elaine Bourg prior to

19       the date of this letter, May, 3, 2006, that

20       Ms. Mathews had returned to work?

21    A. I don't recall that.

22    Q. Okay.  And as of May 3, 2006, did you

23       believe that Ms. Mathews had returned to

24       work?

25    A. I don't recall having a definite knowledge

26
```

1     either way.

2   Q. Okay.  Let's go to an exhibit that we will

3     mark as Exhibit #26.

4         (Exhibit #26 was marked for

5            identification.)

6         I ask you if you can identify that

7     document?

8   A. It is a letter from Pan American Life.

9     From me.

10  Q. Okay.  Do you recall writing this letter?

11  A. No, not the actual typing of it, but it

12    looks like good work.  Looks like me.

13  Q. Do you recall why you wrote this letter?

14  A. Yes.  This would have been a letter to

15    address the withdrawal that happened on her

16    premium account -- her being the insured --

17    on April 12, and I was sending her a letter

18    to let her know what I found in my research

19    of the policy.

20  Q. Okay.  How did you come to learn that there

21    was any kind of problem at all with the

22    withdrawals from Ms. Mathews' account?

23  A. When she called the customer service unit

24    and was very vocal in her -- in what

25    happened to her bank account.

26

1    Q. Someone contacted you.  Is that right?

2    A. Oh, yeah, they would contact me.

3    Q. And who was that who contacted you?

4    A. I couldn't recall the individual, but it

5       would have been somebody from customer

6       service that would have notified me,

7       saying, hey, Michael, we have an insured

8       who has a problem, can you take a look at

9       it.

10   Q. Okay.  And did they tell you anymore about

11      what the problem was?

12   A. No.  I can't imagine that they would be

13      particularly detailed.  I mean it would be

14      helpful if they were, but most of the time

15      I have to just go and research it out

16      myself.

17   Q. Okay.  So in this case you did research it

18      out.

19          What did you find?

20   A. I found that there had been a withdrawal to

21      her account, and that the withdrawal was

22      for an annual premium benefit, and that

23      wasn't good.

24   Q. Do you know how that happened, that the

25      annual premium had been withdrawn?

26

1    A. You mean the actual mechanics of what

2       happens in the system?

3    Q. Well, just -- It was a mistake.  Right?

4    A. Oh, yes.

5    Q. Okay.  Who made that mistake?

6    A. That would have to come to me.  That would

7       have been my mistake.

8    Q. What did you do that caused that mistake?

9    A. Well, when I placed the policy back into

10      premium paying status, I did not adjust the

11      mode for her premium amounts from 12, which

12      would indicate a year, to one month, which

13      would -- Excuse me.  To a one in our system

14      that would indicate one month worth of

15      premium to be taken out.

16          As I spoke -- As I addressed yesterday,

17      I was unaware that me taking it out of the

18      waiver status wouldn't automatically adjust

19      it.  Wouldn't automatically return her mode

20      to what the prior billing rate was.  So I

21      attempted to correct that.

22   Q. I see.

23          Okay.  Let's go to a document marked as

24      Exhibit #21.

25          Did you find that?

26

1    A. Yes, I did.

2    Q. Okay.  And there are -- There are two pages

3       to this document Bates stamped PAL 0584 and

4       PAL 0585.  They appear to be the same

5       letter, but the first page has a post-it

6       note posted over a portion of the letter.

7          Do you see that?

8    A. Yes.

9    Q. Do you know whose handwriting is on the

10      post-it note?

11   A. No, I do not.

12   Q. Well, I would like for you to look -- Let's

13      start with the second page that doesn't

14      have a note on it.

15   A. Oh, okay.

16   Q. Do you recall this letter?

17   A. Not in particular.

18   Q. Okay.  Did you write this letter?

19   A. Yes, that's my name down at the bottom, and

20      this would be the type of letter that I

21      would write.

22   Q. Okay.  And what type of letter is this?

23   A. It's a reservation of rights letter.

24   Q. Okay.  Do you recall why you sent Ms.

25      Mathews a reservation of rights letter?

26

```
 1    A. My recollection would be that I would have

 2       written her a reservation of rights letter

 3       because we would have -- Well, I would have

 4       made a determination to go ahead and issue

 5       her benefits.  So I would have sent the

 6       letter to let her know that the benefits

 7       were being issued under a set -- a certain

 8       set of circumstances.

 9    Q. Okay.

10    A. As addressed in the letter.

11    Q. Going to the second paragraph of the

12       letter, the first sentence, which reads

13       your policy provides that if a claim occurs

14       within the first two years from the

15       effective date, the company has a right to

16       investigate the representations made in the

17       application for insurance.

18          Do you see that?

19    A. Yes, I do.

20    Q. When you sent this letter, did you believe

21       that a claim had occurred within the first

22       two years from the effective date of Ms.

23       Mathews' policy?

24    A. Off the top of my head, no, I don't really

25       recall that.

26
```

1              This is the standard letter.

2      Q. So that letter --

3      A. What do you guys call it?

4              Boilerplate.

5              There you go.

6      Q. Okay.  So this letter goes out -- Strike

7         that.

8              Let me ask you this.

9              This language is included in every

10        reservation of rights letter that you send.

11             Is that right?

12     A. Yes.

13     Q. And you don't make a decision when you send

14        the letter out as to whether or not the

15        claim did occur within the first two years

16        of the effective date?

17     A. No, I don't make a decision at that time,

18        no.

19     Q. Okay.  And does it concern you at all that

20        a policyholder might believe that you

21        thought she just recently acquired the

22        policy even though she had had it for

23        years?

24     A. I'm sorry.

25             Could you say that again?

26

1    Q. Well, do you understand that a policyholder

2        who received this letter might think that

3        you believed that she was a newly insured

4        policyholder with Pan American Life?

5            MR. EVANS:

6                Objection.  Calls for speculation.

7            THE WITNESS:

8                Oh, sorry.  I thought you were

9            going to respond to him.

10               I can't say that I had concern

11           about that.  It's never really

12           crossed my mind.

13               You know, I've never tried to

14           anticipate how someone -- how an

15           insured would respond to this

16           particular letter.  I wouldn't know.

17    EXAMINATION BY MR. KINNEY:

18    Q. Okay.  Is it within the scope of your

19        authority to change the wording of this

20        letter?

21    A. I believe so.  My boss might say otherwise

22        I suppose.

23    Q. Going back to the post-it note.

24            I don't know if you noticed, but before

25        you came in here we were taking the

26

```
1        deposition of Elaine Bourg, and I asked Ms.

2        Bourg if she could recognize the

3        handwriting here, and she said it was hers.

4    A. Okay.

5    Q. Okay.  Do you have any idea why Ms. Bourg

6        would write pay one monthly benefit 3/14 to

7        4/14, send letter with pay?

8    A. Yes, I do.

9    Q. Why?

10   A. Because she would have stuck a note on the

11       letter to remind herself that when she

12       generated a benefit payment for this

13       policy or policies, that that was the date

14       span that she was going to attach -- Well,

15       not attach.  But that would be the date

16       span that she would write in the EOB to

17       indicate what time period that benefit

18       payment was for.

19   Q. Okay.  Did you instruct Ms. Bourg to send

20       one monthly payment along with this letter

21       of July 12?

22   A. Yes.  Most likely.

23   Q. Okay.

24   A. Because she wouldn't do something like that

25       on her own.

26
```

1    Q. Okay.  Why did you instruct her to send one

2        monthly payment instead of three monthly

3        payments?

4    A. Because at the time we hadn't made -- Well,

5        I hadn't made a determination as to what

6        I -- what conclusion I could come to with

7        the information that I had with the

8        insured.

9            So my thought is as the insurance

10        company, we always try to give the benefit

11        of the doubt to the insured.  So rather

12        than not sending any money at all, if

13        there's -- Like in baseball, a tie goes to

14        the runner.

15            If I'm not sure about something, I

16        would rather go ahead and just make the

17        benefit payment to assist the insured in

18        whatever, you know, their circumstances may

19        be.

20    Q. Okay.  And at some point would it be your

21        policy to catch the benefits up?

22    A. Absolutely.

23    Q. At what point would that happen?

24    A. When I felt comfortable making that

25        decision.

26

1   Q. What decision would it be that you would

2      have to make?

3   A. I would have to make a decision that the

4      person was qualified within the guidelines

5      of their policy as to them being actually

6      disabled, and when I was able to come to

7      that conclusion, if they were behind in

8      their payments, I would catch them up.

9   Q. Okay.  Did you ever come to that conclusion

10     in Ms. Mathews' case?

11  A. I believe so.  She's actually on claim now.

12  Q. And did you catch up her benefit payments?

13  A. That I don't recall.

14        That would be my standard operating

15     procedure is to have her caught up.  I

16     believe she's caught up, but you're looking

17     at me like maybe she is not.

18  Q. We will get to that as we go forward.

19  A. Okay.

20  Q. Is it common for you to start a

21     policyholder up a couple, three months

22     behind as was done here with Ms. Mathews?

23  A. I'm sorry.

24        Could you rephrase that?

25  Q. Yeah.

26

1          I mean does this happen all the time,

2      that you authorize a benefits payment

3      that's three, four months in arrears?

4   A. It happens frequently.

5   Q. In what percentage of the cases that you

6      handle do you authorize a benefit payment

7      to be paid -- a single monthly payment to

8      be paid several months in arrears?

9   A. I don't have a percentage.  I couldn't

10     speculate as to that.

11  Q. Let's go to a document we previously marked

12     as Exhibit #20.

13  A. Okay.

14  Q. And this is a document of the sort you have

15     been referring to as an EOB.  Right?

16  A. Yes.

17  Q. Okay.  And EOB means explanation of

18     benefits.  Right?

19  A. That's correct.

20  Q. And what's the date of this document,

21     Exhibit #20?

22  A. There's no date on there.

23  Q. How did that happen?

24  A. How did that happen?

25  Q. Yes.

26

```
 1   A. Because it was deleted from Excel in the

 2      Excel spreadsheet.

 3   Q. Why?

 4   A. I couldn't tell you why other than a typo.

 5      I mean there would be no purpose in

 6      deleting the date.  It's not our -- It's

 7      not helpful to anybody.

 8   Q. Okay.  I want you to go to the last page of

 9      this document Bates stamped PAL 0094.

10   A. Okay.

11   Q. This is another undated EOB.  Correct?

12   A. Yes.

13   Q. Okay.  On the right side about halfway down

14      the page, there's an indication one monthly

15      benefit, and then beneath that the words

16      ABI 2/14/06 through 3/14/06.

17           Do you see that?

18   A. Yes, I do.

19   Q. What does that mean?

20   A. The ABI?

21   Q. Yes.

22   A. That means additional benefit increase.

23   Q. Does that refer to the $400 to the left of

24      that line?

25   A. Yes, it does.

26
```

```
 1    Q. Okay.  Why was there an additional benefit

 2       increase on this EOB?

 3    A. Because she would have a rider for that

 4       amount attached to her policy.

 5    Q. Do you know whether page 1 of Exhibit #20

 6       was sent to Ms. Mathews?

 7    A. Oh, no, I do not.

 8    Q. Okay.  And the same question for page 3 of

 9       this document.  Do you know whether it was

10       sent to Ms. Mathews?

11    A. No, I don't.

12    Q. Okay.  Do you know -- Well, let's go on to

13       something else.

14          I am going to show you a document which

15       we will mark as Exhibit #27.

16          (Exhibit #27 was marked for

17             identification.)

18          Have you ever seen this document

19       before?

20    A. Yes, I believe so.

21    Q. Okay.  Do you know when Pan American

22       received this document?

23    A. Yes, I do.

24    Q. When?

25    A. It is date stamped July 26, 2006.

26
```

```
 1    Q. Okay.  And did you understand from this
 2       letter that Ms. Mathews wanted to apply for
 3       rehabilitation benefits?
 4    A. Yes.
 5    Q. Okay.  And is there a standard practice at
 6       Pan American as to what to do when you
 7       receive a letter like this requesting
 8       rehabilitation benefits?
 9    A. Yes, I have a standard practice.  I would
10       respond to the insured please present your
11       claim.
12    Q. Okay.  So you would -- Your standard
13       practice would be to write back to the
14       insured?
15    A. Yes.
16    Q. Okay.  And ask for additional information?
17    A. Uh-huh (affirmative response).
18          I'm sorry.  Yes.
19    Q. Okay.  And would you specify what
20       information it is that you want?
21    A. I'm sorry.
22          Specify?
23    Q. What kinds of information you are looking
24       for.
25    A. I would ask them to present their plan.
26
```

```
 1   Q. Okay.  I would like for you to take a look
 2      at Exhibit #2.
 3          Have you ever read Exhibit #2?
 4   A. I believe I have looked at it.
 5   Q. Do you have a copy of it at your desk?
 6   A. Not to my recollection, no.
 7          There's a lot of stuff on there, but I
 8      don't think this is one of the many piles
 9      of paper that I have.
10   Q. Okay.  So when you looked at it in the past
11      where were you?
12   A. At work.
13   Q. Okay.  I mean were you at somebody else's
14      desk?
15   A. Oh.
16          Probably at Mr. Simon's desk.  His
17      area.
18   Q. Okay.  Did he give you a copy?
19          Did he show you a copy?
20   A. He showed me a copy, yes.
21   Q. Did he say anything about it?
22   A. This would be something good to take a look
23      at sometime.  Something along those lines.
24   Q. Okay.  And you looked through it at that
25      time?
26
```

1    A. Yes.

2    Q. And have you looked at it since?

3    A. Well, not until today.

4    Q. Okay.  How long did you spend with it on

5       that first occasion?

6    A. Probably not that long.

7    Q. Five minutes?

8    A. Just a little while.  I mean this would

9       have been, you know, hey, take a look at

10      what some of our competition is doing.

11      Kind of general guidelines sort of thing.

12   Q. Okay.  How long ago was it that you looked

13      at this?

14   A. I have no immediate recollection.

15   Q. Do you have any estimate at all?

16   A. A year or two.

17   Q. Okay.

18        THE VIDEOGRAPHER:

19            Excuse me, Counsel.  I need to

20          change tapes.

21        MR. KINNEY:

22            Okay.  Let's take a break.

23        THE VIDEOGRAPHER:

24            Going off the record.  This is the

25          end of videotape number 1.  It's

26

1          12:12.

2          (Off the record.)

3          THE VIDEOGRAPHER:

4              We are back on the record.  This

5          is the beginning of videotape number

6          2.  It's 12:21.

7     EXAMINATION BY MR. KINNEY:

8     Q. Mr. Jones, we are back on the record.

9          We were -- Before we went off the

10         record we were starting to talk a little

11         bit about Exhibit #2 which you have in

12         front of you.

13    A. Yeah.

14    Q. I would like for you to turn to page --

15         Bates stamp page PAL 1053, and I direct

16         your attention to the bottom of the page

17         where it begins a section entitled

18         Rehabilitation.

19         Do you see that?

20    A. Yes, I do.

21    Q. Okay.  Do you recall -- The time that you

22         looked at this document at Mr. Simon's work

23         space, did you read the section on

24         rehabilitation?

25    A. I might have eyeballed it.  I -- you know,

26

```
 1          not to commit it to memory or anything.

 2      Q. Okay.  Do you recall whether you read it or

 3          not?

 4      A. Not any particulars, no.

 5      Q. Did this section have any influence on the

 6          way you handled Ms. Mathews' claim for

 7          rehabilitation benefits?

 8      A. No.  I can't say that.

 9      Q. Now, let's go to Exhibit #8.

10              Did you find that?

11      A. Yes, I did.

12      Q. Have you ever seen that document before?

13      A. Yes.

14      Q. Okay.  There's some handwriting in the

15          margins of this document.

16              Do you see that?

17      A. Yes, I do.

18      Q. Okay.  Do you know whose handwriting that

19          is?

20      A. That would be mine.

21      Q. Okay.  Good.

22              Well, I would like for you to start by,

23          if you can, reading the handwriting that is

24          in the left margin of the first page of

25          Exhibit #8.

26
```

1   A. Okay.  Had phone conversation where this

2      was explained on 5/26.

3   Q. Okay.  Can you tell what it was that you

4      were referring to that was explained?

5         In other words, there was something in

6      the body of the letter that you thought had

7      previously been explained.

8         Is that right?

9   A. Right.

10  Q. Can you tell what it was that had already

11     been explained?

12  A. Well, from what I'm looking at, it seems to

13     be referring to the first sentence of this

14     paragraph.

15  Q. Okay.  And had you had a conversation with

16     Ms. Mathews on May 26 in which you had

17     explained something about that information?

18  A. I don't believe that I did, because I

19     typically don't actually talk to insureds.

20        This would have been a note referring

21     to a conversation that Elaine would have

22     had with her.  Elaine as in Elaine Bourg.

23  Q. Okay.  And how would you know whether

24     Elaine Bourg had had a conversation with

25     the plaintiff on May 26?

26

1   A. Because Elaine would tell me.

2   Q. She would just orally tell you that?

3   A. Yeah.  She would mention that she spoke to

4      somebody regarding whatever the issue of

5      the day was.

6   Q. Okay.  Well, do you have any idea when you

7      received Exhibit #8 -- without the

8      handwritten notes -- but when you received

9      the letter that is the typed portion of

10     Exhibit #8?

11  A. No.  Other than the fax -- the fax date and

12     time indicator at the top of the letter.

13  Q. That would seem to indicate August 23?

14  A. Yes.

15  Q. Okay.  When you received this letter, let's

16     say on or about August 23, 2006, did you

17     ask Ms. Bourg if she had explained some

18     things to Ms. Mathews in the past?

19  A. Yes, I probably would ask her.

20  Q. Okay.  And she was able to tell you that,

21     yes, she had on May 26th?

22  A. Well, yes, that's what my note indicates,

23     unless I got that wrong.

24  Q. Okay.  Do you know does -- Strike that.

25         Did Ms. Bourg keep records of telephone

26

```
1          conversations that she had with insureds?

2     A. She did on occasion.  She had a little note

3          pad or something she would scribble stuff

4          on.

5     Q. Okay.  Do you see in the first paragraph --

6          Strike that.

7             Do you see in the second paragraph that

8          we are currently focused on here Ms.

9          Mathews indicates that she was concerned

10         that the sum total that was deducted from

11         her account did not equal the amount that

12         was refunded?

13    A. Yes, I see her writing about those concerns

14         in the letter.

15    Q. Okay.  And you understood that what

16         happened had been explained to her.

17            Is that right?

18    A. Yes, that's correct.

19    Q. And that Ms. Bourg had explained it to her?

20    A. Yes.

21    Q. Okay.  And do you know what explanation Ms.

22         Bourg gave to Ms. Mathews?

23    A. No.  I can't say for sure what she told Ms.

24         Mathews.

25    Q. Okay.  Do you see the last sentence of that

26
```

1       paragraph that says, the reimbursed amounts

2       of 40680 and 53457 not only did not include

3       two months premiums totaling 21054, but

4       also the amount of $37.70 that has

5       continued to be deducted monthly until this

6       last period ending 8/16/06?

7          Do you see that?

8  A. Yes, I do.

9  Q. Okay.  Did that cause you to do anything?

10  A. Beyond wonder what she was referring to?

11  Q. Yes.

12  A. I don't recall what it made me do at this

13      particular moment.

14  Q. Okay.  I want you to look at the

15      handwritten portion next to the right side

16      of that paragraph.

17       Now, I wonder if you could read that

18      into the record.

19  A. Our records show that the annual premiums

20      were deducted in error on 4/12/06.  The

21      record amounts did not include premium --

22      something cut off -- needed to keep the

23      policy in force because she was off of

24      disability as stated by her physician.

25  Q. That wasn't actually true.  Was it?

26

1    A. I'm sorry?

2    Q. It wasn't true that her physician stated

3       that she was off of disability?

4    A. This would be referring to the initial

5       attending physician statement that

6       indicated that she would have returned to

7       work on March 15.

8    Q. Were you concerned at all with Ms. Mathews'

9       statement that $37.70 has continued to be

10       deducted monthly?

11    A. I think I would have been wondering what

12       she was referring to.

13    Q. Okay.  Do you recall checking with Pan Am

14       to find out if it was true that $37.70 was

15       being deducted monthly?

16    A. Yes, I recall doing some kind of -- doing a

17       search to try to figure out what she was

18       referring to.

19    Q. And did you find out?

20    A. Eventually I did.

21    Q. Okay.  How did you find out?

22    A. Eventually I found that she had another

23       policy in the system.  She had a third

24       policy, and that was the -- that's what she

25       was referring to with the $37.70.

26

 1   Q. That's what you found out.

 2        My question is how did you find that

 3      out?

 4   A. Well, probably somebody came across it in

 5      customer service and let me know.

 6   Q. Do you have a recollection as you sit here

 7      today, or are you just assuming that that's

 8      what happened?

 9   A. I am anticipating that that is how it

10      occurred.

11        They would have said, hey, there's

12      another policy, and then I would have had

13      to hunt for it.

14   Q. Okay.  Let's go down to the next marginal

15      notation.

16        Do you see -- Do you see right beneath

17      the one you just read there is what looks

18      to me like a question mark and the writing

19      makes no sense.

20        Do you see that?

21   A. Yes.

22   Q. What was it that caused you to write makes

23      no sense?

24   A. Because it didn't make sense to me.

25   Q. What didn't?

26

1    A. Her sentence.

2    Q. Which reads?

3    A. Your recent letter insinuated that it was a

4       new policy.

5    Q. Okay.  You didn't understand why she

6       thought that you thought that.  Right?

7    A. I didn't understand why she thought that I

8       thought -- that I was --

9    Q. That it was a new policy?

10   A. Yes, I would agree with that.

11         I didn't understand why she would think

12      I -- I didn't understand where she was

13      going with the sentence.

14   Q. Okay.

15   A. So I just made a note to myself.

16   Q. Do you understand it now?

17   A. Oh, sure, I do.

18   Q. Well, what do you understand now?

19   A. I understand that she had a third policy

20      and that that policy was withdrawing

21      premiums, and as it was withdrawing

22      premiums it should have been on -- it

23      should have been on waiver.

24   Q. Okay.  My question is the sentence your

25      recent letter insinuated that it was a new

26

1       policy, that didn't -- that sentence didn't

2       make sense to you back in August, 2006?

3  A. Not to my recollection.

4  Q. Okay.  Does it make sense to you now?

5  A. No.  Because I don't believe that my letter

6       insinuated anything.

7  Q. Okay.  Remember we talked about a letter

8       that you had written, the reservation of

9       rights letter of July.

10      Do you recall our discussion about that

11      earlier today?

12  A. Yes, I do.

13  Q. In which you indicated that -- it's

14      Exhibit #21 -- your policy provides that if

15      a claim occurs within the first two years

16      from the effective date.

17      Do you remember that language we talked

18      about in Exhibit #21?

19  A. Okay.  I'm looking at that.

20  Q. Okay.  Do you understand now that that was

21      what Ms. Mathews was referring to in her

22      letter of August 23?

23  A. Well, yes, you just explained that.

24  Q. Okay.  When you got this letter of August

25      23, did that cause you to go back and look

26

1       through your prior correspondence to her to

2       see what you had said to her?

3   A.  I don't recall that happening.

4   Q.  You just noted it made no sense, and did no

5       further investigation.

6           Is that right?

7   A.  Investigation as far as looking into my own

8       correspondence?

9   Q.  Right.

10  A.  I don't recall doing that.

11  Q.  Okay.  You didn't feel that you had any

12      duty to clear anything up with Ms. Mathews

13      regarding something she thought you had

14      insinuated?

15  A.  I'm sorry.

16          Would you repeat that?

17  Q.  I said you didn't feel you had any duty to

18      Ms. Mathews to clear anything up in

19      connection with something she thought you

20      had insinuated?

21  A.  I believe that -- I believe that I think I

22      did try to clear things up with Ms.

23      Mathews, because I don't think I have ever

24      written any one insured as many letters as

25      I wrote to Ms. Mathews to try to clear

26

1      things up.

2          I think I -- I think I refer to that in

3      one of these letters, that I think I

4      wrote -- I sent her maybe 60 to 70 pages of

5      correspondence trying to clear things up

6      for her.  So I --

7  Q.  Your recollection is you attempted to clear

8      up the fact that your reservation of rights

9      letter was not intended to suggest that she

10      had a new policy?

11  A.  I don't recall referring to that

12      specifically.  I think that my attempts to

13      clear things up with her were, you know,

14      whatever question that she was raising at

15      the particular time, and I tried to respond

16      to them.  Hence the 50, 60, 70 pages of

17      stuff that I ended up sending to her.

18  Q.  Okay.  I would like you to read the next

19      marginal comment.  It makes no sense.

20  A.  Oh.

21          The policy's benefit amounts are $1700

22      and $500 respectively.

23  Q.  Okay.

24  A.  Okay.  That -- I'm sorry.

25  Q.  Okay.  I just wanted to hear what you had

26

1       to say.

2   A. Okay.

3   Q. You see she requests a thorough evaluation

4       into the amount awarded to her to the left

5       of the comment you just read?

6   A. Yes.

7   Q. Okay.  Did you perform that thorough

8       evaluation for her?

9   A. Yes, I believe I did.

10          She stated that she thought she was

11      supposed to be getting -- supposed to

12      receive between 3,000 and $4,000 per month

13      in benefits, and after my investigation I

14      don't believe the amount was between 3,000

15      and $4,000 per month.

16  Q. Did your investigation -- your thorough

17      investigation that you performed at Ms.

18      Mathews' request turn up the third policy?

19  A. Yes.  And she was issued benefits in

20      accordance with that policy.

21  Q. Okay.  Well, could you read the next

22      portion on the right-hand column that you

23      wrote?

24  A. There was an overpayment of $800 on policy

25      1257-758.

26

1    Q. How did that happen?

2    A. That happened because Elaine entered -- she

3        entered the wrong amount for a month, and

4        it was an overpayment.

5    Q. Okay.

6    A. So at the time I thought, you know, this is

7        not a good thing to have this overpayment

8        for this month.

9    Q. So I take it you took steps to correct that

10       for future payments?

11   A. Yes.

12   Q. Okay.  Now, on the -- at the very bottom of

13       the page there's also handwriting that

14       appears again to say this makes no sense.

15           Do you see that?

16   A. Yes.

17   Q. That's also your handwriting?

18   A. Yes, it is.

19   Q. And what is it that made no sense there?

20   A. The statement here that says all receipts

21       have left the date field blank.

22           I didn't know what she was referring

23       to.

24   Q. Do you now?

25   A. Not right off the top of my head, no.

26

```
 1            Other than -- I recall thinking at the
 2       time that she must have been referring to
 3       something that was actually on the check.
 4    Q. Okay.  But now we have seen the EOB's for
 5       that period today that left the date field
 6       blank?
 7    A. Right.
 8    Q. Does it make sense to you that she would be
 9       concerned about that?
10    A. Not necessarily about the date, because the
11       date field was for our records so that we
12       would know what date we generate the EOB.
13            It wouldn't affect -- that date field
14       doesn't have anything to do with the amount
15       of benefits a person would receive or the
16       time period for which they were receiving
17       them.
18    Q. Okay.  And when you read this, it didn't
19       occur to you that when she said receipts
20       that she meant EOB's?
21    A. No.  Not when I read it, no.
22    Q. Okay.  And were you sending her anything
23       other than checks and EOB's?
24    A. Well, no.
25    Q. So what else could receipts have referred
26
```

```
 1      to?

 2   A. That was my question.

 3   Q. Okay.  Let's skip on over to the third

 4      page, Bates PAL 0739.

 5          Do you see that?

 6   A. Okay.

 7   Q. And we again have marginal handwriting

 8      there.

 9          Do you see that?

10   A. Yes, I do.

11   Q. That's your writing?

12   A. Yes, it is.

13   Q. What does it say?

14   A. 2,200 is the full benefit due from the

15      policies.

16   Q. Did you subsequently realize that that was

17      incorrect?

18   A. Yes, I did.

19          I corrected it by issuing the benefits

20      due on the third policy.

21   Q. Okay.  Now, I want you to go to the third

22      paragraph from the top.  It begins as you

23      can imagine.

24          Do you see that?

25   A. Yes.

26
```

1   Q. Dealing with a severe disability, such as

2       this one, creates enormous stress.

3           Has that been your experience dealing

4       with disabled people, that they are often

5       under enormous stress?

6           MR. EVANS:

7               Objection.  Calls for speculation.

8   EXAMINATION BY MR. KINNEY:

9   Q. You can answer.

10  A. Could you repeat the question?

11  Q. Sure.

12          Has that been your experience when

13      dealing with disabled people that they are

14      often under enormous stress?

15  A. I can't say that.

16  Q. The next sentence says, I am so saddled

17      with financial commitments that before I am

18      no longer able to work in my chosen

19      profession of over 30 years that provided

20      me with an adequate income.

21          Do you see that?

22  A. Yes, I do.

23  Q. Okay.  And then she writes I want to be a

24      productive citizen once again and am

25      therefore pursuing a career change that

26

 1          will allow me to do this.

 2              Do you see that?

 3     A. Yes, I do.

 4     Q. Your insurance policy is the bridge that

 5          will allow me the necessary funding to get

 6          there.

 7              Do you see that?

 8     A. Yes, I do.

 9     Q. Okay.  Was that your understanding of the

10          purpose of your insurance policy was to

11          provide an insured with the bridge to allow

12          the necessary funding to make a career

13          change?

14     A. No.

15              A disability policy is to replace the

16          income that is lost due to a disability.

17     Q. Okay.  The next sentence says, anticipating

18          a possible scenario such as this was the

19          primary motivation for my purchasing your

20          company's coverage in the first place.

21              Did you see that when she wrote it?

22     A. Yes, I am looking at it.

23     Q. Were you surprised by that?

24     A. That one sentence?

25     Q. Yes.

26

1    A. I don't recall feeling anything about it.

2    Q. Okay.  Did you wonder how the policy had

3       been marketed when you saw that sentence?

4    A. No, not because of that sentence.

5    Q. Do you know anything as you sit here today

6       as to how the policy has been marketed as

7       to rehabilitation benefits?

8    A. No.  I've never worked as a producer.

9    Q. Okay.  And you have never inquired of

10       anyone else how the policy is marketed on

11       that subject?

12   A. Oh, no.

13   Q. And that information wouldn't influence

14       your decision on whether to pay

15       rehabilitation benefits.

16          Is that right?

17   A. That's correct.

18   Q. Next sentence says, career retraining for

19       me cannot possibly happen without

20       consistency on your part to cover my

21       ongoing living expenses as well as tuition,

22       books, and other student expenses.

23          Do you see that?

24   A. Yes, I do.

25   Q. Okay.  Did you think that at this time Ms.

26

1    Mathews had a legitimate concern about

2    consistency by Pan American Life Insurance

3    Company?

4  A. No.

5  Q. You didn't feel that Pan American had been

6    inconsistent in the handling of her matter

7    up until that point?

8  A. No.

9    I felt that you always try to do the

10    best thing you can do.  You just try to do

11    the best you can do.

12  Q. The next sentence says, the program I am

13    attempting is a rigorous one and I must

14    have these issues settled so that I can

15    devote my full concentration to performing

16    well.

17    Do you see that?

18  A. Yes, I do.

19  Q. Okay.  Does that make sense to you?

20  A. In what context?

21  Q. I mean do you agree that it would be

22    necessary for her to have her issues

23    settled so that she can focus on performing

24    well at retraining?

25  A. You're asking me do I agree?

26

1   Q. Yes.

2   A. I don't know what kind of circumstances she

3      needs in order to perform well.

4   Q. Okay.  And it was not a concern of yours

5      one way or the other whether or not she

6      needed issues settled in order to perform

7      well?

8   A. You're asking me if I felt personally --

9   Q. Yes.

10  A. -- involved with her circumstances?

11  Q. I'm asking you if that was a matter that

12     concerned you?

13  A. I can't say that those were the things

14     going through my mind.  I think basically

15     my concerns came down to making sure that

16     the policy was being evaluated as well as I

17     could evaluate it.

18  Q. Okay.  Let's go to the next paragraph.

19         As for my rehabilitation plans, I

20     previously began working on a bachelor's

21     degree, but realized it would be of no

22     benefit to my scope of practice, pay scale,

23     or work setting.

24         Do you see that?

25  A. Yes, I do.

26

```
1    Q. Okay.  Now all that has changed for me.  To

2       work as closely with patients in the

3       diagnosis, treatment planning, and patient

4       care in medicine as I did in dentistry, I

5       will have to earn at least a bachelor's

6       degree, but I am aiming for nurse

7       practitioner certification.

8          Do you see that?

9    A. Yes, I do.

10   Q. Okay.  Did that influence your decision?

11         Those sentences I just read, did they

12      in any way influence your decision as to

13      whether to provide rehabilitation benefits

14      to Ms. Mathews?

15   A. No.

16   Q. No?

17   A. No.

18   Q. They didn't -- They weren't -- They didn't

19      contribute positively or negatively to your

20      decision?

21   A. No.

22         My only response would be to request

23      what is the details of her plan.

24   Q. Okay.  So after you received this level of

25      information, it would be your practice to

26
```

1       request further information.

2              Is that right?

3    A. That's correct.

4    Q. Okay.  Let's go on.

5              This can begin in Santa Rosa Junior

6       College, Napa Valley Junior College,

7       Pacific Union College, or Sonoma State

8       University.

9              Do you see that?

10   A. Yes, I do.

11   Q. Okay.  Would that influence in any way,

12      that sentence, your decision whether or not

13      to provide rehabilitation benefits?

14   A. No.

15   Q. Okay.  Would it require further information

16      from the policyholder?

17   A. Yes.

18   Q. What further information would you need?

19   A. In this particular context?

20   Q. Yes.

21             In the context that she has identified

22      four institutions of higher learning that

23      could provide her with the education that

24      she needs to take this step.

25   A. Well, from my perspective, I would want to

26

1      know which one of these schools, are you

2      actually going to go through the entire

3      program, how long is the program going to

4      be.  For instance, a bachelor's degree is

5      generally 120 hours depending on where you

6      go and what your major is.  So how many

7      hours do you need to complete it.  How long

8      do you anticipate it's going to take.  How

9      much is the tuition.  How much are the

10     books.

11         If you're going to continue on through

12     the bachelor program and get any kind of

13     graduate degree or certification, how long

14     would that achievement take, how much would

15     it cost, where would you go to get it.

16         We also want to know is it feasible

17     that you could actually, you know, achieve

18     the goals.  You know, if somebody was --

19     Like when Christopher Reeves got injured,

20     you know, I recall him making a statement

21     that he would walk again, but if he

22     was -- I mean it's heartwarming, but, you

23     know, is it medically feasible that

24     Christopher Reeves was going to hop out of

25     his wheelchair and go live the life that he

26

1       had before the injury.

2              We would have to make a determination

3       on that.

4   Q. Okay.  So you just gave me a lot of

5       questions that this sentence had generated

6       for you?

7   A. Well, yes.  I mean I think -- Well, yeah.

8              Your question was what kind of

9       information would we look for.

10  Q. Okay.

11  A. I think that's reasonable.

12  Q. Okay.  Some of that information would have

13      to come from Ms. Mathews.  Right?

14  A. Yes, some of it would.

15  Q. Okay.  Such as her dedication, and what it

16      is that she personally hoped to do?

17             Those kinds of questions.  Right?

18  A. Yes.

19  Q. But some of these questions could be

20      answered directly from the institutions of

21      higher learning.  Right?

22             Such as the amount of tuition, for

23      example?

24  A. Oh, I see.

25             Yes.

26

1    Q. Right.

2         Did you make any effort to check with

3    any of these institutions to find out what

4    the tuition was?

5    A. No.

6    Q. Is it your practice in a situation like

7    this to check with those institutions to

8    find out information of that sort that is

9    equally available to you and the

10   policyholder?

11   A. No.

12   Q. Okay.  Even though the information is

13   available -- equally available to you and

14   the policyholder, you rely entirely on the

15   policyholder to get the information.

16        Is that correct?

17        MR. EVANS:

18             Objection.  Calls for speculation.

19          Assumes facts not in evidence.

20   EXAMINATION BY MR. KINNEY:

21   Q. Is that right?

22   A. I'm sorry.

23        Would you repeat the question?

24        MR. KINNEY:

25             Could you read that question back?

26

1               (The requested testimony was read back

2               as follows:

3                    Q.   Okay.  Even though the

4               information is available -- equally

5               available to you and the

6               policyholder, you rely entirely on

7               the policyholder to get the

8               information.

9                    Is that correct?)

10        THE WITNESS:

11               Yes.  It would be the

12               policyholder's responsibility.

13    EXAMINATION BY MR. KINNEY:

14    Q. All right.  Let's continue.

15          I am currently enrolled for fall,

16       beginning today in anatomy at Santa Rosa

17       JC.  I finished physiology over the summer

18       and will be eligible to apply to the

19       nursing program at Santa Rosa in October of

20       this year for spring and fall of 2007.

21          Did you gather from that statement that

22       she would like to apply to the nursing

23       program at Santa Rosa?

24    A. Well, she does mention it.  So you could

25       assume that that was something she thought

26

1      about.

2   Q. Okay.  Was that enough information for you

3      as to what -- Strike that.

4          Was that enough information to allow

5      you to assess her rehabilitation program?

6   A. No.

7   Q. And I continue.

8          I will also pursue the application

9      processes for the other schools.  The first

10     step is a two-year program and the

11     possibilities are many to make the next

12     step to nurse practitioner, but it will

13     most likely be an additional two years.

14         Do you see that information?

15  A. Yes.

16  Q. Did that information -- Was that

17     information helpful to you in determining

18     whether or not to grant the disability --

19     Strike that.

20  A. No.

21  Q. Let me ask the question correctly.  Since I

22     just stepped all over my own question.

23         Was that information helpful to you in

24     attempting to determine whether to provide

25     rehabilitation benefits?

26

```
1    A. No.  It didn't help me be able to draw any

2       conclusions.

3    Q. Okay.  You understood that Ms. Mathews was

4       planning on applying to four institutions

5       of higher learning.  Right?

6    A. I don't know what she was intending to do.

7    Q. Well, she says I will also pursue the

8       application processes for the other

9       schools.

10          You read that.  Right?

11   A. I'm sorry.  I don't know what she ended up

12      doing.

13          She says that she was going to apply.

14   Q. Yeah.

15   A. Okay.

16   Q. Okay.  I'm asking about what was happening

17      in this letter.  We are not talking about

18      her future yet.

19          I'm asking -- You understood when you

20      saw this letter she was planning on

21      applying to these four institutions of

22      higher learning?

23   A. Yes.  That was her statement.

24   Q. Okay.  And that her goal was to go into a

25      nursing program and become a nurse

26
```

```
1        practitioner.  Right?

2    A. That's what she said.

3    Q. Okay.  And you understood that until she

4       had applied, she wouldn't know whether she

5       had been accepted to one of these schools.

6       Right?

7    A. Oh, okay.

8           Yes.

9    Q. Okay.  So would that mean that you would

10      have to wait until the application process

11      was complete before you decided whether to

12      grant or deny the rehabilitation benefits?

13   A. No, that wouldn't be necessarily the case.

14   Q. You could decide to grant them before you

15      knew whether she had been accepted to these

16      schools?

17   A. Well, I imagine you could -- I mean I

18      imagine you could do anything you wanted to

19      do, but I would want to -- I would want to

20      know did she apply to the program, was she

21      accepted, is she still in the program.

22          I mean you would want to know that she

23      was actually involved in doing something

24      before you could make any kind of decision.

25   Q. Okay.  So, in other words, until the

26
```

1    application process had at least gone

2    forward and you found out whether she had

3    been accepted into the program, you

4    couldn't decide one way or another whether

5    or not to grant the rehabilitation

6    benefits.

7        Right?

8  A. Right.

9        I couldn't make a decision on the

10    information that I had.

11 Q. Okay.  So what did you do after receipt of

12    this letter, Exhibit #8, in terms of Ms.

13    Mathews' rehabilitation benefits?

14 A. I believe I sent her a letter asking her

15    for details.

16    MR. EVANS:

17        I have got 1:00.  I need to --

18    MR. KINNEY:

19        Let me do this one letter.  It

20        won't take too long.  I want to get

21        started on it and hear what he has to

22        say about it.

23    MR. EVANS:

24        Well, that's great, but why don't

25        we break for lunch.

26

1          MR. KINNEY:

2              Okay.

3          THE VIDEOGRAPHER:

4              Off the record at 12:58.  This is

5          videotape number two.

6          (Off the record.)

7          THE VIDEOGRAPHER:

8              We're back on the record after a

9          lunch break.  It's 1:49.  This is

10         still videotape number 2.

11     EXAMINATION BY MR. KINNEY:

12     Q. All right.  Mr. Jones, we are back on the

13        record.  You are still under oath.

14         I am going to ask the court reporter to

15        mark this next exhibit.  I believe it's

16        Exhibit #28.  I will hand it over to you.

17         (Exhibit #28 was marked for

18             identification.)

19         Do you have that, sir?

20     A. Oh.  Yes, I do.

21     Q. Okay.  You will see that the top two pages

22        of Exhibit #28, which are Bates stamped PAL

23        0823 and 0824, appear to be a letter.

24         Do you recognize that letter?

25     A. Yes, I do.

26

1    Q. Okay.  Did you write this letter?

2    A. Yes.

3    Q. Okay.  Do you know when you wrote this

4       letter?

5    A. It's dated August 25, 2006.

6    Q. And is it your understanding that that

7       would be the date that you wrote it?

8    A. Yes.

9    Q. Okay.  First, I direct your attention to

10      the first -- the second full paragraph that

11      begins, first, the letter is May 17.

12         Do you see that?

13   A. Yes, I do.

14   Q. Okay.  About the middle of that paragraph

15      you wrote, as was explained to you directly

16      in phone conversations, there was no

17      indication in our system that an amount of

18      118961 was drafted.

19         Do you see that?

20   A. Yes, I do.

21   Q. In fact, were you referring to the

22      withdrawals of premium directly from Ms.

23      Mathews' account?

24   A. Yes.

25   Q. Okay.  And was it correct that you had no

26

1      record in your system that 118961 had been

2      drafted?

3   A. Yes.

4   Q. That was correct?

5   A. Yes.

6   Q. How do you know that was correct?

7   A. That -- I didn't find that amount when I

8      looked into the system to see what the

9      drafts were.

10  Q. Okay.  Well, subsequently you determined

11     that there was actually a third insurance

12     policy.

13         Right?

14  A. Yes.

15  Q. That was -- That was discovered after this

16     August 25, 2006, letter.

17         Correct?

18  A. I don't recall.

19  Q. Well, I guess my question is when you said

20     there's no indication in our system that

21     118961 was drafted, had you considered the

22     amount that had been drafted in connection

23     with the third policy?

24  A. I don't recall right offhand right now.

25  Q. Okay.  So then you're unsure at this moment

26

1       whether or not that sentence is correct.

2            Is that correct?

3  A. I'm sorry.

4            Could you rephrase that?

5  Q. If you don't know whether you had taken

6       into account the third policy, how can you

7       know what was the amount that was actually

8       drafted?

9  A. At the time I wrote the letter?

10 Q. Yes.

11 A. That's what I believed.

12 Q. Okay.  And today is that still what you

13      believe?

14 A. Well, without any contradictory evidence,

15      yes.

16 Q. Then you state, a total of 115191 was

17      identified as being overdrafted.  It was

18      requested that you forward a bank statement

19      illustrating the amount in question.

20           Do you see that?

21 A. Yes.

22 Q. Did you -- Had you asked Ms. Mathews to

23      forward a bank statement illustrating the

24      amount?

25 A. Well, no, I never -- I don't recall

26

1       speaking with her.

2   Q. Well, what made you think that it had been

3       requested that she forward a bank

4       statement?

5   A. A conversation with Ms. Bourg.

6   Q. Ms. Bourg told you that she told Ms.

7       Mathews to forward a bank statement?

8   A. To my recollection.

9   Q. Okay.  And why did Ms. Bourg want a bank

10      statement?

11  A. Ms. Bourg would have wanted a bank

12      statement -- I don't believe that she would

13      have.  I mean she would have just been

14      responding to me saying that we would need

15      a bank statement.

16  Q. So you told Ms. Bourg that you would need a

17      bank statement.  Is that right?

18  A. To my recollection.

19  Q. When did you tell her that?

20  A. Before August 25, 2006.

21  Q. Okay.  Before July 12, 2006?

22  A. I have no way of recalling that.

23  Q. So just anytime -- somewhere in the past

24      before August 25, 2006?

25  A. Yes.

26

1    Q. Okay.  Did you tell Ms. Bourg what you

2       needed a bank statement for?

3    A. I don't recall.

4    Q. Okay.  Well, did you need a bank statement?

5    A. Oh, yes, I would.

6    Q. What for?

7    A. To identify the amount she is referring to

8       in the overdraft fees.  She being the

9       insured.

10   Q. Okay.  Okay.

11        Go to the next paragraph, the second

12      sentence.  Your attending physician,

13      Dr. Alexander, provided a written statement

14      indicating that you were cleared to return

15      to work on March 15, 2006.

16        Do you see that?

17   A. Yes, I do.

18   Q. Did you believe that was true when you

19      wrote this on August 25, 2006?

20   A. Yes, because that's what the attending

21      physician statement said.

22   Q. Well, did it say she was cleared to return

23      to work?

24   A. To my recollection, the attending physician

25      statement said -- in the section of the

26

180

1         statement that she was cleared to return to

2         work as of 3/15/06.

3      Q. It didn't just give that as a predicted

4         prognosis.  Did it?

5      A. That was the date that was on the sheet.

6         So that's what I went by.

7      Q. Okay.  Why don't you go down a couple of

8         more paragraphs to a paragraph that begins

9         on April 3, 2006.

10          Do you see that?

11     A. Yes, I do.

12     Q. Okay.  That refers to a process whereby Pan

13        American had requested some additional

14        records.

15     A. Uh-huh (affirmative response).

16     Q. And then the last sentence of that

17        paragraph says, while these records were

18        being requested, your policy remained in

19        premium paying status as we had already

20        received information from your initial

21        physician which indicated that you were

22        recovered and able to return to work.

23          Do you see that?

24     A. Yes, I do.

25     Q. What information had you received that Ms.

26

1        Matthews was recovered?

2    A. That would be the attending physician

3        statement that indicated that her date was

4        3/15/06.

5    Q. And nothing else?

6    A. Not to my recollection.

7    Q. Okay.  I want you to go to the second page

8        of this letter.  Toward the bottom there's

9        a paragraph that begins your letter states.

10           Do you see that?

11   A. Yes, I do.

12   Q. Okay.  Your letter states my disability

13       began December 14, 2005.  So including the

14       60-day waiting period, I was entitled to

15       full benefit compensation beginning

16       February 14, 2006.  This has not happened.

17           She is correct on that.  Right?

18   A. I'm sorry.

19           What part are you saying she's correct

20       on?

21   Q. She wrote these sentences, that her

22       disability began on December 14, 2005, and

23       she was entitled to full compensation

24       beginning February 14, 2006, and that had

25       not happened.

26

1          Was that correct or not?

2    A. I don't recall that being correct.

3    Q. Do you recall it being incorrect?

4    A. I really don't recall the letter, what she

5       was writing at all.  I'm just looking at

6       this now for the first time in a very long

7       time.

8    Q. Okay.  Well, let's just go to the next

9       paragraph.

10         It says, as for your rehabilitation

11      plan, Pan American Life will not be

12      extending benefits.

13         Do you see that?

14   A. Yes, I do.

15   Q. Well, why did you write that?

16   A. Because I hadn't received any information

17      that would indicate that she was -- she had

18      a specific plan for her rehabilitation

19      plan, and most likely because in the letter

20      that I was responding to at the time that I

21      was writing this she probably inquired

22      about it.

23   Q. Well, this letter we are looking at,

24      Exhibit #28, if you look at the first

25      paragraph of the first page, do you see

26

1      what letter you were responding to?

2   A. Yes.  It says fax August 23, 2006.

3   Q. Okay.  And that was Exhibit #8 that we

4      looked at before lunch.  Right?

5   A. I'm sorry?

6         Which one?

7   Q. Exhibit #8?

8   A. Okay.

9   Q. Do you recall discussing that with me

10      before lunch?

11   A. Yes, I do.

12   Q. Okay.  And do you recall we spent a lot of

13      time talking about her request for

14      rehabilitation that's contained in that

15      letter?

16         Do you recall that discussion?

17   A. Yes.

18   Q. And you indicated to me that you couldn't

19      make a decision one way or another based on

20      the information that was contained in

21      Exhibit #8.

22         Do you recall that testimony?

23         MR. EVANS:

24            Objection.  Misstates his

25         testimony.

26

1    EXAMINATION BY MR. KINNEY:

2    Q. Do you recall that testimony?

3    A. I recall stating that on the basis of

4       looking at the letters that were being

5       presented to me at the time, you know, that

6       was my recollection.

7          I don't -- I'm sorry.

8          I was not able at that time to look at

9       the letters that I was writing to her.  I

10      was only seeing hers.  So, you know, if I

11      have confused a date or two about the

12      sequence of events, then that would be my

13      error.

14   Q. Between receipt of Exhibit #8 of August 23,

15      2006, and writing Exhibit #28 of August 25,

16      2006, did you talk to anyone about Ms.

17      Matthews' request for rehabilitation

18      benefits?

19   A. I don't recall speaking to anyone.

20   Q. Okay.  In that same time frame, between

21      August 23, 2006, and August 25, 2006, did

22      you do any investigation on your own into

23      Ms. Mathews' request for rehabilitation

24      benefits?

25   A. How do you mean research, sir?

26

1    Q. Anything at all.

2    A. I don't recall.

3    Q. When you received Exhibit #8 and read it,

4       the letter of August 23, 2006, did you know

5       immediately that Ms. Mathews was not

6       entitled to rehabilitation benefits?

7    A. Immediately?

8    Q. Yes.

9    A. I can't say I would have immediately made

10      that decision as soon as the fax appeared

11      on my desk.

12   Q. But did you immediately make the decision?

13   A. I doubt it.  I would have mulled it over.

14   Q. Did anything happen between receipt of the

15      letter of August 23, 2006, and your letter

16      of August 25, 2006, that influenced your

17      decision as to whether or not Ms. Mathews

18      was entitled to rehabilitation benefits?

19   A. No, I don't believe so.

20   Q. Okay.  Following sending Exhibit #28 to Ms.

21      Mathews, did you learn that Ms. Mathews had

22      any response to Exhibit #28?

23   A. Oh, I have no, you know, recollection.

24   Q. Okay.  You don't recall talking to her

25      yourself?

26

1    A. No, I don't believe I ever spoke with Ms.

2       Mathews.

3    Q. And did someone else tell you that they

4       received a telephone call from Ms. Mathews

5       concerning what you wrote on August 25?

6    A. I don't recall that.

7    Q. All right.  Let's mark another exhibit.

8       This would be Exhibit #29.

9          (Exhibit #29 was marked for

10            identification.)

11            I represent to you, sir, that this was

12       a document that was produced by Pan

13       American's attorney in this case.  Bates

14       stamp PAL 0818.

15            I ask if you have ever seen this

16       document before?

17    A. No, I don't believe so.

18    Q. If you look at the entry that appears to be

19       dated September 12, 2006, you will see --

20       and this is Ms. Mathews writing -- I told

21       her the account -- I told her about the

22       account I discovered yesterday as well as

23       dealing with the Department of Insurance

24       and the DA.

25            Had you at any time heard that Ms.

26

```
 1        Mathews had discovered the third account
 2        that was being withdrawn from her bank
 3        account?
 4    A. I don't recall when Ms. Mathews was
 5        discovering, as you put it, the account.  I
 6        don't recall anything at this moment.
 7    Q. Okay.  You don't recall Ms. Bourg coming to
 8        you and saying Donna Mathews said there's a
 9        third policy?
10    A. Well, I'm sure she must have come to me at
11        some point.  I just don't know when that
12        was.
13    Q. Okay.  But you do recall that something
14        like that happened at some point.  Is that
15        right?
16    A. Right.
17           That's how I was able to issue the
18        benefits on the third policy.
19    Q. Okay.  Did you hear at some point that
20        Donna Mathews had filed a complaint with
21        the California Department of Insurance?
22    A. Sure.  At some point I would have heard.
23    Q. Okay.  Was this the first time that a
24        policyholder had ever made a regulatory
25        complaint about a claim that you were
26
```

1     handling?

2   A. I have no recollection.

3   Q. Do you recall any other regulatory

4     complaints that had been made by

5     policyholders about claims that you were

6     handling?

7   A. I know there have been complaints.  I --

8     you know, I don't mark down when they

9     happen in a date book or anything.  I mean

10    it's not like something I would carry

11    around personally with a -- thinking about.

12   Q. Okay.  Was this the first time that a

13    policyholder had ever made a complaint to a

14    district attorney about any claim that you

15    were handling?

16   A. I have no recollection of that.  I have no

17    idea when that would happen.

18   Q. Okay.  Have there been other policyholders

19    that have made complaints to district

20    attorneys about claims that you were

21    handling?

22   A. I don't know who they made complaints to.

23    I mean if people make complaints, I mean

24    it's not like the DA would pick up the

25    phone and call me.

26

```
 1    Q. Okay.  So there may be complaints that you

 2       don't know about?

 3    A. Yes.

 4    Q. Okay.  But leaving aside the complaints

 5       that you don't know about, just talking

 6       about complaints that you do know about,

 7       have there been any other complaints that

 8       you do know about by policyholders to

 9       district attorneys about claims that you

10       were handling?

11    A. No, I don't know that.

12         THE VIDEOGRAPHER:

13            Excuse me.  I need to change

14          tapes.

15         MR. KINNEY:

16            Sure.

17         THE VIDEOGRAPHER:

18            We are going off the record at

19          2:10.  This is the end of videotape

20          number 2.

21       (Off the record.)

22         THE VIDEOGRAPHER:

23            We're back on the record.  This is

24          the beginning of videotape number 3.

25          It's 2:11.

26
```

```
 1    EXAMINATION BY MR. KINNEY:

 2    Q. When you found out that Ms. Mathews had

 3       made a complaint to a district attorney

 4       about a claim that you were handling, were

 5       you upset?

 6          MR. EVANS:

 7              Objection.  Misstates his

 8           testimony.

 9    EXAMINATION BY MR. KINNEY:

10    Q. You can answer.

11    A. No, I wouldn't be upset by something like

12       that.  It's just how life is.  I mean I

13       have been threatened.  You know, people

14       call and say they are going to blow up the

15       building and kill us all.  It's just part

16       of the business.

17    Q. You have a lot of people angry at you

18       because of the way you handle disability

19       claims?

20    A. Oh, no.  I don't believe so.

21          I was thinking -- I'm sorry.

22          I was referring to my -- some of my

23       earlier experiences in the industry.

24    Q. Did learning that Ms. Mathews had made a

25       complaint to the California Department of

26
```

1        Insurance in any way change the way that

2        you handled her claim?

3    A. No.

4            Information comes in, we handle the

5        claim.  Whatever is happening -- excuse

6        me -- happening other than the claim, I

7        don't have any concerns.

8    Q. And did learning that Ms. Mathews had made

9        a complaint to her local district attorney

10       in any way change the way you handled her

11       claim?

12   A. No.

13   Q. Let's go to the next document which we will

14       mark as Exhibit #30.

15           (Exhibit #30 was marked for

16              identification.)

17           And I direct your attention to the

18       second page of Exhibit #30, sir.

19           This refers to a payment to Ms. Mathews

20       of $2000.  Does it not?

21   A. Yes, it does.

22   Q. Okay.  And what was that payment for?

23   A. Benefits for her disability income policy.

24   Q. Okay.  And for what period were those

25       benefits paid?

26

1    A. It was for February 14, 2006, to June 14,

2       2006.

3    Q. And when was the payment made?

4    A. That would be September 13, 2006.

5    Q. And why didn't the payment include payment

6       for a period all the way through to

7       September 14, 2006?

8    A. I don't recall.

9    Q. Did you direct Ms. Bourg to pay these

10      specific four monthly benefits?

11   A. Yes, I would have directed her.

12   Q. And at the bottom right corner you read the

13      language this policy has been placed on

14      waiver.

15         Do you see that?

16   A. Yes.

17   Q. Did you instruct Ms. Bourg to write that?

18   A. Yes.  That would have been there under my

19      instruction.

20   Q. Okay.  Let's mark the next exhibit as

21      Exhibit #31.

22         (Exhibit #31 was marked for

23            identification.)

24   Q. Okay.  Can you identify this document, sir?

25   A. Sure.  It's a letter from Pan American

26

```
 1      Life.

 2   Q. And did you write it?

 3   A. Yes, I did.

 4   Q. Okay.  And what caused you to write this

 5      letter?

 6   A. Somebody from the department would have

 7      notified me about a complaint, and I would

 8      have had to issue a response.

 9   Q. I would like you to look at the last full

10      paragraph on this page that begins finally

11      Ms. Mathews.

12         Do you see that?

13   A. Yes.

14   Q. Okay.  Do you see Ms. Mathews states in her

15      complaint that no explanation was given

16      her -- was given concerning her

17      rehabilitation?

18         Was there an explanation given to Ms.

19      Mathews concerning her rehabilitation?

20   A. I don't recall.

21   Q. Okay.  Well, I direct your attention once

22      again to Exhibit #28, second page, toward

23      the bottom, where you wrote, as for your

24      rehabilitation plan, Pan American will not

25      be extending benefits.

26
```

```
 1          Do you see that?
 2    A. Oh, okay.
 3          Yes.
 4    Q. Was that the only explanation that you gave
 5       Ms. Mathews for the denial of her benefits?
 6    A. I don't recall.  I might have said things
 7       on other letters.
 8    Q. Then going back to Exhibit #31, you quote
 9       policy language there.
10          Do you see that?
11    A. Oh, yes.
12    Q. Okay.  And following your quotation of the
13       policy language you state, the
14       rehabilitation portion of the policy is an
15       additional benefit that is disbursed at Pan
16       American Life's discretion.
17          Do you see that?
18    A. Yes, I do.
19    Q. Do you believe that that's correct?
20    A. That's what the policy states.
21    Q. Do you believe that Pan American Life has
22       absolute discretion to decide one way or
23       another on its own whether or not to
24       provide the rehabilitation benefit?
25          MR. EVANS:
26
```

```
 1                    Objection to the extent it

 2               mischaracterizes the exhibit.

 3    EXAMINATION BY MR. KINNEY:

 4    Q. You may answer.

 5    A. Would you repeat the question?

 6          MR. KINNEY:

 7                    Would you read the question back,

 8             please?

 9               (The requested testimony was read back

10             as follows:

11                    Q.    Do you believe that Pan

12             American Life has absolute discretion

13             to decide one way or another on its

14             own whether or not to provide the

15             rehabilitation benefit?)

16          THE WITNESS:

17                    I think that that statement is an

18             extreme interpretation of the policy

19             language.

20    EXAMINATION BY MR. KINNEY:

21    Q. Is it your interpretation of the policy

22       language?

23    A. My interpretation of the policy language

24       was simply to read the policy language and

25       that was that.  I didn't try to out think

26
```

1      it.

2    Q. Okay.  The next sentence in Exhibit #31

3       says the rehabilitation benefit is not nor

4       was it ever an entitlement for the insured.

5          Do you see that?

6    A. Yes, I do.

7    Q. What do you mean an entitlement for the

8       insured?

9    A. An entitlement would be like your basic

10      benefit.  If you buy a policy for $2,000,

11      then that's what your insured for.  2,000

12      per month for whatever period of time.

13   Q. And why was the rehabilitation benefit not

14      an entitlement?

15   A. I don't know, sir.  I didn't design the

16      policy.

17   Q. Why did you consider it not to be an

18      entitlement?

19   A. Because there was nothing in the policy

20      that said that benefits should be extended

21      along with the basic monthly benefit.

22   Q. Okay.  Do you know a person at Pan American

23      named Glenda Griffin?

24   A. I know of her.

25   Q. Do you know what she does?

26

1    A. Somewhat.

2    Q. What?

3    A. She works for Mr. Rowell in the -- I

4       believe in the complaints department.

5    Q. What is the complaints department handling?

6    A. Most likely complaints.

7    Q. You don't know?

8    A. No.  I have never worked with them on

9       anything.

10   Q. Have you ever discussed the rehabilitation

11      benefit with Glenda Griffin?

12   A. Not to my recollection.

13   Q. Have you ever written to her about the

14      rehabilitation benefit?

15   A. To?

16   Q. Glenda Griffin.

17   A. I don't believe I have ever written to her,

18      but I don't recall that.

19   Q. Well, let me show you an exhibit that we

20      will mark as Exhibit #32.

21          (Exhibit #32 was marked for

22            identification.)

23          And I will represent to you that this

24      was produced in the course of the

25      litigation by Pan American's attorney.

26

```
1              I will direct your attention to the
2         last lengthy paragraph two thirds of the
3         way down the page, and the last sentence of
4         that paragraph, which says the
5         rehabilitation benefit is not nor was it
6         ever an entitlement.
7              Do you see that?
8    A. Yes, I do.
9    Q. And that is verbatim a sentence that
10        appears in your letter of October 3, 2006,
11        the rehabilitation benefit is not nor was
12        it ever an entitlement.
13             Do you see that?
14   A. Yes, I do.
15   Q. Okay.  Do you know how Ms. Griffin came to
16        utilize the same language that you
17        utilized?
18   A. No, I don't.
19   Q. At some point did you decide to place Ms.
20        Mathews under surveillance?
21   A. Yes, I did.
22   Q. Why?
23   A. Because I had her scheduled for a medical
24        examination.
25   Q. And is it your policy whenever you schedule
26
```

```
 1        someone for a medical examination you put

 2        them under surveillance?

 3   A. Yes.

 4   Q. In every case?

 5   A. Budget permitting.

 6   Q. And what is the benefit to Pan American

 7        Life of engaging in that practice?

 8   A. I'm sorry.

 9          Could you rephrase that?

10   Q. Yeah.

11          Why does Pan American Life put every

12        policyholder who is going to go to an

13        independent medical examination under

14        surveillance?

15   A. Well, in my opinion I think it helps us to

16        make sure that we get the payment of the

17        claim correct.

18   Q. I'm sorry?

19          I didn't hear it.

20   A. I said --

21          THE COURT REPORTER:

22             Do you want me to read it back?

23          MR. KINNEY:

24             Yeah.  Could you read it back?

25          (The requested testimony was read back

26
```

```
1              as follows:
2                   A.   Well, in my opinion I think
3              it helps us to make sure that we get
4              the payment of the claim correct.)
5    EXAMINATION BY MR. KINNEY:
6    Q. Okay.  How does it help that?
7    A. It helps us determine the person's
8       disability.
9    Q. What percentage of policyholders of
10      disability claims are sent to an
11      independent medical examination?
12   A. I wouldn't know that right offhand.
13   Q. Can you give me a rough estimate?
14   A. No, not really.
15   Q. Is it more than half?
16   A. Half of the people sent to medical
17      examination?
18   Q. Half of the claims that come in go to
19      independent medical examination?
20   A. No, I don't think it would be half.
21   Q. When you decided to put Ms. Mathews under
22      surveillance, what information did you
23      think you might gain from the surveillance
24      itself that would inform your decision on
25      Ms. Mathews' claim?
26
```

```
 1    A. I didn't have a particular goal other than

 2       to try to buttress the disability claim.

 3    Q. How would putting Ms. Mathews under

 4       surveillance buttress her disability claim?

 5    A. Well, I wanted to make sure she was

 6       actually going to show up for the medical

 7       examination, and surveillance would be a

 8       good way for me to make sure.  In addition

 9       to making sure we get the report.

10    Q. Well, wouldn't the doctor tell you if she

11       had failed to show up for her medical

12       examination?

13    A. They would tell me if she failed to show

14       up, yes.

15    Q. Isn't putting her under surveillance a

16       rather expensive way of confirming whether

17       or not the doctor is right on whether she

18       showed up?

19    A. Not to my mind.

20    Q. How much does it cost Pan American to put

21       someone under surveillance?

22    A. It depends.

23    Q. Do you know how much it cost in this case

24       to put Ms. Mathews under surveillance?

25    A. No.

26
```

1    Q. Is that a factor -- cost, is that a factor

2       that you weigh in deciding whether to put

3       somebody under surveillance?

4    A. No, I wouldn't say that.

5    Q. Okay.  Do you have to get approval from

6       anybody to authorize surveillance against a

7       policyholder?

8    A. Yes, I do.

9    Q. Would do you get approval from?

10   A. Mr. Simon.

11   Q. Has he ever turned down a request for

12      surveillance?

13   A. I'm sure it must have happened.

14   Q. You don't recall it though?

15   A. No.

16         Can I -- Can I get some more water?

17   Q. Oh, of course.

18         THE VIDEOGRAPHER:

19             Going off the record at 2:30.

20          This is videotape number 3.

21       (Off the record.)

22          THE VIDEOGRAPHER:

23             We are back on the record.  This

24          is videotape number 3.  It's 2:31.

25   EXAMINATION BY MR. KINNEY:

26

1    Q. Other than showing whether Ms. Mathews

2        showed up for her independent medical

3        examination, was there any other

4        information that you thought a surveillance

5        of her might provide that would help you in

6        deciding whether to pay her benefits?

7    A. Well, I wouldn't have really known what

8        kind of information would help me until I

9        actually got back the tape.  So I didn't

10       think of anything in particular when I was

11       making the order.

12   Q. Did the surveillance affect in any way your

13       decision whether to pay her benefits?

14   A. No, because she's currently receiving

15       benefits.

16   Q. So a surveillance -- Am I right, a

17       surveillance never helps the policyholder?

18           It only -- You only use it to decide

19       not to pay benefits.  Right?

20   A. I didn't say that.

21           MR. EVANS:

22               Objection.  Misstates his

23            testimony.

24   EXAMINATION BY MR. KINNEY:

25   Q. Does this surveillance sometimes help a

26

1          policyholder?

2     A. Yes.

3     Q. When?

4          In what sort of circumstances?

5     A. Could you be more specific?

6     Q. I don't think so.

7     A. Okay.

8     Q. Under what circumstances does a

9          surveillance help a policyholder?

10    A. I mean that's a very wide ranging question.

11        We could be here the rest of the day.

12    Q. Okay.  Well, let me ask you this.

13        Has there ever been a case that you

14        have had before you where you had -- you

15        were pretty sure you were going to deny the

16        benefits, and then you got the surveillance

17        back and it changed your mind?

18    A. Well, I'm never really pretty sure that I

19        am going to do anything.  I try to keep an

20        open mind and stay unbiased when it comes

21        to the claims process.  So I don't go into

22        evaluating a claim with any kind of

23        preconceived notion as to what I might

24        find.

25    Q. Did your decision to put Ms. Mathews under

26

```
 1          surveillance have anything to do with the

 2          fact that she had filed complaints with the

 3          Department of Insurance or the district

 4          attorney?

 5     A. No.

 6     Q. Why did you wait until October, 2006, to

 7          put Ms. Mathews under surveillance?

 8     A. I believe that's when we had the -- when we

 9          were able to get the medical exam

10          scheduled.

11     Q. Do you always put people under surveillance

12          for the date of their medical exam?

13     A. I try to.

14     Q. Okay.  When did you decide to schedule a

15          medical examination for Ms. Mathews?

16     A. Oh, I don't recall the date.

17     Q. Okay.  Well, her claim came in, and you

18          started paying benefits back in February.

19          Effective February, 2006.

20             Do you recall that?

21     A. Yes.

22     Q. Okay.  And her medical examination didn't

23          occur until sometime in October of 2006.

24             Right?

25     A. I don't really recall when it happened,

26
```

1        but --

2     Q. Actually November, 2006, is when it

3        happened.

4     A. Okay.

5     Q. So how come there was some eight or nine

6        months between the time the claim came in

7        and the time of the medical examination?

8     A. It can be a challenge to get these medical

9        examinations scheduled.

10    Q. Typically it takes eight or nine months to

11       schedule a medical examination?

12    A. I didn't say that.

13    Q. Well, is that kind of long in your

14       experience to wait for a medical

15       examination?

16    A. I don't recall waiting eight or nine months

17       for a medical examination.

18    Q. How long was it after the claim came in

19       that you decided to schedule Ms. Mathews

20       for a medical examination?

21    A. Oh, I don't recall.

22    Q. More than six months?

23    A. I don't recall.

24    Q. More than eight months?

25    A. I don't recall.

26

```
 1   Q. Did something happen in the course of this
 2      claim that made you decide to schedule Ms.
 3      Mathews for a medical examination?
 4   A. Just the medical notation.
 5   Q. What medical notation?
 6   A. Just in trying to make sure I had a good
 7      grip on the claim and understanding what
 8      her medical condition was.  I wanted to get
 9      -- I just wanted to be right about what I
10      was doing.
11   Q. But you always wanted to be right about
12      what you were doing from the first day the
13      claim came in.
14          Right?
15   A. That's correct.
16   Q. So that didn't change in the course of the
17      nine months -- eight or nine months that
18      passed until the medical examination.
19          Right?
20   A. I'm sorry.
21          You said change?
22   Q. Yes.
23          I'm asking if something happened during
24      this claim that made you decide to schedule
25      a medical examination.
26
```

```
 1    A. I mean I can't recall anything specific.

 2    Q. Okay.  Let's go to another exhibit.  Mark

 3       this one as Exhibit #33.

 4          (Exhibit #33 was marked for

 5            identification.)

 6    A. Okay.

 7    Q. Have you ever seen this document before?

 8    A. I'm sure I have.

 9    Q. Do you recall it?

10    A. I'm sorry?

11    Q. Do you recall it?

12    A. Somewhat.

13    Q. Okay.  Do you know when Pan American

14       received this document?

15    A. Yes.

16    Q. When?

17    A. The date stamp says received November 2,

18       2006.

19    Q. Okay.  I would like to go to the bottom

20       paragraph on the first page of this

21       document.  It begins finally.

22          Do you see that?

23    A. Okay.

24          Yes.

25    Q. Finally, the rehabilitation portions of my

26
```

```
 1        policy are, as you state, disbursed at Pan
 2        American Life's discretion.  Can you tell
 3        me what would justify rehabilitation.
 4            Do you see that?
 5   A. Yes, I do.
 6   Q. Did you ever respond to that question?
 7   A. I don't recall right now.
 8   Q. Okay.  As you sit here today, if you were
 9        to respond to this question, how would you
10        respond?
11   A. There's a number of things she is saying
12        here.
13            Which particular part would you like to
14        address?
15   Q. Well, she has written you a letter, and she
16        says can you tell me what would justify
17        rehabilitation.
18            Do you see that question?
19   A. Yes.
20   Q. Okay.  If you were going to write back to
21        her and answer her question, what would you
22        say?
23   A. Well, probably the same things I said when
24        she initially asked for the rehabilitation
25        benefit.  We need to have a plan.
26
```

```
 1   Q. Okay.  You wouldn't tell her what kinds of
 2      things needed to be in the plan?
 3   A. I wouldn't tell her what to do with her
 4      life.  I mean I'm not a -- What do you
 5      call -- an occupational counselor to tell
 6      her what she should do or what she is
 7      capable of doing.
 8          I would rely on the insured to bring
 9      that information to us.
10   Q. Okay.  Go to the next sentence of the
11      paragraph.  Is there a company policy
12      regarding rehabilitation.
13          Do you see that?
14   A. Yes, I do.
15   Q. Did you answer that question?
16   A. I don't recall.
17   Q. If you were to answer that question today,
18      how would you answer it?
19   A. Yes.
20   Q. And what is the policy?
21   A. The policy is that the insured would
22      provide whatever their plan is, and we
23      would evaluate it.
24   Q. Okay.  Finally, the next sentence in the
25      same paragraph, do you ever approve this
26
```

1       benefit or make exceptions, or could I make

2       an appeal for this benefit.

3           Do you see that question?

4   A. Yes, I do.

5   Q. Did you answer that question?

6   A. I don't recall.

7   Q. If you were going to answer that question

8       today, how would you answer it?

9       MR. EVANS:

10          Objection.  The question is

11          compound.  Not your question, but the

12          question that you are referring to is

13          compound.

14  EXAMINATION BY MR. KINNEY:

15  Q. All right.  Well, let's take it piece by

16      piece.

17          She asked do you ever approve this

18      benefit or make exceptions.

19          How would you answer that question if

20      you answered it today?

21  A. From my perspective I think that is asking

22      about Pan American Life's business

23      practices.

24  Q. It may well be.

25          How would you answer it?

26

```
 1    A. I don't believe I would really have an
 2       answer about the internal workings of Pan
 3       American Life to an insured.
 4    Q. You personally couldn't answer that
 5       question.
 6          Is that right?
 7          You personally couldn't answer the
 8       question do you ever approve this benefit
 9       or make exceptions?
10    A. No, I wouldn't feel comfortable crafting
11       any kind of response to that.
12    Q. Okay.  So who at Pan American could answer
13       that question?
14       MR. EVANS:
15          Objection.  Calls for speculation.
16    EXAMINATION BY MR. KINNEY:
17    Q. If you know.
18    A. I couldn't say I would know that.
19    Q. How about Mr. Simon?  Would he be able to
20       answer that question to your knowledge?
21    A. I don't know all the things that Mr. Simon
22       is capable of doing.
23    Q. And particularly you don't know whether
24       he's capable of answering this question?
25    A. You would have to ask Mr. Simon.
26
```

1     Q. Because you don't know?

2     A. That's correct.

3     Q. Okay.  And then the second part of her

4        question which was could I make an appeal

5        for this benefit.

6            Do you see that question?

7     A. Yes, I do.

8     Q. What's the answer to that?

9     A. Yes, she can make an appeal.

10    Q. Did you tell her that?

11    A. I'm sorry?

12    Q. Did you tell her?

13    A. I don't recall.

14    Q. How does -- How would she have gone about

15       an appeal?

16    A. By requesting the benefit.

17    Q. How does it get to the appeal level?

18    A. If she wanted to appeal a decision, she

19       could send a letter saying I would like to

20       appeal the decision.

21    Q. And what would happen then?

22    A. It would be reevaluated.

23    Q. Who would do the reevaluation?

24    A. Probably myself or -- Myself really.

25    Q. So if Ms. Mathews wants to appeal an

26

1       adverse decision that you made, she could

2       appeal to you to reevaluate your own

3       decision?

4    A. Yes, she could.

5    Q. And there's no other appeal that's

6       available?

7    A. I couldn't answer that.  I mean I am just

8       telling you what I could do.

9    Q. Okay.  But I'm asking about the way the

10      process works at Pan American.

11          Your not aware of any other appeal

12      process that's available other than that.

13          Is that correct?

14   A. No, I can't say that I'm aware of another

15      appeal process.

16   Q. Okay.

17      MR. EVANS:

18          I'm sorry.

19          Can we take five minutes?

20      MR. KINNEY:

21          Absolutely.

22          Off the record.

23      THE VIDEOGRAPHER:

24          We are going off the record.  This

25       is videotape number 3.  It's 2:44.

26

```
1              (Off the record.)

2            THE VIDEOGRAPHER:

3                  We are back on the record.  This

4            is videotape number 3.  It's 2:51.

5    EXAMINATION BY MR. KINNEY:

6    Q. Okay.  Let's go to another exhibit we will

7       mark as Exhibit #34.

8            (Exhibit #34 was marked for

9              identification.)

10           It's Bates stamped PAL 0137.

11           Mr. Jones, have you ever seen this

12      document before?

13   A. Yes.

14   Q. And what is the date on this document?

15   A. October 27, 2006.

16   Q. And what was the purpose of this letter?

17   A. Off the top of my head I believe the

18      response was to identify the premium

19      refunds to the insured for the dollar

20      amount and the dollar amount according to

21      which policy they belong to.

22   Q. Okay.  Let's go to the next document which

23      would be Exhibit #35.

24           (Exhibit #35 was marked for

25              identification.)

26
```

```
 1              Do you have that, sir?

 2    A. Yes, I do.

 3    Q. Okay.  And what is that?

 4    A. This a letter from me at Pan American Life

 5       to the insured.

 6    Q. Okay.  And what's the date on that?

 7    A. That is dated November 6, 2006.

 8    Q. Okay.  I direct your attention to the third

 9       paragraph which begins also Ms. Bourg.

10              Do you see that?

11    A. Yes.

12    Q. It says also Ms. Bourg did not inform you

13       that a third party did not exist.  She

14       simply stated that she was only able to

15       find two policies on record for you at the

16       time of your conversation.

17              How did you know that a conversation

18       between Ms. Bourg and Ms. Mathews had gone

19       on on that subject?

20    A. Because Ms. Bourg would have informed me.

21    Q. And do you recall what she said about that

22       conversation?

23    A. She said she did not -- Well, what I recall

24       Ms. Bourg telling me about the conversation

25       is what I put in the letter.

26
```

```
1    Q. You don't recall anything else other than

2       that?

3    A. No.

4    Q. Go a couple of sentences on, it says, on

5       September 12, 2006, I was able to locate a

6       third policy within our system and issue

7       benefits accordingly.

8          Do you see that?

9    A. Yes, I do.

10   Q. Okay.  When you -- Is that accurate, that

11      you located the third policy on September

12      12?

13   A. I believe it to be.

14   Q. Okay.  And did you locate that third policy

15      in response to an inquiry from Ms. Mathews?

16   A. Yes.

17   Q. Then that same paragraph goes on to discuss

18      a statement by Ms. Mathews about a

19      telephone conversation.

20          Do you see that?

21          Also in your letter you state that you

22      were assured by you and Elaine Bourg only

23      via telephone conversation?

24   A. That's correct.

25   Q. Okay.  And then you responded, Ms. Mathews,

26
```

1        I never had a telephone conversation with

2     you.

3        Is that right?

4   A. That's my response.

5   Q. Okay.  And was that correct, that at that

6     time you did not have a telephone

7     conversation?

8   A. I believe it to be.

9   Q. Okay.  Were you present when Ms. Bourg had

10     a telephone conversation with Ms. Mathews?

11   A. I imagine so.  I mean I don't take days

12     off.  I'm always in the building.

13   Q. And how far is your work station from Ms.

14     Bourg's?

15   A. Well, very far.  Ms. Bourg doesn't work

16     here anymore.

17   Q. At the time of November 6, 2006.

18   A. Oh.  Oh, I'm sorry.  I see what your

19     saying.

20        No.  We were on the same floor.  We

21     were in the same -- what do you call --

22     like vicinity.

23   Q. Right next to each other?

24   A. In cubes, yes.

25   Q. Okay.  And could you hear Ms. Bourg's side

26

1          of a telephone conversation?

2     A. Generally no.

3     Q. But occasionally were there situations

4          where you could?

5     A. Well, sure, if she was on the phone with a

6          friend and they were laughing or something,

7          I could hear her laughing.

8     Q. Were there occasions when Ms. Bourg was on

9          the phone with a customer where she would

10         just ask you a question to -- about the

11         claim so that she could just tell the

12         customer right then?

13    A. I'm sure it could have happened.

14    Q. Do you recall it happening with Ms.

15         Mathews?

16    A. No.

17    Q. Okay.  Turn to page 2, the first full

18         paragraph up at the top there, the check

19         for policy 1257-573.

20             Do you see that?

21    A. Yes.

22    Q. Was there yet another mistake on payments

23         for Ms. Mathews that you corrected with

24         this letter of November 6?

25    A. I don't know what you mean by yet another

26

```
 1      mistake.
 2   Q. Well, I see here it says the check for
 3      policy 1257-758 in the amount of $200 was
 4      paid incorrectly due to a clerical error.
 5         Do you see that?
 6   A. Oh, yes.
 7   Q. Okay.  Was that -- What I want to know is
 8      was that a new mistake, or does that refer
 9      to an old mistake?
10   A. I don't recall the timing sequence.
11   Q. Okay.  I want you to go onto the last
12      lengthy paragraph on that page that begins
13      with you have received.
14         Do you see that?
15   A. Yes.
16   Q. You have received a refund for all the
17      premiums we have on record as paid.
18         Do you see that?
19   A. Yes.
20   Q. Was that correct as of this date?
21   A. Yes, I believe it to be.
22   Q. And then you write in the future please
23      refrain from continuing to forward premiums
24      once you have been placed on waiver.
25         Do you see that?
26
```

1    A. Yes.

2    Q. Why did you write that?

3    A. Because to my recollection she had been

4       placed on waiver, and she was actually

5       still sending in premium payments.

6    Q. Had she ever sent in a premium payment to

7       your recollection?

8    A. Oh, I have no idea.  I mean I don't work in

9       billing.

10    Q. But you knew she wasn't sending in any

11       premium payments.  Didn't you?

12    A. I'm sorry.  I don't deal with premium

13       payments.

14    Q. Well, didn't you realize that the payments

15       were being withdrawn directly from her

16       account?

17    A. Well, sure, I realized that when she called

18       and started yelling at everybody.

19    Q. That was long before this November 6th

20       letter.  Right?

21    A. I believe so.

22    Q. So you knew she wasn't sending in any

23       premium payments.  Right?

24    A. No, I can't say that, because in the letter

25       I asked her to not forward any premiums.

26

```
 1              So as I am reading this letter today, I
 2         would believe that I wrote that sentence in
 3         response to her forwarding some premiums.
 4    Q. So you believe you found out that she was
 5         no longer on automatic withdrawal of
 6         premiums and had started forwarding the
 7         premiums through payments that she was
 8         making to Pan Am.
 9              Is that right?
10    A. I'm sorry.
11              Would you state that again?
12    Q. You had found out prior to November 6,
13         2006, that premiums were no longer being
14         automatically withdrawn from her bank
15         account.
16              Right?
17    A. I attempted previously to that date to make
18         sure that no premium was being withdrawn
19         from her account in error, and those were
20         my actions.
21    Q. Okay.  And did you find out that she had no
22         longer authorized withdrawal of premiums
23         from her account?
24    A. Oh, I don't know that she had done that at
25         all.
26
```

1   Q. Well, did you think she was voluntarily

2      mailing in premiums to Pan American Life

3      Insurance Company when you wrote this

4      letter on November 6, 2006?

5   A. Well, judging from the language of the

6      letter, yes, I think that was my thought at

7      the time.

8   Q. What made you think that?

9   A. I believe that we had actually received a

10     premium payment from her.

11  Q. How had you learned that?

12  A. That information would have come from the

13     billing department.

14  Q. And but for your receipt of that

15     information, you wouldn't have written this

16     sentence that we just went over.

17       Correct?

18  A. That's correct.

19  Q. Because if you thought the payments were

20     being automatically withdrawn, writing a

21     sentence like this would just be to anger

22     the policyholder.

23       Right?

24       MR. EVANS:

25          Objection.  Argumentative.

26

1    EXAMINATION BY MR. KINNEY:

2    Q. You can answer.

3    A. Would you say that again, sir?

4    Q. If the payments were being automatically

5       withdrawn and you knew it, the only

6       rationale for a sentence that says stop

7       sending us premiums would be to anger the

8       policyholder.

9          Isn't that correct?

10         MR. EVANS:

11            Objection.  Calls for speculation.

12            Argumentative.

13    EXAMINATION BY MR. KINNEY:

14    Q. Go ahead.

15    A. Sir, I mean the only thing I'm trying to

16       accomplish in any of the letters that I

17       send to insureds is to finish the claim

18       evaluation and make sure everyone is on the

19       same page about what is happening on the

20       policy.  I don't have any other reason to

21       write a letter.

22    Q. You weren't personally angry at Ms. Mathews

23       at this point, November 6, 2006?

24    A. Oh, no.

25    Q. And you weren't doing anything to try to

26

1          anger her.

2                 Is that right?

3     A. That's correct.

4                 I wouldn't do that.

5     Q. All right.  Let's mark Exhibit #36.

6                 (Exhibit #36 was marked for

7                   identification.)

8                 Before we go into Exhibit #36, I want

9          to go back to a question I still have over

10         the last exhibit, Exhibit #35, that we were

11         just talking about.

12                In Exhibit #33, which was the letter of

13         October 24, 2006, from Ms. Mathews to you,

14         she had asked some questions.

15                Do you recall at the bottom of the page

16         there we talked about those?

17    A. On the second page?

18    Q. Yeah.

19                She asked some questions, you know, can

20         you tell me what would justify a

21         rehabilitation, and we went over those a

22         little bit ago.

23    A. Uh-huh (affirmative response).

24    Q. Exhibit #33 was received on what date by

25         Pan American?

26

Exhibit #33?

A. That is stamped November 2, 2006.

Q. Okay. And then we have a letter from you, Exhibit #35, dated November 6, 2006?

A. That's correct.

Q. Four days later.

Do you see that?

A. Yes, I do.

Q. I will represent to you that I was not able to find anything in the file that was a correspondence from you to Ms. Mathews between November 2 and November 6.

My question to you is why in your letter of November 6, 2006, didn't you answer her questions that she wrote on the bottom of Exhibit #33?

A. I can't think of any particular reason why I wouldn't have other than I made an error.

Q. Let's go on to Exhibit #36.

Do you have that in front of you?

A. Yes, I do.

Q. That's the Stanford University Medical Center?

A. Yes.

Q. What is this document, Exhibit #36?

1    A. It is a report from Dr. Date.

2    Q. And what -- How did Dr. Date come into the

3       picture here?

4          Who is Dr. Date?

5    A. Dr. Date is a physician in the State of

6       California, and I requested through our

7       medical consultant to have the insured

8       examined, and they presented me with Dr.

9       Date as being their top choice to go with.

10         I relied on their recommendation and

11      said, okay, let's schedule the appointment.

12   Q. Okay.  Did they give you more than one

13      physician possibility for this medical

14      examination?

15   A. I don't recall that.  I believe to my

16      recollection Dr. Date was their -- was

17      their -- was the pick, the person that they

18      said was very qualified.

19   Q. Okay.  And do you know where Dr. Date is

20      located?

21   A. California.

22   Q. Where in California?

23   A. I don't know.

24   Q. Well, do you see the letterhead at the top?

25   A. Oh, I'm sorry.

26

1       Stanford.

2  Q. Stanford University.

3      Do you know where that is in

4  California?

5  A. I'm not really familiar with California.

6  Q. Okay.

7  A. I would like to get there someday.

8  Q. Do you know how far Stanford University

9  Medical Center is from Mr. Mathews'

10  residence?

11  A. No.

12  Q. Do you have a policy in terms of distance

13  that you require an insured to go for a

14  medical examination?

15  A. Not so much.  We try to keep them in the

16  state.

17  Q. Oh.

18      In California that could be a thousand

19  miles.

20  A. Well, okay.

21  Q. Is that okay with you?

22      Would you schedule someone for an

23  appointment a thousand miles away?

24      MR. EVANS:

25        Objection.  Calls for speculation,

26

1          and an incomplete hypothetical.

2     EXAMINATION BY MR. KINNEY:

3     Q. You can answer.

4     A. I would schedule someone with an

5          appointment with the physician I thought

6          could do the best job.

7     Q. Regardless of the distance?

8          MR. EVANS:

9               Objection.  Misstates his

10              testimony.

11    EXAMINATION BY MR. KINNEY:

12    Q. You can answer.

13    A. I didn't state that the distance had

14         anything to do with it.  I'm just trying to

15         find the best physician.

16    Q. Well, I'm asking about distance.

17         How far would you require a

18         policyholder to go to attend a medical

19         examination?

20    A. That's never really entered my mind.

21    Q. Does Pan American Life Insurance Company

22         have any policy as to how far a

23         policyholder would be required to go for a

24         medical examination?

25    A. No, I can't say that I'm aware of one.

26

1    Q. Okay.  Did you ask anyone whether there was

2       a qualified medical examiner available to

3       examine Ms. Mathews closer to her home than

4       Stanford University?

5    A. I don't recall that coming into the

6       conversation.

7    Q. Had you ever utilized the services of Dr.

8       Date before?

9    A. No.

10   Q. When this report from Dr. Date came into

11      Pan American Life Insurance Company, did

12      you read it?

13   A. Yes.

14   Q. And did you reach any conclusions about Ms.

15      Mathews' disability upon reading this

16      report?

17   A. She was disabled.

18   Q. That's what the report says.  Right?

19   A. That's right.

20   Q. Okay.  And thereafter did you stop

21      analyzing the question of Ms. Mathews'

22      disability?

23   A. Yes.  I believe so.

24   Q. At this point did you pay -- or did you

25      authorize -- At this point of reading Dr.

26

```
 1          Date's examination report, did you

 2          authorize Ms. Mathews' to be paid the three

 3          months of arrearage of her benefits?

 4     A. I don't recall.

 5     Q. All right.  Let's go to the next document.

 6              We will mark this Exhibit #37.

 7              (Exhibit #37 was marked for

 8                 identification.)

 9              Do you recall seeing this document

10          before?

11     A. Yes, vaguely.

12     Q. I want to address your attention to the

13          third paragraph that begins regarding the

14          third policy.

15              Do you see that?

16     A. You said as for my concern?

17     Q. I'll tell you what.  Let's start off at the

18          very first.

19              Do you see that this letter is a

20          response to your letter of November 6?

21     A. Okay.  Yes.

22     Q. Okay.  And your letter of November 6 we've

23          attached as Exhibit #35.  We just looked at

24          it a minute ago.

25              Now, I direct your attention to the

26
```

1          paragraph that begins regarding the third

2          policy.

3    A. Okay.

4    Q. Do you see that?

5    A. Yes.

6    Q. Okay.  Ms. Mathews says, on September 11,

7          2006, I called the collection department

8          and spoke to Diana M.  She was the person

9          who was able to find the policy number

10         1257-5730.  It was clearly listed in my

11         name, but it was not activated with the

12         other policies that also had my name on

13         them.

14             Do you see that?

15   A. Yes, I do.

16   Q. Okay.  Do you have any reason to believe

17         that that statement is incorrect?

18   A. That Diane M was the person that she spoke

19         to?

20   Q. Yes.

21   A. No.

22   Q. Okay.  Do you know a Diane M in the

23         collection department?

24   A. Yes.

25   Q. Okay.

26

1   A. No.  In the customer service department.

2   Q. And what is Diane M's last name?

3   A. I could only make a guess.

4   Q. Well, I don't want you to guess, but if you

5      think you know I would like to know.

6   A. No.

7   Q. Okay.  Going on, and not quoting directly,

8      but going on with that same paragraph, you

9      will see that Ms. Mathews indicates that

10     she understood Ms. Bourg to say that you

11     were sitting right there when she had a

12     conversation with Ms. Bourg.

13         Do you see that?

14  A. Yes, I do.

15  Q. Okay.  Did you talk to Ms. Bourg about that

16     particular comment by Ms. Mathews?

17  A. About her comment in the letter?

18  Q. Yes.

19         About Ms. Mathews' comment on the

20     letter that she had a conversation with Ms.

21     Bourg, and Ms. Bourg said you were sitting

22     right there?

23  A. I don't recall having a conversation

24     concerning this letter.

25  Q. So as you sit here right now you don't know

26

```
 1        whether you talked to Ms. Bourg about that

 2        or not?

 3   A.  No, I don't recall it.

 4   Q.  Okay.  I would like for you to turn to the

 5        next page, and there's a paragraph that

 6        begins more importantly about the third

 7        paragraph there.

 8            Do you see that?

 9            Are you there?

10   A.  Yes.  I'm sorry.  Yes.

11   Q.  Okay.  Ms. Mathews says, I wish that these

12        payments were as trivial to me as simple

13        clerical errors seem to be to you and your

14        company.

15            Do you see that?

16   A.  Yes, I do.

17   Q.  Were you troubled at all by that statement

18        that she seemed to think that you had

19        trivialized this problem?

20   A.  I'm sorry.

21            Was I troubled by her statement?

22   Q.  Yes.

23   A.  I don't recall having any real emotional

24        responses.

25   Q.  Okay.  Do you see the next sentence

26
```

1           indicating -- where she says this has been

2           a very difficult transition for me and my

3           family, and the continual stress of

4           wondering when a check may come and in what

5           amount is only increasing my stress.

6               Do you see that?

7    A. Yes.

8    Q. Okay.  Do you believe that Pan American

9           Life Insurance Company has a duty to its

10          disability insurance policyholders to get

11          their benefit checks correct?

12   A. Yes, I do.  We try to do as good a job as

13          possible.

14   Q. Going to the next paragraph.

15          THE VIDEOGRAPHER:

16               Excuse me.  I need to change

17           tapes.

18          MR. KINNEY:

19               Okay.

20          THE VIDEOGRAPHER:

21               We are going off the record.  This

22           is -- It is 3:18.  This is the end of

23           videotape number 3.

24          (Off the record.)

25          THE VIDEOGRAPHER:

26

```
1                    We're back on the record.  This is

2                    the beginning of videotape number 4.

3                    It's 3:22.

4    EXAMINATION BY MR. KINNEY:

5    Q. Okay.  Let's go back to Exhibit #37.  We

6       were talking about it before the break.

7    A. Okay.

8    Q. We were on the second page of it.  I'm down

9       to the -- what looks like the fourth

10      paragraph which begins in your last

11      paragraph I felt insult added to injury.

12          Do you see that?

13   A. I'm sorry.

14          Which paragraph is that?

15   Q. In your last paragraph I felt insult --

16   A. Okay.  I got you.

17   Q. Do you see that?

18   A. Yes, I do.

19   Q. Where she says she has been trying for

20      months to have your company stop

21      automatically withdrawing from my bank

22      account.

23          Do you see that?

24   A. Yes.

25   Q. Did you know that that was the case when

26
```

1       you wrote the letter of November 6, 2006?

2    A. I don't recall.

3          I mean from what she is saying, and as

4       I am thinking about the claim, there was a

5       good period of time that I was thinking

6       about the first two policies, and that

7       third policy, you know, I wasn't aware of

8       it.  So, you know, that would be what she

9       is referring to when she is -- at least

10      that's what I believe that she is referring

11      to when she writes this sentence.

12   Q. Okay.  Did you get the impression when you

13      read this paragraph in Exhibit #37 that Ms.

14      Mathews was upset?

15   A. Well, that seems to be what her language is

16      indicative of.

17   Q. Okay.  Now, I want you to go to the last

18      paragraph, and just take a look at that.

19          Do you see that Ms. Mathews asks how

20      come you didn't answer my questions about

21      rehabilitation?

22          Do you see that?

23   A. Yes, I do.

24   Q. Okay.  And you just told me the answer to

25      that earlier.  Was it was just a mistake on

26

1       your part?

2    A. Yes, sir.

3    Q. Okay.  Let's go to the next exhibit which

4       we will mark as Exhibit #38.

5          (Exhibit #38 was marked for

6              identification.)

7          Before we go on, I want you to go back

8       to Exhibit #37 for one more second.

9    A. Okay.

10   Q. If you can.

11         Tell me when did Pan American Life

12      receive Exhibit #37?

13   A. That date stamp says November 30.  I

14      believe that is 2006.

15   Q. Okay.  Now take a look at Exhibit #38.

16         What is Exhibit #38?

17   A. It's a letter from Pan American Life.

18   Q. From you?

19   A. I'm sorry.

20         Yes, from me at Pan American Life.

21   Q. To Ms. Mathews?

22   A. Yes.

23   Q. Okay.  And what was the purpose of this

24      letter?

25   A. To address that -- what she was saying in

26

1       the letter dated November 27.

2   Q.  Okay.  I want you to go to the paragraph

3       beginning concerning the rehabilitation

4       clause.

5           Do you see that?

6   A.  Okay.  Yes.

7   Q.  Okay.  Was this your effort to answer the

8       questions that Ms. Mathews had written in

9       Exhibit #37 and her earlier letter

10      of Exhibit #35 about rehabilitation?

11          I'm sorry.  I got that wrong.  I see by

12      the look on your face your confused, and

13      that's justified.

14          I am going to ask that question again.

15      Hopefully without so many problems.

16          On October 24, Ms. Mathews had written

17      you some questions about rehabilitation

18      which we put into the record in

19      Exhibit #33.

20  A.  Okay.

21  Q.  And on November 27, she had restated those

22      same basic questions which we put into the

23      record in Exhibit #37.

24  A.  Okay.

25  Q.  Okay.  My question is is Exhibit #38 your

26

1        answer to those questions?

2    A. Yes, I believe so.

3    Q. Okay.  So tell me, how does your

4        Exhibit #38, your letter of November 8,

5        answer the question that Ms. Mathews wrote

6        can you tell me what would justify

7        rehabilitation?

8           What in here did you answer -- did you

9        provide as an answer to that question?

10   A. I said this includes but is not limited to

11       evaluation by a certified rehabilitation

12       specialist, physical testing, and

13       vocational aptitude testing.

14   Q. Okay.  In Ms. Mathews' case did you have an

15       evaluation by a certified rehabilitation

16       specialist?

17   A. Yes, we did.  That was Dr. Date.

18   Q. Dr. Date was a certified rehabilitation

19       specialist?

20   A. I'm sorry.  I could be wrong on that.

21          I mean I don't recall her CV right off

22       the top of my head.

23   Q. Well, she says she's the associate

24       professor and head of division of physical

25       medicine and rehabilitation.

26

```
 1            So you consider her to be a certified
 2       specialist -- certified rehabilitation
 3       specialist?
 4  A. Well, I consider her to be certainly
 5       knowledgeable about the subject.
 6  Q. Okay.  And did Dr. Date provide an opinion
 7       about occupational therapy for Ms. Mathews?
 8  A. I don't recall.
 9  Q. Okay.  Did you ask Dr. Date to provide such
10       an opinion?
11  A. I don't recall asking her to do that.
12  Q. Did you expect Dr. Date to provide you an
13       opinion on that subject?
14  A. My goal in scheduling the examination with
15       Dr. Date was to have Dr. Date take a look
16       at the insured and give me some idea of her
17       medical condition at the time.
18  Q. And you didn't expect her to give an
19       opinion on Ms. Mathews retraining to become
20       a practical nurse or registered nurse.  Did
21       you?
22  A. No.  I don't recall having that
23       expectation.
24  Q. Did you -- Okay.
25            Was any physical testing performed that
26
```

```
 1        affected your decision as to Ms. Mathews'

 2        eligibility for rehabilitation benefits?

 3    A. I don't recall that.

 4    Q. And did you have any vocational aptitude

 5        testing performed on Ms. Mathews?

 6    A. I don't believe so.

 7    Q. Okay.  Then Ms. Mathews asks is there a

 8        company policy regarding rehabilitation.

 9            Did you answer that in your letter of

10        December 8?

11    A. I don't recall right offhand.

12    Q. Well, take a look at it, and see if you

13        did.

14    A. I tried to answer her question to the best

15        of my ability.

16    Q. Okay.  So how did you answer that question

17        is there a company policy regarding

18        rehabilitation?

19    A. I believe I quoted the policy.

20    Q. Then she asked do you ever approve this

21        benefit or make exceptions.

22            Did you answer that question?

23    A. I don't think I answered that question in

24        this letter.

25    Q. Okay.  And then she asks could I make an

26
```

```
 1        appeal for this benefit.

 2            Did you answer that question?

 3   A. No, I don't believe so.

 4   Q. The last sentence in that same paragraph on

 5        Exhibit #38, when you say, as we have

 6        previously indicated in the correspondence

 7        dated August 31, 2006, Pan American Life

 8        will not be entering into a rehabilitation

 9        agreement with you.

10            Do you see that?

11   A. Yes, I do.

12   Q. Did you intend that sentence to completely

13        close the door on this subject with Ms.

14        Mathews?

15   A. No.  I just wanted to inform her that

16        that's where we were at that point.

17   Q. I am going to show you another exhibit.

18        This will go fast.

19            This will be marked Exhibit #39.

20            (Exhibit #39 was marked for

21              identification.)

22            This appears to be a letter from Glenda

23        Griffin at Pan American Life to the

24        California Department of Insurance.

25            Do you have that in front of you, sir.

26
```

1   A. Yes, I do.

2   Q. Have you ever seen that before?

3   A. I don't recall it immediately, no.

4   Q. Okay.  I want you to look at the first

5      sentence there.  After careful review and

6      consideration, it is necessary that the

7      Complaint Donna Mathew's submit the

8      complete/full account summary for the

9      period December 1, 2005, to January 1,

10     2006.

11         Do you see that?

12  A. Yes, I do.

13  Q. Do you have any idea what that means?

14  A. No, I didn't write the letter.

15  Q. Well, but do you understand it?

16  A. What I see is that -- looking for an

17     account summary of the premiums is what I

18     would anticipate.

19  Q. Okay.  Do you know why Glenda Griffin would

20     want an account summary of the premiums for

21     the period December 1, 2005, to January 1,

22     2006?

23  A. No.  I would only be guessing.

24  Q. Okay.  Do you know as you sit here today

25     whether or not Ms. Mathews is still being

26

```
 1         paid benefits 90 days in arrears?
 2    A. No, I do not know, but my belief is that
 3         she is caught up.
 4    Q. Okay.  I will show you a document we will
 5         mark next in order.
 6              (Exhibit #40 was marked for
 7               identification.)
 8              Can I just have that back for a second?
 9              Thanks.
10              Okay.  I show you this document, sir.
11              This is three pages in length
12         consisting of what exactly?
13    A. This would be the EOB.
14    Q. Okay.  For what period?
15    A. From January 14, 2008, to February 14,
16         2008.
17    Q. Okay.  And does it show the date on which
18         payment is being made?
19    A. Yes.  That's what I was reading.
20    Q. Okay.  And does it -- That shows the period
21         for which payment is being made.  Right?
22    A. Yes.
23    Q. And does it show that a payment is being
24         made on or about -- or a check at least is
25         being requested on or about February 7,
26
```

1       2008?

2    A. That's correct.

3    Q. And that would be for that period?

4    A. That's correct.

5    Q. And so that would indicate that Ms. Mathews

6       was being paid currently.  Wouldn't it?

7    A. Yes.

8    Q. Okay.  And I see Ms. Bourg's name appears

9       in the bottom right-hand corner.

10          Do you see that?

11   A. Yes, I do.

12   Q. Okay.  But she actually wasn't working

13      there as of the date that this was

14      prepared.

15          Right?

16   A. That's correct.

17   Q. Okay.  So this was actually prepared by

18      somebody else?

19   A. Yes, that's correct.

20   Q. Okay.  And there's an authorization code on

21      this, CRS1.

22          Do you see that?

23   A. Yes.

24   Q. Who is that?

25   A. That would be Cory Simon.

26

```
 1    Q. Okay.  We -- When we looked at the EOB's

 2       earlier, they all had your initials on

 3       them.

 4            Do you recall that?

 5    A. Yes.

 6    Q. Okay.  But this one has Mr. Simon's

 7       initials.

 8            Do you know how the change happened

 9       that Mr. Simon initialed this one?

10    A. Yes, I do.

11    Q. What happened there?

12    A. Well, Elaine was no longer with the

13       company.  I had no support staff.  So I was

14       trying to do all couple hundred checks

15       myself manually.

16            So I didn't want to have a situation

17       where my authorization code was on there if

18       I was actually the one punching these

19       manually into the system, because, you

20       know, just as far as accounting principles,

21       I didn't want anyone to think that I would

22       be authorizing a check to myself.

23            So -- Also his limit is higher than

24       mine.  So -- and I had some new claims come

25       in that were larger amounts.  So that is

26
```

1        what I did.

2    Q. Okay.  So did Mr. Simon actually authorize

3        the payments that are shown on Exhibit #43?

4    A. No.  That would be me.

5    Q. So this was actually all done by you?

6    A. Yes.  I punched them into the system.

7    Q. So you did the authorization, and you

8        actually were the name who should have

9        appeared where Elaine Bourg's name is.

10           Is that right?

11   A. Yes.

12   Q. Okay.  I want to show you -- Let's mark

13       this next exhibit.

14           (Exhibit #41 was marked for

15            identification.)

16           THE WITNESS:

17               I'm sorry.

18               Can we take another quick timeout?

19           MR. KINNEY:

20               Sure.

21           THE VIDEOGRAPHER:

22               We're going off the record.  It is

23               3:40.  This is videotape number 4.

24           (Off the record.)

25           THE VIDEOGRAPHER:

26

```
 1                    We are back on the record.  It is

 2              3:42.  This is videotape number 4.

 3    EXAMINATION BY MR. KINNEY:

 4    Q. Okay.  In front of you should be a document

 5       marked Exhibit #41.

 6              Do you have that?

 7    A. Yes.  Yes, I do.

 8    Q. Okay.  What's that?

 9    A. That's an explanation of benefits.

10    Q. For what period?

11    A. That says 9/14/07 through 10/14/07.

12    Q. And when was the check requested for that

13       period?

14    A. This says January 7, 2008.

15    Q. So am I right that in January -- January 7,

16       2008, Ms. Mathews was being paid 90 days in

17       arrears?

18    A. I don't know.  My anticipation of this

19       would be that this is a typo.

20    Q. You think this was a typo?

21    A. That's the first thing that comes to my

22       mind, but, you know, I couldn't be sure

23       because I didn't prepare that one.

24    Q. Okay.  Well, we know that Ms. Mathews was

25       receiving payments 90 days in arrears back

26
```

1      in 2006.  Right?

2          MR. EVANS:

3              Objection.  Vague as to time.

4   EXAMINATION BY MR. KINNEY:

5   Q. In September of 2006 we know that Ms.

6      Mathews was receiving payments 90 days in

7      arrears.

8          Right?

9   A. To my knowledge she had been caught up, or

10     at least I believe she had been caught up.

11  Q. And what was your basis for that belief?

12  A. Because my general practice is to always

13     catch people up.

14  Q. But you never did any checking to find out

15     if that had happened, did you?

16  A. I don't recall.  I could have made a

17     mistake on that.

18  Q. Okay.  And when you prepared Exhibit #40,

19     the February of 2008 EOB --

20  A. Yes.

21  Q. -- did you check to see whether or not Ms.

22     Mathews had ever been caught up on her

23     90-day arrearage?

24  A. No, I don't recall doing that.

25  Q. Okay.  And did you understand when you

26

1        prepared Exhibit #40, that if she had not

2        been caught up that Exhibit #40 would be

3        deceptive?

4            MR. EVANS:

5                Objection.  Argumentative.

6    EXAMINATION BY MR. KINNEY:

7    Q. You can answer.

8    A. Can you repeat the question?

9    Q. Yes.

10           You knew when you prepared Exhibit #40

11       that if Ms. Mathews had not been caught up

12       from her 90-day arrearage that Exhibit #40

13       would be wrong.

14           Didn't you?

15   A. I can't say that I knew that.

16   Q. Okay.

17   A. When I prepared this check request, I was

18       just preparing a check request.  That's it.

19           You just type in some numbers, and you

20       let the system generate a check.  There's

21       no -- There wasn't any other thought than

22       that.

23   Q. These explanations of benefits go to the

24       insured.  Don't they?

25   A. That's correct.

26

1     Q. And the insured should be able to rely on

2        the statements that are made in the

3        explanation of benefits.  Shouldn't they?

4     A. That would be an ideal world, yes.

5     Q. Yes.

6           And if the period of payment that's

7        reflected on the explanation of benefits is

8        off, that would tend to deceive an insured.

9           Wouldn't it?

10          MR. EVANS:

11             Objection.  Calls for speculation,

12             argumentative.

13    EXAMINATION BY MR. KINNEY:

14    Q. You can answer.

15          MR. EVANS:

16             And vague.

17          THE WITNESS:

18             I can't say that exactly that I

19             would agree with that.

20    EXAMINATION BY MR. KINNEY:

21    Q. Okay.  Well, Mr. Jones, when you prepared

22       Exhibit #40, was it your intention to

23       deceive Ms. Mathews as to whether or not

24       her benefits were caught up current?

25    A. No.  No.  I had no intent to deceive anyone

26

1       about anything.

2   Q. Did you make any investigation before you

3       prepared Exhibit #40 to find out if it was

4       correct?

5   A. No.

6   Q. Okay.  Go back to Exhibit #7.

7           Have you got Exhibit #7 there?

8           Do you have that there?

9   A. Exhibit #7, yes.

10  Q. What is that?

11  A. It's a letter from Pan American -- Well,

12      from me at Pan American Life.

13  Q. And what was the purpose of this letter?

14  A. The letter was to acknowledge receipt of

15      her letter on July 21, 2006.

16  Q. Okay.  Anything else?

17  A. I'm sorry.

18          Yes, there's more to the letter.

19  Q. Yeah.

20          Was there more purpose to the letter

21      than just to -- acknowledgment of receipt?

22  A. Oh.

23          Yes, there was a response to her

24      request for rehabilitation.

25  Q. Okay.  And you requested certain things.

26

1        Right?

2    A. Yes, I did.

3    Q. Okay.  And then you quoted language from

4        the policy.

5            Do you see that?

6    A. Yes, I do.

7    Q. Okay.  But there were two policies.  Right?

8    A. There was three policies.

9    Q. There were two policies that contained

10       different language for rehabilitation

11       benefits.

12           Isn't that right?

13   A. There was two policy versions that your

14       referring to?

15   Q. There's two policy provisions.  Separate,

16       distinct, different policy provisions on

17       rehabilitation benefits.

18           Right?

19   A. Yes, there's two versions of the policy.

20   Q. Okay.  And each contains a somewhat

21       different statement about what

22       rehabilitation benefits are available.

23       Right?

24   A. Yes.  There are -- There is differences in

25       the language.

26

1    Q. Okay.  And you chose to quote one, but not

2       the other.  Right?

3    A. Yes.  I quoted whichever one I believe I

4       had at the time.

5    Q. Did you look at them both?

6    A. Yes.

7    Q. Okay.  Was there a reason that you only

8       quoted one and not the other?

9    A. Nothing I could think of off the top of my

10      head.

11   Q. Do you recall any discussions about Ms.

12      Mathews with Mr. Simon?

13   A. Yes.

14   Q. Okay.  How recently have you discussed Ms.

15      Mathews with Mr. Simon?

16   A. In the past couple of weeks when they told

17      me that this was going to be scheduled.

18   Q. Was anyone else present when you had that

19      discussion with him?

20   A. It wasn't so much of a discussion.  It was,

21      hey, Michael, your going to get deposed.

22   Q. Okay.  Was anything else said in that

23      discussion?

24   A. Yeah.  Make sure that you have the day

25      clear.

26

1    Q. Anything else?

2    A. Nothing else that I can really recall.

3    Q. You didn't discuss the substance of her

4       lawsuit?

5    A. The substance?

6    Q. Yeah.

7        What she was suing for?

8    A. I have no idea what she is suing for.

9    Q. Okay.  So then I would take it you didn't

10      discuss that with Mr. Simon.

11       Is that right?

12   A. I -- No.  I mean -- Let me make sure I

13      understand what your saying.

14       The substance of the lawsuit, like how

15      much she is suing for, like in some kind of

16      dollar amount?

17   Q. No.  No.

18       I am talking about -- Well, anything

19      about the lawsuit at all.

20       Did you discuss it with Mr. Simon?

21   A. No.  Just be ready to go to this

22      deposition.

23   Q. Okay.

24   A. Make sure you have the day clear.

25   Q. Prior to that brief discussion about coming

26

257

1      to this deposition, when was the last time

2      that -- before that that you had talked to

3      Mr. Simon about Ms. Mathews?

4   A. I have no idea.  I mean the last time I

5      would really think that we had a

6      conversation would be is it okay if I

7      order, you know, the -- if I contact these

8      vendors and have these actions carried out.

9   Q. Okay.  That would be the surveillance and

10     the medical examination?

11  A. Yes.  Because I would have needed to

12     explain to him -- I would need his approval

13     for the dollars, but I would need to

14     explain to him why I was going to order the

15     surveillance and the medical exam.

16  Q. Do you recall what you said to him about

17     that?

18  A. Vaguely.  I mean basically I would have

19     just laid out to him that we had a claim at

20     the beginning part of the year.  It was

21     open, we paid benefits, and then we closed

22     the benefits, and the insured came back and

23     said that she was still disabled.

24         I would have needed to explain why I

25     needed -- well, why I felt what we needed

26

```
 1        to do was order the surveillance and the

 2        medical exam, and I would have told him

 3        that based on my experience, her behavior

 4        with having a different physician or

 5        having -- just the way that the medical

 6        claim evolved with the physicians and given

 7        the nature of the injury, I would have

 8        thought, you know, this is something that

 9        we should check out to be sure.

10            I would have been wanting to make sure

11        that I had a good grasp on what was

12        happening with this individual medically.

13        So I would have needed to explain those

14        kinds of things to Mr. Simon to get his

15        approval for it.

16   Q.   Do you actually recall giving him that

17        explanation, or are you just thinking this

18        is what I probably would have done?

19   A.   I mean I couldn't give you like a date and

20        time or, you know, what color shirts we

21        were wearing.  I mean I couldn't provide

22        that kind of information.  But those are

23        the kinds of conversations that we have,

24        because this isn't something out of the

25        ordinary.

26
```

1    Q. So that's what you would ordinarily have,

2       that sort of a conversation.

3          Is that right?

4    A. Yes.  About why I was making this request.

5       I mean it's a normal course of business.

6    Q. But you don't specifically recall the

7       conversation where you actually made the

8       request.

9          Is that right?

10   A. That's correct.  It would have been about

11      the time that I would have made the order

12      to the vendors.

13   Q. Okay.  So your testimony about the contents

14      of the conversation that you just gave,

15      that's not based on an actual recollection

16      of a conversation.

17         Is it?

18   A. No.  I couldn't say that it's based on the

19      actual date or anything, but, again, those

20      are the kinds of conversations that we have

21      in the course of claim evaluation.

22      Because, like I said, I couldn't just pull

23      out my own personal checkbook and pay for

24      these sorts of things, but as I typically

25      have medical investigations and

26

1       surveillance, these are the factors that

2       would weigh into it.

3   Q. Okay.

4       MR. KINNEY:

5           I believe I'm done.

6       THE WITNESS:

7           No way.

8       MR. EVANS:

9           Let me take two minutes.

10          I don't think I have any

11        questions.

12      MR. KINNEY:

13          You want to go off the record?

14      MR. EVANS:

15          Yes, let's go off the record.

16      THE VIDEOGRAPHER:

17          We are going off the record at

18        3:56.  This is videotape number 4.

19      (Off the record.)

20      THE VIDEOGRAPHER:

21          We are back the record.  This is

22        videotape number 4.  It's 3:59.

23      MR. EVANS:

24          And I have no questions.

25      MR. KINNEY:

26

```
 1              You know, I'll tell you the bad
 2         thing about going out of the room
 3         before the record is closed.  I
 4         thought of one more question I wanted
 5         to ask while you were out.
 6              You may -- Let me tell you what it
 7         is.
 8   EXAMINATION BY MR. KINNEY:
 9   Q. Here is my question.
10   A. Okay.
11   Q. What is your residence address?
12   A. Where I actually live?
13   Q. Yeah.
14   A. I live at 2425, O-X-F-O-R-D, Oxford Place,
15      number 121, and that's Gretna, spelled
16      G-R-E-T-N-A, Louisiana, and that is 70056.
17         MR. KINNEY:
18              Thank you very much.
19              Nothing further.
20         THE VIDEOGRAPHER:
21              This concludes the deposition.  We
22          are going off the record at 4:00.
23          This is the end of videotape number
24          4.
25      (Conclusion.)
26
```

```
 1              Deposition of MICHAEL R. JONES

 2                Taken on March 14, 2008

 3

 4

 5                WITNESS' CERTIFICATE

 6

 7

 8      I have read or have had the foregoing

 9   testimony read to me and hereby certify that

10   it is a true and correct transcription of my

11   testimony, with the exception of any attached

12   corrections or changes.

13

14

15

16

17

18                MICHAEL R. JONES

19

20

21

22

23

24

25

26
```

1                        REPORTER'S CERTIFICATE

2

3           I, LINDY ROOT, Certified Court Reporter,

4     do hereby certify that the above-mentioned

5     witness, after having been first duly sworn by

6     me to testify to the truth, did testify as

7     hereinabove set forth;

8           That the testimony was reported by me in

9     shorthand and transcribed under my personal

10    direction and supervision, and is a true and

11    correct transcript, to the best of my ability

12    and understanding;

13          That I am not of counsel, not related to

14    counsel or the parties hereto, and not in any

15    way interested in the outcome of this matter.

16

17

18

19

20

21                        LINDY ROOT

22                  CERTIFIED COURT REPORTER

23             REGISTERED PROFESSIONAL REPORTER

24

25